IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF CONNECTICUT
HARTFORD DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| CURTIS JAMES JACKSON, III, | § | CASE NO. 15-21233 |
| | § | |
| DEBTOR. | § | |

**DEBTOR'S OBJECTION TO MOTION FOR RELIEF FROM STAY
FILED BY LASTONIA LEVISTON**

Curtis James Jackson, III ("Jackson" or the "Debtor"), files this objection (the "Objection") to the motion for relief from automatic stay (the "Motion") [Docket No. 7] filed by Lastonia Leviston (the "Movant"), and in support states as follows:

**I. PRELIMINARY STATEMENT**

1.  The Debtor filed his Chapter 11 petition to obtain the full protections of the bankruptcy laws, including the benefit of the automatic stay, in order to reorganize his financial affairs in a reasonable and timely manner and in accordance with an approved plan for the benefit of his estate and all of his creditors.  In connection with this bankruptcy proceeding, this Court will determine the extent and value of the Debtor's assets and liabilities – and, thus, the Debtor's net worth.

2.  Movant seeks to lift the stay to proceed with the punitive damages phase of a state court lawsuit.  Significantly, that jury has already completed its work with respect to its findings of liability and compensatory damages.  That part of the bifurcated state court trial has ended.  What remains for determination (by whatever fact-finder this Court ultimately deems appropriate) is the amount of punitive damages, if any, to be awarded.  Such damages, if

1

awarded, would constitute a penalty claim that would then be subject to subordination and/or disallowance under the Bankruptcy Code.

3. Consequently, Movant has not, and indeed cannot, demonstrate "cause" to lift the stay less than one week into the Debtor's Chapter 11 case, with essentially no notice to other creditors whose rights are effected, to allow her to prosecute what would at best be a subordinated claim against the Debtor's estate. Instead, it is in the best interests of the estate and all of the Debtor's creditors, and in the interests of judicial economy, that the stay should remain in effect.

## II. FACTUAL & PROCEDURAL BACKGROUND

**A.      The Debtor**

4. Curtis James "50 Cent" Jackson, III is an internationally recognized recording artist, an actor, an entrepreneur and a philanthropist. Since his entrance onto the music scene in 2003 with his multi-platinum debut album, Mr. Jackson has sold more than 22 million albums worldwide, and has received numerous awards and Grammy nominations throughout his career.

5. Given the publicity that Mr. Jackson's Chapter 11 filing has triggered, it is easy to forget that Mr. Jackson grew up in proverty in South Jamaica, a rough neighborhood of Queens, New York. His single mother was murdered when Mr. Jackson was only 8 years old. After her death, he was raised by his grandparents. As a boy, Mr. Jackson dreamed of being a boxer, but by the time he was a teenager, he was caught up in a life of crime. The consequences of that lifestyle were realized in 2000 when Mr. Jackson was shot nine times outside of his grandmother's house. After recovering from his injuries, Mr. Jackson determined to improve his life and focused on his music, and the rest is music history. In many respects, Mr. Jackson typifies the American dream.

6.      Mr. Jackson has leveraged his fame as a recording artist into brand extensions encompassing a broad spectrum of businesses including music ownership, artist management, film production, footwear and apparel, fragrance, video games, publishing, headphones and health drinks and supplements. It has also allowed Mr. Jackson to follow through with his dream of giving back to the community.

7.      In 2012, Mr. Jackson's audio brand, SMS Audio, launched a partnership with Feeding America, the nation's largest domestic hunger-relief organization. That partnership continues today. Over the next year, SMS Audio will provide the equivalent of half a million meals to Feeding America. In addition, Mr. Jackson serves on the Feeding America Entertainment Council, volunteers at numerous organization events, is a proud supporter of Tuesday's Children, a nonprofit organization founded by family and friends of the 9/11 victims, and has provided thousands of dollars in scholarships to students at Queensborough Community College in New York.

8.      As a result of Mr. Jackson's success, he has been fortunate to acquire a significant amount of assets. Like many other celebrity entertainers that make their living in full view of the public eye, however, Mr. Jackson has accumulated a substantial amount of liabilities as well. Notwithstanding this fact, Mr. Jackson's bankruptcy filing is not primarily a result of excessive current expenses exceeding Mr. Jackson's current revenues, but rather the substantial costs of litigation and resulting awards against Mr. Jackson in the past year which total in excess of $20 million, and which are discussed in more detail below. While Mr. Jackson has substantial assets, he does not have the ability to pay the full amount of these litigation claims and all other asserted claims at the present time, thereby necessitating this Chapter 11 filing.

