IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF CONNECTICUT
HARTFORD DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| CURTIS JAMES JACKSON, III, | § | CASE NO. 15-21233 (AMN) |
| | § | |
| DEBTOR. | § | |

**MOTION FOR ORDER (1) LIMITING ACCESS TO TRADE SECRET AND
CONFIDENTIAL COMMERCIAL INFORMATION, AND (2) FOR
AUTHORIZATION TO FILE RELATED ENDORSEMENT
AGREEMENTS UNDER SEAL**

Curtis James Jackson, III (the "Debtor"), the debtor and debtor in possession in the above-captioned bankruptcy case (the "Bankruptcy Case"), that was filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"),[1] files this *Motion For Order (1) Limiting Access to Trade Secret and Confidential Commercial Information, and (2) For Authorization to File Related Endorsement Agreements Under Seal* (the "Motion") under §§ 105(a), 107(b)(1) and Rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking the entry of an order limiting access to trade secret and confidential commercial information regarding agreements related to the Debtor endorsing products of RevolutionWear, Inc. ("RI"), and for authorization to file those agreements under seal, if at all. In support of this Motion, Debtor submits the following:

## I. JURISDICTION AND VENUE

1. On July 13, 2015 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby initiating the Bankruptcy Case. Under § 301, the filing of the petition constituted an order for relief under chapter 11 and, since that filing, under §§ 1107 and 1108, the Debtor has continued in possession and control of his assets

---

[1] All of the section references contained in this Application not otherwise defined are to the Bankruptcy Code.

and property, and has continued to operate his businesses and manage his affairs. This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This Application is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper before this Court in this district under 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested in this Motion includes §§ 105(a), 107(b)(1) and Bankruptcy Rule 9018.

## II. FACTUAL BACKGROUND

### A. INTRODUCTION TO THE DEBTOR AND THE FILING OF THIS BANKRUPTCY CASE

2. The Debtor, Curtis James "50 Cent" Jackson, III, is an internationally recognized recording artist, an actor, an entrepreneur and a philanthropist. Since his entrance onto the music scene in 2003 with his multi-platinum debut album, the Debtor has sold more than 22 million albums worldwide, and has received numerous awards and Grammy nominations throughout his career.

3. As a result of the Debtor's success, he has been fortunate to acquire a significant amount of assets. Like many other celebrity entertainers that make their living in full view of the public eye, however, the Debtor has accumulated a substantial amount of liabilities as well. Notwithstanding this fact, the Debtor's bankruptcy filing is not primarily a result of excessive current expenses exceeding his current revenues, but rather the substantial costs of litigation and resulting awards against him in the past year which total in excess of $20 million, and which are discussed in more detail below. While the Debtor has substantial assets, he does not have the ability to pay the full amount of these litigation claims and all of the other asserted claims at the present time, thereby necessitating this chapter 11 filing.

4. The Debtor filed his chapter 11 petition to obtain the full protections of the bankruptcy laws in order to reorganize his financial affairs in a reasonable and timely manner

and in accordance with an approved plan for the benefit of his estate and all of his creditors.  In connection with this bankruptcy proceeding, the Court will determine the extent and value of the Debtor's assets and liabilities – and, thus, Debtor's net worth.

**B.  THE ENDORSEMENT RELATED AGREEMENTS**

5.  RI is a clothing manufacturer that produces the FRIGO® RevolutionWear line of men's underwear, which is a premium line of men's underwear.  The FRIGO® collection originates from the Latin terms for dry and cool.  Dubbed "not underwear," the line blends microfibers and cotton fabrics with a high-technology design, with its patented FRIGO Zone™.  With the incorporation of a silicone-lined leg, the fabric will never ride up or bunch.

6.  RI is FRIGO®'s parent, and combines innovative design with technology to create radically different, superior products for global distribution.  RI was founded in Sweden, incorporated in the United States in 2010, and is headquartered in New York City.  Pre-petition, the Debtor entered into a several related agreements with RI (the "RI Agreements"), either directly or indirectly through corporate affiliates that he owns an interest in, under which he agreed to endorse the FRIGO® RevolutionWear line of men's underwear.

