# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

In re

CURTIS JAMES JACKSON, III,

      Debtor.

Case No. 015-21233

Chapter 11

Jointly Administered

-----------------------------------------------------------x

CURTIS JAMES JACKSON, III,

      Plaintiff,

     - against –

GARVEY SCHUBERT BARER, a
partnership of professional corporations,
R. BRUCE BECKNER, HILLARY H.
HUGHES, JE JUN MOON, and PAUL H.
TRINCHERO,

      Defendants.

Adv. Proc. No. _____

-----------------------------------------------------------x

## COMPLAINT

The above-captioned debtor and plaintiff ("Jackson" or the "Debtor"), by

and through his counsel Robins Kaplan LLP, hereby alleges the following against

Garvey Schubert Barer ("GSB"), a partnership of professional corporations , R.

Bruce Beckner ("Beckner"), Hillary H. Hughes ("Hughes"), Je Jun Moon

("Moon"), and Paul H. Trinchero ("Trinchero"), (collectively "Defendants"):

## I. OVERVIEW

1.   This action arises from the attorney-client relationship between Jackson and GSB, and the legal services provided to Jackson by GSB and its current/former attorneys, including Hughes, Beckner, Moon, and Trinchero.

2.   GSB and attorney Hughes represented Jackson in negotiations leading up to and closing a transaction with Sleek Audio, LLC ("Sleek"), and continuing thereafter. During the course of that representation, GSB and attorney Hughes failed to employ the requisite knowledge and skill necessary to properly conduct due diligence of Sleek or to adequately advise Jackson.

3.   GSB and attorneys Beckner, Moon, and Trinchero represented Jackson in arbitration against Sleek and others.  During the course of that representation, GSB and attorneys Beckner, Moon, and Trinchero failed to employ the requisite knowledge and skill necessary to confront the circumstances of the case.  Among GSB's numerous failures was its inexplicable decision not to call technical and damages experts to rebut expert testimony offered by Sleek—failures relied upon by the arbitrator in crediting Sleek's experts and entering an eight-figure award in Sleek's favor.

**THE PARTIES**

4.    Jackson is a natural person who resides in Connecticut. Jackson is a

Grammy-award winning rap music artist, investor, entrepreneur, and

philanthropist whose stage name is "50 Cent."

5.    GSB is a partnership of professional corporations with offices in

Washington D.C., Anchorage, Alaska, Beijing, China, New York, New York,

Portland, Oregon, and Seattle, Washington.

6.    Hughes is a licensed attorney practicing law in the state of New York.

She is employed as an attorney at, and is an owner of, GSB.

7.    Beckner is a licensed attorney who, on information and belief, has

retired from the practice of law. He was formerly employed as an attorney at,

and was an owner of, GSB, where he practiced law in Washington, D.C.

8.    Moon is a licensed attorney who, on information and belief, practices

law in the state of New York. He was formerly employed as an attorney at GSB.

9.    Trinchero is a licensed attorney practicing law in the state of Oregon.

He is employed as an attorney at, and is an owner of, GSB.

**JURISDICTION AND VENUE**

10.   On July 13, 2015, Jackson filed a voluntary petition for relief under

chapter 11 of title 11, United States Code (the "Bankruptcy Code"), in the District

of Connecticut. No trustee has been appointed. Under section 323 of the

Bankruptcy Code, Jackson is the representative of Debtor's estate and has the capacity to bring this action.

11.  This Court has jurisdiction over the action pursuant to diversity of citizenship provisions contained in 28 U.S.C. § 1332(a). Jackson and Defendants do not share any common citizenship.

12.  Jackson is a resident of the State of Connecticut.

13.  On information and belief, GSB, a professional service corporation formed as a partnership of professional corporations, is domiciled in the State of Washington and maintains active corporate entities registered in Oregon, New York, Washington, D.C., and Alaska.

14.  On information and belief, Beckner is a resident of the District of Columbia.

15.  On information and belief, Hughes is a resident of the State of New York.

16.  On information and belief, Moon is a resident of the State of New York.

17.  On information and belief, Trinchero is a resident of the State of Oregon.

18.  There is complete diversity of citizenship among the parties within the meaning of 28 U.S.C. § 1332.

19.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

20.  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b). This adversary proceeding arises in and relates to Case No. 015-21233 pending in the Bankruptcy Court.

21.  This action is a proceeding in which the Bankruptcy Court may enter a final judgment.

22.  Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. § 1409(a).

## FACTS
### GSB's representation of Jackson

23.  In or around February 2010, GSB and Jackson entered into an attorney-client relationship, which continued until at least December 2014.

24.  GSB and Jackson entered into a general engagement agreement in or around February 2010.

25.  GSB represented Jackson as his attorneys for purposes of general legal advice, as well as representation on specific matters, including various disputes related to Jackson's dealings with Sleek and its principals, Michael E. Krywko, Mark A. Krywko, Jason D. Krywko, and Gregory L. Wysocki.

26. GSB represented Jackson in his efforts to obtain and enforce judgments against Sleek on two promissory notes Sleek had executed in favor of Jackson, and on which Sleek had defaulted.

27. GSB also represented Jackson in an arbitration conducted in West Palm Beach, Florida, on February 18-20, 22, 25-28, and March 1, 2013, which consolidated two arbitration cases, *Sleek Audio, LLC v. Curtis J. Jackson, III,* and *Curtis J. Jackson, III v. Sleek Audio, LLC, et al.*, JAMS Ref. Nos. 1440003176 and 1440003314 (the "Florida arbitration").  In the Florida arbitration, Sleek asserted claims against Jackson, including a claim of misappropriation of Sleek's trade secrets with respect to certain audio headphones developed by Sleek.

28. Among the GSB attorneys who performed legal services for, and rendered advice to, Jackson in connection with Jackson's business dealings—and later legal disputes—with Sleek and its principles, were Hillary H. Hughes, R. Bruce Beckner, Je Jun Moon, Paul Trinchero, and Michelle De Lappe.

29. Hughes of GSB represented Jackson in Jackson's initial business dealings with Sleek, including conducting due diligence prior to Jackson's investments in Sleek.

30. Beckner, Moon, and Trinchero of GSB represented Jackson in the Florida arbitration; Beckner and Moon appeared at and conducted the arbitration

hearing. Trinchero appeared on pleadings and the attorney service list as counsel for Jackson.

31.  GSB also represented Jackson's entity, G-Unit Brands, Inc. in certain capacities related to Sleek.

### Jackson invests in Sleek Audio, LLC

32.  In or around 2009, hip-hop artist Dr. Dre introduced *Beats by Dr. Dre*, a wired headphone, which enjoyed success in the market.

33.  Following *Beats by Dr. Dre*, other rap and hip-hop artists including Ludacris, Snoop Dogg, Sean "P Diddy" Combs, and Jay-Z released their own lines of headphones.

34.  Recognizing the financial success of these other hip-hop artists, Jackson decided to market his own line of headphones to take advantage of his status as a music celebrity and the value of his 50 Cent brand.

35.  Beginning in or around 2006, Mark Krywko formed Sleek to create and sell custom-molded earbuds and earphone products. Among the products developed by Sleek were the SA1, SA6, and SA7 earphone products, in addition to wireless products that accompanied these products.

36.  In or around January 2010, Jackson was introduced to Mark and Jason Krywko of Sleek.

37. In the initial and subsequent meetings, Jackson and the members of Sleek discussed the possibility of Jackson working with Sleek to develop and market a new wireless over the ear ("OTE") headphone to be sold under Jackson's brand as the "Sleek by 50" headphones.

38. On or about April 20, 2010, Jackson and Sleek entered into the Securities Purchase Agreement pursuant to which Jackson invested $1.3 million dollars in Sleek.

39. Jackson became a member of the Board of Directors of Sleek, effective April 22, 2010.

40. Jackson and Sleek's principals/members also entered into an operating agreement dated April 22, 2010, titled the Second Amended and Restated Operating Agreement for Sleek Audio, LLC ("Second Amended and Restated Operating Agreement").

41. On or about April 22, 2010, G-Unit Brands, Inc. ("G-Unit"), a company controlled by Jackson, entered into a Brand License Agreement with Sleek, which set forth the terms under which Sleek could use Jackson-related marks and branding on its products.

42. The Second Amended and Restated Operating Agreement selected Florida state substantive law as the applicable law and required that arbitration and all related litigation be conducted in Palm Beach County, Florida.

**GSB and Hughes fail to perform adequate due diligence on Sleek**

43.  On or about February 24, 2010, Hughes of GSB was representing

Jackson to obtain due diligence documentation on Sleek.

44.  Despite identifying a number of deficiencies in Sleek's corporate books,

including, for example, six-figure discrepancies between borrowed sums and the

recording of such sums in the company's "Promissory Note chart," and a

previous operating agreement in 2010 which reflected guaranteed payments only

for 2009, Hughes did not adequately advise Jackson of the risks of entering into

business with Sleek.

