## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

In re:                                                  Chapter 11
                                                        Case No. 15-21233 (AMN)
CURTIS JAMES JACKSON, III,
     Debtor.
_____

## DISCLOSURE STATEMENT TO JOINT PLAN OF SLEEK AUDIO, LLC, SUNTRUST BANK AND LASTONIA LEVISTON FOR THE INDIVIDUAL CHAPTER 11 REORGANIZATION OF CURTIS J. JACKSON, III UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

SLEEK AUDIO, LLC
LASTONIA LEVISTON
SUNTRUST BANK

DANIEL F. GOSCH (P35945)
GREGORY J. GUEST (P79724
DICKINSON WRIGHT PLLC
200 OTTAWA AVE., N.W., SUITE 1000
GRAND RAPIDS, MI 49503
TELEPHONE: (616) 336-1015
DGOSCH@DICKINSON-WRIGHT.COM

MICHAEL R. ENRIGHT (CT10286)
PATRICK M. BIRNEY (CT19875)
ROBINSON & COLE LLP
280 TRUMBULL STREET
HARTFORD, CT  06103
TELEPHONE: (860) 275-8290
MENRIGHT@RC.COM
PBIRNEY@RC.COM

COUNSEL FOR SLEEK AUDIO, LLC

ELIZABETH J. AUSTIN (CT04384)
PULLMAN & COMLEY, LLC
850 MAIN STREET, PO BOX 7006
BRIDGEPORT, CT  06601
TELEPHONE 203-330-2000
EAUSTIN@PULLCOM.COM

COUNSEL FOR LASTONIA LEVISTON

LYNNE B. XERRAS (MASS. BAR #632441)
(ADMITTED PRO HAC VICE)
HOLLAND & KNIGHT LLP
10 ST. JAMES AVENUE
BOSTON, MA  02116
TELEPHONE 617-523-2700
LYNNE.XERRAS@HKLAW.COM

COUNSEL FOR SUNTRUST BANK

Dated: January 14, 2016

## TABLE OF CONTENTS

Section I          Introduction                                                              1

Section II         Legal Requirements                                                        2

          Voting Procedures                                                                  2
          Waivers of Defects, Irregularities, Etc.                                           3
          Withdrawal of Ballots                                                              4
          Confirmation                                                                       4
          Best Interests of Creditors Test                                                   4
          Plan Must Be Feasible                                                              5
          Plan Modification                                                                  5
          Nonconsensual Confirmation                                                         5

Section III        The Debtor and his Business; Important Pre-Petition Events                5

          The Debtor and the Debtor's Business                                               5
          Debt Structure                                                                     9
          Assets                                                                             11
          Pre-Petition Litigation                                                            16
          Key Events Leading to Chapter 11 Filing                                            16

Section IV         Events During the Chapter 11 Case                                         17

          Post-Petition Events                                                               17
          Professional Retentions                                                            18

Section V          Liquidation Analysis                                                      20

          Liquidation Analysis and Best Interests of Creditors                               20
          Claims Process                                                                     23

Section VI         Details Regarding Classifications, Treatment and Implementation
                   of the Plan                                                               23

          General Description of the Plan                                                    23
          Means of Implementation of the Plan                                                25
          Feasibility of the Plan                                                            26
          Classification and Treatment of Claims                                             27
          Other Important Plan Provisions                                                    28
          Effect of Confirmation of the Plan, The Debtor's Discharge                         29
          Alternatives to Confirmation of the Plan                                           29

Section VII        Tax Consequences of the Plan                                              30

          General                                                                            30
          Tax Consequences to the Debtor                                                     30
          Tax Consequences to the holders of Claims                                          31

Section VIII       Risk Factors to be Considered                                             31

Conclusion                                                                      33

Exhibits                                                                     35-36

## SECTION I: INTRODUCTION

The Proponents, each creditors of the Debtor Curtis J. Jackson, III (the "**Debtor**"), hereby submit this disclosure statement (the "**Disclosure Statement**") pursuant to section 1125 of Title 11 of the Bankruptcy Code, to holders of Claims against the Debtor in connection with (i) the solicitation of acceptances of the Joint Plan of Sleek Audio, LLC, SunTrust Bank and Lastonia Leviston for the Individual Chapter 11 Reorganization of Curtis J. Jackson, III Under Chapter 11 of the Bankruptcy Code (as the same may be amended from time to time, the "**Plan**"), filed contemporaneously herewith by the Proponents with the United States Bankruptcy Court for the District of Connecticut, and (ii) the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**").

The Proponents are Sleek Audio, LLC, ("**Sleek**"), SunTrust Bank ("**SunTrust**") and Lastonia Leviston ("**Leviston**"). Each of the Proponents holds a Claim against the Debtor. The Claims of Sleek and Leviston are unsecured Claims in the approximate amounts of $18,100,000 and $7,000,000 respectively. Both such Claims arise out of either judgments or jury verdicts entered in favor of the respective Proponent and against the Debtor prior to the Petition Date. SunTrust Bank holds an unsecured Claim against the Debtor on account of certain guaranty obligations of the Debtor, in the approximate amount of $3,900,000. A related entity, SunTrust Mortgage, holds a Claim against the Debtor that is secured by certain real property of the Debtor. SunTrust Mortgage is not a Proponent under the Plan.

Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

On July 13, 2015, the Debtor filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut, case number 15-21233. The Debtor has continued to operate his businesses as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No creditors' committee has been appointed in the case.

This Disclosure Statement is proposed by the Proponents, who have filed the Plan for the benefit of creditors of the Debtor. The Debtor is not a proponent of the Plan, and has not been consulted in the preparation of the Plan, in connection with terms and conditions of the Plan, or in connection with the preparation and promulgation of this Disclosure Statement. The Plan, as proposed, is the Proponents' proposal for satisfaction of the Claims of creditors of the Debtor. This Disclosure Statement describes certain aspects of the Plan, the Debtor's business, certain events occurring in the Debtor's Chapter 11 Case and other related matters.

**For a complete understanding of the Plan, you should read the Disclosure Statement, the Plan, and any and all exhibits and/or schedules thereto and the other documents referred to herein and therein in their entireties.**

**The Proponents believe that acceptance of the Plan is in the best interests of all holders of Claims against the Debtor.**

A ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement and submitted to the holders of the Claims that the Proponents believe are entitled to vote to accept or reject the Plan.

The purpose of this Disclosure Statement is to provide adequate information, within the meaning of Bankruptcy Code § 1125(a), to the creditors of the Debtor, of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the circumstances of the

Chapter 11 Case, so that such creditors may make a reasonably informed judgment about the Proponents' Plan.

No person is authorized in connection with the Plan or solicitation of acceptances of the Plan to give any information or to make any representations other than those contained in this Disclosure Statement, its exhibits and any court-approved solicitation materials.  If such representations or information are given or made, such representations or information should not be relied upon.  The delivery of this Disclosure Statement will not under any circumstances imply that all the information contained herein is correct as of any time subsequent to the date hereof.

This Disclosure Statement describes various transactions contemplated under the Plan but is not a substitute for the Plan.  The terms of the Plan shall govern in case of any inconsistency between the Plan and this Disclosure Statement.  The definitions of the Plan are incorporated by reference in this Disclosure Statement.  Defined terms are capitalized.

**You are urged to study the Plan in full and to consult with your legal counsel and tax advisors about the Plan and its impact upon your legal rights, including possible tax consequences. Please read this Disclosure Statement and its exhibits carefully before voting on the Plan.**

The statements contained in this Disclosure Statement are made as of the date hereof, unless another time is specified herein.  Delivery of this Disclosure Statement in connection with the Plan shall not create an implication that there has been no change in the information set forth herein since the date of this Disclosure Statement and the date that the materials relied upon in preparation of this Disclosure Statement were compiled.

**This Disclosure Statement may not be relied upon for any purpose other than to determine whether to vote in favor of or against the Plan, and nothing contained herein shall constitute an admission of any fact or of liability by any party, or be admissible in any proceedings involving any of the Proponents or involving any legal effect of the reorganization of the Debtor.**  Certain of the information contained in this Disclosure Statement may prove to be different from actual results.

The information contained in this Disclosure Statement has been submitted by the Proponents based primarily upon information that is publicly available to the Proponents as a result of the Schedules, Statement of Financial Affairs, and Monthly Operating Statements filed by the Debtor (all of which were prepared solely by the Debtor), as a result of requests for information made by the Proponents of the Debtor and his advisors pursuant to Bankruptcy Rule 2004, or as a result of other information publicly available to the Proponents.  None of the information set forth herein constitutes a representation by the Debtor, except to the extent that such information is based upon representations of the Debtor in underlying source materials, including, without limitation, the Schedules and the Statement of Financial Affairs.  You should not rely on any representations or inducements made by any person to secure your vote on the Plan other than those contained in this Disclosure Statement.  The Proponents have used their reasonable efforts to be accurate in this Disclosure Statement in all material respects and believe that the contents of this Disclosure Statement are reasonably complete and accurate.  However, none of the Proponents warrant or represent that the information contained herein is without inaccuracy.

## SECTION II: LEGAL REQUIREMENTS

### 2.1    Voting Procedures

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of Claims that are Impaired under the Plan.  Accordingly, classes of Claims that are Unimpaired

are *not* entitled to vote on the Plan.  The Plan filed by the Proponents contains both Impaired and Unimpaired Classes of Claims as follows:

Impaired Classes

| | |
|---|---|
| Class II | Secured Claims |
| Class III | Unsecured Claims |

Unimpaired Classes

| | |
|---|---|
| Class I | Other Priority Claims |
| Class IV | Unimpaired Claims |

Creditors that may hold Claims in more than one Impaired Class are entitled to vote separately in each Class.  A creditor who asserts a Claim in more than one Class may photocopy the ballot received and submit multiple ballots.

Votes on the Plan will be counted only with respect to Claims:  (a) that are listed on the Debtor's Schedules *other* than as disputed, contingent or unliquidated; (b) for which a proof of Claim was filed on or before the Bar Date (except for certain Claims expressly excluded from that requirement or which are Allowed by order of the Bankruptcy Court), or (c) which are expressly Allowed under specific terms of the Plan, either generally, or for purposes of voting only.  Section 4.3(a) of the Plan specifically provides that all Unsecured Claims are allowed solely for purposes of voting on the Plan.  Any vote by a holder of a Claim will not be counted if such Claim has been Disallowed.

Voting on the Plan by each holder of a Claim in an Impaired Class is important.  After carefully reviewing the Plan and Disclosure Statement, each holder of such a Claim should vote on the enclosed ballot either to accept or to reject the Plan, and then return the ballot by mail to the Proponents' attorney by the deadline established by the Bankruptcy Court.  Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted.  A ballot that is not received by the deadline will not be counted.  If a ballot is damaged, lost, or missing, the replacement ballot may be obtained by sending a written request to the Proponents' attorney.

By signing and returning the ballot, each holder of a Claim entitled to vote will also be confirming that (i) such holder and/or any agents acting on its behalf has read this Disclosure Statement and the Plan; (ii) such holder and/or any agents acting on its behalf has had the opportunity to ask questions of and receive answers from the Proponents concerning the terms of the Plan and related matters; (iii) the Proponents have made available to such holder or its agents all documents or information relating to the Plan as set forth in this Disclosure Statement; and (iv) except for information provided by the Proponents or their agents in writing as set forth in this Disclosure Statement, such holder has not relied on any statements made or other information received from any person with respect to the Plan.

**2.2    Waivers of Defects, Irregularities, Etc.**

Unless otherwise ordered by the Bankruptcy Court, all questions as to the validity, form, eligibility, acceptance and revocation or withdrawal of ballots will be determined by the Proponents, in the exercise of their reasonable discretion, subject to the right of any party in interest to object and request an appropriate hearing before the Bankruptcy Court, and the Proponents' reasonable determination will be final and binding. The Proponents shall have the right to reject any and all ballots reasonably determined by them to not be in proper form, and/or if the acceptance of such ballot would, in their opinion or the opinion of their counsel, be unlawful.  The Proponents reserve the right to waive any defects or

irregularities or conditions of delivery as to any particular ballot.  Unless waived, any defects or irregularities in connection with the delivery of a ballot must be cured within such time as the Bankruptcy Court orders.  The Proponents will not be under any duty to provide notification of defects or irregularities with respect to ballots nor will any of them incur any liability for failing to provide any such notification.  Unless otherwise ordered by the Bankruptcy Court, defective or irregular ballots will not be deemed to have been delivered until corrected or waived.  As indicated in Section 2.3 below, withdrawals of ballots must be submitted timely to be effective.  The Proponents will have the right to challenge or contest the validity of any such withdrawal.