**B.     The Sleek Audio Litigation**

9.     One of Mr. Jackson's prior business investments was in a business venture involving Sleek Audio, LLC ("Sleek"), pursuant to which Sleek was to develop headphone products to be marketed under Mr. Jackson's professional name, "50 Cent." In connection therewith, Sleek entered into a Brand License Agreement with G-Unit Brands, Mr. Jackson's brand licensing company, that authorized Sleek to use Mr. Jackson's trademarks in the marketing of certain headphone products.

10.    The collaboration between Sleek Audio and Mr. Jackson involved both the design and marketing of "Sleek by 50" over-the-ear headphones. The Brand License Agreement required Sleek to use best efforts to launch retail sales of the headphones by February 15, 2011.

11.    Unfortunately, the headphones were never released because Sleek failed to have the headphones ready for commercial production by the February 15, 2011 deadline, and G-Unit Brands terminated its licensing agreement with Sleek. After Sleek's efforts to produce headphones failed, Mr. Jackson formed a new company, SMS Audio, to develop a new headphone.

12.    In August 2011, Sleek Audio and certain individuals filed an arbitration proceeding against Mr. Jackson, alleging that Mr. Jackson had stolen the design of the "Sleek by 50" headphones to produce his new headphones. An arbitration hearing was held over the course of several days during February and March 2013. The arbitrator issued an Interim Award on May 2, 2013, and a Final Award on July 13, 2013.

13.    Mr. Jackson moved the circuit court to vacate the arbitration award, and Sleek asked the circuit court to confirm the award. The circuit court issued an order denying Mr. Jackson's motion to vacate the arbitration award on September 30, 2014. The order confirming

the arbitration award and judgment was issued on October 16, 2014 (the "Sleek Order and Judgment"). Pursuant to the Sleek Order and Judgment: (i) Sleek was awarded $17,247,426.11 against Mr. Jackson, plus post-judgment interest at the rate of 4.75%; (ii) three other parties were awarded $125,728.40 against Mr. Jackson, plus post-judgment interest at the rate of 4.75%; and (iii) a fourth individual was awarded $53,853.72 against Mr. Jackson, plus post-judgment interest at the rate of 4.75% per annum. A copy of the Sleek Order and Final Judgment is attached hereto as Exhibit "A".

14. Mr. Jackson has appealed the Sleek Order and Judgment.

**C.     The Leviston Litigation**

15. On or about February 24, 2010, Ms. Lastonia Leviston ("Ms. Leviston") commenced an action against Mr. Jackson in the Supreme Court of the State of New York, County of New York (the "Leviston Litigation"), alleging that Mr. Jackson: (1) violated N.Y. Civil Rights Law sections 50-51 by using her name and/or picture without her consent for advertising purposes or for the purposes of trade; (2) intentionally caused her to suffer emotional distress by posting a videotape of her and another man on the internet; and (3) defamed her. Ms. Leviston subsequently withdrew her claim for defamation.

16. Ms. Leviston had previously been in a relationship with William Leonard Roberts, a rap musician that was better none by his stage name "Rick Ross", and she bore Mr. Ross's child, who was Ms. Leviston's second daughter. Sometime after separating from Mr. Ross, Ms. Leviston began a long- distance relationship with Maurice Murray in 2008. In or around May 2008, Ms. Leviston and Maurice Murray created a videotape that showed the couple engaging in sexually explicit acts. Ms. Leviston created this videotape (the "Videotape") willingly, and she agreed to leave it in Mr. Murray's possession.

5

17. In March 2009, Mr. Murray provided the Videotape to Mr. Jackson. Mr. Murray told Mr. Jackson that he was free to use the tape in any manner that he chose, and that Ms. Leviston would concur in that permission. At the time, Mr. Jackson was involved in a "rap war" with Mr. Ross, and Mr. Murray apparently thought that Mr. Jackson could use the Videotape as a way of responding to Mr. Ross's disrespectful comments about him. Mr. Murray allowed Mr. Jackson's employees to make a digital copy of the Videotape, to which Mr. Jackson then added narration mocking Mr. Ross.