7.  The RI Agreements include the following:

- Series A Preferred Stock Purchase Agreement dated August 27, 2013 (the "SPA");

- Secured Promissory Note dated November 14, 2014, wherein the Debtor loaned RI $100,000;

- Warrant to Purchase Common Stock or RevolutionWear, Inc. dated May 5, 2014;

- Amended and Restated Memorandum of Agreement For Service Upon Board of Advisors; and

- RevolutionWear, Inc. 2011 Equity Incentive Plan Non-Statutory Stock Option Agreement dated November 30, 2014.

The Debtor's relationship with RI began on August 27, 2013, when the Debtor, through his wholly-owned corporate entity G-Unit Brands, Inc., entered into the SPA, with other purchasers, to acquire shares of Series A Preferred Stock of RI. At the time of its execution, the SPA was much ballyhooed. Along with the Debtor, former New York Yankee's captain Derek Jeter, New York Knick's star Carmelo Anthony, and Timothy "Timbaland" Mosley, either directly or indirectly, also purchased interests in RI.

### III. RELIEF REQUESTED

8. The RI Agreements, and their terms and conditions, contain trade secrets and confidential commercial information. By this Motion, the Debtor seeks an order that (a) permits the Debtor to file the RI Agreements with this Court under seal, if at all; and (b) limits access to the RI Agreements to those parties that sign the non-disclosure agreement (the "RI NDA") that is attached as **Exhibit A**.

### IV. BASIS FOR RELIEF

9. Under Section § 107(b)(1), on the request of a party in interest, the bankruptcy court **shall**, and on the bankruptcy court's own motion, the bankruptcy court may, among other things, protect an entity with respect to a trade secret or confidential research, development, or commercial information.[2] Likewise, under Bankruptcy Rule 9018, on a motion or on its own initiative, with or without notice, the court may make any order which justice requires to, among other things, protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information.[3]

---

[2] Section 107(b)(1) (emphasis added).
[3] Bankruptcy Rule 9018.

10. Although "[T]here is a strong presumption and public policy in favor of public access to court records,"[4] this common law right is not absolute and concealment may be needed if access is sought for an improper reason.[5] Section 107(b) creates a statutory exception to this presumption of public access by requiring courts to protect, among other things, trade secrets and confidential commercial information, when requested by a party in interest.[6] And Bankruptcy Rule 9018 puts into place the procedure to apply § 107(b) and allows the court to "make any order which justice requires."[7]

11. In order to overcome the presumption of access and invoke the limitations and restrictions of § 107(b)(1), the requesting party must provide the court with specific factual and legal authority showing that a certain document is correctly classified as confidential.[8] The burden of proof is on the movant, the Debtor here, to show the court that the information sought to be protected from public viewing is both commercial and confidential.[9] The standard is not good cause.[10] The standard that must be met is that the information at hand be confidential and

---

[4] In re Anthracite Capital, Inc., 492 B.R. 162, 170 (Bankr. S.D.N.Y. 2013) ("Anthracite Capital"), citing, In re Borders Group, Inc., 462 B.R. 42, 46 (Bankr. S.D.N.Y. 2011) ("Borders Group"). See also § 107(a), which codifies the common law right of the public to inspect and copy judicial records and creates a presumption that all documents that are filed in a bankruptcy case are open and accessible to the public and subject to examination by the public at reasonable times and at no charge. Anthracite, 492 B.R. at 170, citing Video Software Dealers Assoc. v. Orion Pictures Corp. (In re Orion Pictures Corp.), 21 F.3d 24, 26 (2nd Cir. 1994) ("Video Software"); and Nixon v. Warner Commc'ns, 435 U.S. 589, 597 (1978) ("Nixon") ("It is clear that courts in this country recognize a general right to inspect and copy public records and documents, including judicial records and documents.") (citations omitted).