45.  Hughes proceeded to represent Jackson in negotiating and entering the

Second Amended and Restated Operating Agreement with Sleek, and in

Jackson's decision to make a substantial investment in the company.

46.  Hughes, having reviewed the due diligence documentation first-hand,

was in a position to properly advise Jackson against entering into business with

Sleek.

47.  Hughes failed to advise Jackson of the risks involved in investing in

Sleek personally rather than through a business entity.

**Sleek's continued funding needs and stunted progress**

48.  By June 7, 2010, just a few months after Jackson's initial $1.3 million

investment in Sleek, it was clear to Jackson's business manager, Greg Collins,

that Sleek would need an additional $2 to $3 million in the next six months to continue operating.

49.  Jackson entered into a second Securities Purchase Agreement with Sleek on November 19, 2010, through which he provided additional funding.

50.  Sleek continually missed deadlines for the development and marketing of the Sleek by 50 headphones as required by the Brand License Agreement.

51.  Sleek failed to provide four prototypes as required by the Brand License Agreement and was unable to produce a sample of a wired or wireless headphone with audio capabilities.  Jason Krywko delivered one mock-up to Jackson for approval which broke apart in Jackson's office.

52.  Sleek further failed to timely generate and provide G-Unit with a Marketing Plan by May 22, 2010 as required by the Brand License Agreement.

53.  Sleek failed to provide a prototype of the Headphone and Custom Ear Bud Products by October 15, 2010, as it was required to use its best efforts to do under the Brand License Agreement.

54.  Sleek also missed the February 15, 2011 launch deadline.

55.  Sleek never marketed or sold the Sleek by 50 headphones.

56.  Jackson provided Sleek with a total of over $2 million in investments and loans.

**Jackson forms SMS Audio and develops the
Street by 50 and Sync by 50 headphone products in 2011**

57.  Due to Sleek's failure to meet deadlines, Jackson became interested in developing headphones to market under his brand through a new venture.

58.  On March 4, 2011, Jackson incorporated SMS Audio, LLC ("SMS") for the purpose of developing and marketing OTE headphones.

59.  G-Unit Brands terminated the Brand License Agreement with Sleek on or about March 10, 2011.

60.  SMS commenced designing the Street by 50 (wired) and Sync by 50 (wireless) headphones on or about April 18, 2011.

61.  Both Street by 50 and Sync by 50 were offered for sale approximately seven months later, in November 2011.

62.  SMS spent in excess of $100,000 for the design, development, manufacture, promotion, and launch of each of the Street by 50 and Sync by 50 products.

**GSB and its attorneys advise Jackson that Jackson's new venture with SMS
will not implicate any Intellectual Property law or infringe any trade secret**

63.  The law firm of Gottlieb, Rackman & Reisman, P.C. evaluated the SMS Audio and Sleek by 50 headphones and issued a formal opinion that the SMS Audio products did not infringe any patent or copy any trade dress of the Sleek by 50 headphones.

64. In addition to the legal opinion by Gottlieb, Rackman & Reisman, P.C., GSB and its attorneys *independently* assured Jackson that the Street by 50 and Sync by 50 headphones developed by SMS did not infringe the intellectual property rights, including trade secret rights, of Sleek.

65. GSB assured Jackson that he was "good to go" on intellectual property rights and did not risk infringement of any Sleek products.

66. This assurance by GSB was stated verbally to Jackson and his advisors in or around September 2011.

67. Jackson relied on the advice of GSB that he was "good to go" — i.e. that SMS would not infringe on the intellectual property rights, including trade secret rights, of Sleek.

68. In the Florida arbitration, Sleek asserted a number of claims against Jackson related to SMS products and sought damages on a number of theories including: lost profits from sales of the SA1, SA6, and SA7 earphones; lost profits for the Sleek by 50 earphone; and revenues from all of SMS's sales of its entire line of headphones and earphones.

69. Jackson counterclaimed on a number of theories; GSB represented Jackson.

- 12 -

### GSB and its attorneys represent Jackson in a number of separate but related disputes against Sleek and its principals without defining the scope of the engagement

70.  Ultimately, the legal disputes between and among Sleek, its principals,

Jackson, and G-Unit involved five separate, but related, matters—two actions

related to promissory notes (regarding amounts Jackson lent to Sleek); one action

by G-Unit against Sleek for violation of the Brand License Agreement; one action

by Sleek against Jackson; and one action by Jackson against Sleek, et al. (the latter

two were consolidated in the Florida arbitration).

71.  GSB and its attorneys did not fulfill their reasonable duties as attorneys

and their fiduciary duties of care and loyalty to Jackson through a variety of

failures, lapses in judgment, lack of diligence, and deficient advice, which

ultimately resulted in (a) GSB's failure to represent Jackson in the Florida

arbitration with the requisite knowledge and skill necessary to confront the

circumstances of the case, and (b) GSB's failure to handle Jackson's affairs with

the utmost degree of honesty, forthrightness, loyalty and fidelity.

72.  GSB's failures rose to the level of malpractice.

### GSB and attorneys Beckner, Moon, and Trinchero engage in the unauthorized practice of law during the Florida arbitration by failing to comply with the requirements of Florida Bar Rule 1-3.11

73.  Three attorneys of GSB—Beckner, Moon, and Trinchero—appeared on

the pleadings and in the hearing of the Florida arbitration; none of these

- 13 -

attorneys is licensed to practice law in the State of Florida.

74. Beckner is licensed in the District of Columbia; Moon is licensed in New York; and Trinchero is licensed in Oregon and Washington.

75. Upon information and belief, none of these three attorneys complied with the requirements of Florida Bar Rule 1-3.11. Specifically, none submitted the necessary filings to appear in an arbitration proceeding in Florida—either before or during the Florida arbitration proceeding.

76. It was not until completion of the Florida arbitration that counsel licensed in Florida appeared on pleadings (in Florida state and federal courts) alongside GSB attorneys.

77. On or about July 26, 2013, John F. Mariani of Shutts & Bown LLP appeared alongside Beckner of GSB on a Civil Cover Sheet and "Complaint for an Order Vacating Arbitration Award" filed in the United States District Court for the Southern District of Florida, Case No. 9:13-CV-80725.  Mariani did not appear on the pleadings submitted to Arbitrator William H. Needle during the Florida arbitration, however, and Mariani was not present during the arbitration hearing.

78. Beckner, Moon, and Trinchero of GSB drafted pleadings, advised and consulted with Jackson, examined witnesses, and appeared and argued on Jackson's behalf in the Florida arbitration.

79.  The Florida Supreme Court has ruled that engaging in conduct such as the professional activities engaged in by these GSB attorneys qualifies as the unauthorized practice of law.

80.  Consequently, GSB's attorneys engaged in the unauthorized practice of law by appearing in the Florida arbitration and participating in the arbitration hearing on February 18-20, 22, 25-28 and March 1, 2013 in violation of Florida Bar Rules 1-3.11 and 4-5.5, and Florida Supreme Court jurisprudence.

### GSB and attorneys Beckner, Moon, and Trinchero fail to identify a conflict of interest with the law firm Kotz Sangster Wysocki P.C.'s representation of Sleek in litigation against Jackson

81.  The law firm Kotz Sangster Wysocki P.C. ("KSW") represented Sleek in the Florida arbitration.

82.  Gregory L. Wysocki ("Wysocki") is a named partner of KSW. Wysocki became a director of Sleek in 2008 and remained a director throughout the Florida arbitration in 2013.

83.  In addition, partners of KSW Robert Kotz, Jeffrey Sangster and Wysocki all became Members[1] of Sleek in 2008 with membership interests in the company following loans extended to and investments in Sleek in excess of $100,000.00 each.

---

[1] The Second Amended and Restated Operating Agreement is entered into by the "Members" or owners of the LLC, consistent with Schedule A, which assigns a membership interest and percentage interest according to a Member's initial capital contribution.

84. Keith Soltis, a KSW associate, became a member of Sleek in 2008, with an ownership interest in the company after making loans to and investments in Sleek.

85. Sleek owed KSW legal fees for services incurred by Wysocki as General Counsel and for other legal services rendered prior to commencement of the litigation.

86. Wysocki attempted to convert unpaid legal fees into additional membership interest in the LLC.

87. Jackson became a director of Sleek in April 2010; he remains a director today.

88. Jackson also became a member of Sleek in April 2010 with a 21.66% membership interest in the company following his initial capital contribution of $1.3 million.  In total, Jackson made loans to and investments in Sleek in excess of $2 million.

89. Wysocki was involved in negotiations with Jackson or his agents regarding events that later became relevant to the disputes between Jackson and Sleek.

90. GSB was aware of Wysocki's involvement in those negotiations.

91. The Rules regulating lawyers of the Florida State Bar require counsel in KSW's situation to: (1) make disclosures of conflicts of interest to Jackson prior to

undertaking representation of Sleek in litigation with Jackson; (2) obtain

informed consent in writing for a waiver of conflicts of interest from Jackson

prior to undertaking the representation of Sleek in litigation with Jackson; and (3)

make disclosures of conflicts of interest and obtain informed consent prior to and

during any further representation of Sleek involving litigation with Jackson (a

continuing obligation).