### 2.3     Withdrawal of Ballots

Any party who delivers a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Proponents before the date the ballots are due.  A notice of withdrawal is valid if it (i) contains the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s); (ii) is signed by the withdrawing party in the same manner as the ballot being withdrawn; (iii) contains a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the ballot; and (iv) is received by the Proponents in a timely manner.  Unless ordered by the Bankruptcy Court, any attempts to withdraw a ballot except as set forth above will be ineffective.

### 2.4     Confirmation

Section 1129(a) of the Bankruptcy Code establishes conditions for the confirmation of a Plan. The findings required for confirmation include, without limitation, the following: (i) the Plan classifies Claims in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Proponents complied with applicable provisions of the Bankruptcy Code; (iv) the Plan has been accepted by the requisite votes of holders of Claims (except to the extent that confirmation is available under section 1129(b) of the Bankruptcy Code); (v) the Plan has been proposed in good faith and not by any means forbidden by law; (vi) the disclosure requirements of section 1125 of the Bankruptcy Code have been met; (vii) the Plan is feasible and confirmation will likely not be followed by liquidation or the need for further reorganization of the Debtor, unless such liquidation or reorganization is proposed in the Plan; (viii) the Plan is in the best interests of all holders of Claims in an Impaired Class by providing to such holders on account of their Claims property of a value that is not less than the amount that such holder would receive or retain in a Chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan; and (ix) all fees and expenses payable under section 1930 of the Bankruptcy Code have been paid or the Plan provides for their payment.  The Bankruptcy Code also contains certain requirements that pertain solely to an individual chapter 11 debtor, such as the Debtor in this case, including, without limitation, the requirements of Section 1129(a)(15), which provides for certain minimum distributions to the holders of Claims as set forth therein.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of Impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or reject the plan.  Thus, a class will have voted to accept a plan if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance.

This description is non-exhaustive.  Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process and/or the requirements for confirmation.

### 2.5     Best Interests of Creditors Test

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of a Claim in such Class either: (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such person would receive or retain if the Debtor liquidated under Chapter 7 of the Bankruptcy Code. This requirement is discussed in more detail in Section 5 of this Disclosure Statement.  In a Chapter 7 liquidation, creditors and interest holders are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to the senior classes are paid in full: (i) secured creditors; (ii) administrative and priority unsecured creditors; (iii) unsecured creditors; (iv) subordinated creditors; and (v) equity interest holders.  The Proponents' financial advisors have prepared a Liquidation Analysis to show the anticipated distribution to creditors in a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.  As demonstrated by the Liquidation Analysis described in Section 5 hereof, the Proponents anticipate that creditors would receive less in a Chapter 7 liquidation than they would under the Plan.  The Proponents therefore submit that the Plan meets the "best interests" requirement of the Bankruptcy Code.

### 2.6     The Plan Must Be Feasible

To be confirmed, the Plan must also be feasible, meaning that it is not likely to be followed by an unplanned liquidation or further financial restructuring, unless proposed in the Plan.  Feasibility of the Plan is discussed in more specific detail in Section 6 of this Disclosure Statement.  The Proponents believe the Plan is feasible.

### 2.7     Plan Modification

The Proponents reserve the right to modify or withdraw the Plan at any time before the Confirmation Hearing, as set forth more fully in the terms of the Plan.

### 2.8     Nonconsensual Confirmation

The Bankruptcy Code contains provisions for confirmation of a Plan even if the Plan is not accepted by all creditors, as long as one Impaired Class accepts the Plan pursuant to the so-called "cram-down" provisions of 11 U.S.C. § 1129(b).  Generally the Plan may be confirmed pursuant to the cram-down provisions if it satisfies a number of criteria, including that the Plan does not unfairly discriminate against and is fair and equitable to those Impaired creditors in a Class that did not accept the Plan.

In general, the requirement that a plan "does not discriminate unfairly" means that a dissenting Class must be treated equally with respect to other Classes of equal rank.  A plan may also provide for different treatment for different classes if the claims or interests in such classes have different priorities or characteristics, and a plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of a similar value under a Plan.  By establishing separate Classes for the holders of each type of Claim and by treating each holder of a Claim in each such Class the same, the Proponents submit that the Plan does not "discriminate unfairly" with respect to any Class of Claims.  Should an Impaired Class that is eligible to vote under the Plan vote to reject the Plan, the Proponents retain the right to seek to amend the Plan or to seek to confirm the Plan (as proposed or as amended) under section 1129(b) of the Bankruptcy Code, by demonstrating that the Plan is fair and equitable.

### SECTION III: THE DEBTOR AND HIS BUSINESS; IMPORTANT PRE-PETITION EVENTS

### 3.1     The Debtor and the Debtor's business

Pleadings filed by the Debtor with the Bankruptcy Court in the Chapter 11 Case describe the Debtor as follows:

"The Debtor, Curtis James "50 Cent" Jackson, III, is an internationally recognized recording artist, an actor, an entrepreneur and a philanthropist. Since his entrance onto the music scene in 2003 with his multi-platinum debut album, the Debtor has sold more than 22 million albums worldwide, and has received numerous awards and Grammy nominations throughout his career."

Most recently, in pleadings filed in the Bankruptcy Court, the Debtor makes the following statements:

"Jackson is a preeminent hip-hop artist known for his hard-knocks success story and vast musical talent. Jackson has sold more than 30 million albums worldwide. Jackson has leveraged his musical achievements into a popular record label, 'G-Unit Records', a clothing line, 'G-Unit Clothing Company', and several other lucrative ventures and has created and steered the '50 Cent' brand to among the most recognized and respected in the entertainment world. Additionally, Jackson has experienced great success as an actor and producer."

While the Proponents have received various anecdotal information regarding the conduct of the Debtor since the Petition Date, including, without limitation, information suggesting that the Debtor is making various personal performances, and engaged in the promotion of various products, presumably for remuneration, the Debtor has provided little actual information to creditors regarding his post-petition business activities, or the economic benefit if any, from the various activities that the Debtor claims to have been successful in pursuing. On August 3, 2015, the Debtor filed the Schedules and Statement of Financial Affairs that he was required to file pursuant to the Bankruptcy Rules. Reference should be made to the Schedules and Statement of Financial Affairs for more information as to the Debtor's description of the Debtor's business activities. The Statement of Financial Affairs, as well as the Debtor's Monthly Operating Reports described below, and the Debtor's Periodic Report Regarding Value, Operations and Profitability of Entities in which the Estate of Curtis James Jackson, III Holds a Substantial or Controlling Interest (filed on August 5, 2015) indicates that the Debtor's business activities involve dealings with the following entities which he either controls or in which he holds a substantial interest:

| Entity | Identified Business |
|---|---|
| 50's Liquid Asset | Investments |
| 50 Cent Music LLC | Publishing |
| Animal Ambition Short Film, LLC | Short Film |
| Before I Self Destruct Short Film, LLC | None listed in Statement of Financial Affairs |
| CT Lights, LLC | Personal Holding/property |
| G Note Records, Inc. | Record Label |
| G-Unit Adult Films, Inc. | Adult Film |
| G-Unit Books, Inc. | Book deals, publishing and royalties |
| G-Unit Brands, Inc. | Endorsement Deals |
| G-Unit Clothing, LLC | unknown |
| G-Unit Film & Television, Inc. | Film Company |
| G-Unit Merchandising, Inc. | Merchandising |
| G-Unit Records, Inc. | Record label, office, salaries |
| G-Unit Touring, Inc. | Touring |
| G-Unity Foundation, Inc. | Charitable Foundation |
| In the Passing Lane, LLC | Auto and transportation |

| | |
|---|---|
| Love Me Love Me Not Short Film, LLC | unknown |
| Rotten Apple Records, Inc. | Side artists, royalties, publishing |
| Sire Spirits, LLC | Beam deal |
| SMS Audio, LLC | Headphones |
| SMS Kono Audio, LLC | Headphones |
| SMS Promotions, LLC | Boxing promotion, Las Vegas gym |
| Things Fall Apart, LLC | Film |
| Tomorrow, Today Entertainment, Inc. | Website |
| Broadway Boxing, LLC | unknown |
| Cheetah Vision, Inc. | unknown |
| CJJ Enterprises, LLC | unknown |
| Hollow Point, Inc. | unknown |
| TMT Promotions, LLC | unknown |
| 3286 Northside C Unit, LLC | unknown |
| Boneyard Entertainment China, LLC | unknown |
| Lighthouse Beauty | unknown |

While the full nature and extent of the Debtor's dealing with the above entities (herein the "**Related Entities**") have not been fully disclosed by the Debtor and are presently unknown to the Proponents, the Proponents believe that the Debtor is engaged in ongoing business dealings with one or more of the Related Entities, and possibly with other Entities that the Debtor may not have yet fully disclosed to creditors. As of the date of the Disclosure Statement the Proponents are continuing to seek additional information regarding the Related Entities and the business dealings between the Related Entities and the Debtor. As noted, the Proponents believe that the Debtor is also engaged in ongoing personal performances, and engaged in the promotion of various products, but have not received complete information about the compensation that may have been actually paid to the Debtor post-petition on account of such matters, or as to which the Debtor may be due. The failure of the Debtor to fully disclose all aspects of his post-petition business activities is a material issue that is addressed by the Plan.

The Statement of Financial Affairs filed by the Debtor further indicated that during 2015, as of the Petition Date, the Debtor, under the category of "Entertainer" had received income as a result of trade or business activities consisting of "Royalties", "Royalties Advance", and "Sale of Catalog" in the aggregate amount of $3,318,245.30. The Debtor claimed to have incurred unspecified "business expenses" during this same period of time, as an "Entertainer" in the amount of $1,008,682.84. The Debtor further claimed to have received further income during this period from "SMS Promotions" (one of the entities identified above), in the net amount of $33,215.53, and aggregate "Flow-Thru Income" during this same period of time in the net amount of $771,104.22. This "Flow-Thru Income" was sourced from various of the Related Entities, as set forth in more detail in the Statement of Financial Affairs. The Statement of Financial Affairs provided no detail as to the methodology for determining the foregoing net income, and no detail as to the asserted "business expenses" incurred by the Debtor during 2015. The Debtor has not supplemented the Statement of Financial Affairs in any fashion since it was filed.

Since the Petition Date the Debtor has filed four Monthly Operating Report of Business forms, purporting to disclose information relating to the Debtor's post-petition business operations. The first such Report, filed on September 30, 2015, indicated that for the period from July 13, 2015-August 31, 2015, the Debtor received total income of $57,620.10, consisting of "wages" in the amount of $3,106.85, "Residuals" in the amount of $18.88, and "Royalties" in the amount of $54,494.37. This Report contains no further detail as to the Debtor's income or business activities and no further details as to the underlying source of any of the foregoing payments. Further attached to this Report is a Balance Sheet of the Debtor, purportedly as of August 31, 2015, reflecting the purported value of the Debtor's interests in the Related Entities, and reflecting a purported valuation of the Debtor's "Total Assets" of $13,663,364.99.

The second Monthly Operating Report of Business was filed on November 13, 2015 for the period from September 1-September 30, 2015. This report indicated that for the period from September 1-September 30, 2015, the Debtor received total income of $37,601.03, consisting of "wages" in the amount of $1,538.76, "Residuals" in the amount of $34.68, and "Royalties" in the amount of $36,027.59. This Report contains no further detail as to the Debtor's income or business activities and no further details as to the underlying source of any of the foregoing payments. Further attached to this Report is a Balance Sheet of the Debtor, purportedly as of September 30, 2015, reflecting the purported value of the Debtor's interests in the Related Entities, and reflecting a purported valuation of the Debtor's "Total Assets" of $16,772,835.89.

The third Monthly Operating Report of Business was filed on December 18, 2015 for the period from October 1-October 31, 2015. This report indicated that for the period from October 1-October 31, 2015, the Debtor received total income of $33,037.05, consisting of "wages" in the amount of $1,538.76, "Residuals" in the amount of $4.22, and "Royalties" in the amount of $30,117.07 and a tax refund in the amount of $1,377.00. This Report contains no further detail as to the Debtor's income or business activities and no further details as to the underlying source of any of the foregoing payments. Further attached to this Report is a Balance Sheet of the Debtor, purportedly as of October 31, 2015, reflecting the purported value of the Debtor's interests in the Related Entities, and reflecting a purported valuation of the Debtor's "Total Assets" of $16,750,677.34.

The fourth Monthly Operating Report of Business was filed on December 31, 2015 for the period from November 1-November 30, 2015. This report indicated that for the period from November 1-November 30, 2015, the Debtor received total income of $29,528.66, all of which comprised Royalties". This Report contains no further detail as to the Debtor's income or business activities and no further details as to the underlying source of any of the foregoing payments. Further attached to this Report is a Balance Sheet of the Debtor, purportedly as of November 30, 2015, reflecting the purported value of the Debtor's interests in the Related Entities, and reflecting a purported valuation of the Debtor's "Total Assets" of $16,658,657.64.