18. Mr. Jackson contended that before the edited Videotape was ever placed on the internet by Mr. Jackson, the edited Videotape was leaked to someone outside of Mr. Jackson's control. Mr. Jackson did not cause the Video's initial publication on the internet, and no website he owns, controls, or operates did so.

19. The parties to this lawsuit engaged in discovery beginning in mid-2010 and ending in September 2012. The trial of the Leviston Litigation was initially scheduled to begin on January 21, 2015. However, the weekend before the trial was scheduled to begin, Ms. Leviston's counsel sent a series of emails disclosing additional documents which Ms. Leviston had not previously disclosed but which counsel stated they intended to introduce at trial. On January 18, 2015, Ms. Leviston's counsel served an "Amended Exhibit List" which included four such documents, and which provided links to the websites hosting those documents.

20. The Supreme Court adjourned the trial date to address the new documents produced by Leviston, as well as any other motions in limine. The court subsequently re-scheduled the trial.

21. On Sunday, May 31, 2015, Ms. Leviston's counsel requested leave to file an Amended Complaint. After a conference with the court on June 1, 2015, the parties entered into

6

a so-ordered stipulation to allow Ms. Leviston to amend her Complaint and Mr. Jackson was given until 9:30 a.m. on June 2, 2015, to file his Answer. Mr. Jackson duly submitted and served his Answer at that time, together with certain other pleadings related to the amended Complaint and Answer.

22. A jury was sworn in on June 10, 2015, and the presentation of evidence began on June 15, 2015. On July 10, 2015, the jury returned a verdict $2.5 million for Ms. Leviston's emotional distress based on a claim of violating the New York Civil Rights Law Sections 50 and 51 by posting the Videotape online and a verdict of $2.5 million for Ms. Leviston's emotional distress based on a claim for Intentional Infliction of Emotional Distress from posting the Videotape online. The jury found that Ms. Leviston was entitled to punitive damages and the punitive damage phase was scheduled to begin on July 13, 2015. Because of the requirements of New York and constitutional law as it pertains to limits on punitive damages, the punitive damages phase is expected to focus heavily on Mr. Jackson's net worth. As a result of Mr. Jackson's bankruptcy filing, the punitive damages phase has not yet begun, and the jury has not heard any evidence regarding Mr. Jackson's assets or liabilities.

**D.** **Bankruptcy of SMS Promotions LLC**

23. On May 26, 2015, one of Mr. Jackson's companies, SMS Promotions, LLC ("SMS Promotions") filed for bankruptcy under chapter 11 of the Bankruptcy Code with this Court (the "SMS Bankruptcy Case"), as a result of liquidity concerns and the need to restructure (or reject) certain contracts. Mr. Jackson is the managing member of SMS Promotions and is the individual who capitalized SMS Promotions during its early years of operations. SMS Promotions has previously promoted boxing events in Nevada, New York, Florida, Texas and

Connecticut, and currently has 8 boxers under contract, including former featherweight champion, Yurikis Gamboa.

24.     On July 13, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

25.     As a result of the commencement of his Chapter 11 case, all of the litigation has been stayed pursuant to Section 362 of the Bankruptcy Code.

### III. ARGUMENT & AUTHORITIES

**A.**     The Automatic Stay Protects Creditors By Preserving Estate Assets

26.     The automatic stay imposed by Section 362 of the Bankruptcy Code is one of the most fundamental protections to a debtor under the bankruptcy laws, a principal purpose of which is to permit a debtor to focus its energies on the reorganization without facing diversions and litigation brought on by its creditors. *See, e.g., Eastern Refractories Co. v. Forty Eight Insulations, Inc.*, 157 F.3d 169, 172 (2d Cir. 1998). The automatic stay protects both creditors and debtors since, without the stay, creditors might scramble to obtain as much property of the debtor's limited estate as possible. *See Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 207 (2d Cir. 2014). The automatic stay prevents such a scramble by providing a "'breathing spell'" for a debtor and the bankruptcy court to institute an organized repayment plan which provides for the equitable disbursement of estate property among creditors. *United States v. Colasuonno*, 697 F.3d 164, 172 (2d Cir. 2012) (*quoting Eastern Refractories Co. v. Forty Eight Insulations, Inc.*, 157 F.3d 169, 172 (2d Cir. 1998)) (*citing SEC v. Brennan*, 230 F.3d 65, 70 (2d Cir. 2000)).