[5] Anthracite, 462 B.R. at 170, citing Nixon, 435 U.S. at 597-598.

[6] Video Software, 21 F.3d at 27 ("[I]f the information fits any of the specified categories, the court is *required* to protect a requesting interested party and has no discretion to deny the application.") (emphasis added). Anthracite Capital, 492 B.R. at 170-171.

[7] Anthracite Capital, 492 B.R. at 171. Borders Group, 462 B.R.at 46. Bankruptcy Rule 9018.

[8] Anthracite Capital, 492 B.R.at 171, citing United States v. Continental Airlines, Inc. (In re Continental Airlines, Inc.), 150 B.R. 334, 340-341 (Bankr. D.Del. 1993) (refusing to seal documents based on "nothing more than the mere possibility" that they contained defamatory information).

[9] Anthracite Capital, 492 B.R. at 177, citing In re Oldco M Corp., 466 B.R. 234, 237 (Bankr. S.D.N.Y. 2012); and In re Northwest Airlines Corp., 363 B.R. 704, 706 (Bankr. S.D.N.Y. 2007).

[10] Anthracite Capital, 492 B.R. at 177, citing Video Software, 21 F.3d at 28.

commercial.[11]    The language used in § 107(b)(1) separates trade secret from confidential commercial information with the word "or," which means that the information sought to be restricted can be either or both.  In other words, the subject information is not required to rise to the level of trade secret status.[12]

12.    Commercial information is "information which would cause 'an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'"[13]  When information "is so critical to the operations of the entity seeking the protective order that its disclosure will unfairly benefit that entity's competitors[,]" that information should be sealed under § 107(b).[14]

13.    Although the RI Agreements are technically corporate transaction contracts, for the celebrity signatories such as the Debtor, they are more than that.  They are endorsement contracts.  Pictures and videos of the Debtor are prominently displayed on RI's website, touting the benefits of FRIGO® underwear.

14.    An endorsement contract is an often used device for an entertainer like the Debtor to obtain publicity, solidify his brand and provide a significant stream of income.  The RI Agreements are an example of this.  Those contracts give the Debtor widespread exposure as a spokesman for FRIGO®, a premium high-end line of men's underwear, associates the Debtor

---

[11]    Anthracite Capital, 492 B.R. at 177, citing Video Software, 21 F.3d at 28.  Section 107(b)(1).
[12]    Anthracite Capital, 492 B.R. at 177.  Borders Group, 462 B.R. at 47.  Video Software, 21 F.3d at 28.
[13]    Gowan v. Westford Asset Mgmt. LLC (In re Dreier, LLP), 485 B.R. 821, 822-823 (Bankr. S.D.N.Y. 2013).  Anthracite Capital, 492 B.R. at 178.
[14]    In re Barney's, Inc., 201 B.R. 703, 709 (Bankr. S.D.N.Y. 1996) (the bankruptcy court provided examples of commercial information that should be sealed including pricing formulae, short and long term marketing strategies, and the terms of agreements with suppliers).  In re Frontier Group, LLC, 256 B.R. 771, 774 (Bkrtcy. E.D.Tenn. 2000) (a physician list of a debtor-corporation that procured and assigned physicians to temporary positions in emergency rooms was held to confidential commercial information).  In re Nunn, 49 B.R. 963, 965 (Bankr. E.D.Va. 1985) (a customer list of a creditor was held to qualify as confidential commercial information).  Anthracite Capital, 492 B.R. at 178.

with the luxury end of the consumer market, and provides the Debtor with a potential upside that will help pay back his creditors.

15. Endorsement contracts are competitive. Entertainers compete to endorse certain consumer products. No entertainer wants the terms of its endorsement contracts made public because the results of that disclosure would be disastrous by giving competitors an unfair advantage in allowing them to undercut the financial terms of the entertainer's endorsement deals.