92.  KSW neither made disclosures to Jackson, nor obtained informed

consent from Jackson regarding its representation of Sleek adverse to him.

93.  GSB and attorneys Beckner, Moon, and Trinchero failed to raise the

issue of a conflict of interest at any point during their representation of Jackson

and failed to take steps to protect Jackson from proceeding in litigation in which

a conflict of interest existed, and for which Jackson did not provide his informed,

written consent to waive the conflict.

**GSB and attorneys Beckner, Moon, and Trinchero fail to identify or
challenge the deficiencies in the submissions by Sleek's attorneys to appear in
the Florida arbitration pursuant to Florida Bar Rule 1-3.11, and thus fail to
object to the unauthorized practice of law by KSW**

94.  Sleek entered into an agreement to retain KSW in connection with the

arbitrations between Sleek and G-Unit Brands and between Sleek and Jackson on

or about July 11, 2011.

95.  On or about April 10, 2012, Dennis K. Egan ("Egan") and Lynn A.

Sheehy ("Sheehy") of KSW each filed a Verified Statement Pursuant to Rule 1-

- 17 -

3.11, Rules Regulating the Florida Bar (the "Verified Statements") with the

Florida Bar in Tallahassee, Florida, which purported to demonstrate compliance

with Florida Bar Rule 1-3.11.

96.  The Verified Statements were in fact defective in that Egan and Sheehy

did not satisfy the eligibility requirements contained in subpart (a) of Florida Bar

Rule 1-3.11.

97.  Accordingly, Egan and Sheehy were not authorized to appear in the

Florida arbitration and engaged in the unlicensed practice of law.

<b>GSB and attorneys Beckner and Hughes<br>
fail to enforce the judgment against Sleek</b>

98.  Jackson prevailed against Sleek in two disputes related to promissory

notes Sleek had signed with Jackson.  Jackson received two favorable arbitration

awards and ultimately reduced those awards to judgments against Sleek; the two

judgments totaled over $700,000.

99.  GSB and attorneys Beckner and Hughes failed to enforce these two

judgments, notwithstanding specific requests to do so from Jackson's authorized

representative.

<b>In defending against Sleek's misappropriation of trade secret claims,<br>
GSB and attorneys Beckner, Moon, and Trinchero fail to retain an expert to<br>
testify as to the technical aspects of Sleek's headphone design to rebut<br>
claims of misappropriation of trade secrets</b>

100.      GSB and attorneys Beckner, Moon, and Trinchero were aware that

Sleek intended to call two experts to testify about "the similarities between" the

Sleek by 50 headphones and the SMS headphone products as of July 2, 2012,

when Sleek identified experts Thomas L Blackburn and Faruk Bursal, Ph.D. ("Dr.

Bursal").

101.    While both Blackburn and Dr. Bursal were deposed, Sleek elected

not to call Blackburn to testify at the Florida arbitration.  The arbitrator relied on

and credited Dr. Bursal's testimony on issues regarding misappropriation of

trade secrets.

102.    GSB and attorneys Beckner, Moon, and Trinchero failed to retain

an expert to testify about the technical and mechanical characteristics of the

internal gimbal mechanism[2] of the Sleek by 50 headphones to rebut Dr. Bursal's

expert testimony regarding misappropriation of trade secrets.

103.    GSB and attorneys Beckner, Moon, and Trinchero further failed to

advise Jackson of the risks associated with not providing technical expert

testimony on liability in connection with Sleek's misappropriation of trade

secrets claim.

104.    The June 5, 2012 Joint Discovery Plan in the Florida arbitration

allowed Jackson 30 days from Sleek's disclosure of its non-rebuttal experts to list

---

[2] A gimbal is a pivoted support that allows the rotation of an object about a single axis.
Headphone products have varied designs related to a gimbal.  For instance, a design
may implement an internal gimbal such as the headphones at issue in the Florida
arbitration, an external gimbal, or perhaps a ball-and-socket arrangement.

any rebuttal experts.

105.     GSB retained Professor Robert Anders ("Anders"), a recognized authority on industrial design, as Jackson's expert witness on issues of trade dress. But Anders' expert report did not address any other design elements of the headphones at issue (besides trade dress).

106.     Dr. Bursal, a mechanical engineer with experience dealing with headphones, testified on behalf of Sleek both about the issue of the technical similarities between Sleek's headphone technology and Jackson's SMS headphones (Synch by 50 (wireless) and Street by 50 (wired)), and also the issue of whether Sleek's technology was known in the marketplace.  "Dr. Bursal particularly considered Sleek's paddle-gimbal mechanism to be 'truly a unique piece.'" (*See* Exhibit A hereto, Final Award of Arbitrator William H. Needle (including Interim Award as exhibit A thereto); Interim Award at 16.)

107.     GSB and attorneys Beckner and Moon failed to call an expert to rebut Dr. Bursal's testimony.

108.     Dr. Bursal testified about the reasons he concluded that the gimbal mechanism in the Sleek by 50 headphone was unique and distinct from the use of gimbals in other headphone designs at the time:

> There are several things that are valuable about this gimbal mechanism.
> First and foremost, because of its action on the foam pads,
> there is a restoring force acting on this gimbal; so rather than having

- 20 -

a freely-swinging earcup, once this is captured in place, we have an earcup that comes to its home position under the action of the foam.

So that gives the earphones a much more solid and robust feel and also prevents this inner earcup from rattling relative to the outer earcup when you shake it.

Also, what I find particularly valuable in this embodiment is the minimalistic elegance of this solution that, by using this dense foam that is so small in form factor and pushed out as far as possible in the earcup, it opens up the entire center of the earcup for the positioning of a printed circuit board. So by doing so, they are able to push the printed circuit board as far as possible to the outside of the earcup, and that then allows the inner earcup, which is the primary acoustic enclosure, to grow into that space. So, therefore, you are maximizing the acoustic volume, and that gives deeper bass sound in the headphones; so that's an additional value to this gimbal mechanism.

(Conf. Arb. Tr. Vol. II, Feb. 19, 2013 at 435:23–436:23.)

109.    In arriving at his opinion, Dr. Bursal failed to disassemble several of the third-party headphones that he examined, because "the feel of the headphone and the absence of any resistance" led Dr. Bursal to "*suspect* that" the headphones did not incorporate a gimbal with foam pads."

110.    Two lay witnesses called by Jackson testified about the mechanical design and offered conflicting testimony to that of Dr. Bursal's suspicions that other headphones did not incorporate a gimbal.

111.    These two witnesses, Brian Nohe, President of SMS Audio, and Beau Reid, a graphic designer who worked on the headphones at issue in the arbitration for both Sleek and SMS, both provided testimony regarding the

similarities between the design of the Sleek by 50 headphones and other

competing headphones that conflicted with Dr. Bursal's testimony and opinion.

112.    Mr. Nohe testified that the internal gimbal was not proprietary

and that he could "'go find . . . 2000 headphones that have the exact same

design."' (Exhibit A, Interim Award at 17 (quoting Nohe Jan. 16, 2012 Dep. Tr. at

79).)

113.    The arbitrator rejected Nohe's testimony as a lay witness, noting

that Nohe did not provide evidence in support of his testimony and that he is

"not a technical guy." (Exhibit A, Interim Award at 17.)

114.    Reid testified that the gimbal design in the Sleek by 50

headphones was "not unique in any way." (Exhibit A, Interim Award at 16–17

(quoting Reid Dep. Tr. at 216).)

115.    The arbitrator declined to credit Reid's testimony, noting that he

"does not have a degree in engineering." (Exhibit A, Interim Award at 16–17.)

116.    With Jackson offering rebuttal testimony only from lay witnesses,

the arbitrator credited Dr. Bursal's testimony based on Dr. Bursal's experience

and the failure of GSB and attorneys Beckner and Moon to provide rebuttal

expert testimony on Jackson's behalf.

117.    Specifically, the Interim Award of the arbitrator at page 17 states:

Based upon his extensive experience with headphones and the fact
that Jackson presented no credible evidence that the Sleek by 50

paddle-gimbal design existed in any third-party headphone at the
time of the development of the Sleek by 50 headphone, the
Arbitrator accepts as credible Dr. Bursal's conclusion that those
third-party headphones did not have a gimbal/pad mechanism
similar to the Sleek-designed headphone.

118.    GSB's and attorneys Beckner's and Moon's failure to call a

rebuttal expert on the issue of liability for trade secret misappropriation on the

technical design elements of the Sleek by 50 headphones was harmful because it

resulted in the arbitrator crediting Dr. Bursal's testimony on at least three salient

points: (1) that the Sleek by 50 design was unique; (2) that there was not

sufficient lead time for the independent development of the SMS headphones;

and (3) the unlikelihood that Sleek and SMS would separately arrive at the same

design independently. (Exhibit A, Interim Award at 15–20, 25–27.)