In each of the first two Reports noted above, the Debtor indicates that his monthly expenses during the respective periods exceed the Debtor's income, resulting in Net Cash Flow (as reflected in such Reports) in the amount of ($64,170.50) during the period of July 13, 2015-August 31, 2015 and ($30,660.95) during the period of September 1, 2015-September 30, 2015. The third such Report reflects positive cash flow during the period from October 1 through October 31, 2015 but only as a result of the Debtor's receipt of transfers from other accounts maintained by the Debtor; a comparison of actual expenses as against income during the period again reflects negative cash flow for the period in the amount of ($43,624.43) without taking into account professional fees and "other reorganization expenses". The fourth such Report indicates approximately a $600.00 excess of income over expenses for the related period, and also reflects both a transfer to the Debtor of approximately $50,000.00 from other existing accounts. Certain of the Reports also reflect transfers to GSO Business Management, LLC which appear to be unauthorized in the Chapter 11 Case. The Proponents are investigating those matters. In the Proponent's view, the Reports do not indicate any effort on the part of the Debtor to reduce his monthly expenses so as to become cash flow neutral or cash flow positive. Thus, the Reports noted above indicate that the Debtor's cash position is diminishing during the ongoing pendency of the Chapter 11 Case.

The Debtor has also advised the Proponents, or the Proponents have discovered by reviewing documents filed by the Debtor that the Debtor, either directly, or through arrangements with one or more of the Related Entities, has business dealings with, or holds an interest of some kind in, the following entities: RevolutionWear, Inc., Jim Beam Brands Co., Energy Brands, Inc., Luxe Valet, Inc., Evacuation

8

Complete, LLC, As Seen On TV, Med Mobile, Hang W, Boneyard Entertainment China, LLC, Street King, LLC, and JC Network, LLC (herein, collectively the "**Additional Entities**"). The details relating to the Debtor's business dealings with RevolutionWear, Inc., Jim Beam Brands Co., Energy Brands, Inc., Evacuation Complete, LLC and Luxe Valet are subject to the terms and conditions of various Non-Disclosure Agreements approved by the Bankruptcy Court, or which are in the process of approval. The Debtor has not provided details regarding his business dealings with, or interests in the remaining Additional Entities, but may hold a controlling interest in one or more of the Additional Entities. In addition, as of the Petition Date, the Debtor held a non-controlling membership interest in Sleek arising on account of certain pre-petition transactions, and was a member of Sleek's board of directors, but has no day to day business dealings with Sleek of any kind. The Proponents believe that the Debtor's interests in one or more of the foregoing entities may be saleable and/or otherwise subject to liquidation for the benefit of creditors.

As the foregoing demonstrates, the Debtor apparently generates certain amounts of ongoing income based upon the sale and use of previously performed musical compositions, and otherwise on account of certain copyrights or other intellectual property owned by the Debtor. Since the Petition Date, the Debtor has apparently made various television and other personal appearances at worldwide events, and performed certain concerts. The Proponents believe that the Debtor is likely to have received remuneration for such performances and/or appearances. However, the Debtor has not provided the Proponents, or, to the Proponents' knowledge, other creditors, with information as to such appearances or performances, or any fees or other compensation the Debtor may have earned or otherwise be entitled to receive as a result of any such appearances or performances, and the Monthly Operating Statements filed by the Debtor do not appear to provide detail regarding such matters. The Proponents are therefore generally not aware of current business operations of the Debtor, or sources of income of the Debtor other than as set forth above, and as detailed in the Schedules, the Statement of Financial Affairs, and the Monthly Operating Statements previously filed by the Debtor. Because the information provided by the Reports filed by the Debtor is furnished in arrears (as noted the third such report was filed more than 45 days after the end of the reporting period), the information contained in such Reports is not current, and does not reflect the immediate day to day cash flow of the Debtor, such that the Proponents do not have real time visibility to the day to day business operations, cash flow or other financial condition of the Debtor. Moreover, as reflected in more detail below, the Proponents have concerns about the completeness of the Debtor's disclosures and the accuracy of the financial information the Debtor has provided.

The Proponents believe, however, that while the day to day cash flow position of the Debtor is important, especially in light of what appears to be ongoing diminution of that position, because the Plan requires that all income of the Debtor from any source whatsoever be turned over to the Trustee for distribution under the Plan, a more immediate understanding of the current business dealings between the Debtor and the Related Entities is not critical to an understanding of the Plan or to confirmation of the Plan. Under the terms of the Plan, the Trustee will be responsible for reviewing the foregoing matters and will be required to obtain more immediate and real time visibility with respect to the Debtor's financial affairs.

   **3.2**   **Debt Structure**

   (a)   Secured Debt.

According to the Schedules and filed proofs of Claim, the following parties hold secured claims against the Debtor:

   (i)   SunTrust Mortgage holds a Claim in the amount of $1,022,587.15 as of the Petition Date

secured by a mortgage upon the Debtor's property located at 50 Poplar Hills Drive, Farmington, CT.

(ii)    Bentley Financial Services, holds a Claim in the amount of $130,965.28 purportedly secured by a Lien upon a 2012 Bentley automobile.  While the Debtor's Schedules and Statement of Financial Affairs indicate that the agreements relating to this matter comprise a "lease", the Proponents believe that the documents filed by Bentley Financial Services in support of its Claim evidence a sale transaction secured by a lien.  The Proponents cannot confirm that Bentley Financial Services properly perfected its lien on the related automobile as they have not been furnished with the vehicle title.

The Proponents believe, based upon the Schedules and filed proofs of Claim, that no other Entity holds a consensual Lien to secure any Claim against the Debtor.   The Proponents note that two other Entities have asserted Claims against the Debtor which the holders thereof assert may give rise to claims of a lien arising as a matter of law.  The American Society of Composers, Authors and Performers ("**ASCAP**") has asserted a claim in the amount of $1,294,626.94, which it asserts may be subject to setoff, or subject to a recoupment right against future royalties payable to the Debtor, and which may give rise to a claim of Lien on limited assets of the Debtor (i.e. future royalty payments).  The Plan treats the ASCAP Claim as Unimpaired, and permits ASCAP to continue to assert its alleged recoupment rights after confirmation of the Plan, accordingly the Proponents believe that characterization of ASCAP's claim as a secured or unsecured claim is irrelevant for purposes of the Plan.  Robins Kaplan, a pre-petition attorney for the Debtor, holds a retainer in the amount of $275,000, ostensibly for, without limitation, security for unpaid pre-petition Professional Fees in the amount of approximately $172,000.  The Plan addresses payment of claims for Professional Fees, and Robins Kaplan's ability to utilize the retainer will be subject to determination by the Bankruptcy Court.  The Proponents believe that Robins Kaplan does not have any Lien on any current Property of the Debtor, other than, possibly, the amount held as a retainer.

(b)    <u>Unsecured Debt</u>.

The majority of the unsecured Claims against the Debtor arise out judgments or verdicts entered against the Debtor as a result of certain pre-petition actions taken by the Debtor, and claims asserted against him as a result of those actions.  Certain other Claims arise as a result of the Debtor's failure to pay for goods and services rendered to him or for his account.  According to the Schedules and filed proofs of Claim, unsecured non-priority Claims in the approximate amount of $30,433,352 have been asserted against the Debtor.  Of this amount, the largest holders are:

|     | Creditor | Amount |
|-----|----------|--------|
| (i) | Sleek Audio, LLC | $18,131,668.65 |
| (ii) | Lastonia Leviston | $7,000,000.00 |
| (iii) | SunTrust Bank | $3,890,000.00 |
| (iv) | Reed Smith, LLP | $609,235.41 |

The four above-described holders hold $29,630,904.06 (i.e. approximately 97%) of the total unsecured Claims asserted against the Debtor.  Three of these four holders are the Proponents.  There are approximately 27 additional holders of Claims that hold approximately $802,448 in aggregate amount of unsecured Claims.  These Claims range in dollar amount from roughly $133,000 to approximately $13.00 in amount.  The Proponents believe that for purposes of distribution under the Plan most, if not all of these unsecured Claims may be allowable as reflected in the Schedules or as filed, subject to review by

10

the Trustee and the possible filing of objections to such Claims as permitted under the Plan. The Bar Date for the filing of proofs of Claim was November 3, 2015. The information reflected with respect to unsecured Claims reflects Claims filed as of that date.

  (c) <u>Claims Asserting Priority</u>.

  Various unsecured Claims seeking priority under section 507 of the Bankruptcy Code have also been filed against the Debtor, or identified in the Schedules, as follows:

| | Creditor | Basis for Priority | Amount |
|---|---|---|---|
| (i) | Daphne Navarez | Domestic Support | $832,600.00 |
| (ii) | State of New York | Domestic Support | $22,491.00 |
| (iii) | Internal Revenue Service | Taxes | $175,067.91 |
| (iv) | State of New York | Taxes | $1,379,687.00 |

  The Proponents have not been provided with documentation sufficient to support any of the foregoing Claims, and the amounts reflected do not take into account possible objections to Claims that may be asserted by the Trustee as contemplated by the Plan, or the ultimate determination as to any claims of priority, or the reconciliation of any such Claims. Some portion of the foregoing Claims may be subject to disallowance or reduction.

  In addition to the foregoing, as described in more detail in Section 4.2 of this Disclosure Statement, the Debtor has retained, or sought to retain, with Bankruptcy Court approval, a large number of professional persons. Those professional persons either have asserted, or will presumably assert claims which, to the extent allowable by the Bankruptcy Court in accordance with the procedures established by the Bankruptcy Code and the Orders of the Bankruptcy Court in the Chapter 11 Case, be entitled to priority under Sections 503 and 507 of the Bankruptcy Code. In addition, the Proponents anticipate that such priority claims may include, without limitation claims asserted by one or more of the Proponents or their professionals and which are approved pursuant to Section 503(b)(3)(D) and/or 503(b)(4) of the Bankruptcy Code. Generally, the Plan provides for the payment of Allowed claims for professional compensation at the earlier of the time the claims become Allowed Claims, or upon the Effective Date of the Plan.

  **3.3** <u>**Assets**</u>

  (a) The Debtor's assets, as disclosed by the Debtor to date, are set forth in the Schedules and the Statement of Financial Affairs. In general, according to the Schedules and the Statement of Financial Affairs, the Debtor's assets consist of the following, valued in each case by the Debtor as of the Petition Date:

  (i) Real Property at 50 Poplar Hill Drive, Farmington, CT, valued by the Debtor at $8,250,000.

  (ii) Real property at 8 Gale Drive, Valley Stream, NY, valued by the Debtor at $572,000.

  (iii) Real Property at 3286 Northside Parkway, Unit 302, Atlanta, GA valued by the Debtor at $464,000.

(iv)      Cash and cash equivalents on hand in bank and/or brokerage accounts as of the Petition Date in the amount of $10,554,486.13

(v)       The Debtor's interest in various Entities, including, the Related Entities, which the Debtor values at $4,412,712.24 at "book value".

(vi)      Certain automobiles valued by the Debtor, in the aggregate, in the amount of $500,618.00, without reference to the Debtor's Bentley automobile.  The Proponents are currently unaware of the status, location and disposition of any of the Debtor's automobiles, as despite being identified in the Schedules they do not appear on the balance sheets included with the Debtor's Monthly Operating Statements.

(vii)     Miscellaneous personal property, the value of which is estimated at approximately $130,000.

(b)       The Proponents lack information to confirm the valuations provided by the Debtor, but believe such valuations to be speculative and unreliable. The Proponents believe that the real estate holdings disclosed by the Debtor may be materially overvalued, especially the Farmington, CT property, given the Debtor's failure to obtain any meaningful offers for sale of the property.  The Proponents believe that the Debtor may have materially under-valued the Debtor's interests in the Related Entities, and that the stated "book value" of such interests, as reflected in the Schedules may not be reflective of actual value.  The Debtor has not provided the Proponents with information sufficient to identify the value of the Debtor's interests in the Additional Entities and the value of the Debtor's holdings in such Additional Entities will be determined by the Trustee under the Plan.  The Proponents believe that it is possible, as further reflected in the Liquidation Analysis set forth below, that reasonable valuations of the Debtor's assets to be determined after confirmation of the Plan by the Trustee in the course of the administration of the Plan will demonstrate that upon post-confirmation liquidation of all of the Debtor's assets, including the interests in the Additional Entities and/or the Related Entities, sufficient value will exist to pay at least a portion of the Claims against the Debtor, but more specific estimates, beyond those provided in conjunction with the Liquidation Analysis are not ascertainable at this time.