27.     Pursuant to Section 362(d)(1) of the Bankruptcy Code, the automatic stay may only be lifted upon a showing of "cause" by the Movant. In a request for stay relief based upon "cause," the moving party bears the initial burden to demonstrate that cause exists for lifting the

stay, and the court may deny the motion if the movant fails to make an initial showing of "cause." *In re Busch*, 294 B.R. 137, 140-141 (10th Cir. BAP 2003); *In re Pioneer Commercial Funding Corp.*, 114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990).

28. In determining whether "cause" exists to lift the automatic stay to allow litigation to proceed in another forum, courts generally consider the following twelve factors, which are commonly referred to as the "*Sonnax* factors":

(1) whether relief would result in a partial or complete resolution of the issues;

(2) lack of any connection with or interference with the bankruptcy case;

(3) whether the other proceeding involves the debtor as a fiduciary;

(4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

(5) whether the debtor's insurer has assumed full responsibility for defending it;

(6) whether the action primarily involves third parties;

(7) whether litigation in another forum would prejudice the interests of other creditors;

(8) whether the judgment claim arising from the other action is subject to equitable subordination;

(9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;

(10) the interests of judicial economy and the expeditious and economical resolution of litigation;

(11) whether the parties are ready for trial in the other proceeding; and

(12) impact of the stay on the parties and the balance of harms.

*See, e.g., In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990). Not all of the *Sonnax* factors are relevant in every case, and "cause" is a broad and flexible concept that must be determined on a case-by-case basis. *Spencer v. Bogdanovich ( In re Bogdanovich)*, 292 F.3d

104, 110 (2d Cir.2002) (*citing Mazzeo v. Lenhart (In re Mazzeo)*, 167 F.3d 139, 143 (2d Cir.1999)).

29.     In this case, a substantial majority of the *Sonnax* factors (including those most relevant) weigh in favor of the continuation of the automatic stay as it relates to the Leviston Litigation.  As noted, the liability phase of Leviston Litigation has concluded and the jury has rendered a verdict in favor of Leviston and fixed the amount of compensatory damages. Leviston seeks to lift the stay to proceed to the punitive damages phase of the trial.

30.     However, unlike compensatory damages which are intended to make the injured party whole for their loss, the purpose of punitive damages is to punish tortfeasors and deter them from their wrongful conduct.  *In re Johns-Manville Corp.*, 68 B.R. 618, 627 (Bankr. S.D.N.Y. 1986).  Neither purpose is typically served by permitting such a recovery against a bankrupt's estate, as the burden is placed on innocent creditors that are looking to the same estate (and limited assets) to satisfy their claims.

31.     As a result, punitive damages are penalty claims that are routinely subordinated or disallowed by bankruptcy courts pursuant to Section 510(c) of the Bankruptcy Code.  *See, e.g., In re Motors Liquidation Company*, 2012 WL 10864205, *10-11 (Bankr. S.D.N.Y. August 6, 2012) (disallowing claim for punitive damages); *In re Merwede*, 84 B.R. 11 (Bankr. D. Conn. 1988) (subordinating IRS penalty claim to claims of other general unsecured creditors); *In re Colin*, 44 B.R. 806 (Bankr. S.D.N.Y. 1984) (subordinating punitive damages portion of claim to unsecured creditors).

32.     Because the Motion relates solely to a claim for punitive damages, the first, second, eighth and twelfth factors are the most relevant *Sonnax* factors to this analysis, and all weigh in favor of denying the Motion and maintaining the automatic stay.  In an abundance of

caution, however, the Debtor will address each of the other factors as well (substantially all of which mandate the same result).