16. Currently, the Debtor, either directly or indirectly through related corporate entities, is a party to a number of contracts that involve product endorsements, advertising, promotions, and marketing. These contracts could provide the Debtor with a stream of income to pay back his creditors. As a part of his business operations, the Debtor is constantly on the look-out for other such contracts if the terms, conditions and circumstances are right. Therefore, it makes sense to protect the Debtor's ability to enter those contracts by maintaining the confidentiality of his past and current endorsement contracts.

17. For these reasons, the terms and conditions of the RI Agreements constitute trade secrets[15] and confidential commercial information under § 107(b)(1). Those contracts, in addition to others, are agreements under which the Debtor intends to pay back his creditors, and those contracts must be protected so that the income stream that they helps to generate for the Debtor is preserved. This can be accomplished by permitting the Debtor to file the RI Agreements under seal, if at all, and conditioning access to the RI Agreements only to those

---

[15] A trade secret is a "combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." Integrated Cash Management Services, Inc. v. Digital Transactions, Inc., 920 F.2d 171, 173 (2nd Cir. 1990). In re American Preferred Prescription, Inc., 186 B.R. 350, 356 (Bankr. E.D.N.Y. 1995).

**MOTION FOR ORDER (1) LIMITING ACCESS TO TRADE SECRET AND CONFIDENTIAL COMMERCIAL INFORMATION, AND (2) FOR AUTHORIZATION TO FILE RELATED ENDORSEMENT AGREEMENTS UNDER SEAL -- PAGE 7**

parties who sign the RI NDA, **Exhibit A** hereto.  The Debtor reserves the right to object to any parties signing the RI NDA and gaining access to the RI Agreements to the extent that such parties are not creditors of the Debtor.

## V.  PRAYER

The Debtor prays that this Court grant this Motion by entering an order (a) authorizing the Debtor to file the RI Agreements under seal, if at all; (b) limiting access to the RI Agreements to those parties that sign the RI NDA, **Exhibit A** hereto; and (c) awarding the Debtor such other and further relief, special or general, at law or in equity, as this Court may deem just and proper.

Dated:  September 28, 2015.	Respectfully submitted,

**NELIGAN FOLEY LLP**

*/s/ Patrick J. Neligan, Jr.*
Patrick J. Neligan, Jr.
Texas State Bar No. 14866000
pneligan@neliganlaw.com
Seymour Roberts, Jr.
Texas State Bar No. 17019150
sroberts@neliganlaw.com
325 N. St. Paul, Suite 3600
Dallas, Texas  75201
Telephone:  214-840-5300
Facsimile:  214-840-5301

**ZEISLER & ZEISLER, P.C.**

*/s/ James Berman*
James Berman
CT Bar No. 06027
jberman@zeislaw.com
10 Middle Street, 15th Floor
Bridgeport, Connecticut  06604
Telephone:  (203) 368-4234
Facsimile:  (203) 367-9778

**PROPOSED COUNSEL FOR THE DEBTOR**

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of September, 2015, a true and correct copy of the foregoing was served via this Court's ECF notification system and upon RevolutionWear at the address of 1745 Broadway, 17th Floor, New York, NY 10019 and via electronic mail to Mathias Ingvarsson at the electronic mail address of mathias@revolutionwear.com.

                                                              */s/ Patrick J. Neligan, Jr.*
                                                             Patrick J. Neligan, Jr.

# EXHIBIT A

# **CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT**

This Confidentiality and Non-Disclosure Agreement (the "Agreement") is executed and made effective as of _____, 2015 by Curtis James Jackson, III (the "Debtor"), and the Recipient (as defined below) (the Debtor and the Recipient, each a "Party" and, collectively, the "Parties").