119.    The Interim Award of the arbitrator at page 27 reinforces the

impact of GSB's failure: "Jackson did not offer rebuttal expert testimony on

whether Sleek had any protectable trade secrets in its Sleek by 50 headphone[s]

and whether or not they were misappropriated or on the length of time for the

development cycle of headphones."

120.    Upon information and belief, GSB attorneys Beckner, Moon, and

Trinchero failed to use the testimony of a designer of the Synch by 50

headphones that he modeled that design after certain headphones that were

already on the market, including headphones by, *inter alia,* Beats, Monster and

Sol Republic—*prima facie* evidence that Sleek's misappropriation of trade secret

claims were meritless—either leading up to the arbitration, or as part of the

arbitration hearing.

121.    In addition to failing to highlight this evidence, GSB and attorneys

Beckner, Moon, and Trinchero failed to even open up the Synch by 50 or Street

by 50 headphones, or engage someone to do so.  Such an exercise could have

exposed a number of salient and persuasive defenses to Sleek's misappropriation

of trade secret claim.

### GSB and its attorneys Beckner, Moon, and Trinchero fail to consider expanding Professor Anders' report to issues beyond trade dress and fail to engage a separate expert to opine on the gimbal design

122.    GSB and its attorneys Beckner, Moon, and Trinchero retained only

one expert (Anders) and only in defense of Sleek's claims related to trade dress.

123.    Through his expert report, Anders confirmed that the Sleek by 50

and SMS' Synch by 50 headphones are different in appearance, and that the

Synch by 50 headphones do not infringe on the Sleek by 50 headphone's trade

dress.

124.    Anders' report was effective; so effective, in fact, that Sleek

declined to depose Anders and did not call a rebuttal expert.

125.    Sleek actually withdrew its Lanham Act and unfair competition claims, which were based on the idea that the trade dress of the Sleek headphones was copied or infringed by the SMS headphones.

126.    The Anders report was limited to trade dress, however, and did not address the technical issues covered in Dr. Bursal's report.

127.    Despite the progress gained through retention of Anders, GSB did not expand the scope of Anders' expert opinion or engage another expert to opine on the gimbal technology.

128.    GSB and attorneys Beckner, Moon, and Trinchero failed to advise Jackson of the risks associated with relying solely on cross-examination and lay-witness testimony to defend against liability on Sleek's misappropriation of trade secret claims.

**GSB and attorneys Beckner, Moon, and Trinchero fail to identify similar products in their answers to interrogatories, resulting in limited cross-examination of Dr. Bursal and the preclusion of important evidence about headphones branded by Dr. Dre, Ludacris and AKG**

129.    In addition to failing to retain and call a technical expert to offer rebuttal testimony on misappropriation of trade secrets, GSB failed to adequately prepare for and preserve issues for cross-examination of Dr. Bursal.

130.    First, GSB and attorneys Beckner, Moon, and Trinchero failed to identify similar, competing headphones in responding to interrogatories that Sleek served on this issue.

131.    Interrogatory number 14 in Sleek Audio's First Set of Discovery to

Curtis J. Jackson, III asked:

> With respect to your responses to Sleek's Statement of Claim, you
> stated that other than its trade dress, Sleek by 50 headphones are
> "no different than a dozen over-the-ear wireless Headphones
> available on the market then or today." With regard to this
> allegation:
>
>> a) Identify all wireless headphones that share the same
>> technical characteristics of the "Sleek by 50" headphones;
>>
>> b) Identify all wireless headphones that share the same
>> mechanical characteristics of the "Sleek by 50" headphones;
>>
>> c) Identify all wireless headphones that share the same design
>> characteristics of the "Sleek by 50" headphones

132.    In advance of the Florida arbitration, the arbitrator signed an

order capturing agreements among counsel regarding discovery matters

discussed on or about July 6, 2012.  As part of this order (that captured counsels'

agreement) and with respect to Sleek's interrogatory number 14 specifically, the

arbitrator ordered that "Jackson shall answer with respect to all headphones of

which he is aware and upon which he will rely on in the arbitration, without

conducting independent research."

133.    Beckner of GSB prepared and served answers to interrogatories,

including interrogatory number 14 on behalf of Jackson, which Beckner signed

on or about July 12, 2012, identifying eight headphones that he claimed shared

common characteristics with the Sleek by 50 headphones:

c.   The following have design characteristics in common with the Sleek by 50 headphones:
- Koss Striva Pro
- Klipsch M40 (wired)
- Beats Studio (wired)
- Beats Wireless Over the Ear
- Sennheiser RS 110
- Logitech H600
- Wireless Rhythm by Miikey
- Wireless Bluetooth Headphone G08-002 by Syllable (comes in a variety of colors)

134.    This Answer 14(c) fails to identify any shared design characteristics, leaving both the specific similarities and the extent of any such similarities ambiguous.  This answer further fails to include any reference to headphones that incorporate an internal gimbal similar to the Sleek by 50 headphones.

135.    GSB reaffirmed the answer to interrogatory number 14 on or about January 24, 2013, around three-and-a-half weeks prior to the Florida arbitration hearing, and again failed to identify the shared design characteristics between the Sleek by 50 and other headphones on the market.

136.    Sleek's technical expert, Dr. Bursal, testified at the Florida arbitration about the gimbal mechanism and offered his opinion that the gimbal mechanism was unique to the Sleek by 50 headphones. (*See* Conf. Arb. Tr. Vol. II, Feb. 19, 2013 at 434:20–24 ("This gimbal mechanism – this specific embodiment of this gimbal mechanism – is unique, in my opinion, because I have never seen it

before, nor—not in my years at Bose and not in the research that I did in

connection with this case.").)

137.     At the Florida arbitration, when asked about the eight

headphones identified in Jackson's answer to interrogatory number 14, Dr.

Bursal testified that he did not find anything in the eight identified headphones

that was similar to the internal gimbal in the Sleek by 50 headphones. (Conf. Arb.

Tr. Vol. II, Feb. 19, 2013 at 435:1–17.)

138.     During cross-examination of Dr. Bursal, the arbitrator limited the

scope of cross-examination, which precluded Jackson from offering into evidence

certain competing headphones, including headphones branded by Dr. Dre —

specifically, the Beats™ Pro by Dr. Dre, the Beats™ Solo by Dr. Dre, and AKG

142hd headphones (collectively, with the Soul by Ludacris, the "competing

headphones").  The limited scope of cross-examination also precluded Jackson

from adequately cross-examining Dr. Bursal on the similarities between these

competing headphones and the Sleek by 50 headphones (with the exception of

limited cross-examination regarding the Soul by Ludacris headphones).

139.     The arbitrator based his decision to limit the cross-examination on

the competing headphones upon GSB's failure to identify those specific

competing headphones in the answer to interrogatory number 14 (answered on

or about July 12, 2012), and further failure to identify the competing headphones

on January 24, 2013 (when re-affirming interrogatory responses), after the

arbitrator ordered that Jackson identify "all headphones of which he is aware

and upon which he will rely on in the arbitration."

140.     Between July 12, 2012 and January 24, 2013, Sleek's expert, Dr.

Bursal, filed his Final Expert Report on September 17, 2012.  Dr. Bursal's Final

Expert Report included his conclusion that "[t]he mechanical design of the Sync

by 50 headphones is exactly or virtually the same as that of the Sleek by 50

headphones in multiple respects" and specifically identified among the

similarities the gimbal mechanism as well as the specific features Sleek argued

were similar:

> F.   The tilting of the inner earcups with respect to the outer earcups
> is accomplished in both headphones by way of the same—and
> unique—gimbal mechanism. The inner earcup is outfitted by a
> gimbal piece that has two paddles at the end of short pivot axes. The
> pivot axes fit into grooves in the cylindrical extension described
> above. The paddles then come to rest on two foam pads that are
> attached to the outer earcup. A retainer piece screws onto the outer
> earcup from over the pivot axes of the gimbal piece, so as to
> complete the upper half of the bearing in which the pivot axes can
> rotate. The rest of the inner earcup parts are screwed onto the
> gimbal piece to complete the assembly. Figure 8 shows the earcup
> assembly of the Sync by 50 in a partially disassembled state. The
> paddles resting on the foam pads constitute a unique detail not
> found in other headphones cited by Jackson, and have the
> advantage of returning the pivoting earcup to its natural, straight
> orientation when not in use. This benefit is illustrated in Figure 9.
> The foam helps damp the rotation to impart a higher-quality feel,
> and prevents rattling of the pivot interface . . .

G.  Figures 12 and 13 show two prototypes of the gimbal part
produced by Sleek during development. Figure 14 shows the
corresponding piece in the Sync by 50. Each part has 4 screw holes
on a 3 inch bolt circle. The retaining covers attach over the gimbal
part to build up the inner earcup are shown in Figures 15 and 16 for
the Sleek by 50 and Sync by 50, respectively.