(c)       The Proponents further believe there are also material issues as to (i) the completeness of the disclosure by the Debtor of his personal assets, and (ii) the Debtor's accounting of his post-petition business revenues and assets.  In this respect, the Proponents note the following:

(i)       The Schedules and Statement of Financial Affairs appear materially incomplete with respect to the Debtor's ownership of intellectual property assets.  For example, in pleadings filed in the Bankruptcy Court on December 23, 2015, the Debtor makes the following statements:

"On January 20, 2004, Jackson was issued United States Trademark Registration Number 2,807,302 for the mark 50 Cent for use in connection with promoting the goods and/or services or others through the issuance of pre-recorded phonograph records, compact discs, audio and video cassettes, and DVDs featuring music.  The 50 CENT trademark is, and at all relevant times was, a strong, famous and distinctive mark.  Jackson has used the Mark in interstate commerce throughout the United States for over fifteen years to promote a wide variety of goods and services."

However, Schedule B filed by the Debtor in connection with Chapter 11 Case in question 22, requires that the Debtor disclose all "patents, copyrights and other intellectual property", and requires that the Debtor "give particulars" as to such matters.  The Debtor indicated, in response to this question, that he held "none" of this type of property, notwithstanding the recent claim by the Debtor that he has held the above referenced trademark for nearly 12 years.

12

(ii)      Neither the Schedules nor the Statement of Financial Affairs indicates that the Debtor holds any claims against any person.  Nonetheless, since the Petition Date, the Debtor has commenced an action asserting certain claims against attorneys that previously represented the Debtor in the litigation with Sleek which resulted in the entry of a pre-petition judgment in favor of Sleek against the Debtor. The appropriate venue for this proceeding is in dispute between the Debtor and the defendants in the action.  The present value of the claims asserted in this litigation by the Debtor, if any, is unknown, and has not been quantified by the Debtor in any documentation provided to the Proponents, although the Proponents understand that the Debtor believes he has been damaged by an amount equal to at least the amount of Sleek's Claim against the Debtor (i.e., approximately $18,000,000.00).  The defendant in that litigation has not yet answered the complaint.

On December 23, 2015, the Debtor commenced an action in the Bankruptcy Court alleging certain claims against William Leonard Roberts, II, relating to alleged "unauthorized use of [the Debtor's] stage name and registered trademark. . . ".  The Complaint appears to seek damages in the amount of at least $2,000,000.00.  The Proponents have no information regarding the claims asserted by the Debtor in this litigation.

(iii)      The Statement of Financial Affairs requires, subject to certain immaterial limitations, that the Debtor disclose "payments on loans, installment purchases of goods or services and other debts to any creditor made within 90 day immediately preceding the commencement of [the] case", and that the Debtor list "all payments made within one year immediately preceding the commencement of [the] case to or for the benefit of any creditors who are or were insiders".

The Statement of Financial Affairs stated that there were no payments to insiders during the one year period prior to the commencement of the Chapter 11 Case, and as to other transfers, attached a schedule of "Payments to creditors April-July, 2015", revealing payments during that period to 16 different "creditors" in an aggregate amount of approximately $507,000.  The Proponents believe that the information provided by the Debtor in this regard may be materially inaccurate.  Subsequent to the Petition Date, the Proponents obtained various financial documents from the Debtor pursuant to subpoena.  Those documents included, without limitation, bank statements and related information reflecting disbursements from the Debtor's various personal accounts during the period from April 1, 2015 through the Petition Date.  Attached as **Exhibit "A"** hereto is a summary of bank account entries revealing disbursements from the Debtor's bank accounts during the 90 day period prior to the commencement of the Chapter 11 Case as reflected by the information provided to the Proponents by the Debtor.  Exhibit "A" contains a specific notation identifying transfers from such accounts that were also identified by the Debtor in the noted exhibit to the Statement of Financial Affairs.

As Exhibit "A" reveals, the exhibit to the Statement of Financial Affairs set forth only a small portion of the Debtor's actual transfers during the 90 day period prior the commencement of the Chapter 11 Case.  Exhibit "A", among other things, reveals aggregate transfers of more than $1,565,000, i.e. more than three times the amount claimed by the Debtor, which cleared the Debtor's primary checking account during this time period, including what would appear to be material transfers to various of the Related Entities.

No document provided by the Debtor purports to make any determination as to the possible avoidance of any such transfers under the avoidance powers provided under the Bankruptcy Code, or the related value of any avoidance claims, and the information provided to the Proponents by the Debtor to date set forth only a limited basis for the Proponents to try to make a reasonable determination as to such matters.  The Plan specifically preserves any and all such claims for the benefit of creditors, notwithstanding the failure of the Debtor to provide any meaningful information regarding such claims. A further discussion of these matters is set forth in Section V of this Disclosure Statement.

(iv)    At various times subsequent to the Petition Date, the Debtor has posted pictures on his Instagram social media account reflecting what appears to be his retention of what would appear to be material amounts of cash, and his performance of services and/or performances, all of which are wholly unaccounted for, while at the same time claiming an ongoing inability to satisfy the claims of creditors, and failing to take any action to propose a plan for the payment of creditor claims.  Under the Plan, the Trustee will be charged with the duty of reviewing and examining all such matters for the benefit of creditors.  Set forth below are examples of the Debtor's actions as outlined above:

A.    On November 26, 2015, the Debtor posted the following photograph on his Instagram account:



https://www.instagram.com/p/-j4dt2sLyj/?taken-by=50cent, (last visited December 23, 2015),

B.    On December 3, 2015, the Debtor posted a video on his Instagram site, at https://www.instagram.com/p/-0VL7kML8Z/ (last visited December 23, 2015), showing the Debtor opening a refrigerator to show his possession of large containers of cash.

C.    On November 7, 2015, the Debtor posted the following photograph of his performance at a post-petition concert. The Debtor has provided no accounting for any revenues earned by this performance (or any other post-petition performance).



14

https://www.instagram.com/p/9yHh9-sL3q/ (posted November 7, 2015, last visited December 23, 2015)

       D.      On October 14, 2015, the Debtor posted the following photographs:



https://www.instagram.com/p/80Hm94sL2w/?taken-by=50cent  (last visited December 23, 2015).



https://www.instagram.com/p/8zy-nCsLyL/?taken-by=50cent  (last visited December 23, 2015).

       E.      A further review of the Debtor's social media accounts reveal other similar photos posted post-petition revealing the Debtor's appearance at numerous and varied entertainment related events.  The Proponents believe it is commonplace in the Debtor's industry for appearance fees and other remuneration to be received by the Debtor in connection with such appearances.  The Debtor has provided no detail to creditors regarding any such matters.

       F.      In early September, 2015, various news and media sources reported that the Debtor, via social media, had disclosed that the Debtor was the owner of a residence in Africa that was in the stages of completion.  As reported by the Huffington Post, the Debtor claimed, via Instagram, that "My crib is almost finished in AFRICA.  I'm gonna have the craziest housewarming party ever."  See, http://www.huffingtonpost.com/entry/50-cent-africa-home-after-bankruptcy_55f04c25e4b093be51bcf110 (last visited December 23, 2015).  The Schedules and Statement of Financial Affairs make no mention of

15

this property.  Similarly, the Debtor has failed to make any disclosure to creditors regarding this property, and has not amended the Schedules or Statement of Financial Affairs to provide information regarding this property.

### 3.4     Pre-Petition Litigation

As of the Petition Date, the Debtor was a party to certain pending litigation, as set forth in further detail in the Schedules and Statement of Financial Affairs, including, without limitation, an appeal relating to the Claims asserted by Sleek, a state court action against Sleek relating to corporate governance issues, and the action commenced by Lastonia Leviston.  Since the Petition Date, to the knowledge of the Proponents, the Debtor has not sought relief from the automatic stay to actively prosecute such appeals, although the Debtor has filed certain post-trial motions in connection with the Leviston action.  The Proponents question the economic benefit of continuing to prosecute any such matters, and believe that any such actions on the part of the Debtor in any event lack merit.  The Proponents believe that incurring ongoing expenses to prosecute such matters is not in the best interests of creditors generally.  Under the Plan, the Trustee will be charged with reviewing all such litigation, and will have the power to resolve all such litigation, including without limitation, the power to grant releases on behalf of the Debtor.  Certain other litigation pending against the Debtor was stayed as a result of the commencement of the Chapter 11 Case.

### 3.5     Key Events Leading to Chapter 11 Filing

The Debtor's bankruptcy filing was unanticipated by the Proponents, and commenced without advance notice to, or pre-petition discussion with the Proponents.  The Debtor, in pleadings filed with the Bankruptcy Court, has provided only the following statement identifying the factors contributing to the filing of the Chapter 11 Case:  "As a result of the Debtor's success, he has been fortunate to acquire a significant amount of assets.  Like many other celebrity entertainers that make their living in full view of the public eye, however, the Debtor has also accumulated a substantial amount of liabilities as well.  Notwithstanding this fact, the Debtor's bankruptcy filing is not primarily a result of excessive current expenses exceeding his current revenues, but rather the substantial costs of litigation and resulting awards against him in the past year which total in excess of $20 million. . .".

The Proponents believe that the foregoing explanation on the part of the Debtor is not complete, and is at least somewhat misleading.  The judgments that have been entered against the Debtor are the result of (a) actions undertaken volitionally by the Debtor resulting in claims against him, and (b) volitional decisions of the Debtor to engage in litigation strategies that have refused to address good faith settlement proposals, resulting, instead, in trials and arbitration proceedings that were resolved adversely to the Debtor.  Stated differently, it is the Proponents' view that the Debtor has chosen an ill-founded course of conduct and subsequent litigation tactics which have resulted directly in more than $25,000,000 in judgments and jury verdicts being entered against him.  Throughout that process, the Debtor has engaged in litigation tactics and incurred litigation expenses which have resulted in material expenditures of professional fees, with ultimately, little to no benefit to the Debtor.  The Debtor has in some instances, simply refused to pay for professional fees incurred, resulting in some of the Claims asserted in the Chapter 11 Case.  In addition, in the opinion of the Proponents, the Schedules and Statement of Financial Affairs reflect that the Debtor has lived an extravagant lifestyle at the expense of creditors, whose Claims the Debtor has steadfastly refused to pay, preferring instead an ongoing litigation strategy intended to defer payment of legitimate Claims for as long as possible  This behavior appears to have continued by the Debtor since the commencement of the Chapter 11 Case, as reflected earlier in this Disclosure Statement.  Finally, the Proponents contend that public conduct undertaken by the Debtor since the Petition Date, as reflected in the foregoing provisions of this Disclosure Statement, belies any contention on the part of the Debtor that the Chapter 11 Case was filed for any legitimate reason, or that the Debtor

16

has any actual intent to take affirmative action to restructure his financial affairs or pay his indebtedness to creditors. Rather, the Proponents believe that the Debtor interposed the Chapter 11 Case solely for purposes of delay, as evidenced by the Debtor's failure to take any meaningful action to share relevant financial information with creditors, and his failure to propose a plan of reorganization. The Proponents believe that the only means by which creditors will receive payment on account of their Claims will be by the structure proposed by the Plan, which is described in more detail below.

## SECTION IV: EVENTS DURING THE CHAPTER 11 CASE

**4.1** **Post-Petition Events.**

There have been few events of any significance that have occurred during the pendency of the Chapter 11 Case. The Debtor has made no apparent effort to move towards the formulation or proposal of a plan of reorganization, and has engaged in no discussions with creditors regarding a plan. The Debtor took no action to extend the exclusive period for filing a plan of reorganization. The Debtor has produced limited financial information only after the issuance of subpoenas, and the information that has been produced has been only marginally responsive to creditor requests. In sum, the Debtor has, as a practical matter, done nothing to proceed towards good faith reorganization or the payment of the Claims of creditors. The following is a summary of the few events of any significance that have occurred in this case:

(a)     Immediately upon filing of the Chapter 11 Case, Lastonia Leviston, one of the Proponents, moved for relief for the automatic stay so as to continue and complete the trial of then pending state court litigation against the Debtor. The Debtor objected to the Motion. The Debtor's objection was overruled, the state court proceeding involving Ms. Leviston went forward, and a jury verdict was ultimately issued against the Debtor in the amount of $7,000,000.00. The Debtor has sought to have the damages reflected by the verdict reduced, but no ruling on any such request has yet occurred.

(b)     The Debtor has filed numerous motions seeking authority to retain professional persons as outlined further below. Most all of the motions were objectionable to one or more of the Proponents and/or to the United States Trustee, primarily because the Debtor sought repeatedly to obtain pre-approval of the anticipated fees and expenses of counsel, notwithstanding the lack of any basis for such relief. With the exception of limited instances in which creditors agreed to limited pre-approval, creditors objected to every other application filed by the Debtor seeking such relief. In keeping with what the Proponents believe to be the Debtor's general litigation "strategy" the Debtor refused to compromise most objections filed by the creditors. Only after a hearing with respect to the initial group of such motions before the Bankruptcy Court, and upon realizing that the motions would not be approved as requested did the Debtor consent to modified relief acceptable to creditors. The Debtor subsequently agreed to negotiate retention terms in other instances, in connection with the entry of orders approving retentions.