**B.**     The Automatic Stay Should Not be Lifted

*The First Factor:  Whether Relief Would Result in Partial or Complete Resolution of the Issues*

33.     Should the Court lift the stay to allow Leviston to proceed with the punitive damages phase of the trial; and even if Leviston obtains a favorable outcome, the result would only be a partial resolution of that issue.  In addition to a probable appeal that would follow, Leviston would still need to file a proof of claim with respect to any punitive damages award, which will prompt an objection to the allowance and/or subordination of Leviston's claim on Section 510(c) grounds.  Thus, the first factor warrants denying the Motion.  *See In re Drexel Burnham Lambert Group, Inc.*, 1990 WL 302177, *7 (Bankr. S.D.N.Y., Dec. 14, 1990) (declining to modify stay to permit NYSE to conclude disciplinary proceedings against debtor where resulting penalty claim would be subject to 510(c) objection, even though disciplinary proceeding was substantially complete at time bankruptcy was filed).

*The Second Factor:  Lack of Any Connection or Interference with the Bankruptcy Case.*

34.     Lifting the automatic stay to permit the punitive damages phase of the Leviston Litigation to go forward at this time would substantially interfere with the Debtor's bankruptcy case.  This Chapter 11 case is only a few days old, and the Debtor and his professionals will be required to spend a significant amount of time in the coming days and weeks preparing and filing the necessary documents (including the Debtor's schedules and statement of financial affairs), and preparing for and attending associated hearings and meetings related to this bankruptcy case.

35. Should the Court lift the stay, a principal issue in the punitive damages phase is a determination of the Debtor's net worth, and that issue is expected to be the subject of substantial disagreement between the parties. *See, e.g., Rose v. Brown & Williamson Tobacco Corp.*, 809 N.Y.S.2d 784, 808-809 (N.Y. Sup. Ct. 2005), *rev'd on other grounds*, 53 A.D.3d 80 (2008) ("In New York, the relevant financial information on the question of the amount of a punitive damage award is defendant's net worth"); *Thoreson v. Penthouse Int'l, Ltd.*, 149 Misc. 2d 150, 164 (N.Y. Sup. Ct. 1990) ("To ensure that the size of a [punitive] damages award is reasonable as punishment and effective as a deterrent, a final inquiry must be made concerning the net worth of each defendant."); *see also* Pattern Jury Instructions (Civil) 2:278 Damages – Punitive (2015).

36. Should the stay be lifted, the Debtor will need to immediately employ both special litigation counsel to litigate the claim, as well as other professionals to provide expert testimony on the value of the Debtor's assets, including his numerous, privately-held interests in various business ventures. Additionally, the state court has compelled the Debtor to appear and testify at the punitive damages phase, which will require a significant amount of his time and detract from his bankruptcy responsibilities during the early stages of this bankruptcy case. And for what? To fix the amount of a penalty claim that will be subject to subordination or disallowance?

37. Forcing the Debtor to expend a substantial amount of his time and estate resources litigating a claim that, even if awarded, would be subject to subordination or disallowance in this bankruptcy case would constitute substantial interference with this bankruptcy case. *See generally, In re Drexel Burnham*, 1990 WL 302177 at *7. Accordingly, the second *Sonnax* factor strongly weighs in favor of keeping the stay in place, as lifting the stay will interfere with the Debtor's Chapter 11 case.

*The Third Factor:  Whether the Other Proceeding Involves the Debtor as a Fiduciary.*

38.     The Leviston Litigation does not involve the Debtor as a fiduciary, and no such claim is made in the Motion.  Consequently, the third *Sonnax* factor weighs against lifting the stay.

*The Fourth Factor:  Whether a Specialized Tribunal with the Necessary Expertise has Been Established to Hear the Cause of Action.*

39.     The state court overseeing the Leviston Litigation has no special expertise in determining the Debtor's net worth.  To the contrary, a determination of the Debtor's assets and liabilities is at the core of bankruptcy administration, and of paramount interest to all of the Debtor's creditors.  Consequently, the fourth *Sonnax* factor does not weigh in favor of lifting the stay at this stage of this bankruptcy case.

*The Fifth Factor:  Whether the Debtor's Insurer has Assumed Full Responsibility for Defending the Debtor.*

40.     No insurer has assumed responsibility for defending the Levison Litigation.  To the contrary, all expenses associated with continuing to litigate the lawsuit will be borne by the bankruptcy estate.  Requiring the estate to expend funds in connection with the litigation of a claim that, at best, would be subordinated to general unsecured claims, is an unnecessary and unwarranted burden on the estate and innocent creditors at this early stage of this bankruptcy case.  As a result, the fifth *Sonnax* factor does not support relief from the stay.