## **Recitals**

A.  On July 13, 2015 (the "Petition Date"), the Debtor filed his voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code") in Case No. 15-21233 (AMN) (the "Bankruptcy Case"), before the United States Bankruptcy Court for the District of Connecticut, Hartford Division (the "Bankruptcy Court").  The filing of the Debtor's petition constituted an order for relief under chapter 11 and, since that filing, the Debtor has continued in possession and control of his assets and property, and has continued to operate his businesses and manage his affairs.

B.  RevolutionWear, Inc. ("RI") is a clothing manufacturer that produces the FRIGO® RevolutionWear line of men's underwear, which is a premium line of men's underwear.  The FRIGO® collection originates from the Latin terms for dry and cool.  Dubbed "not underwear," the line blends microfibers and cotton fabrics with a high-technology design, with its patented FRIGO Zone™.  With the incorporation of a silicone-lined leg, the fabric will never ride up or bunch.  RI is FRIGO®'s parent, and combines innovative design with technology to create radically different, superior products for global distribution.  RI was founded in Sweden, incorporated in the United States in 2010, and is headquartered in New York City.  Pre-petition, the Debtor entered into a several related agreements with RI (the "RI Agreements"), either directly or indirectly through corporate affiliates that he owns an interest in, under which he agreed to endorse the FRIGO® RevolutionWear line of men's underwear.  The RI Agreements include the following:

- Series A Preferred Stock Purchase Agreement dated August 27, 2013 (the "SPA");

- Secured Promissory Note dated November 14, 2014, wherein the Debtor loaned RI $100,000;

- Warrant to Purchase Common Stock or RevolutionWear, Inc. dated May 5, 2014;

- Amended and Restated Memorandum of Agreement For Service Upon Board of Advisors; and

- RevolutionWear, Inc. 2011 Equity Incentive Plan Non-Statutory Stock Option Agreement dated November 30, 2014.

C.  The terms and conditions of the RI Agreements constitute trade secrets and confidential commercial information under Bankruptcy Code § 107(b)(1).

D.  The Recipient has requested to review the RI Agreements. The Debtor, in his Bankruptcy Case, filed a motion for an order (i) limiting access to the RI Agreements to those parties who sign this Agreement, are creditors of the Debtor, and (ii) authorizing the Debtor to file the RI Agreements under seal, if at all (the "RI Agreements Motion").

E.  The Bankruptcy Court granted the RI Agreements Motion and entered an order (the "RI Agreements Order") (i) limiting access to the RI Agreements to those parties who sign this Agreement, are creditors of the Debtor, and (ii) authorizing the Debtor to file the RI Agreements under seal, if at all.

F.  The Recipient is a creditor of the Debtor (and was a creditor of the Debtor as of the Petition Date), and a party-in-interest in the Bankruptcy Case. The Recipient did not purchase its claim against the Debtor.

G.  The Debtor and the Recipient desire to establish and set forth the obligations of the Recipient with respect to the terms and conditions of the RI Agreements, which is the Confidential Information (as defined herein) of the Debtor.

**Agreement**

In consideration of the foregoing and of the Debtor's providing its Confidential Information to the Recipient for review, the Recipient expressly agrees as follows:

1.  Confidential Information

    a.  For the purposes of this Agreement, "Written Confidential Information" means any type of tangible information, documents, data or materials (whether prepared by the Debtor, his representatives or otherwise, and regardless of the form of communication or the medium or media in which it is transmitted) concerning the Beam Contract that is disclosed to the Recipient or its Consultants by the Debtor and/or his representatives either prior to or after the execution of this Agreement. "Verbal Confidential Information" means any information concerning the Beam Contract that is disclosed to the Recipient or its Consultants by the Debtor or his representatives which is not Written Confidential information. "Confidential Information" means Written Confidential Information and Verbal Confidential Information. Confidential Information may include, without limitation, contracts, leases, information concerning business operations, procedures, accounting, marketing and marketing plans, business plans, forecasts, budgets, and/or strategies.

    b.  Confidential Information shall not include any information that:

        (i)  would otherwise be Confidential Information but for the fact it is or becomes a matter of public knowledge; provided such information did not become public as the result of a breach of this Agreement by the Recipient or its Consultants;

2

      (ii)    is disclosed by the Recipient or its Consultants with the prior written approval of the Debtor and RI;

      (iii)    is already in the possession of the Recipient or its Consultants, or is known to the Recipient or its Consultants from a source other than the Debtor or its representatives; provided that such source was not known to the Recipient or its Consultants to be bound by a confidentiality agreement with, or a fiduciary obligation to, the Debtor to keep such information confidential, and provided that the Recipient furnishes the Debtor with written notice and evidence of prior possession of such information;

      (iv)    would be readily obtainable from an observation of the Debtor's operations that are open or accessible to the public; or

      (v)    is independently developed by the Recipient.

c.    For the purposes of this Agreement, "Consultants" means (i) any affiliate of the Recipient; (ii) the officers, directors, shareholders, employees, and agents of the Recipient or any affiliate of Recipient, and (iii) any representatives of the Recipient, or any affiliate of the Recipient, including their respective attorneys, accountants, actuaries, financial consultants or any other person or entity engaged by the Recipient who may possess or review Confidential Information as permitted by this Agreement.

d.    The Debtor is disclosing its Confidential Information to the Recipient in conformance with the RI Agreements Order. This Agreement establishes a confidential relationship between the Debtor on the one hand and the Recipient on the other hand, and sets forth the obligations of the Recipient with respect to such Confidential Information.

e.    The Recipient agrees that any and all Confidential Information disclosed by the Debtor and/or its representatives or otherwise subject to this Agreement is, and shall at all times be and remain, the information and property of the Debtor.

2.    Restricted Use and Disclosure of Confidential Information

a.    The Recipient agrees not to disclose any Confidential Information to any person or entity without the prior written consent of the Debtor and RI, other than to its Consultants each of whom, in each case, has a need to know the Confidential Information in connection with its review and evaluation of the RI Agreements, and each of whom shall be advised of the confidential nature of the Confidential Information, shall be required to maintain its confidential nature, and shall be required to sign an acknowledgement to be bound by this Agreement. The Recipient shall provide to the Debtor and RI a list of the Consultants to whom Confidential Information was disclosed, and shall be responsible for having its Consultants sign an acknowledgment (a copy of which is attached to this Agreement as Exhibit 1) to be bound by this Agreement and providing that acknowledgment to the Debtor and RI. Confidential Information that is disclosed to Consultants retains its status as Confidential Information unless otherwise indicated by the Debtor and RI, in writing.

b.     Except for its Consultants, the Recipient agrees not to disclose any Confidential Information to any third party until it has obtained the Debtor's and RI's prior written consent to make such disclosure, and has provided to the Debtor and RI (i) notice of such intended disclosure and (ii) a signed acknowledgment by the third party to be bound by this Agreement (a copy of which is attached as <u>Exhibit 1</u>). Confidential Information that is disclosed under this paragraph 2(b) retains its status as Confidential Information.

c.     The Recipient will not distribute or make use of the Confidential Information in any manner or on any basis whatsoever except as follows:

    (i)     as set forth in paragraph 2(a) above;

    (ii)     solely in conjunction with the Bankruptcy Case;

    (iii)     in communications with other parties in the Bankruptcy Case that have signed this Agreement and with the Consultants of those parties that signed an acknowledgment to be bound by this Agreement (a copy of which is attached as <u>Exhibit 1</u>); and

    (iii)     for any other purpose the Debtor and RI may hereafter authorize in writing prior to such distribution or use, in the Debtor's and RI's sole and absolute discretion.

d.     The Recipient will not, and will direct its Consultants not to, disclose, except as may be permitted by the terms of this Agreement, to any Person:

    (i)     that Confidential Information has been requested, received or reviewed pursuant to this Agreement;

    (ii)     any of the terms, conditions or other facts with respect to the RI Agreements, or that discussions regarding the RI Agreements are or have been underway; or

    (iii)     any other facts relating to such discussions, including, without limitation, the terms and conditions of this Agreement.