141.    Despite having received notice of Dr. Bursal's testimony on these

points, along with the qualifier in paragraph F "the foam pads constitute a *unique

detail not found in other headphones cited by Jackson*" [emphasis added], GSB failed,

on January 24, 2013, to supplement its list of eight headphones in Jackson's

answer to Sleek's interrogatory number 14 with the additional four "competing

headphones." Nor did GSB ever seek leave to amend Jackson's answer to Sleek's

interrogatory number 14 to add the additional four "competing headphones."

142.    GSB and Beckner did in fact identify three of the four headphones

on Jackson's exhibit list[3] but failed to include reference to them on January 24,

2013 in the re-affirmance of Jackson's answer to interrogatory number 14.

143.    Beckner identified all four competing headphones for the first

time in Jackson's Prehearing Memorandum, stating "For example, similar

internal gimbal technology, which allows movement of the earcups of

headphones, is used in competing products, such as the Beats™ Pro by Dr. Dre,

---

[3] On the exhibit list GSB included Beats by Dr. Dre Pro, Beats by Dr. Dre Solo, and Soul
by Ludacris, but not the AKG 142hd.

the Beats™ Solo by Dr. Dre, the Soul by Ludacris and the AKG 142d and 242d headphones."

144.    GSB raised this limitation (its inability to cross-examine Dr. Bursal about the competing headphones) as one of the asserted bases to vacate the arbitration award in a Motion To Vacate Arbitration Award filed in Florida Circuit Court following the Florida arbitration, arguing that the limitation of cross-examination was damaging to Jackson.  The reviewing Florida court affirmed the award and specifically the limitation regarding the competing headphones on the same basis as the arbitrator —"failure to specifically identify any of these headphones as required during pre-hearing discovery."

### GSB and attorneys Beckner and Moon fail to call a damages expert to testify on apportionment of damages

145.    Sleek called Rodney Crawford ("Crawford"), a CPA, to provide expert testimony on the issue of damages. Crawford submitted two reports—an initial report and a supplemental report.

146.    As with the liability issue, GSB and attorneys Beckner and Moon failed to retain an expert to provide rebuttal testimony on the issue of damages.

147.    GSB and attorneys Beckner, Moon, and Trinchero failed to advise Jackson of the risks associated with not providing expert testimony on damages.

148.    As with Dr. Bursal, the arbitrator credited Crawford's testimony and expert opinion on damages, pointing out Jackson's failure to call an

economic expert to testify as to damages in support of his position (Exhibit A,

Interim Award at 48-49).

149.     Not only did GSB's and attorneys Beckner's and Moon's failure to

present rebuttal expert testimony on damages result in the arbitrator's

unequivocal crediting of Sleek's expert, but it also thwarted Jackson's argument

on mitigation of damages—including any argument regarding the

apportionment of damages between the value of the alleged trade secrets and the

value of Jackson's brand.

150.     Specifically, the arbitrator noted:

> Crawford applied the royalty to sales of the entire product (Tr. 1074–75)
> which Jackson objects to, arguing that Sleek failed to present any evidence
> of the amount of profits earned by SMS that are attributable to Sleek's
> claimed trade secrets. Moreover, Jackson claims that Sleek's damage
> calculation completely overlooks the significant marketing power of the 50
> Cent brand, which is entirely attributable to Jackson. Even if Sleek is
> entitled to trade secret protection for some of the Sleek by 50 design
> features, he contends that it has failed to present sufficient evidence as to
> the value of those features—or the share of SMS profits to be disgorged
> that is attributable to them and not other aspects of the SMS headphones,
> most notably the "50 Cent" brand. Since Jackson is arguing that there
> should be an apportionment of damages that is only attributable to Sleek's
> trade secrets, that burden fell to Jackson who did not present any evidence
> to that end.

(Exhibit A, Interim Award at 48.)

151.    The enhanced market value of a headphone that bears the "50 Cent" brand endorsement (attributable solely to the brand endorsement) is undoubtedly significant.

152.    Jackson's brand carried with it the lion's share of the marketing appeal for any headphone product that Sleek tried to develop.

153.    Indeed, the enhanced brand value associated with successful artists spurred the entire trend for rappers and hip hop artists to develop and market their own headphone products.

154.    Yet because GSB and attorneys Beckner and Moon provided no rebuttal testimony on behalf of Jackson, the arbitrator credited Crawford's blanket approach to attribute the entire value of Sleek's headphones to Sleek's purported trade secrets.

### GSB and attorneys Beckner and Moon fail to call a damages expert to rebut Crawford's testimony on a reasonable royalty calculation

155.    GSB's and attorneys Beckner's and Moon's failure to call an expert to provide testimony rebutting Crawford's opinions had consequences beyond relinquishing Jackson's powerful apportionment of damages argument.

156.    Crawford selected an improper comparable, the brand license between Sleek and G-Unit Brands, to form the basis of his opinion as to the proper royalty rate to apply to his damages calculation.  Crawford also selected a

three-year base-of-sales of SMS on which to apply that rate.  Both of these

variable selections were improper.

157.     Without rebuttal expert testimony on the issue of a reasonable

royalty rate applied in a trade secret action, Crawford's selection of an

inappropriate royalty rate, and an inappropriate base upon which to apply it,

went unchallenged.

158.     The arbitrator pointed out this failure as well, stating:

"Crawford's lost profits and royalty calculations are both reliable and credible,

particularly where no contrary expert testimony was provided by Jackson."

(Exhibit A, Interim Award at 49.)

### GSB fails to challenge the reasonableness of the amount of attorneys' fees sought by Sleek and the Individual Respondents

159.     Following the Interim Award, the arbitrator retained jurisdiction

in the Florida arbitration for the parties to submit their written positions on the

amount of reasonable attorneys' fees and costs to be awarded to Sleek and the

Individual Respondents[4] as the prevailing parties.

160.     Sleek and the Individual Respondents submitted their respective

papers and evidence reflecting the attorneys' fees and costs associated with the

dispute, including details on attorneys' fees by date, a description of the services

rendered, the hourly rate by timekeeper, and disbursements.

---

[4] The Individual Respondents were Mark Krywko, Jason Krywko, Michael Krywko and Gregory Wysocki.

161.    On Jackson's behalf, GSB challenged the fees on four grounds, none of which directly challenged the reasonableness of the amount of attorneys' fees sought.

162.    First, GSB claimed that the determination of the amount of reasonable attorneys' fees was within the exclusive jurisdiction of the Florida courts (and thus not within the arbitrator's jurisdiction).

163.    Second, GSB argued that Sleek did not demonstrate that a contingency multiplier was appropriate for the matter.

164.    Third, GSB challenged the allocation of fees and expenses between the two arbitrations, arguing for a 50/50 split, rather than an allocation of 66% to the Florida arbitration and 33% to the G-Unit Brands, Inc. v. Sleek Audio, LLC arbitration then-pending in New York.

165.    Fourth, GSB sought exclusion of certain categories of Sleek's fees and expenses, which included objections to heavily-redacted entries, the mediation, attorneys' travel time and expenses associated with out-of-town counsel, certain Westlaw entries that were redacted, document storage fees for Sleek's e-discovery vendor to maintain documents after the post-hearing briefs, fees for a patent attorney, and fees for Sleek's expert Thomas Blackburn who was deposed but not called during the Florida arbitration.

166.    The arbitrator rejected each of GSB's challenges, concluding that the fees and costs were recoverable, and applying a 2.0 contingency multiplier to Sleek's attorneys' fees.

167.    The arbitrator awarded to Sleek and the Individual Respondents a total of $3,950,300.58 in attorneys' fees and $538,030.59 in costs, for a combined total of $4,488,331.17 for enhanced attorneys' fees and costs.

168.    GSB failed to challenge the reasonableness of the amount of time spent on tasks, the hourly rate of a timekeeper who performed certain tasks including whether tasks could have been performed by a paralegal or an attorney with less experience and a lower hourly rate, as well as whether certain tasks were redundant or unnecessary to representation in the case.

169.    Because GSB failed to object to the reasonableness of attorneys' fees sought, Jackson missed myriad opportunities to reduce the amount of awarded attorneys' fees and became liable for twice the full amount of fees and costs sought by Sleek and the Individual Respondents.

**GSB fails to challenge the award of attorneys' fees sought by Sleek on the basis that Sleek's attorneys Egan and Sheehy engaged in the unauthorized practice of law by failing to satisfy the requirements of Florida Bar Rule 1-3.11**

170.    Sleek's attorneys at KSW, Egan and Sheehy, engaged in the unauthorized practice of law by appearing in the Florida arbitration without satisfying the requirements of Florida Bar Rule 1-3.11.

171.     On or about April 10, 2012, Sleek's attorneys Egan and Sheehy,
filed Verified Statements for leave to appear in the Florida arbitration with The
Florida Bar which falsely stated that Egan and Sheehy were in compliance with
Florida Bar Rule 1-3.11 subpart (a).