(c)     The Debtor negotiated with creditors for the entry of an agreed order that governed the procedures for the production of documents and the conducting of examinations under Bankruptcy Rule 2004. Such agreed order was entered by the Court on October 22, 2015. Pursuant to document requests made of the Debtor by Sleek before such order was entered, and thereafter pursuant to subpoenas for such documents issued in accordance with the order, the Debtor produced documents on November 13, 2015. The Proponents believe that such documents were not wholly responsive to the document requests. The Debtor has responded to requests made by the Proponents for additional documents to rectify the non-responsiveness of the Debtor's existing production, and produced a limited number of additional documents. The Proponents have ongoing questions regarding the completeness of the information provided by the Debtor.

(d)      Shortly after obtaining Bankruptcy Court approval of the proposed retention of the Debtor's pre-petition financial advisor, GSO Business Management, LLC as the Debtor's post-petition Financial Advisor and Accountants, the Debtor filed a motion seeking to obtain approval of Boulevard Management to serve in the same capacity, advising creditors that the Debtor had determined to terminate his relationship with GSO. No meaningful information for this change in professional services providers has been provided by the Debtor, other than an allegation that the cost of Boulevard Management's services would be less than the cost of GSO's services. Sleek and Leviston objected to the retention of Boulevard Management. That matter was resolved on January 6, 2016, and awaits entry of an Order of the Bankruptcy Court approving Boulevard Management's retention.

(e)      The Debtor has filed various motions seeking to limit public access to information relative to certain of the Entities described in this Disclosure Statement with which the Debtor has dealings. Creditors have consented to such motions, and to related Non-Disclosure Agreements, so as to facilitate the delivery of related information to creditors.

(f)      The Debtor commenced the cause of actions described in Section 3.3(c) of this Disclosure Statement.

(g)      On November 10, 2015 the exclusive period for the Debtor to file a plan of reorganization expired, without the Debtor having filed a plan. The expiration of the exclusive period provided the Proponents with the opportunity to file the Plan.

**4.2    Professional Retentions.** The Debtor has sought to retain numerous professional persons through the Chapter 11 Case as outlined below, at what would appear to be potentially material expense to creditors. On September 30, 2015, the Court entered its Order Pursuant to 11 U.S.C. §105(A) and 331 Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals, addressing the means by which interim compensation could be paid to retained professionals pending final approval of compensation requests under Section 330 and 331 of the Bankruptcy Code (the "**Fee Procedures Order**"). Since the entry of the Fee Procedures Order, only two requests for interim monthly compensation have been actually filed by retained professionals as required under the terms of the Fee Procedures Order. The Proponents are currently investigating the extent to which post-petition payments to professional persons may have been made without compliance with the Fee Procedures Order of the Court.

Under the terms of the Plan, the need for many if not all of the following professional persons will be eliminated. A summary of these retentions is set forth below:

(a)      GSO Business Management, LLC.    On September 18, 2015, the Bankruptcy Court entered an Order approving the application to employ GSO Business Management LLC as the Debtor's financial advisor and accountants, to be compensated in accordance with §§ 330 and 331 of the Bankruptcy Code. On November 3, 2015, the Debtor indicated that he had terminated his relationship with GSO. GSO had not filed an application for compensation as of the filing of the Plan. The Proponents do not presently know the extent to which GSO claims to hold a Claim for Professional Fees. The Monthly Operating Reports filed by the Debtor reveal post-petition payments to GSO which may not have been made in compliance with the Fee Procedures Order. The Proponents are investigating such payments.

(b)      Neligan Foley.    On September 30, 2015, the Court entered an Order authorizing the retention of Neligan Foley as the Debtor's attorneys, to be compensated in accordance with §§ 330 and 331 of the Bankruptcy Code. Neligan Foley's Application for retention and employment disclosed a retainer in the amount of $150,000, out of which prepetition fees and expenses were paid in the amount of

$7,995, leaving $142,005.00 in trust as of the date of the petition. Neligan Foley had not filed an application for compensation as of the filing of the Plan. The Proponents assume that Neligan Foley holds a Claim for Professional Fees, but does not know the current amount of such Claim.

(c)     Zeisler & Zeisler, P.C.   On September 30, 2015, the Court entered an Order authorizing the appointment of Zeisler & Zeisler, P.C. ("**Zeisler**") as the Debtor's attorneys under a general retainer, to be compensated in accordance with §§ 330 and 331 of the Bankruptcy Code. Zeisler's Application for retention discloses a retainer in the amount of $50,000. On November 20, 2015, pursuant to the Fee Procedures Order, Zeisler filed a First Monthly Fee Statement, covering the period from July 13, 2015 through October 31, 2015, and requesting $59,705.96 (equal to 80% of the fees and 100% of the expenses incurred in the period and subject to objection). No objections have yet been filed to this statement by any party in interest. The Proponents have no further information at this time regarding the possible Claim for Professional Fees that may be asserted by Zeisler.

(d)     Reid & Riege, P.C.      On September 29, 2015, the Court entered an Order authorizing the employment of Reid & Riege, P.C. as special conflicts counsel of the Debtor under § 327(e), to render those services to the Debtor that Neligan Foley, LLP and/or Zeisler are prevented from rendering due to any conflict of interest. The Order further ordered that Reid & Riege, P.C. be compensated in accordance with §§ 330 and 331of the Bankruptcy Code. The Proponents are not aware that Reid & Riege, P.C. has rendered any services whatsoever in connection with the Debtor's case, and have no further information at this time regarding any possible Claim for Professional Fees that may be asserted by this firm.

(e)     Robins Kaplan.   On September 18, 2015, the Court entered an Order approving the application to employ Robins Kaplan, LLP as special counsel for the Debtor under § 327(e) in connection with a host of prepetition litigation matters, including litigation against certain of the Proponents, and against the Debtor's former counsel, Garvey Schubert Barer, as described above. The Order further provided that Robins Kaplan be compensated in accordance with §§ 330 and 331 of the Bankruptcy Code, subject to the terms of certain fee accommodations provided to the Debtor as set forth in the engagement letters entered into by the Debtor with Robins Kaplan. Robins Kaplan's Application for employment disclosed a retainer in the amount of $275,000. On October 20, 2015, Robins Kaplan filed its first Monthly Fee Statement, covering the period from July 13, 2015, through September 30, 2015, and requesting $73,818.39 (equal to 80% of the fees and 100% of the expenses incurred in the period and subject to objection). No objections were filed to this Monthly Fee Statement. On November 18, 2015, Robins Kaplan filed a Second Monthly Fee Statement, covering the month of October, 2015 and requesting $38,990.72 (equal to 80% of the fees and 100% of the expenses incurred in the period and subject to objection). No objections have yet been filed to this Monthly Fee Statement. The Proponents assume that Robins Kaplan holds a Claim for Professional Fees, but does not know the current amount of such Claim.

(f)     Brewer.   On September 18, 2015, the Court entered an Order approving the application to employ Brewer, Attorneys & Counselors ("**Brewer**") as special counsel for the Debtor under § 327(e) in connection with certain pending litigation relating to Ms. Leviston. The Order further required that Brewer be compensated/reimbursed in accordance with §§ 330 and 331 of the Bankruptcy Code. Brewer's Application for employment indicated that Brewer was paid a flat fee for its services and a $200,000 retainer for the reimbursement of its expenses. On October 30, 2015, Brewer filed an Interim Application for Reimbursement, seeking $123,455.92 in expenses incurred from July 13, 2015 through October 15, 2015. After objections to this Application were filed by various parties in interest, Brewer agreed to reduce its request for reimbursement to $75,000.  An Order approving such resolution was entered by the Bankruptcy Court which authorized Brewer to withdraw $75,000 in funds from its retainer for application to its approved expenses, with the balance, in the amount of $27,450.45 to be held in trust by Zeisler pending further order of the Bankruptcy Court. It appears that there are no further services to

19

be provided by Brewer, and it does not appear that in any event Brewer will hold a Claim for Professional Fees.

(g)    Hamilton Group.  On September 18, 2015, the Court entered an Order approving the application to employ the Hamilton Group, LLC to perform appraisal and appraiser services for the Debtor, to be compensated via a flat fee under § 328 and not in accordance with §§ 330 and 331 of the Bankruptcy Court.  The Debtor has not made parties in interest aware of the results of any appraisal services provided by Hamilton Group.  No request for compensation has been made by this professional.

(h)    Douglas Elliman.  On September 30, 2015, the Court entered an Order authorizing the employment of Douglas Elliman of Connecticut, LLC as a real estate leasing agent and listing agent for the Debtor, regarding the lease and/or sale of 50 Poplar Hill Drive, Farmington, CT, to be compensated pursuant to §328 by a commission under the terms of his contracts with the Debtor.  The Proponents are not aware of any proposed sale or lease of the noted property, and no request for compensation has been made by this professional.

(i)    Lee & Thompson.  On October 30, 2015, the Debtor filed an application to employ Lee & Thompson, as special counsel in connection with a claim pending against the Debtor in England.  No Order of the Bankruptcy Court has yet been entered with respect to this application.

(j)    Boulevard Management.  On November 3, 2015, the Debtor filed an application to employ Boulevard Management as financial advisors and accounts, ostensibly in replacement of GSO Management.  Certain of the Proponents filed an objection to this application on November 18, 2015, which was resolved by an agreed order on January 6, 2016.

(k)    Brett Kimmel, PC.  On November 24, 2015, the Debtor filed an application to employ Brett Kimmel, PC as special counsel to the Debtor for certain domestic relations matters.  No Order of the Bankruptcy Court has yet been entered with respect to this application.


## SECTION V: LIQUIDATION ANALYSIS

### 5.1    Liquidation Analysis and Best Interests of Creditors

In order to confirm the Plan, the Bankruptcy Court must determine that the Plan meets the requirements of Section 1129(a)(7) of the Bankruptcy Code, i.e., the Bankruptcy Court must find that the Plan is in the best interests of all Impaired Classes under the Plan, and that the Plan provides to each Entity that may have rejected the Plan, a recovery which has a value at least equal to the value of the distribution that such Entity would receive if all of the Debtor's assets were liquidated under Chapter 7 of the Bankruptcy Code.  Attached hereto as **Exhibit "B"** is a liquidation analysis of the Debtor (the "**Liquidation Analysis**") prepared by AlixPartners LLP, financial consultants to Sleek.  The Liquidation Analysis is based upon a number of estimates and assumptions regarding liquidation proceeds and the liquidation process which are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Proponents.  **ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTOR WERE, IN FACT TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN IN THE LIQUIDATION ANALYSIS.**

In determining whether the requirements of Section 1129(a)(7) of the Bankruptcy Code have been met, the first step is to determine the dollar amount that would be generated from a hypothetical

liquidation of the Debtor's assets in Chapter 7. Such amount must then be reduced by the costs and expenses of the liquidation. Further reductions would be required to eliminate cash and asset liquidation proceeds that would be applied to secured Claims and amounts necessary to satisfy priority Claims that are senior to general unsecured Claims (including any incremental administrative expense Claims that may result from the termination of the Debtor's business and the liquidation of his assets). Consistent with the foregoing, the Liquidation Analysis is based upon a determination and estimation of the aggregate dollar amount that would be generated from the Debtor's assets if the Chapter 11 Case were immediately converted to Chapter 7 and the assets liquidated by a Chapter 7 trustee as promptly as possible. As to secured creditors, this analysis assumes that such creditors would receive their collateral for liquidation, and not be entitled to any further distribution on account of such claims from the proceeds of the remaining liquidation of the Debtor's property, and that the estate would recover any equity in such collateral.

The Debtor's assets consist primarily of the following: Cash and marketable securities which are convertible to Cash, equity in real estate holdings, including, the Debtor's primary residence, various personal property (books, pictures, clothing, art, jewelry), certain automobiles, and the Debtor's interests in the Related Entities and other business interests such as the Additional Entities. The Liquidation Analysis assumes that the value attributed to these assets (to the extent actually identified) by the Debtor in the Schedules was, in the case of assets other than Cash and marketable securities, a non-liquidation, or "fair market" type valuation, assuming a non-liquidation disposition. Accordingly, to take into account the inherent forced sale nature of any liquidation sale and the resultant possible ranges of value, the Proponents' Liquidation Analysis values each of these classes of assets on a "high" and "low" liquidation basis, which reflects a discounted value as against the presumed "fair market" value of the assets set forth in the Schedules. For purposes of the Liquidation Analysis, the "high" liquidation value is generally equal to 60% of the value of such assets set forth in the Debtor's Schedules, and the "low" liquidation value is generally equal to 40% of the value of such assets as set forth in the Debtor's Schedules, with Cash and cash equivalents receiving a higher valuation. Utilizing these assumptions, and assuming no material diminution in the amount of the Debtor's Cash or the value of marketable securities since the Petition Date, the Proponents' Liquidation Analysis assumes a "high" value of the Debtor's assets (other than interests in the Related Entities) in the amount of $16,175,626, and a "low" value of $12,285,449.