*The Sixth Factor:  Whether the Action Primarily Involves Third Parties.*

41.     The punitive damages phase does not involve third parties.  Instead, it is solely focused on the Debtor and his conduct.  Consequently, the sixth *Sonnax* Factor does not warrant relief from stay.

*The Seventh Factor: Whether Litigation in Another Forum Would Prejudice the Interests of Other Creditors.*

42. The seventh *Sonnax* factor also weighs against lifting the stay. Lifting the stay to allow the punitive damages phase to go forward will deplete estate assets and divert resources and attention away from the bankruptcy case, to the detriment of innocent creditors.

*The Eight Factor: Whether the Judgment Claim Arising from the Other Action is Subject to Equitable Subordination*

43. The eighth *Sonnax* factor is the most important factor in this case, and also weighs strongly against lifting the stay. As discussed in more detail above, punitive damages are intended to punish a tortfeasor and deter future conduct and are penalty claims. Because neither of those objectives are satisfied in a bankruptcy case where the burden falls on innocent creditors, any award of punitive damages would be subject to equitable subordination or disallowance in this bankruptcy case. *See, e.g.*, *In re Motors Liquidation Company*, 2012 WL 10864205, *10-11 (disallowing claim for punitive damages); *In re Merwede*, 84 B.R. 11 (Bankr. D. Conn. 1988) (subordinating IRS penalty claim to claims of other general unsecured creditors); *In re Colin*, 44 B.R. 806 (Bankr. S.D.N.Y. 1984) (subordinating punitive damages portion of claim to unsecured creditors).

*The Ninth Factor: Whether Movant's Success in the Other Proceeding Would Result in a Judicial Lien Avoidable by the Debtor*

44. The Debtor does not believe that any judgment entered in the Leviston Litigation would result in a judicial lien avoidable by the Debtor. Consequently, this factor weighs in favor of lifting the stay, but is outweighed by the application of the other *Sonnax* factors which are more relevant in this case and, in particular, the eight factor (equitable subordination).

***The Tenth Factor: The Interests of Judicial Economy and the Expeditious and Economical Resolution of Litigation***

45. The tenth factor also weighs in favor of denying the Motion. This court will necessarily have to determine the Debtor's assets and liabilities (and, by extension, his net worth) as part of the administration of this Chapter 11 case and the plan process. While any findings by a jury in the Leviston Litigation in this regard may not be binding on this Court, lifting the stay to allow the punitive damages phase to go forward will require the Debtor to litigate those issues *twice* at the estate's expense. It would be far more efficient for this Court to first determine the Debtors' assets, liabilities and net worth as an initial matter, before any consideration is given to moving forward with the punitive damages phase of the Leviston Litigation..

46. Consequently, this factor weighs in favor of maintaining the stay. *Compare In re Roman Catholic Archbishop of Portland in Oregon*, 338 B.R. 414, 422 (Bankr. D. Or. 2006) (denying stay relief for claimants who were seeking punitive damages and granting stay relief to those seeking only compensatory damages).

***The Eleventh Factor: Whether the Parties are Ready for Trial in the Other Proceeding***

47. While the current procedural posture of the Leviston Litigation suggests that this factor weighs in favor of lifting the stay, there are several distinguishing facts applicable here. First, if the stay is lifted the Debtor must first obtain this Court's approval to retain his litigation counsel and expert witness to defend him in the punitive damages phase of the trial, which must be done on notice to all creditors and in accordance with the Bankruptcy Rules. Consequently, the parties (and the Debtor in particular) cannot immediately proceed to trial on the question of punitive damages. Second, this case differs from the cases cited by the movant in that this case solely relates to the punitive damages phase of the trial whereas the liability and compensatory damages phase of the trial have been completed. Furthermore, the citation to one of the cases

15

relied upon by the movant (*In re Kangadis Food, Inc. d/b/a The Gourmet Factor*, 2014 WL 4164627 (Bankr. E.D.N.Y. 2014)) appears to be a citation to the pleading filed by the party seeking relief from stay, and not an order of the Court. In that case, the court actually denied the motion to lift the stay. Copies of the foregoing are attached hereto as Exhibits "B" and "C", respectively. Finally, this factor is outweighed by the application of the other *Sonnax* factors which are more relevant in this case.