As used in this paragraph 2(d), "<u>Person</u>" shall be interpreted broadly to include the media (whether broadcast, print, internet or otherwise) and any corporation, partnership, limited liability company, group, individual or entity, and shall also include but not be limited to any entity with whom the Debtor may be discussing a potential transaction or relationship.

e.     In the event that the Recipient or any of its Consultants is requested or required (by subpoena or other compulsory judicial or administrative process) to disclose any of the Confidential Information, the Recipient shall provide the Debtor and RI with written notice of such request or requirement within two business days of receiving that request or requirement to disclose so that the Debtor and RI may have adequate time to prepare and seek a protective order or other appropriate remedy and/or waive the Recipient's compliance with the terms of this Agreement relating to the non-disclosure of such Confidential Information for which disclosure is sought. If the Debtor and RI waive the Recipient's compliance with

4

    the terms of this Agreement in accordance with this paragraph 2(e) with respect to certain Confidential Information and permit disclosure of such Confidential Information, the Recipient shall nonetheless exercise its best efforts to request an order from the applicable court authorizing the Recipient to file the Debtor's Confidential Information under seal, and obtain reliable assurances that confidential treatment will be accorded such Confidential Information which is requested or required to be disclosed.  In the event that no protective order or other remedy is obtained or the Debtor and RI waive the Recipient's compliance with the terms of this Agreement in accordance with this paragraph 2(e), the Recipient shall nonetheless furnish only that portion of the Confidential Information which the Recipient shall be advised by written opinion of legal counsel is legally required to be disclosed.

3. No Assignment or License.  Neither the Recipient nor any of its Consultants will acquire by reason of this Agreement any patent, copyright, trade secret or other intellectual property right, or license thereunder, in or with respect to any of the Confidential Information communicated by the Debtor and/or his representatives.  Furthermore, nothing in this Agreement will be construed to prevent the Debtor from disclosing his Confidential Information to third parties.

4. Return or Destruction of Confidential Information.  All Confidential Information furnished by the Debtor and/or any of his representatives to the Recipient and/or any of its Consultants will be and remain the property of the Debtor.  Upon the Debtor's request, the Recipient will return to the Debtor or destroy any and all Written Confidential Information provided to the Recipient and/or any of its Consultants, together with any copies thereof.

    The Recipient and its Consultants shall continue to treat any Verbal Confidential Information subject to the terms of this Agreement as Confidential Information until the third anniversary of the date of the RI Agreements Order.

    Upon the request by the Debtor, the Recipient will certify in writing to the Debtor that the Recipient has complied with the requirements of this paragraph 4 relating to the return or destruction of Written Confidential Information.

5. Survival.  Notwithstanding any breach of this Agreement, the obligations of the Recipient under this Agreement shall continue until the third anniversary of the expiration of the RI Agreements Order.

6. Legal and/or Equitable Relief.  Since the unauthorized disclosure of Confidential Information will diminish the value of the Debtor's estate, if the Recipient or any of its Consultants breaches any of the obligations set forth herein, the Debtor will be entitled to equitable relief (including injunctive relief) and/or monetary damages.  The Recipient acknowledges that remedies at law may be inadequate to protect the Debtor from and against any actual or threatened breach of this Agreement by the Recipient and/or its Consultants and that any such breach may cause the Debtor irreparable harm, the amount of which may be impossible to ascertain, and, in addition to any other rights and remedies otherwise available to the Debtor.  The Recipient agrees to indemnify and hold the

       Debtor harmless from any damage, loss, cost or liability (including reasonable legal fees and disbursements and the costs of enforcing this indemnity) arising out of or resulting from any unauthorized use or disclosure by the Recipient or its Consultants of the Confidential Information and/or from any other violations of this Agreement.