172.     GSB, through Beckner, was served with Egan's and Sheehy's
Verified Statements for leave to appear in the Florida arbitration on or around
April 10, 2012.

173.     In opposition to Sleek's application for attorneys' fees (which
KSW filed with the arbitrator after the arbitrator issued his Interim Award), GSB
failed to assert that KSW was entitled to no legal fees because Egan and Sheey
were engaged in the unlicensed practice of law in Florida.

**The $17 million judgment following the Florida arbitration**

174.     On or about July 15, 2013, the arbitrator issued a "Final
Arbitration Award" (the "Award").

175.     The Award granted Sleek, the company that never even sold the
Sleek by 50 headphones, damages of $11,693,247, with enhanced attorneys' fees
and costs of $4,488,331.17.

176.     Ultimately, Sleek reduced the Award to a final judgment entered
by a Florida state court in the amount of $17,247,426.11 with post-judgment
interest accruing at 4.75% from October 16, 2014.

### GSB failed to raise the lack of evidence to support application of a multiplier as an alternative ground to vacate the Final Arbitration Award

177.     Absent an enforceable, written contingency-fee agreement, an attorney can recover a fee based only upon a *quantum meruit* theory of recovery.

178.     Sleek never entered into evidence any written contingency fee agreement between Sleek and its non-Florida counsel.

179.     The only evidence that formed the basis of the arbitrator's decision to apply a 2.0 multiplier was the affidavit of Sleek's Detroit-based counsel, Dennis Egan, and the affidavit of Mark Krywko. (Exhibit A, Final Arbitration Award at 6-7.)

180.     In response to Sleek's submission on attorneys' fees, GSB challenged Sleek's evidence in support of applying a multiplier as inadequate. In the Final Arbitration Award, the arbitrator admitted that "[i]t is true that details are lacking in the Krywko affidavit," but he ultimately rejected GSB's objections to the evidentiary basis for the multiplier, and applied the 2.0 multiplier. (Exhibit A, Final Arbitration Award at 6–7.)

181.     There was no evidentiary hearing conducted on the factors for an award of fees on the theory of *quantum meruit.*

182.     Thus, the record is devoid of any substantial, competent evidence to support the arbitrator's application of a 2.0 or "two-times" multiplier to Sleek's actual attorney's fees.

183.     GSB failed to raise this issue as an alternative ground to vacate the Final Arbitration Award, and further failed to even reference it as one of the ways in which the arbitrator exceeded his authority in determining the amount of attorneys' fees in GSB's Motion To Vacate Arbitration Award (filed in Florida Circuit Court following the Florida arbitration).

**GSB and attorney Beckner failed to raise the unauthorized practice of law by Sleek's attorneys at KSW—Egan and Sheehy—as an alternative ground to vacate the Final Arbitration Award**

184.     Sleek's attorneys at KSW, Egan and Sheehy, engaged in the unlicensed practice of law by appearing in the Florida arbitration without satisfying the requirements of Florida Bar Rule 1-3.11.

185.     In its Motion to Vacate Arbitration Award filed in the Florida Circuit Court, GSB, through Beckner, failed to assert this issue (the unlicensed practice of law) as an alternative ground to vacate the arbitration award.

**GSB fails to enforce the promissory note judgments against Sleek**

186.     By May 2013, GSB still had failed to enforce the over $700,000 in total judgments owed to Jackson by Sleek under the promissory notes, despite Beckner's assurance in December 2012 that Jackson would have the second promissory note arbitration award reduced to judgment by early 2013, at which point GSB could proceed with enforcing both judgments and could seek Jackson's legal fees.

## GSB seeks removal of Jackson's claims
## without an objectively reasonable basis

187.    On or about July 26, 2013, GSB on behalf of Jackson filed a

Complaint for an Order Vacating Arbitration Award in the United States District

Court for the Southern District of Florida.

188.    On or about July 29, 2013, Sleek and the Individual Respondents

("Sleek Defendants") filed a Petition to Confirm Arbitration Award in the Circuit

Court for the Fifteenth Judicial Circuit for Palm Beach County, Florida.

189.    Jackson removed Sleek's Petition to federal court, citing federal

question as the basis for jurisdiction under 28 U.S.C. § 1331; the two cases were

consolidated.

190.    The Sleek Defendants moved to dismiss Jackson's federal court

action to vacate the Arbitration Award and also moved to remand the Petition to

Confirm Arbitration Award to state court, asserting that the federal court lacked

subject-matter jurisdiction.

191.    There was no dispute that there is no diversity of citizenship

between Jackson and the Sleek Defendants.

192.    There was also no dispute that the Federal Arbitration Act

("FAA") cannot serve as the basis for federal question jurisdiction.

193.    GSB posited that removal was nonetheless proper by asserting

that the arbitrator relied on the FAA's preemption of Florida law as the basis for

his authority to retain jurisdiction for purposes of awarding attorneys' fees to Sleek in contravention of the Florida statutes.  GSB contended that federal preemption formed the basis of federal question jurisdiction to allow for removal.

194.    The federal district court rejected GSB's arguments, and held that, even assuming the arbitrator relied on preemption, the federal court cannot base subject-matter jurisdiction solely on preemption of state law by the FAA.

195.    Indeed, only complete preemption may convert state claims into federal statutory claims and fulfill federal question jurisdiction, and the FAA does not completely preempt state law. The district court's order cited solid authority on these points.

196.    GSB failed to exercise an ordinary level of skill in researching its alleged basis for federal question jurisdiction, resulting in a removal motion that it should not have filed, or should have withdrawn.

197.    Because it lacked subject-matter jurisdiction, the district court filed an order on March 17, 2014 granting the Sleek Defendants' Motion to Dismiss, dismissed without prejudice Jackson's Complaint for an Order Vacating Arbitration Award, granted the Sleek Defendants' Motion to Remand the case (*Sleek Audio, LLC v. Curtis J. Jackson, III*, Case No. 13-cv-80881) back to the

Fifteenth Judicial Circuit in and for Palm Beach County, Florida, and denied all other pending motions before it as moot.

198.    Because GSB failed to identify that its removal motion lacked a reasonable basis for federal subject-matter jurisdiction, Jackson was compelled to incur unnecessary legal fees paid to GSB.

**Jackson incurred additional legal fees and expenses
as a result of the appeal in Florida state court and other litigation
necessitated by GSB's failures and lack of diligence**

199.    Jackson lost confidence in GSB and retained substitute counsel to represent him in appealing the Order Denying Motion To Vacate Final Arbitration Award and other, related litigation.

200.    Jackson incurred significant, additional legal fees and expenses associated with this appeal and other litigation, all of which was necessitated by GSB's failures and lack of diligence.

## II.    FIRST CLAIM FOR RELIEF

**Garvey Schubert Barer and Attorneys Hughes, Beckner, Moon, and Trinchero
Committed Legal Malpractice in Their Representation of Curtis J. Jackson, III**

201.    Jackson re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 72 and 81 through 200.

202.    In or around February 2010, GSB entered into a general engagement agreement with Jackson which established Jackson's attorney-client relationship with GSB.

203.	Under that engagement agreement, GSB represented Jackson as his attorneys for purposes of general legal advice, as well as representation on specific matters.

204.	Hughes, as an attorney at GSB, represented Jackson as part of Jackson's attorney-client relationship with GSB.

205.	Beckner, as an attorney at GSB at the time, represented Jackson as part of Jackson's attorney-client relationship with GSB.

206.	Moon, as an attorney at GSB at the time, represented Jackson as part of Jackson's attorney-client relationship with GSB.

207.	Trinchero, as an attorney at GSB, represented Jackson as part of Jackson's attorney-client relationship with GSB.

208.	As part of this engagement, GSB and attorneys Hughes, Beckner, Moon, and Trinchero, in accordance with their professional obligations, were responsible to competently represent Jackson and render legal advice pursuant to that representation and, at a minimum, to exercise the requisite knowledge and skill necessary to confront the circumstances of the case, and to use such skill, prudence, and diligence as attorneys of ordinary skill and capacity commonly possess and exercise in the performance of the tasks they undertake, and to at all times handle Jackson's affairs with the utmost degree of honesty, forthrightness, loyalty and fidelity, including but not limited to identifying

certain business and legal issues related to Jackson's transactions with Sleek or

other entities and discussing those with Jackson; and providing all information

obtained in their representation to Jackson to help inform strategic decisions.

209.     GSB represented Jackson in connection with his transactions with

Sleek and in his litigation with Sleek and the Individual Respondents, including

the Florida arbitration.

210.     By virtue of GSB's attorney-client relationship with Jackson, GSB

and attorneys Hughes, Beckner, Moon, and Trinchero owed a duty to Jackson to

use such skill, prudence and diligence as other members of the profession

commonly possess and exercise.