The Proponents have been furnished with minimal information that would allow them to perform a more detailed valuation of the Debtor's interests in the Related Entities, including without limitation, a determination as to whether adjustments exist which might be appropriate to adjust book value to liquidation value. As a result, the valuations provided with respect to the Related Entities are merely the book values provided by the Debtor in the Schedules without adjustments other than the Proponents' elimination of investments in partnerships reporting negative asset balances as reported by the Debtor. These valuations, after such adjustments, are reflected in the second page of the Liquidation Analysis in the "Net" column. Applying valuation factors estimated by the Proponents (which are consistent with the valuation factors applied to the other property described in the Liquidation Analysis) to this data suggests a "high" side valuation of the interests in the Related Entities of $2,913,166 and a "low" side valuation of $275,754. The Debtor has provided no meaningful information from which the Proponents are able to discern a more detailed liquidation value of such interests. Further, the Proponents have no information whatsoever relating to the valuation of the Debtor's interests in the Additional Entities, and thus no basis for asserting that the liquidation value of the Debtor's interests in the Additional Entities is anything other than zero.

In sum, utilizing the foregoing assumptions, the Proponents' liquidation analysis projects the total value of all of the Debtor's assets to be between $19,088,792 on the "high" side and $12,561.204 on the "low" side.

21

The Liquidation Analysis next seeks to estimate certain liquidation expenses such as brokerage commissions, certain tax consequences of the sale of marketable securities, and auction expenses, estimating the totality of such expenses to be $1,035,432 on the "high" side and $778,315 on the "low" side. Reducing the valuations by these amounts leaves anticipated net proceeds of liquidation of approximately $18,053,360 on the "high" side and $11,782,889 on the "low" side. These amounts are in turn reduced by the anticipated amount of allowable Secured Claims, and by filed Priority Claims, leaving an estimated amount available to unsecured creditors upon liquidation in the amount of $13,729,307 on the "high" side and $7,458,836 on the "low" side. Dividing these amounts by the estimated amount of unsecured Claims based upon the Schedules and proofs of Claim that were timely filed by the Bar Date, provides an estimated recovery for the holders of unsecured Claims in the amount of approximately 43% on the "high" side, and approximately 23.5% on the "low" side.

The Proponents note that while Causes of Action are preserved under the Plan for prosecution by the Trustee for the benefit of creditors, they have been unable to assign any meaningful valuation to the Causes of Action addressed by the Plan for purposes of the Liquidation Analysis, due primarily to the lack of meaningful information provided to creditors by the Debtor regarding the nature, extent and value of such Causes of Action. The Schedules and Statement of Financial Affairs provided no meaningful information to creditors regarding the existence of Causes of Action, yet alone with respect to the value of any Causes of Action. As set forth previously, Debtor has provided certain limited information regarding the amount of certain transfers made by the Debtor to third parties during the 90 day period prior to the Petition Date, but the reliability of that information is questioned by the Proponents and is in any event insufficient to permit the Proponents to determine whether any of the transfers identified would constitute avoidable transfers under the Bankruptcy Code. The Proponents are therefore not able to determine if such avoidance Causes of Action are ultimately material to the Liquidation Analysis. As noted previously as well, the Proponents are aware of a claim asserted by the Debtor against his former counsel in connection with the litigation that gave rise to the Claim held by Sleek, and of a new claim asserted by the Debtor relative to certain intellectual property. The Proponents are unable to determine whether such claims have merit, and/or what the value of such claims might be.

While it is possible, therefore, that the value of certain of the Causes of Action could have a material impact on the final Liquidation Analysis, the Proponents believe, given the lack of meaningful information regarding Causes of Action provided by the Debtor, that the potential existence of Causes of Action does not alter any of the conclusions set forth in the Liquidation Analysis with respect to anticipated recoveries for unsecured creditors upon liquidation under Chapter 7 of the Bankruptcy Code. To the extent such Causes of Action are determined to have value, that value may be utilized to accelerate payments otherwise required under the Plan to the benefit of creditors, and possibly the Debtor.

There are various other factors which may impact the reliability of the Liquidation Analysis. Liquidation of the assets may take longer than the Liquidation Analysis anticipates. Recoveries may be less than the percentages utilized in the Liquidation Analysis. Costs of liquidation may prove to be higher than estimated. In preparing the Liquidation Analysis, the Proponents did not retain third party experts to independently value individual assets, choosing instead to rely upon the representations of the Debtor in the Schedules and Statement of Financial Affairs. The Liquidation Analysis also is based in part upon an estimate of the amount of Claims that will ultimately become Allowed Claims under the Plan. Estimates for various classes of Claims are based solely upon the Proponents' preliminary review of the Claims filed in the Chapter 11 Case and as set forth in the Schedules and Statement of Financial Affairs as of the date of this Disclosure Statement. No order or finding has been entered by the Court estimating or otherwise fixing the amount of Claims at the projected levels set forth in the Liquidation Analysis. Finally, the largest unknown component of the Liquidation Analysis is clearly the value of the Related Entities. The Proponents have not been furnished with sufficient information by the Debtor to make a further determination as to whether the "book" value of the Debtor's interests in the Related Entities is

22

actually consistent with or comparable to the liquidation value of the Debtor's interests. It is possible that the value of the Related Entities may be higher than the "book" value identified by the Debtor and incorporated into the Liquidation Analysis, and it is also possible that there may be a limited marketplace for the Debtor's interests in the Related Entities, such that upon liquidation the value of such interests may alternatively be less than the Debtor's stated "book" value of such interests.

As set forth above, the Proponents believe that the greatest likelihood is that upon liquidation of the Debtor's assets, claims of unsecured creditors would not be paid in full. The Proponents' Plan proposes to provide unsecured creditors with full payment of their Claims, an amount which is in all likelihood in excess of the recovery that the Proponents project would be available under Chapter 7.

**5.2    Claims Process**

A general description of the Claims asserted against the Debtor in connection with the Chapter 11 Case is set forth previously in this Disclosure Statement. Upon confirmation of the Plan the Trustee will conduct a further analysis of Claims in connection with the Plan. Under the terms of the Plan, except as to applications for allowance of compensation and reimbursement of expenses under sections 330, 331 and 503 of the Bankruptcy Code, the Trustee shall have the exclusive right and authority to (A) make and file objections to all Claims, and (B) compromise, settle, otherwise resolve or withdraw any objections to such Claims without approval of the Bankruptcy Court, in each case with consultation with the Post-Confirmation Committee.

The actual final amount of Allowed Claims under the Plan may differ from the estimates of the Proponents as set forth herein. In such event, the amount of any Pro Rata distributions that may be made under the Plan with respect to unsecured Claims may be positively or negatively impacted by the Claims resolution process.

**SECTION VI: DETAILS REGARDING CLASSIFICATIONS,
TREATMENT AND IMPLEMENTATION OF THE PLAN**

**6.1    General Description of the Plan**

The Plan provides generally for the classification of Claims into four separate classes. Two classes are Unimpaired, and two classes are Impaired under the Plan. The two Impaired classes are each entitled to vote to accept or reject the Plan and the two Unimpaired classes are deemed to have accepted the Plan.

In general, the Plan provides for the turnover of all of the Debtor's Property to a Trustee appointed under the terms of the Plan. The Trustee will be required to accomplish a number of tasks. First and foremost, the Trustee will take charge of all of the Debtor's property and engage in an overall supervisory role with respect to the Debtor's business dealings, including, without limitation, the Debtor's rights under recording contracts, personal services contracts, and any intellectual property. The Debtor will be prohibited from engaging in any further business activities without the review, consent and approval of the Trustee. The Trustee will first liquidate certain of the Debtor's existing marketable securities and Personal Property, after making a determination as to what Personal Property the Debtor may require to continue his business. The Trustee will thereafter distribute the Proceeds thereof in a waterfall created under the Plan. The waterfall first takes into account the amounts necessary to pay administrative expense Claims arising in the Chapter 11 Case, Claims for Professional Fees, priority unsecured Claims and other anticipated future administrative expense claims, and provides for an initial distribution to the holders of unsecured Claims of all excess amounts received by the Trustee. All of these matters require the Trustee to consult with the Post-Confirmation Committee formed under the Plan,

and in most instances, to consult with the Debtor in the decision making process. The Trustee is specifically required to act in good faith and to review and consider good faith business proposals of the Debtor during the administration of the Plan.

The Plan appoints Richard M. Coan of New Haven, Connecticut as the Trustee. Mr. Coan's biography is accessible at the following link: http://www.clgmlawoffices.com/Our-Attorneys/Richard-M-Coan.shtml (last accessed December 29, 2015). Mr. Coan is a member of the panel of standing Chapter 7 Trustees in the United States Bankruptcy Court for the District of Connecticut who is well known to the Proponents, and who has significant experience in bankruptcy matters. The Proponents anticipate that the Trustee will utilize the services of other professional persons as specifically contemplated by the Plan, in particular professional persons with industry specific knowledge, to carry out certain of the Plan's provisions. The Proponents anticipate that the Trustee will identify and retain such professional persons in consultation with the Post-Confirmation Committee. The Post-Confirmation Committee created under the Plan will consist of each of the Proponents, or an appointed representative of the Proponents.

The Proponents believe that the anticipated future income that may be generated from the Debtor's ongoing business activities will be sufficient to satisfy the Claims of creditors, based, in the first instance, upon a review of the Debtor's budget as disclosed in the Schedules. That budget, as set forth in the Schedules, demonstrated an excess of monthly income over monthly expenses of the Debtor in the amount of approximately $77,000. The Proponents believe that this income stream can be increased based upon the ongoing operation of the Debtor's business activities, and based upon the Trustee's review and analysis of the Debtor's ongoing relationship with the Related Entities, who the Proponents believe may have the ability to fund additional cash flow to the Debtor for the benefit of creditors. The Proponents further believe that there may be amounts which may be monetized from the Debtor's recording contracts, personal services contracts, and intellectual property, and that the amount of the Debtor's monthly income over monthly expenses can be increased simply by a reduction in the level of monthly expenses that the Debtor funds to support his lifestyle. All of these matters will be subject to review, approval and administration by the Trustee, in various instances in consultation with the Post-Confirmation Committee. The Plan further contemplates that the Trustee, in consultation with the Post-Confirmation Committee will have the discretion to make certain excess distributions to the Debtor from the proceeds of the Debtor's ongoing business operations.

Consistent with the foregoing, future distributions to creditors under the Plan are determined based upon the future disposable net income of the Debtor, as generated by the Debtor's ongoing business operations; in effect, the Plan requires that the ongoing income generated by the Debtor's ongoing business be shared amongst the Debtor and the Debtor's creditors, with the Debtor receiving a monthly stipend from the Trustee sufficient to satisfy certain monthly expenses of the Debtor, comprised of ongoing domestic support obligations, tax obligations, and reasonable living expenses as reasonably determined by the Trustee. However, the Debtor's ability to receive payments from the Trustee is premised in part upon the requirements that there be sufficient income to also make an equal distribution to the Debtor's creditors. Thus the basic concept of the Plan is that the Debtor is required to work both for the benefit of creditors, and for the Debtor's own benefit, as long as creditors remain unpaid under the Plan. During this period of time, the Trustee is required to supervise, review and approve all aspects of the Debtor's business affairs for the benefit of creditors under the Plan. The Proponents anticipate that the Trustee will utilize professional persons with specific industry knowledge and experience to assist in this aspect of the operation of the Plan. Nothing in the Plan requires that the Debtor continue in the performance of his business operations. However, to the extent that the Debtor chooses to no longer engage in any business activities, there will be no future income available to the Debtor for purposes other than paying the claims of creditors under the terms of the Plan. The Plan requires that this arrangement continue until such time as the creditors have been paid in full with Interest, or for five years, whichever comes first. At that point in time, the Trustee may elect to continue the terms of the Plan for a longer

24

period of time, or to simply liquidate all then remaining Property of the Debtor for the benefit of creditors, after consultation with the Post-Confirmation Committee.