### *The Twelfth Factor: Impact of the Stay on the Parties and the Balance of Harms.*

48. For many of the reasons stated above, the twelfth *Sonnax* factor, the balance of the harms, weighs in favor of continuing the stay of the Leviston Litigation. Lifting the stay would unnecessary drive up the administrative expenses of this estate in forcing the Debtor to appear at, and defend against, the punitive damages phase of the Leviston Litigation. Forcing the Debtor to return to a state court to litigate a penalty claim that would likely be subject to subordination and/or disallowance at this stage of this Chapter 11 case is unwarranted and needlessly burdensome on the Debtor's estate and innocent third-party creditors.

49. Conversely, delaying the punitive damages phase of the Leviston Litigation will not prejudice the movant. Under New York law, trials for liability and damages are often bifurcated. *See, e.g., Martinez v. Town of Babylon*, 191 A.D.2d 483, 483-84, 594 N.Y.S.2d 357, 358 (1993) (the Supreme Court affirmed the interlocutory judgment that applied the general rule that issues of liability and damages in a negligence action are distinct and severable issues which should be tried and determined separately); *Barrera v. Skaggs-Walsh, Inc.*, 279 A.D.2d 442, 442, 719 N.Y.S.2d 90, 91 (2001) (the Supreme Court affirmed the lower court's denial of plaintiff's motion for a unified trial on the issues of liability and damages). In fact, courts are encouraged

16

to bifurcate trials in order to try damages separately from liability.[1] Indeed, in order to mitigate use of a defendant's wealth against him, a bifurcated trial should be used in regard to punitive damages.[2] Further, evidence of defendant's wealth should not be disclosed to plaintiff until the jury or court returns a special verdict entitling plaintiff to punitive damages.[3] Additionally, courts often use separate juries to decide the liability and damages issues.[4] In *Ansonia Associates*, for example, the trial court decided that punitive damages would be decided by a

---

[1] *See Bertelle v. New York City Transit Auth.*, 19 A.D.3d 343, 344, 796 N.Y.S.2d 415, 416 (N.Y. App. Div. 2005) ("Courts are encouraged to conduct bifurcated trials in personal injury actions.") (*citing* 22 N.Y. CODES R. & REGS. § 202.42(a) ("Judges are encouraged to order a bifurcated trial of the issues of liability and damages in any action for personal injury where it appears that bifurcation may assist in a clarification or simplification of issues and a fair and more expeditious resolution of the action.")).

[2] *See Rupert v. Sellers*, 48 A.D.2d 265, 272, 368 N.Y.S.2d 904, 912 (N.Y. App. Div. 1975) ("Defendant's wealth should not be a weapon to be used by plaintiff to enable him to induce the jury to find the defendant guilty of malice, thus entitling plaintiff to punitive damages. To avoid such possible abuse, we conclude that the split trial procedure should be used . . . ."); *see also Suozzi v. Parente*, 202 A.D.2d 94, 616 N.Y.S.2d 355 (N.Y. App. Div. 1994); *Suozzi v. Parente*, 161 A.D.2d 232, 554 N.Y.S.2d 617 (N.Y. App. Div. 1990) (financial disclosure to support punitive damage claim should not be had until there is special verdict determining entitlement to punitive damages); *Varriale v. Saratoga Harness Racing, Inc.*, 76 A.D.2d 991, 429 N.Y.S2d 302 (N.Y. App. Div. 1980).

[3] *See Rupert v. Sellers*, 48 A.D.2d 265, 272, 368 N.Y.S.2d 904, 912 (N.Y. App. Div. 1975) ("Not until plaintiff obtains such a special verdict that he is entitled to punitive damages is it necessary or important for him to know defendant's wealth."); *Evans v. Calise*, No. 92 CIV 8430 (PKL), 1994 WL 185696, at *2 (S.D.N.Y. May 12, 1994) ("It has generally been the rule in New York that 'evidence of [a] defendant's wealth [can] not be brought out upon trial unless and until the jury [brings] in a special verdict that plaintiff is entitled to punitive damages against defendant.'") (*citing Chabad v. Gourary*, 1989 WL 38341, at *1 (E.D.N.Y. Apr. 12, 1989) (*quoting Rupert v. Sellers*, 48 A.D.2d 265, 272, 368 N.Y.S.2d 904, 912 (N.Y. 4th Dept. 1975))).