7.    Third Party Beneficiary Status. RI, and its direct and indirect affiliates, are designated by the Parties as third party beneficiaries of this Agreement, and have the same rights to enforce this Agreement or seek remedies under this Agreement, including under Section 6 hereof, as the Debtor.

8.    Miscellaneous.

    a.   Assignment. This Agreement shall be binding upon the Recipient and its Consultants and their respective successors and assigns. This Agreement shall inure to the benefit of the Debtor and his successors and assigns and may be assigned by the Debtor in whole or in part. Neither this Agreement nor any of the rights or obligations set forth herein may be assigned by the Recipient.

    b.   Entire Agreement. This Agreement constitutes the entire agreement between the Debtor and the Recipient regarding the subject matter hereof and supersedes and cancels any and all other arrangements between them relating to the subject matter hereof. This Agreement may be amended, altered or modified only by an instrument in writing signed by the Debtor and the Recipient.

    c.   Disputes. In any action or proceeding arising out of or in connection with this Agreement, the prevailing party will be entitled to recover all reasonable costs and attorneys' fees, with or without suit.

    d.   Governing Law. The rights and obligations under this Agreement shall in all respects be governed by the laws of the State of Connecticut without giving effect to its conflict of laws principles. The Recipient's obligations under this Agreement supplement, and do not supersede, the obligations imposed on the Recipient by the laws of the State of Connecticut.

    e.   Rights. The provisions of this Agreement shall not be construed as limiting any rights or remedies that the Debtor may otherwise have under the applicable law. Except as set forth in Section 7 hereof or otherwise referred to herein, nothing in this Agreement is intended or will be deemed or construed to confer upon or give any other party other than the Debtor and his successors and assigns, if any, any rights or remedies under or by reason of this Agreement.

    f.   Severability. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby, and the intent of this Agreement shall be enforced to the greatest extent permitted by law.

    g.   Non-Waiver. Any waiver or any approval of disclosure by the Debtor and / or RI under this Agreement, including but not limited to any waiver under paragraph 2(e), shall be limited to the specific instance to which such waiver or approval

6

relates, and shall not be deemed to be a general waiver or to prevent the Debtor and / or RI from refusing to grant a waiver or an approval in other cases.

h. <u>Notice Address</u>. Any communication, correspondence or notice to the parties which is required or permitted under this Agreement shall be in writing and shall be given to the following address by electronic mail with follow-up confirmation to be sent by regular U.S. mail. All notices sent to the Debtor will also be sent to Beam Suntory.

    If to the Debtor:    Patrick J. Neligan
    Seymour Roberts
    Neligan Foley LLP
    Republic Center
    325 North Saint Paul, Suite 3600
    Dallas, Texas 75201
    Telephone: (214) 840-5300
    Facsimile: (214) 840-5301
    e-mail: pneligan@neliganlaw.com
    sroberts@neliganlaw.com

    If to the Recipient: _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____

    If to RI:    Mathias Ingvarsson
    RevolutionWear, Inc.
    1745 Broadway, 17th Floor
    New York, NY 10019
    Telephone: _____
    e-mail: mathias@revolutionwear.com

IN WITNESS WHEREOF, the undersigned have executed this Agreement effective as of date first written above.

<u>RECIPIENT</u>

_____

By:_____
Name: _____
Title_____

<u>DEBTOR</u>

_____
Curtis James Jackson, III

# EXHIBIT 1

## ACKNOWLEDGMENT

I, the undersigned, hereby represent and warrant that I have read the Confidentiality and Non-Disclosure Agreement (the "Agreement") that this Acknowledgment is attached to as Exhibit 1, that I have either received independent legal advice from attorneys of my own choosing with respect to the advisability of executing this Acknowledgment or have waived that opportunity, that I fully understand the terms and conditions of the Agreement and affirmatively and fully agree to be bound by them.

Signed this ____ day of _____, 2015

_____

_____
By:
Its:

FirmDocs 83164v.1