211.     By virtue of the attorney-client relationship, GSB and attorneys

Hughes, Beckner, Moon and Trinchero owed the following duties to Jackson:

    a.  The duty to competently represent Jackson in the transactions

        and dealings with Sleek, including all appropriate due

        diligence associated with the same;

    b.  The duty to warn Jackson of the risks inherent in entering into

        business with and investing in Sleek in light of the due

        diligence documentation;

    c.  The duty to competently represent Jackson in litigation with

        Sleek and the Individual Respondents, including defending

Jackson against Sleek's claims of misappropriation of trade

secrets in the Florida arbitration;

d. The duty to reasonably and promptly communicate, consult,

and advise Jackson concerning risks associated with certain

strategic decisions, such as declining to retain and call experts

to rebut the testimony of Sleek experts Dr. Bursal on liability

and Crawford on damages;

e. The duty to zealously represent Jackson and to protect his

interests, including enforcement of the over $700,000 in

judgments against Sleek from the defaulted promissory notes;

f. The duty to disclose material information bearing upon the

transactions with Sleek and Jackson's defense against the

misappropriation of trade secret claims that affected Jackson's

interests;

g. The duty to exercise reasonable care in defending Jackson

against misappropriation of trade secret claims that affected

Jackson's interests;

h. The duty to disclose, inform, and advise Jackson of the risks

associated with failing to retain and call rebuttal experts on

the issue of damages associated with Sleek's

misappropriation of trade secret claims, given the fact that

there was no jury and therefore no risk that the calling of a

rebuttal expert on damages would be viewed by the finder of

fact as a concession on liability;

i.   The duty to disclose material information bearing upon the

attorneys' fees awarded to Sleek, including Jackson's

arguments against that award;

j.   The duty to exercise reasonable care in challenging the

amount of attorneys' fees sought by Sleek and the Individual

Respondents;

k.   The duty to exercise reasonable care in maintaining

arguments related to the arbitrator's improper application of

a multiplier to enhance attorneys' fees in Jackson's Motion To

Vacate Arbitration Award; and

l.   The duty to adequately research federal question jurisdiction

as part of their attempt to remove Jackson's Florida state

court case to federal court without an objectively reasonable

basis for subject-matter jurisdiction.

212.    In its representation of Jackson in the transactions with Sleek, and

later, in litigation with Sleek and the Individual Respondents, GSB and attorneys

Hughes, Beckner, Moon, and Trinchero failed to employ the requisite knowledge and skill necessary to confront the circumstances of the case, and failed to use such skill, prudence and diligence as attorneys of ordinary skill and capacity commonly possess and exercise in the performance of the tasks they undertake, and failed to at all times handle Jackson's affairs with the utmost degree of honesty, forthrightness, loyalty and fidelity on matters within the scope of their attorney-client relationship with Jackson, and neglected to fulfill their reasonable duties as attorneys as well as their fiduciary duties of care and loyalty to Jackson in myriad ways, including by, *inter alia*:

   a.  Failing to properly conduct due diligence of Sleek prior to Jackson entering into business with or investing in Sleek;

   b.  Failing to adequately warn Jackson of the risks inherent in entering into business with and investing in Sleek in light of the due diligence documentation;

   c.  Failing to exercise reasonable care in advising Jackson that the headphones SMS developed to market and sell under his brand would not implicate any intellectual property right or misappropriate any trade secrets;

   d.  Failing to identify a conflict of interest with KSW's representation of Sleek in litigation against Jackson;

e.   Failing to seek relief following KSW's representation of Sleek
    without Jackson's informed, written consent to waive the conflict
    of interest;

f.   Failing to enforce the judgments obtained against Sleek for the
    defaulted promissory notes, judgments totaling over $700,000;

g.   Failing to exercise reasonable care in representing Jackson in the
    Florida arbitration;

h.   Failing to reasonably and promptly communicate, consult, and
    advise Jackson concerning the transaction with Sleek and, later,
    concerning the risks of failing to retain experts on both damages
    and technical aspects of the headphones;

i.   Failing to disclose material information bearing upon the
    likelihood of success in defending against Sleek's
    misappropriation of trade secret claims without rebuttal expert
    testimony;

j.   Failing to expand Anders' expert opinion beyond trade dress and
    failing to hire another expert to opine on the internal gimbal
    mechanism in the headphones at issue;

k.   Failing to identify specific competing headphones in Jackson's
    answer to Sleek's interrogatory number 14, which led to limited

cross-examination of Dr. Bursal and precluded Jackson from

offering relevant evidence in defense of the misappropriation of

trade secret claims;

l.  Failing to adequately disclose, inform, and advise Jackson of the

risks associated with failing to retain and call rebuttal experts on

the issue of damages associated with Sleek's misappropriation of

trade secret claims, given the fact that there was no jury and

therefore no risk that a rebuttal expert on damages would be seen

as a concession on liability;

m. Failing to call a rebuttal damages expert to testify on

apportionment of damages to attribute the proper value to the

alleged trade secret (as opposed to Jackson's personal brand);

n.  Failing to call a rebuttal damages expert to testify about the

reasonable royalty calculation and rebut Crawford's

inappropriate calculation of actual sales based on an unrelated

comparable;

o.  Failing to enforce the judgments against Sleek from the defaulted

promissory notes;

p.  Failing to raise as an argument against the award of attorneys'

fees to Sleek the issue that KSW's attorneys, Egan and Sheehy,

engaged in the unauthorized practice of law by appearing on

behalf of Sleek during the Florida arbitration without first

satisfying the requirements of Florida Bar Rule 1-3.11;

q.  Failing to object to the reasonableness of the detailed specific

entries in the application for attorneys' fees sought by Sleek and

the Individual Respondents;

r.  Failing to exercise reasonable care in maintaining all arguments

in support of Jackson's Motion To Vacate Arbitration Award,

including but not limited to those related to the arbitrator's

improper application of a multiplier to enhance attorneys' fees

and the unauthorized practice of law by Sleek's attorneys at

KSW—Egan and Sheehy; and

s.  Failing to adequately research federal question jurisdiction as

part of their attempt to remove the Florida state case to federal

court without an objectively reasonable basis for subject-matter

jurisdiction.

213.  As a result of the above failures and breaches of fiduciary duty,

GSB and attorneys Hughes, Beckner, Moon, and Trinchero acted negligently and

committed malpractice in their representation of Jackson.

214.     But for the negligence and malpractice of GSB and attorneys
Hughes, Beckner, Moon, and Trinchero, Jackson would have obtained a more
favorable result in the Florida arbitration than the result actually obtained; either
Jackson would not have been held liable for misappropriation of trade secrets, or,
alternatively, Jackson would have provided expert testimony on apportionment
of damages to account for the value of his brand, as well as challenging through
rebuttal expert testimony Crawford's unreasonable rate of royalties associated
with sales of the SMS headphones, which would have reduced the amount of the
judgment. But for GSB's failure to object to the reasonableness of the amount of
attorneys' fees sought by Sleek and the Individual Respondents, and failure to
raise KSW's unauthorized practice of law (which, under Florida law, should
have prohibited the recovery of attorneys' fees), Jackson would have obtained a
reduction in the amount of attorneys' fees included in judgments against him.

215.     Moreover, but for the negligence and malpractice of GSB and
attorneys Hughes, Beckner, Moon, and Trinchero, Jackson would have been able
to vacate the Final Arbitration Award and avoid further legal fees and expenses
associated with appeal of the Order Denying Motion To Vacate Arbitration
Award, and other, related litigation.

216.     The legal malpractice and breaches of fiduciary duties by GSB and
attorneys Hughes, Beckner, Moon, and Trinchero proximately caused damage to

Jackson including the entry of the final judgment in the Florida arbitration

against him and other monetary damages related to GSB's and attorneys

Hughes', Beckner's, Moon's, and Trinchero's failure to enforce the promissory

note judgments against Sleek, as well as other reasonably foreseeable damages.

217.     The conduct of GSB and attorneys Hughes, Beckner, Moon, and

Trinchero rose to the level of gross negligence because this conduct was so

reckless and wanting in care that it constituted a conscious disregard or

indifference to the rights of Jackson, who was exposed to such conduct.

218.     If Jackson would have had counsel that used the skill, prudence

and diligence commonly possessed and exercised in the profession, Jackson,

through other counsel, would have, *inter alia*, provided rebuttal expert testimony

on the issues of liability and damages to rebut Sleek's experts Dr. Bursal and

Crawford.

219.     Specifically, if Jackson, through other counsel, would have called

a technical expert to provide rebuttal testimony on the internal gimbal

mechanism of the Sleek by 50 and SMS headphones, the arbitrator would not

have credited Dr. Bursal's testimony.

220.     If Jackson would have had competent counsel, Jackson would not

have been precluded from asking Dr. Bursal about the similarities in the

competing headphones branded by Dr. Dre —specifically including the Beats™

Pro by Dr. Dre, the Beats™ Solo by Dr. Dre – as well as the AKG 142hd, and Soul
by Ludacris (including detailed questions about the internal mechanics of all of
these competing headphones).