The Proponents believe that the structure of the Plan as outlined generally above is consistent with the concepts outlined in Section 1129(a)(15) of the Bankruptcy Code, which require the Debtor to contribute certain minimum amounts of disposable net income to the satisfaction of the claims of creditors for a period of at least five years, and with the provisions of the so-called "absolute priority rule" described in Section 1129 of the Bankruptcy Code which only permits the Debtor to receive or retain property under the Plan if the Claims of creditors under the Plan are either paid in full, or the holders of such Claims agree to accept less than payment in full of such claims.  Consistent with each of the foregoing principles, the Debtor is required to contribute all disposable net income generated from the post-confirmation operation of the Debtor's business to pay the Claims of creditors, and is not permitted to receive or retain any property under the Plan other than as specifically set forth therein until the Claims of creditors are paid in full.  The amount of disposable net income to which the Debtor is entitled, over and above the amount required to pay certain priority Claims will be determined by the Trustee, but is based, in the first instance, on the Debtor's own independent decision to continue to conduct his business. This in turn recognizes the inherent nature of the Debtor's business.  As a performer, the Debtor is in large measure free to decide when and/or if he will perform in the future.  Under the Plan, to the extent the Debtor chooses to perform and to otherwise carry out his business, he is required to share the income generated with creditors.  To the extent the Debtor chooses not to work or to otherwise not carry out his business, he is free to do so, but because the Plan provides the Trustee with the ability to make certain additional distributions to the Debtor from the proceeds of business activities, the Debtor should recognize an incentive to work diligently to satisfy creditor claims and to maximize his own potential income.  However, the Trustee is free, in the event the Debtor refuses to further perform, to liquidate all of the Debtor's property to satisfy the claims of creditors.  The Proponents believe that the Debtor will choose to continue his business activities so as to avoid liquidation, and to satisfy the Claims of creditors, and that it is in the Debtor's best interests to proceed in that fashion.

As structured, the Plan will provide to creditors an amount that is at least equal to any liquidation dividend the creditors would receive under a Chapter 7 liquidation.  However, by providing for a means of sharing in the ongoing disposable net income of the Debtor over the life of the Plan, the Proponents believe that the Plan will at a minimum, provide for a recovery by creditors that is in excess of any recovery they would receive upon a Chapter 7 liquidation, and that the likely outcome will be payment of 100% of the Claims of creditors, with Interest, as the Plan provides.  The Proponents also believe that there is a possibility that any recovery on account of the Causes of Action (especially relating to the action asserted by the Debtor against former professionals), while difficult to predict, would provide a potential extra basis for an earlier recovery for creditors.  The possibility of an earlier recovery on account of that matter, combined with the benefit to the Debtor from timely dealing with the Claims of creditors will, in the opinion of the Proponents, provide incentive for the Debtor to continue business operations as contemplated by the Plan, and to work cooperatively with the Trustee to effectuate the terms and conditions of the Plan.

**6.2**     **Means of Implementation of the Plan**

The details for the implementation of the Plan are set forth in detail in Article V of the Plan, and described generally above.  The key provisions of the Plan are the following:

(a)     Section 5.2 providing for the turnover by the Debtor and the Related Entities to the Trustee of all Cash and Scheduled Cash, and for the ongoing delivery to the Trustee of all Income After Withholdings.

25

(b)      Section 5.3 providing for the liquidation of the Debtor's Personal Property by the Trustee, and for the retention by the Debtor of certain "Debtor Retained Property" as determined by the Trustee for the maintenance and support of the Debtor.

(c)      Section 5.4 providing for the maintenance, preservation and prosecution of the Causes of Action by the Trustee.

(d)      Section 5.5 providing a comprehensive mechanism for the Trustee's comprehensive control of the Debtor's ownership interests in the Related Entities and for the supervision and approval of the Debtor's post-confirmation business operations.

(e)      Section 5.6, providing a comprehensive mechanism and process for the distribution of the Proceeds collected under Article V of the Plan for the benefit of the Debtor and creditors, in accordance with the priorities of the Bankruptcy Code and the terms and conditions of the Plan.

(f)      Sections 5.7-5.15, which provide a series of additional provisions for the Trustee's implementation of the terms and conditions of the Plan, including, without limitation, details on additional powers and duties of the Trustee, and the means for compensation of the Trustee.

(g)      Article VI, which provides certain injunctions and limitations on the Debtor's post-confirmation business activities.

(h)      Article VII which provides for the formation of the Post-Confirmation Committee.

**6.3      Feasibility of the Plan**

The Bankruptcy Code requires a determination by the Bankruptcy Court that the Plan is feasible and not likely to be followed by liquidation or the need for further financial reorganization, unless such liquidation or reorganization is provided for in the Plan.  As noted, in this instance, the Plan provides for the disposition of most all of the assets of the Debtor over a period of time for the benefit of creditors, and for the ongoing payment to creditors of income generated by the ongoing business operations of the Debtor until the claims of creditors are paid in full, and specifically contemplates the possibility of the liquidation of the Debtor as part of this process.  Further, the Plan is based, at one level, upon the ongoing ability of the Debtor to perform ongoing business services, and upon the Debtor's ongoing willingness to do so.  The amount payable to creditors and the timing over which those payments will occur is based, to an extent, on the Debtor's ongoing business operations.  However, the Plan is not rendered infeasible as a result of any determination by the Debtor not to continue in the operation of his business, as under such circumstances, all of the Debtor's Property will be liquidated for the benefit of creditors.   Thus, the Proponents believe that the Plan is feasible, regardless of any determination made by the Debtor with respect to future business operations.  The Proponents are unable to provide creditors with projections that would reasonably estimate the timing of any recoveries for creditors, because the Proponents lack sufficient information upon which to base those projections (for example, knowledge of the Debtor's future planned concert performances).   The Proponents caution that even if the Debtor indicates a willingness to continue his ongoing business operations, there is no means for projecting the future success of the Debtor, or the income that may be attributable to the Debtor's ongoing business activities. As a public performer, the Debtor's future business prospects are subject to many variables, not the least of which is the attitude and buying habits of the public.  The Proponents are unable to predict the degree to which the buying public may support the Debtor's ongoing business operations, or the degree to which the Debtor may prove to be relevant to the buying public at any time in the foreseeable future.

**6.4      Classification and Treatment of Claims**

As a preliminary matter, and as provided in section 1123(a) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, and Domestic Support Obligations are not classified for purposes of voting on or receiving distributions under the Plan.  All such Claims are instead treated separately pursuant to the terms set forth in Article II of the Plan.  The following is a general description of the treatment of those Claims and Equity Interests which are separately classified under the terms of the Plan.

(a)      Class I – Other Priority Claims

Class I is Unimpaired by the Plan.  Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan. Except to the extent that a holder of an Allowed Other Priority Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim on the later of the Effective Date and the date such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

(b)      Class II – Secured Claim of SunTrust Mortgage

Class II is Impaired by the Plan and entitled to vote on the Plan.  The Class II Claim set forth on Schedule 2 is deemed an Allowed Claim and an Allowed Secured Claim under the Plan, and to the extent the value of the Property that secures the Class II Allowed Secured Claim is determined (whether by sale as provided in the Plan, subsequent foreclosure following abandonment of such Property as set forth herein, or determination of the Bankruptcy Court) to exceed the amount of such Allowed Claim as of the Petition Date, the amount of such Allowed Secured Claim shall further include the amounts set forth in Section 506(b) of the Bankruptcy Code.

As an Allowed Secured Claim, the holder of the Class II Secured Claim shall retain all adequate protection payments, if any, received by such holder during the Chapter 11 Case, and shall further receive, in full satisfaction of such Allowed Secured Claim, Cash in an amount equal to such Allowed Secured Claim on the later of: (i) the Effective Date; (ii) the date such Claim becomes an Allowed Secured Claim; and (iii) the date the Property securing such Allowed Secured Claim is sold by the Trustee after the Effective Date with the consent of the holder of such Allowed Secured Claim and the Trustee has received the Net Proceeds of such Sale in immediately available funds.  Subject to the provisions of Section 5.3(a), any Cash Proceeds of any such sale in excess of the amount of the Allowed Secured Claim secured by such Property shall be retained by the Trustee and distributed in accordance with the remaining terms and conditions of the Plan.  The Trustee  may at any time abandon the Property securing such Claim upon giving not less than 30 days advance notice thereof to the holder of such Claim, and such abandonment shall terminate any treatment of such Claim as an Allowed Secured Claim and any payment obligation to the holder of such Claim as an Allowed Secured Claim under the Plan, provided however, that to the extent the Class II Claim is not satisfied in full through a sale as set forth in this Section 4.2, or foreclosure after abandonment, the holder of the Class II Claim shall be deemed to hold the SunTrust Deficiency Unsecured Claim as described in the Plan.  The holder of any SunTrust Deficiency Unsecured Claim must give prompt written notice of the existence of such Claim to the Trustee, and upon the giving of such notice, such Claim shall be deemed Allowed as a Class III Claim, and paid in accordance with the treatment provided to Class III Claims, except to the extent an objection to such Claim is filed by the Trustee in accordance with Section 10.1(c) of the Plan, and such Claim is thereafter disallowed by an order of the Bankruptcy Court. The holder of the Class II Allowed Secured Claim shall receive post-Effective Date interest payments as outlined in the Plan, at the non-default rate of interest set forth in the applicable loan documents, but may be required to repay amounts received in

the event it is later determined that such payments were not permissible under Section 506(b) of the Bankruptcy Code. Finally, the holder of the Class II Allowed Secured Claim shall retain its Lien, in accordance with the provisions of Section 4.2(d) of the Plan.

(c)    Class III – Unsecured Claims

Class III is Impaired by the Plan. Each holder of an Unsecured Claim is entitled to vote to accept or reject the Plan. Pursuant to the structure described in Article V of the Plan, each holder of an Unsecured Claim shall receive up to 100% of the Allowed amount of such Claim, plus Interest.

(d)    Class IV – Unimpaired Claims

Class IV consists of two groups of holders, both of which are Unimpaired under the Plan: (i) unsecured Claims in the amount of $8,000 or less, and (ii) the claim filed by ASCAP in the amount of $1,294,626.94. All Claims in Class IV of the Plan are unimpaired and conclusively presumed to have accepted the Plan and thus not entitled to vote to accept or reject the Plan. Each holder of an Unimpaired Claim described in subsection 4.4(a)(i) of the Plan shall receive, on the Effective Date, a single payment of Cash from the Trustee as provided in Article V of the Plan in the amount of 100% of the full amount of their Claims, with Interest, in full and complete settlement, satisfaction and discharge of such Claim. ASCAP's rights with respect to the Debtor, as identified in the proof of Claim filed by ASCAP shall be retained and unaltered under the Plan, and ASCAP shall be permitted to continue to exercise its recoupment rights against the Debtor after confirmation of the Plan, until such time as its Claim is fully satisfied. ASCAP shall receive no payment or Distribution under the Plan on account of its Claim.

**6.5**    **Other Important Plan Provisions**

The Plan also contains a number of additional provisions relating to the implementation of the Plan. Set forth below is a summary of a number of important Plan provisions in this regard:

(a) Limited Exculpation and Indemnification.

The Plan provides for the limited exculpation of the Trustee, the Proponents and the Post-Confirmation Committee for acts taken in connection with the Plan and the prosecution of the relief sought in the Chapter 11 Case, and requires the Debtor to indemnify the Proponents and the Post-Confirmation Committee under certain limited circumstances, as set forth in Sections 5.11, 15.3 and 15.11 of the Plan. The Plan does not provide for the general release of any party in interest under the Plan.

(b)    Executory Contracts and Unexpired Leases.

The Debtor identified a limited number of executory contracts and unexpired leases to which the Debtor was a party as of the Petition Date. The Proponents do not believe that the Debtor has necessarily identified every contract and agreement to which the Debtor was a party as of the Petition Date, based in part upon the assertions of various creditors in proofs of Claim and based upon information provided to the Proponents subsequent to the Petition Date. The Bankruptcy Code sets forth particular provisions with respect to the procedures for the assumption or rejection of such executory contracts and unexpired leases, including without limitation, the requirement that the Debtor cure defaults under contracts and leases which are to be assumed. Article XI of the Plan contains the provisions dealing with the assumption or rejection of such executory contracts and unexpired leases, and provides the Trustee generally with the right to determine whether to assume or reject the same. Article XI also contains

provisions relating to the filing of Claims arising from any possible rejection of such executory contracts and unexpired leases.

(c)    <u>Post-Confirmation Committee</u>.  The Plan contemplates that certain post-confirmation matters determined by the Trustee will be made in conjunction with discussions with the Post-Confirmation Committee created under the Plan  The Post-Confirmation Committee will consist of the Proponents or their designees.  The Plan's intent is that the Post-Confirmation Committee, as the holders of the most significant Claims against the Debtor, be closely involved in certain key decisions of the Trustee, including, without limitation, the disposition of the Causes of Action.

(d)    <u>Provisions Relating to Objections to Claims and Distributions under the Plan</u>.  It is possible that some Claims under the Plan may not be Allowed as of the Effective Date of the Plan on account of objections interposed by the Trustee or other parties in interest as set forth in the Plan.  As a result, it is necessary that the Plan contain particular provisions that relate to the assertion of objections to Claims, and as to distribution of dividends under the Plan on account of such Claims.  Article X contains specific provisions dealing with these matters, including, without limitation, providing the Trustee with the primary right to object to, compromise or otherwise resolve Claims, the creation of a reserve to address Disputed Claims, and distributions on account of Disputed Claims.