[4] *See, e.g.*, *Glover v. New York City Transit Auth.*, 60 A.D.3d 587, 591, 876 N.Y.S.2d 40, 43 (N.Y. App. Div. 2009) (proceeding to damages phase with a second jury after first jury found defendant negligent); *John Quincy Adams Prods., Inc. v. Pub. Broad. Commc'ns, Inc.*, 184 A.D.2d 434, 435, 587 N.Y.S.2d 145 (N.Y. App. Div. 1992) (upholding the damages jury's verdict declining to award any damages after the first jury found breach of contract); *Bank of New York v. Ansonia Assocs.*, 172 Misc. 2d 70, 75, 656 N.Y.S.2d 813, 817 (N.Y. Sup. Ct. 1997) (first jury panel being dismissed after liability verdict); *Green v. City of New York*, 115 Misc. 2d 853, 853, 454 N.Y.S.2d 925, 926 (N.Y. Civ. Ct. 1982) (proceeding to damages phase with a second jury after first jury assigned 75% liability to defendants and 25% to plaintiffs); *see also Ramos v. Noveau Indus., Inc.*, 29 A.D.3d 555, 556, 814 N.Y.S.2d 251, 252 (N.Y. App. Div. 2006) (remitted for a new trial on the issue of damages); *Samuels v. City of New York*, 7 Misc. 3d 68, 73, 795 N.Y.S.2d 814, 819 (N.Y. App. Term 2005) (referring to retrial of damages before a second jury); *Larsen v. Sittmar Cruises*, 159 Misc. 2d 159, 160, 602 N.Y.S.2d 981, 982 (N.Y. Civ. Ct. 1993) (re-trial on damages with a new jury).

separate jury.[5]  Indeed, due to the preparation for the punitive damages trial, the short delay between the phases of trial supported the court's decision to dismiss the first jury.[6]

50. Thus, there is nothing unusual or prejudicial by either the passing of time between the liability and compensatory damages portion of the Leviston Litigation, and the resolution of the punitive damages phase of the litigation.

51. Additionally, as a result of the bankruptcy filing, movant will not be able to execute on any such judgment, and as discussed above, any award for punitive damages will be subject to subordination and/or disallowance.  Consequently, there is no prejudice to movant in maintaining the stay.

### IV.  CONCLUSION & PRAYER

For the reasons set forth above, the Debtor requests the entry of an order (i) denying the Motion and (ii) awarding the Debtor any further relief the Court deems appropriate.

Dated:  July 16, 2015                                     Respectfully submitted,

**NELIGAN FOLEY LLP**

/s/ Patrick J. Neligan, Jr.
Patrick J. Neligan, Jr.
Texas State Bar No. 14866000
pneligan@neliganlaw.com
James P. Muenker
Texas State Bar No. 24002659
jmuenker@neliganlaw.com

325 N. St. Paul, Suite 3600
Dallas, Texas  75201
Telephone:  214-840-5300
Facsimile:  214-840-5301

---

[5] *See Bank of New York v. Ansonia Assocs.*, 172 Misc. 2d 70, 75, 656 N.Y.S.2d 813, 817 (N.Y. Sup. Ct. 1997) (wrangling with the issue of an interlocutory appeal—and ultimately denying defendant's request—after the first jury panel had been dismissed and before the second jury panel had been selected).
[6] *See Bank of New York v. Ansonia Assocs.*, 172 Misc. 2d 70, 75, 656 N.Y.S.2d 813, 817 (N.Y. Sup. Ct. 1997) ("[The] gross negligence finding delayed the damages trial for a brief period . . . .").

**ZEISLER & ZEISLER, P.C.**

*/s/ James Berman*
James Berman
CT Bar No. 06027
jberman@zeislaw.com
558 Clinton Avenue
Bridgeport, Connecticut  06605
Telephone:  (203) 368-4234
Facsimile:  (203) 367-9778

**PROPOSED COUNSEL FOR THE DEBTOR**

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2015, a true and correct copy of the foregoing document was served on those parties receiving electronic notification via the Court's ECF system.

*/s/ Patrick J. Neligan, Jr.*
Patrick J. Neligan, Jr.