221.    Furthermore, Jackson, through other counsel, would have raised
the issue of KSW attorneys' failure to satisfy the requirements of Florida Bar Rule
1-3.11 and consequent engagement in the unauthorized practice of law as a basis
to avoid both the award of attorneys' fees to Sleek and to vacate the Final
Arbitration Award itself.

222.    By reason of GSB's and attorneys Hughes', Beckner's, Moon's,
and Trinchero's legal malpractice, Jackson sustained actual damages in an
amount to be determined at trial, but inclusive of the final judgment entered
following the Florida arbitration of $17,247,426.11 with post-judgment interest
accruing at 4.75% from October 16, 2014, and the $700,000 judgments on the
promissory notes, with interest, as well as other reasonably foreseeable damages.

223.    By reason of GSB's and attorneys Hughes', Beckner's, Moon's,
and Trinchero's legal malpractice, GSB and its current/former attorneys are not
entitled to retain, and should be required to disgorge, with interest, the millions
of dollars in fees Jackson paid in connection with their representation of him in
transactions with, and in litigation against Sleek and the Individual Respondents.

- 53 -

224.     By reason of GSB's and attorneys Hughes', Beckner's, Moon's, and Trinchero's legal malpractice, GSB and its current/former attorneys should be liable for the additional legal fees and expenses that Jackson incurred in his appeal of the Order Denying Motion To Vacate Arbitration Award and other, related litigation, which was necessitated by GSB's and attorneys Hughes', Beckner's, Moon's, and Trinchero's failures and lack of diligence.

### SECOND CLAIM FOR RELIEF

**Garvey Schubert Barer and Attorneys Hughes, Beckner, Moon, and Trinchero Breached Their Fiduciary Duties to Curtis J. Jackson, III**

225.     Jackson re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 72, and 81 through 224.

226.     GSB and attorneys Hughes, Beckner, Moon, and Trinchero owed fiduciary duties of loyalty and due care to Jackson because GSB and attorneys Hughes, Beckner, Moon, and Trinchero were under a duty to act for, and to give advice for the benefit of, Jackson on matters within the scope of their attorney-client relationship with Jackson.

227.     GSB and attorneys Hughes, Beckner, Moon, and Trinchero breached their fiduciary duties of loyalty and due care to Jackson.

228.     In their failure to fulfill their duties of loyalty and due care owed to Jackson, GSB and attorneys Hughes, Beckner, Moon, and Trinchero failed to employ the requisite knowledge and skill necessary to confront the

circumstances of the case, and to handle Jackson's affairs with the utmost degree of honesty, forthrightness, loyalty and fidelity on matters within the scope of their attorney-client relationship with Jackson.

229.    As a result of the foregoing breaches of fiduciary duties, Jackson sustained actual damages in an amount to be determined at trial, but inclusive of the final judgment entered following the Florida arbitration of $17,247,426.11 with post-judgment interest accruing at 4.75% from October 16, 2014 and the $700,000 judgments on the promissory notes, with interest, as well as other reasonably foreseeable damages.

230.    By reason of GSB's and attorneys Hughes', Beckner's, Moon's, and Trinchero's breaches of their fiduciary duties, GSB and its current/former attorneys are not entitled to retain, and should be required to disgorge, with interest, the millions of dollars in fees Jackson paid in connection with their representation of him in transactions with, and in litigation against Sleek and the Individual Respondents.

231.    By reason of GSB's and attorneys Hughes', Beckner's, Moon's, and Trinchero's breaches of their fiduciary duties, GSB and its current/former attorneys should be liable for the additional legal fees and expenses that Jackson incurred in his appeal of the Order Denying Motion To Vacate Arbitration Award and other, related litigation, which was necessitated by GSB's and

attorneys Hughes', Beckner's, Moon's, and Trinchero's failures and lack of

diligence.

### THIRD CLAIM FOR RELIEF

**Complete Disgorgement of Attorneys' Fees:
Garvey Schubert Barer and Attorneys Beckner, Moon, and Trinchero
Improperly Billed and Collected Attorneys' Fees from Curtis J. Jackson, III for
Legal Services That Constituted the Unauthorized Practice of Law under
Florida Bar Rules 1-3.11 and 4-5.5, and Florida Supreme Court Jurisprudence**

232.    Jackson re-alleges and incorporates by reference the allegations

set forth in paragraphs 1 through 231 above.

233.    GSB and attorneys Beckner, Moon, and Trinchero represented

Jackson as his attorneys in the Florida arbitration.

234.    Upon information and belief, Beckner is a licensed member of the

New York and District of Columbia bars.

235.    Upon information and belief, Moon is a licensed member of the

New York bar.

236.    Upon information and belief, Trinchero is a licensed member of

the Oregon bar.

237.    None of these three attorneys (Beckner, Moon, and Trinchero) are

admitted to the Florida bar.

238.    The State of Florida permits attorneys licensed in other states to

participate in arbitrations in Florida under certain conditions.

239.    In order to represent a client in a Florida arbitration, an attorney not licensed in the State of Florida must file a Verified Statement Pursuant to Rule 1-3.11 of the Rules Regulating the Florida Bar with the Florida Bar in Tallahassee, Florida, and must also pay a filing fee.

240.    Upon information and belief, attorneys Beckner, Moon and Trinchero did not file any such Verified Statement and did not pay the required filing fee prior to or during the Florida arbitration.

241.    On or about April 10, 2012, GSB, through Beckner, was served with the Verified Statements of Egan and Sheehy filed pursuant to Florida Bar Rule 1-3.11, which purported to satisfy the Rule's requirements.

242.    Notwithstanding the receipt of Egan's and Sheehy's Verified Statements, GSB attorneys Beckner, Moon and Trinchero still failed to file such Verified Statements with the Florida Bar.

243.    Under Florida law, appearing in and conducting an arbitration without filing a Verified Statement and paying the required filing fee constitutes the unauthorized practice of law.

244.    Under Florida law, an attorney engaged in the unauthorized practice of law is not permitted to receive any legal fee, either pursuant to contract or on a theory of *quantum meruit*.

245.     Under Florida law, an attorney engaged in the unauthorized practice of law who receives any fee is required to disgorge such fee.

246.     GSB and attorneys Beckner, Moon and Trinchero engaged in the unauthorized practice of law by appearing in the Florida arbitration in violation of Florida Bar Rules 1-3.11 and 4-5.5 and Florida Supreme Court jurisprudence.

247.     During the course of the Florida arbitration, Jackson paid legal fees to GSB for work done by attorneys Beckner, Moon and Trinchero in connection with the Florida arbitration.

248.     GSB and attorneys Beckner, Moon and Trinchero wrongfully charged and collected payment from Jackson that GSB and attorneys Beckner, Moon and Trinchero were not entitled to receive and are required to disgorge.

## JURY DEMAND

249.     Jackson demands a trial by jury on all issues so triable.

## III.   REQUEST FOR RELIEF

Jackson requests the following relief:

a.     On the First and Second Claims for Relief, an award of damages, including pre-judgment and post-judgment interest, in an amount adequate to compensate Jackson for GSB's and attorneys Hughes', Beckner's, Moon's, and Trinchero's acts of malpractice and breaches of their fiduciary duties alleged herein, in the approximate amount of Twenty-Five Million Dollars ($25,000,000);

b.      On the Third Claim for Relief, an award of disgorgement, with interest, of the fees Jackson paid to GSB and its current/former attorneys Beckner, Moon, and Trinchero in connection with their representation of him in the Florida arbitration;

c.      By reason of the egregious conduct of GSB, and attorneys Hughes, Beckner, Moon and Trinchero, Jackson is able to provide the Court with a reasonable evidentiary basis under Florida Statute § 768.72 to seek an award of punitive damages, and is entitled to an award of punitive damages in the amount of Fifty Million Dollars ($50,000,000);

d.      An award of attorneys' fees and expenses incurred by Jackson in the appeal of the Order Denying Motion To Vacate Arbitration and other, related litigation;

e.      An accounting of damages owed by GSB and attorneys Hughes, Beckner, Moon, and Trinchero from the date proven at trial through the date of trial;

f.      An award of attorneys' fees, costs, expenses, and disbursements; and

g.      Such other and further relief as the court deems just and proper.

Dated: October 6, 2015                    Respectfully submitted,

By:/s/ James Berman_____
            James Berman

ZEISLER & ZEISLER, P.C.
James Berman
10 Middle Street, 15th Floor
Bridgeport, CT 06604
Email: jberman@zeislaw.com
Tel: (203) 368-5480
Fax: (203) 367-9678

and

ROBINS KAPLAN LLP
Craig Weiner
601 Lexington Avenue
Suite 3400
New York, NY 10022
Email: cweiner@robinskaplan.com
Tel: (212) 980-7400
Fax: (212) 980-7499

David B. Shemano
2049 Century Park East, Suite 3400
Los Angeles, CA 90067
Email: dshemano@robinskaplan.com
Tel: (310) 552-0130
Tax: (310) 229-5800

ATTORNEYS FOR PLAINTIFF CURTIS J.
JACKSON, III