## 6.6    <u>Effect of Confirmation of the Plan, The Debtor's Discharge</u>

The legal effects of the confirmation of the Plan are prescribed generally by the provisions of the Bankruptcy Code.  However, the Plan contains two specific provisions relating to these matters which require particular mention:

(a)    <u>Vesting of Property</u>.  Upon the Confirmation Order becoming a Final Order, the only Property that shall vest in the Debtor shall be the Debtor's right to receive the Debtor Retained Property and the Debtor Monthly Distribution as set forth in the Plan.  Upon the earlier to occur of the time the Chapter 11 Case is closed in accordance with the Plan or payment of 100% of all Allowed Class III Claims with Interest, all remaining Property not otherwise liquidated for the benefit of the holders of Claims as set forth in the Plan, shall vest in the Debtor.

(b)    <u>The Debtor's Discharge</u>.  In addition, under the Plan the Debtor shall not be entitled to a discharge of any debt unless the Trustee files a motion with the Bankruptcy Court certifying that (i) the Debtor has complied with all of the terms and conditions of the Plan, and (ii) payment has been made to 100% of all Allowed Class III Claims with Interest.  No discharge granted to the Debtor shall be inconsistent with the terms of any Order of the Court determining that any debt is non-dischargeable, or with the provisions of Section 1141(d)(2) or (d)(6) of the Bankruptcy Code. The Plan permits creditors to seek non-dischargeability determinations with respect to their individual Claims against the Debtor, to the extent creditors perceive that determination to be necessary given the terms and conditions of the Plan.

(c)    <u>Retention of Jurisdiction</u>.  Article XIV of the Plan provides for the continued jurisdiction of the Bankruptcy Court with respect to various matters.

## 6.7    <u>Alternatives to Confirmation of the Plan</u>

The Debtor has not filed a plan of reorganization and, to the knowledge of the Proponents, has taken no action to either propose or discuss a plan with creditors.  No such discussions have taken place with the Proponents.  For the reasons previously outlined in this Disclosure Statement, the Proponents believe that it is reasonable to conclude that the Debtor has no intent to propose or negotiate a plan of reorganization with creditors in the foreseeable future, and that the Debtor's plan is to take as little action

as possible to address the claims of creditors for the longest period of time, while continuing to live an extravagant lifestyle at the expense of creditors, all as reflected in the prior provisions of this Disclosure Statement. The Proponents therefore anticipate that in the event the Plan cannot be confirmed, either by the affirmative votes of Impaired Classes of Claims under the Plan, or pursuant to Section 1129(b) of the Bankruptcy Code, there will be no other means available for satisfaction of the Claims of creditors other than to seek conversion of the case to Chapter 7, or to seek the independent appointment of a Chapter 11 trustee under appropriate provisions of the Bankruptcy Code who could seek to propose an alternative plan of reorganization for the Debtor. It is also possible that the United States Trustee could seek to convert the cases to Chapter 7, or that the Court could determine to enter an appropriate such order sua sponte.

The Proponents believe that it is likely that failure to confirm the Plan will result in a recovery for all creditor constituencies that will be less than the recoveries contemplated by the terms of the Plan.

## SECTION VII: TAX CONSEQUENCES OF THE PLAN

### 7.1    General

The following is a summary of certain U.S. federal income tax consequences to the Debtor and to certain holders of Claims that are expected to result from implementation of the Plan. This discussion is based on the Internal Revenue Code, as amended, treasury regulations in effect on the date of this Disclosure Statement, and administrative and judicial interpretations thereof which are available on or before such date. All of the foregoing is subject to change, which change could apply retroactively and could affect the federal income tax consequences described below. There can be no assurance that the IRS will not take a contrary view to one or more of the issues discussed below. No ruling has been applied for or received from the IRS with respect to any of the tax aspects of the Plan and no opinion of counsel has been requested or received by the Proponents with respect thereto. The following summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder of a Claim. The tax consequences to holders may vary based upon the individual circumstances of each holder. In addition, this discussion does not address any aspect of local, state or foreign taxation, or any estate or gift tax consequences of the Plan. The following assumes that the Plan will be implemented as described in the Plan and does not address the tax consequences if the Plan is not implemented.

THE TAX CONSEQUENCE OF THE PLAN ARE POTENTIALLY COMPLEX AND SUBJECT TO SIGNIFICANT UNCERTAINTIES. THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. EACH HOLDER OF A CLAIM IS URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.

### 7.2    Tax Consequences to the Debtor.

The Proponents lack information that would allow them to provide information regarding the tax consequences of the Plan for the Debtor, but have no reason to believe that such tax consequences are likely to be material. In general, the Plan provides a mechanism to satisfy Allowed Claims for taxes that may be held by creditors, and a means for the payment of ongoing tax obligations of the Debtor incurred after confirmation of the Plan. The Proponents anticipate that the most material tax implications of the Plan for the Debtor may be the possibility that certain capital gains taxes could be recognized upon the disposition of various Personal Property of the Debtor under the Plan, but again note that the Plan makes provision for the payment of tax obligations of

the Debtor which are not addressed through withholding arrangements imposed as a result of existing tax law.

**7.3**     **Tax Consequences to the holders of Claims.**

The federal income tax consequences of the Plan to a holder of a Claim will depend upon several factors, including but not limited to: (i) whether the holder's Claim (or a portion thereof) constitutes a Claim for principal or interest, (ii) the origin of the holder's Claim, (iii) the type of considerations received by the holder in exchange for the Claim, (iv) whether the holder is a resident of the United States for tax purposes, (v) whether the holder has taken a bad debt deduction or worthless security deduction with respect to this Claim, and (vii) whether the holder receives distributions under the Plan in more than one taxable year. Generally, a holder of a Claim will recognize gain or loss equal to the difference between the "amount realized" by such holder and such holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the Cash and the fair market value of any other consideration received under the Plan in respect of a holder's Claim. The character of any recognized gain or loss (e.g. ordinary income, or short-term or long term capital gain or loss) will depend upon the status of the holder, the nature of the Claim in its hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim.

Because the Plan contemplates that a portion of any Distribution on account of certain Claims will be determined based upon the potential value of Proceeds, which are to be paid Pro-Rata to the holders of certain Claims, the holders of such Claims will have to take into account the fair market value of their Pro Rata share, if any, of the anticipated Proceeds in determining the amount of gain realized and required to be recognized in connection with the Plan. In addition, since a holder's share of the Proceeds may change depending upon the resolution of Disputed Claims, the holder may be prevented from recognizing any loss in connection with the Plan until the time that all such Disputed Claims have been resolved.

**HOLDERS OF CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

Payors of interest, dividends, and certain other reportable payments are generally required to withhold a percentage of such payments if the payee fails to furnish such payee's correct taxpayer identification number (social security number or employee identification number) to the payor. The Trustee may be required to withhold a portion of any payments made to a holder of an Allowed Claim who does not provide its taxpayer identification number.

**SECTION VIII: RISK FACTORS TO BE CONSIDERED**

Holders of Claims against the Debtor should read and consider carefully the information set forth in this Disclosure Statement (and the documents delivered together with this Disclosure Statement and/or incorporated by reference), prior to voting to accept or reject the Plan.  As discussed in more detail throughout this Disclosure Statement, there are certain risks associated with the Plan.  The following sets forth a more detailed discussion of various such risks:

(a)     Objections to Classification     Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Proponents believe that the classification of

Claims under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion. In the event that the manner of classification proposed by the Proponents is not permitted by the Bankruptcy Court, the ability of the Proponents to obtain an affirmative vote of one or more Classes under the Plan could be affected. This in turn may make it more likely that the Proponents would be required to amend the Plan or to seek to confirm the Plan pursuant to Section 1129(b) of the Code, as outlined in greater detail below. The Plan also treats various groups of Claims as Unimpaired. It is possible that parties in interest may dispute the contention that such Claims are Unimpaired, and that certain holders of Claims may be entitled to vote on the Plan, notwithstanding the contention of the Proponents that such Claims are not impaired.

(b)     Risk of Non-Confirmation of the Plan. There can be no assurance, initially, that all impaired Classes of Claims under the Plan will vote to accept the Plan, as provided in Section 1129(a)(8) of the Bankruptcy Code. In the event that one or more Impaired Classes of Claims vote to reject the Plan, and the Proponents are required to seek confirmation of the Plan with respect to such Classes pursuant to Section 1129(b) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will find that the Proponents have met the applicable requirements of Section 1129(b) of the Bankruptcy Code. Even if all Classes entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court, because the Proponents fail to comply with one or more of the applicable provisions of Section 1129(a) of the Bankruptcy Code

As discussed herein, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization, and that the value of distributions to dissenting creditors be not less than the value of distributions such creditors would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. As set forth previously in this Disclosure Statement with respect to the discussion of the Liquidation Analysis of the Debtor, the Proponents believe that the Plan provides a greater dividend to holders of Claims than would be received in the event of liquidation of the Debtor under Chapter 7 of the Bankruptcy Code. However, there are risks associated with the Liquidation Analysis, and no assurance can be given that the Bankruptcy Court will agree with the Proponents' contentions.

Thus, while the Proponents believe that the Plan satisfies all the requirements for confirmation of a plan of reorganization under the Bankruptcy Code, there can be no assurance, however, that the Bankruptcy Court will conclude that the requirements for confirmation of the Plan have been satisfied.

(c)     Risks Associated with the Plan and the Debtor. The Plan contemplates that the payment of the Claims of creditors will come primarily from the liquidation of the Debtor's existing property, the reduction of the monthly living expenses presently incurred by the Debtor, and the delivery to creditors of anticipated future income from the ongoing operation of the Debtor's business activities. The most significant risk of the Plan is the possibility that the Debtor's future anticipated future income from the ongoing operation of the Debtor's business activities will be less than anticipated. The Proponents are unable to predict the degree to which the Debtor will cooperate with the Trustee, or refuse to cooperate with the Trustee in the implementation of the Plan and the performance of the obligations imposed upon the Debtor, but seek to provide reasonable incentives for the Debtor to perform post-confirmation services and to cooperate reasonably with the Trustee, who is in turn required to consult with the Debtor and the Post-Confirmation Committee in almost all significant determinations under the Plan. The Plan also anticipates that some level of recovery for creditors under the Plan may come from the resolution of the Causes of Action. Because the Debtor has provided little to no information regarding the Causes of Action, the Proponents are unable to evaluate meaningfully the risk that the Causes of Action will prove to have no value.

In addition to the foregoing, the amounts the Proponents anticipate as being required to be distributed to the holders of Claims as of the filing of the Plan are based on incomplete analysis of such Claims and the possible objections to such Claim.  Inherent in the Proponents' analysis in this regard are certain assumptions and estimates that the Proponents have made in connection with the Plan relating to the amounts necessary to satisfy such Classes of Claims, and the amounts required to be paid on account of professional fees, cure amounts, and other amounts which will be paid upon the Effective Date of the Plan, as set forth in the Plan.  The Proponents' information in this regard is based upon information that it has been able to obtain from the Schedules and filed pleadings, and may not be accurate in all respects. There can be no assurance that the assumptions and estimates made by the Proponents in this regard will ultimately prove to be accurate, either as of the Effective Date, or upon completion of the Claims resolution process, and it is possible that the amount the Proponents presently anticipate as being required to fund obligations under the Plan as of the Effective Date could be underestimated.

**CONCLUSION**

**The Proponents believe that the Plan provides the best recoveries possible for holders of Claims against the Debtor.  EACH OF THE PROPONENTS STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.**

Signatures on following page

Dated:  January 14, 2016

Sleek Audio, LLC

By:_____*/s/ Mark Krywko*_____
Its: President

SunTrust Bank

By:_____*/s/ Juan De Jesus-Cabellero*_____
Its: Senior Vice President

By:_____*/s/ Lastonia Leviston*_____
        Lastonia Leviston

Daniel F. Gosch
Gregory J. Guest
Dickinson Wright PLLC
200 Ottawa Ave., N.W., Suite 1000
Grand Rapids, MI 49503
Telephone: (616) 336-1015
dgosch@dickinson-wright.com

Michael R. Enright (ct10286)
Patrick M. Birney (ct19875)
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT  06103
Telephone: (860) 275-8290
menright@rc.com
pbirney@rc.com

Counsel for Sleek Audio, LLC

Elizabeth J. Austin (ct04384)
Pullman & Comley, LLC
850 Main Street, PO Box 7006
Bridgeport, CT  06601
Telephone 203-330-2000
eaustin@pullcom.com
Counsel for Lastonia Leviston

Lynne B. Xerras (Mass. Bar #632441)
(admitted pro hac vice)
Holland & Knight LLP
10 St. James Avenue
Boston, MA  02116
Telephone 617-523-2700
Lynne.Xerras@hklaw.com
Counsel for SunTrust Bank

34

Exhibit "A"

List of Transfers

Exhibit "B"


Liquidation Analysis



GRAPIDS 65934-1 387641v6