## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | | |
|---|---|---|
| IN RE: | § | **CHAPTER 11** |
| | § | |
| **CURTIS JAMES JACKSON, III,** | § | **CASE NO. 15-21233 (AMN)** |
| | § | |
| **DEBTOR.** | § | |

## DEBTOR'S OBJECTION TO THE DISCLOSURE STATEMENT TO THE JOINT PLAN OF SLEEK AUDIO, LLC, SUNTRUST BANK, AND LASTONIA LEVISTON

Curtis James Jackson, III (the "Debtor"), the debtor and debtor-in-possession in the above-captioned bankruptcy case, files this objection to the Disclosure Statement (the "Disclosure Statement") [Docket No. 308] to the Joint Plan (the "Plan") [Docket No. 307] of Sleek Audio, LLC ("Sleek"), Suntrust Bank ("Suntrust"), and Lastonia Leviston ("Leviston") (collectively the "Plan Proponents"), and in support states as follows:[1]

### I. PRELIMINARY STATEMENT

1.      By proposing the Plan, the Plan Proponents seek to subject the Debtor to a near-indefinite period of involuntary indentured servitude during which he will be required to work solely for the benefit of his creditors.  The Plan prohibits the Debtor from performing any post-confirmation work without the prior approval of the Trustee and requires him to turnover 100% of any post-confirmation income he earns directly to the Trustee.  If confirmed, the Plan would strip the Debtor of both his freedom to work and his ability to earn an income to support himself and his family.  By depriving the Debtor of these most fundamental freedoms, the Plan violates both the Bankruptcy Code and the United States Constitution and is patently unconfirmable.  In the history of the Bankruptcy Code, no bankruptcy court in this country has ever sanctioned a plan both prohibiting a debtor from working and requiring him to devote 100% of his future

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan and Disclosure Statement.

income to the satisfaction of creditors' claims.  This Court should not be the first.  Because the Plan it describes is unconfirmable on its face, the Disclosure Statement cannot be approved.

2.      The Disclosure Statement also cannot be approved because it contains little, if any, of the information necessary for creditors to make an informed decision regarding the Plan. Although creditors' recoveries under the Plan depend almost entirely on the Debtor's future income, the Disclosure Statement contains no projections and no analysis whatsoever of the source or amount of the revenue necessary to fund the Plan.  The Debtor has provided the Plan Proponents with thousands of pages of documents and offered to answer any questions regarding his business activities and financial condition.  Rather than reviewing the information they received or asking for additional information, the Plan Proponents choose to remain willfully ignorant, and the Disclosure Statement contains little more than unsupported allegations and baseless speculation regarding the Debtor's assets and financial condition.  The Plan Proponents' failure to provide any meaningful, supportable information regarding the funding of the Plan renders the Disclosure Statement deficient as a matter of law.  Because neither the Plan nor the Disclosure Statement comply with the requirements of the Bankruptcy Code, the Disclosure Statement should not be approved.

3.      By the time of the hearing on the Disclosure Statement, the Debtor will have proposed a plan that will deliver substantially greater value to creditors that the Plan Proponents' Plan.  Under the Debtor's plan, the Debtor will liquidate his non-exempt assets and voluntarily devote a portion of his future income to the payment of allowed claims.  The additional value delivered to creditors' under the terms of the Debtor's plan provides another reason for the Court to avoid the constitutional implications of the Plan Proponents' Plan by denying approval of their Disclosure Statement.

## II. LEGAL STANDARD

4.       To be approved, a disclosure statement must contain "adequate information" and describe a confirmable plan.  11 U.S.C. § 1125(b); *In re Quigley Co., Inc*., 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).   "Adequate information" means information sufficient to allow a hypothetical investor to make an informed judgment about whether to vote for or against the proposed plan.  11 U.S.C. § 1125(a)(1); *In re RVC, LLC*, 485 B.R. 492, 495 (Bankr. E.D.N.Y. 2012).  If the plan described in a disclosure statement is unconfirmable, solicitation would be futile and the disclosure statement should not be approved.  *Quigley*, 377 B.R. at 115-16; *RVC*, 485 B.R. at 495.   The Plan Proponents' Disclosure Statement does not contain "adequate information" within the meaning of Section 1125 and the Plan it describes is patently unconfirmable.  As a result, the Disclosure Statement cannot be approved.

## III. THE DISCLOSURE STATEMENT CANNOT BE APPROVED BECAUSE THE PLAN IS PATENTLY UNCONFIRMABLE

### A.       Overview of the Plan

5.       The Plan provides for the appointment of a Trustee chosen by the Plan Proponents to liquidate all of the Debtor's existing assets, administer all of the Debtor's post-confirmation business affairs, and make distributions to creditors.  Plan at § 5.  The Plan prohibits the Debtor from working without the prior approval of the Trustee, who has no experience in the entertainment industry.  *Id*. at § 6.1(a).  Assuming the Trustee grants the Debtor permission to work, the Debtor will be required to pay to the Trustee 100% of any income—not just disposable income, but *all* income—the Debtor receives until all claims are paid in full.  *Id*. at § 5.2(c).  In turn, the Trustee will determine how much, if any, of this income to pay to the Debtor as a stipend to cover basic living expenses.  *Id*. at §§ 5.6(a)(iv), (b)(i)(C).  However, there is no requirement that the Trustee make any distribution to the Debtor, even for basic living expenses.

*Id.*[2]  In other words, the Plan conditions the Debtor's access to food and shelter on the whims of the Trustee, who answers only to the Plan Proponents.

6.     The Plan also gives the Trustee the discretion to continue the Plan's term indefinitely, ensuring that the Debtor will be required to toil for the benefit of his creditors as long as any claims remain unpaid.  *Id*. at § 5.1(c).  And because the Plan strips the Debtor of his right to object to creditors' claims, including those of the Plan Proponents, the Debtor will be required to pay claims in the amount asserted by creditors regardless of the claims' merit.  *Id*. at § 5.7(a).  In short, the Plan Proponents seek to subject the Debtor to peonage—compulsive labor for the benefit of creditors—until all his debts have been paid in full.

**B.     Statement Regarding Confirmation Objections**

7.     The Debtor recognizes that objections to confirmation of a plan are generally not addressed in connection with approval of a disclosure statement.  However, the confirmation issues addressed in this objection are limited to fundamental aspects of the Plan that preclude confirmation as a matter of law.  Under these circumstances,  "[s]ubmitting the [D]ebtor to the attendant expense of soliciting votes and seeking court approval on a clearly fruitless venture would be costly and it would delay any possibility of a successful reorganization."  *In re Copy Crafters Quickprint, Inc*., 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) (quoting *In re Pecht*, 53 B.R. 768, 772 (Bankr. E.D. Va. 1985)).  Because the Debtor's "objections are restricted to those defects that [cannot] be cured by voting" and the "pertinent facts are undisputed," the Court can and should decide the confirmation issues addressed herein.  *Id*.  There are numerous additional deficiencies not discussed herein that preclude confirmation of the Plan and the Debtor reserves the right to raise those objections in the event the Disclosure Statement is ultimately approved.

---

[2]  As discussed more fully below, the Plan gives the Trustee near complete discretion regarding the timing and amount of any distributions to the Debtor, and does not require that the Trustee make any such distributions.

## C.    The Plan Violates the Thirteenth Amendment by Forcing the Debtor into Indentured Servitude and Cannot Be Confirmed

8.    The Disclosure Statement should not be approved because the Plan is patently unconfirmable.  The Plan purports to force the Debtor into an indefinite period of indentured servitude against his will for the benefit of his creditors.  Under the Plan, 100% of the Debtor's "Income After Withholdings," defined in the Plan as essentially 100% of the Debtor's future income from any source, must be turned over to the Trustee until all claims are paid in full.  Plan at § 5.2(c).[3]  To be clear, the Plan is not funded by the Debtor's *disposable* income as contemplated by Section 1129(a)(15), but by *all* of his assets and income for an indefinite period of time.  In turn, the Trustee—in consultation with the Plan Proponents—might mete out a sum he deems sufficient for the Debtor to satisfy basic living expenses.  *Id.* at §§ 5.6(a)(iv), (b)(i).[4] The Plan thus conditions the Debtor's access to food and shelter on the discretion of the Trustee and the Plan Proponents, whose sole purpose is maximizing the funds available to them under the Plan.  Neither the Bankruptcy Code nor the Constitution countenance such a result.

9.    "The Thirteenth Amendment to the Constitution prohibits slavery and involuntary servitude."  *In re Clemente*, 409 B.R. 288, 291 (Bankr. D. N.J. 2009).[5]  The Thirteenth Amendment also prohibits peonage, which is a form of involuntary servitude.  *Clyatt v. U.S.*, 197 U.S. 207, 218 (1905); *Clemente*, 409 B.R. at 291 ("Peonage, a subset of involuntary servitude, is the status or condition of compulsory service, based upon the indebtedness of the peon to the

---

[3] The Plan provides, in pertinent part, that "[c]ommencing as of the Effective Date and continuing until such time as all [unsecured] Claims have been irrevocably paid in full with Interest as set forth in the Plan, one hundred percent (100%) of the Income After Withholdings of the Debtor shall be payable solely and exclusively to the Trustee for distribution under the terms of the Plan."  Plan at § 5.2(c).

[4] As set forth above, there is no requirement that the Trustee make such distributions and thus no guarantee the Debtor will receive sufficient income under the Plan to meet even his most basic living expenses.

[5] The Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, except as punishment for a crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."  U.S. Const. Amend. XIII, § 1.

master.") (quotations omitted).  The "essence [of peonage] is compulsory service in payment of a debt;" "[a] peon is one who is compelled to work for his creditor until his debt is paid." *Bailey v. Alabama*, 219 U.S. 219, 242 (1911).

10.    Both Congress and the United States Supreme Court recognize that, by requiring an individual debtor to commit future earnings to the funding of a plan, certain provision of the Bankruptcy Code potentially run afoul of the constitutional prohibitions on peonage and indentured servitude.  For example, Section 1322(a)(1) requires a debtor to commit his future *disposable* income to the funding of a plan.  11 U.S.C. § 1322(a)(1) (emphasis added); *Clemente*, 409 B.R. at 291.  Cognizant of the constitutional issues raised by requiring a debtor to work for the benefit of creditors, Congress included certain "safety valves" for Chapter 13 debtors:

> For example, Chapter 13 is strictly voluntary and a debtor, with minor exception, has an absolute right to convert or dismiss the case whenever desired. 11 U.S.C. §§ 303(a), 1307(a). Moreover, no creditor may convert a debtor's ongoing bankruptcy case into Chapter 13, nor may a Creditor file a Chapter 13 plan on behalf of a debtor. 11 U.S.C. § 1321.

*Clemente*, 409 B.R. at 291.  "These safety valves presumably save the Chapter 13 reorganization scheme from violating the Thirteenth Amendment." *Clemente*, 409 B.R. at 291.

11.    The United States Supreme Court has acknowledged that Congress's "primary concern" in establishing these Chapter 13 protections was that the risk that "a debtor, whose future wages are not exempt from the bankruptcy estate [under Section] 1322(a)(1), would be compelled to toil for the benefit of creditors in violation of the Thirteenth Amendment's involuntary servitude prohibition." *Toibb v. Radloff*, 501 U.S. 157, 165-66 (1991) (citing H.R.Rep. No. 95-595, at 120).  At the time, the Court noted that "Congress' concern about imposing involuntary servitude on a Chapter 13 debtor [wa]s not relevant to a Chapter 11 reorganization" "*[b]ecause there [wa]s no comparable provision in Chapter 11 requiring a*

*debtor to pay future wages to a creditor.*"  *Id.* at 166 (emphasis added).  Implicit in the Supreme

Court's observation is the acknowledgment that requiring a Chapter 11 debtor to pay future

wages to a creditor absent certain statutory protections would potentially violate the Thirteenth

Amendment's prohibition of involuntary servitude.

12.    *Toibb* was decided in 1991, prior to the enactment of the Bankruptcy Abuse

Prevention and Consumer Protection Act of 2005 ("BAPCPA").[6]   After the enactment of

BAPCPA, an individual Chapter 11 debtor's postpetition wages *are* property of the debtor's

estate and remain so until the case is closed.  11  U.S.C. § 1115(a)(2).  In addition, a creditor may

institute an involuntary Chapter 11 against an individual debtor, a debtor has no right to convert

or dismiss an involuntary Chapter 11, and creditors may file plans without the debtor's consent.

11 U.S.C. §§ 101(41), 303(a), 1112(a)(2), 1121(c).  Thus, after BAPCPA "an individual Chapter

11 bankruptcy is more akin to that of Chapter 13, but, significantly, without the precautionary

safety valves."  *Clemente*, 409 B.R. at 292.  As a result, both courts and commentators have

acknowledged that BAPCPA raises serious constitutional issues with respect to individual

Chapter 11 debtors.  *Id.* at 291-92; *see also* Erwin Chemerinsky, CONSTITUTIONAL ISSUES POSED

IN THE BANKRUPTCY ABUSE AND CONSUMER PROTECTION ACT OF 2005, 79 Am. Bankr. L.J. 571,

586–88 (2005); Robert J. Keach, DEAD MAN FILING REDUX: IS THE NEW INDIVIDUAL CHAPTER

ELEVEN UNCONSTITUTIONAL?, 13 Am. Bankr. Inst. L. Rev. 483 (2005).

13.    In *Clemente*, an individual Chapter 11 debtor sought to convert his case to

Chapter 7 after the appointment of a Chapter 11 trustee.  409 B.R. at 290.  However, because of

the appointment of a trustee the Debtor did not have standing to initiate a motion to convert

under Section 1112(a)(1).  *Id.*  As a result, the debtor was effectively held captive in Chapter 11,

---

[6] Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, § 321, 119 Stat. 23 (2005).

which, after BAPCPA, required the debtor to devote his future income to the repayment of claims. *Id*. Recognizing the constitutional implications of requiring a debtor to devote future income to the repayment of creditors against his will, the court exercised its discretion to terminate the Chapter 11 trustee and convert the case. *Id*. at 295.

14.    The same constitutional considerations that troubled the court in *Clemente* are present in this case. By purporting to require the Debtor to devote 100% of his future income to the repayment of creditor claims until all claims are paid in full, the Plan violates the Thirteenth Amendment's prohibition on involuntary servitude. Although the Plan requires the Debtor to turnover 100% of his income to the Trustee, it does not require the Trustee to provide any funds to the Debtor, even such funds as may be necessary to satisfy the Debtor's basic living expenses. Under Section 5.6(a)(iv) of the Plan, the Trustee is only required to provide the Debtor with "such amount as reasonably determined by the Trustee, after consultation with the Debtor and Post-Confirmation Committee [i.e., the Plan Proponents] to permit the Debtor to satisfy any reasonable post-confirmation obligations of the Debtor pending delivery of the initial Debtor Monthly Distribution." Although the Debtor Monthly Distribution might include amounts necessary for the Debtor to pay basic living expenses, the Trustee has near total discretion in determining whether to make a Debtor Monthly Distribution. Plan at § 5.6(b)(i). As such, there is no guarantee that the Plan will even provide the Debtor with sufficient income to meet his basic living expenses. The Plan Proponents acknowledge this in the Disclosure Statement by admitting that "the Debtor's ability to receive payments from the Trustee is premised in part upon the requirements that there be sufficient income to also make an equal distribution to the Debtor's creditors." Disclosure Statement at 24.

15.    Implicitly acknowledging that the Court cannot legally require the Debtor to work for the benefit of his creditors against his will, the Plan Proponents argue that "[n]othing in the Plan requires that the Debtor continue in the performance of his business operations." Disclosure Statement at 24.  But the Plan Proponents also admit that, if "the Debtor chooses to no longer engage in any business activities, there will be no future income available to the Debtor for purposes other than paying the claims of creditors under the terms of the Plan."  *Id*. The Plan therefore presents the Debtor with a Hobson's choice:  work solely for the benefit of his creditors[7] in the hopes that the Trustee might deign to provide him with sufficient funds to meet his basic living expenses or, quite literally, starve.  That is no choice at all.

16.    As the Supreme Court has recognized, "there is little difference between not earning at all and earning wholly for a creditor" *Local Loan Co. v. Hunt*, 292 U.S. 234, 245 (1934).  "Pauperism may be the necessary result of either." *Id*.  And "simply filing for voluntary bankruptcy does not waive a debtor's Thirteenth Amendment right against involuntary servitude." *Clemente*, 409 B.R. at 293.  "A debtor must not be forced with the choice of either gaining a 'fresh start' through bankruptcy relief or becoming an indentured servant to creditors." *Id*.  Because the Plan would force the Debtor to choose between "not earning at all and earning wholly for [his] creditors," it violates the Thirteenth Amendment and cannot be confirmed.

17.    In addition to violating the Thirteenth Amendment's prohibition on involuntary servitude, the Plan also violates the most fundamental aspects of bankruptcy and public policy. To avoid any doubt that the Plan is intended to deprive the Debtor of even the most basic freedoms, the Plan expressly provides that the Debtor *cannot* work without the Trustee's express consent.  To that end, the Plan provides that "each and every aspect of the Debtor's post-

---

[7] Because the Plan requires 100% of the Debtor's income to be paid directly to the Trustee, any post-confirmation labor the Debtor performs will be solely for the benefit of his creditors.

confirmation business activities shall be subject to the express approval of the Trustee and that

"the Debtor is expressly enjoined  and prohibited from . . . [e]ntering to any contract for the

performance of personal services of any kind" "without the express written consent of the

Trustee."[8]  Plan at §§ 5.5(b), 6.1(a).  As the Supreme Court recognized over 80 years ago:

> [t]he power of the individual to earn a living for himself and those dependent
> upon him is in the nature of a personal liberty quite as much if not more than it is
> a property right. To preserve its free exercise is of the utmost importance, not only
> because it is a fundamental private necessity, but because it is a matter of great
> public concern . . . . The new opportunity in life and the clear field for future
> effort, which it is the purpose of the bankruptcy act to afford the emancipated
> debtor, would be of little value to the wage earner if he were obliged to face the
> necessity of devoting the whole or a considerable portion of his earnings for an
> indefinite time in the future to the payment of indebtedness incurred prior to his
> bankruptcy.

*Local Loan*, 292 U.S. at 245.  Following the Supreme Court's directive, this Court has previously

held that "it is against public policy to enter a Chapter 11 plan confirmation order which purports

to authorize and validate a *voluntary* assignment of an individual's future wages."  *In re Flor*,

166 B.R. 512, 516 (Bankr. D. Conn. 1994) (emphasis added).  It is self-evident that the policy

considerations that prohibit a voluntary assignment of wages are even more pronounced in the

context of an involuntary taking of the Debtor's wages, as proposed here.

18.    By depriving the Debtor of the freedom "to earn a living for himself and those

depending upon him" and requiring him to devote "the whole . . . of his earnings for an indefinite

period of time in the future to the payment of indebtedness incurred prior to his bankruptcy," the

Plan violates the fundamental constitutional and public policies that undergird the Bankruptcy

Code itself.  *Local Loan*, 292 U.S. at 245.  Both the Thirteenth Amendment and fundamental

bankruptcy policy prohibit the Court from requiring the Debtor to work for the benefit of his

---

[8] It should be noted that the Trustee has no experience in the entertainment industry and is ill-suited to serve, in effect, as the Debtor's post-confirmation business manager with no mechanism to resolve disputes regarding the Debtor's future business activities.  In that regard, the Plan is not only unconstitutional but it is also impractical and unworkable.

creditors as set forth in the Plan.  As a result, the Plan does not comply with federal law and

cannot be confirmed.

**D.      The Plan Cannot Be Confirmed Because it Does not Comply with the Provisions of the Bankruptcy Code**

19.      The Court need not decide the constitutional issues in order to deny approval of

the Disclosure Statement because the Plan also does not comply with the Bankruptcy Code.  To

be confirmed, a plan must comply with the provisions of the Bankruptcy Code.  11 U.S.C. §

1129(a)(1).  By requiring the Debtor to turnover 100% of his future income to the Trustee until

all claims are paid in full, the Plan violates both the letter and spirit of numerous sections of the

Bankruptcy Code and cannot be confirmed.

20.      The Plan is entirely premised upon the availability of the Debtor's future earnings

to fund the Plan and pay creditors' claims.  Under Section 1115(a)(1), the Debtor's post-petition

income earned "after the commencement of the case but before the case is closed" is property of

the Debtor's estate.  Because it is largely funded by the Debtor's future income, which is only

available to creditors so long as the case is open, the Plan is not feasible unless the Debtor's case

remains open until all claims are paid in full.  As a result, the Plan requires that the case will

remain open until all claims are paid in full.  Plan at § 6.3.  This sole purpose of this provision in

the Plan is to guarantee that creditors can capture all of the Debtor's future income until all

claims are paid in full.

21.      Rule 3022 of the Federal Rules of Bankruptcy Procedure governs the entry of a

final decree closing Chapter 11 cases.  Under Rule 3022, courts must enter a final decree closing

a debtor's case once the estate has been "fully administered."  The Advisory Committee Notes to

Rule 3022 provide that, in determining whether an estate has been fully administered, courts

should consider (1) whether the order confirm the plan has become final, (2) whether deposits

required by the plan have been distributed, (3) whether the property proposed by the plan to be transferred has been transferred, (4) whether the debtor or the successor of the debtor under the plan has assumed the business or the management of the property dealt with by the plan, (5) whether payments under the plan have commenced, and (6) whether all motions, contested matters, and adversary proceedings have been finally resolved.   However, the Advisory Committee Notes also provide that "[e]ntry of a final decree closing a chapter 11 case should not be delayed solely because the payments required by the plan have not been completed."  That is precisely what the Plan contemplates and, ultimately, depends upon.  By artificially keeping the Debtor's case open until all claims are paid in full, the Plan Proponents can effectively trap the Debtor between the Scylla of Section 1115(a)(1) and the Charybdis of Rule 3022. *Cf. Clemente*, 409 B.R. at 290 (observing that individual Chapter 11 debtor in case in which trustee had been appointed was stuck "between the Charybdis of § 1115 and the Scylla of § 1112").  In light of the constitutional constraints discussed above, the Bankruptcy Code cannot be construed to permit this result.

22.     The Plan also rests upon a tortured and inaccurate reading of Section 1129(a)(15). Under Section 1129(a)(15), a debtor is only required to devote his "disposable income," as that term is defined in Section 1325(b)(2), to the repayment of creditors' claims.[9]  Put differently, creditors cannot force a debtor to devote more than his "disposable income" toward the repayment of their claims in a plan. *See In re Ekstrom*, 2010 WL 1254893, at *9 (Bankr. D. Ariz. Mar. 23, 2010) ("[A] debtor may confirm a plan over [a] creditor's objection if the debtor complies with 11 U.S.C. § 1129(a)(15)").  Congress's intent that individual debtors be entitled to

---

[9] Although Section 1129(a)(15) only applies "if the holder of an unsecured claim objects," 11 U.S.C. § 1129(a)(15), it must be read in connection with the good faith requirement of Section 1129(a)(3).  *In re Osborne*, 2013 WL 2385136, at *4-5 (Bankr. E.D.N.C. May 30, 2013).  As discussed more fully below, the Plan does not comport with the requirements of Section 1129(a)(3).

keep a portion of their future wages over creditors' objections is further evinced by Section 1129(b)(2)(B)(ii), which provides that an individual debtor "may retain property included in the estate under section 1115" (i.e., future wages) over the objection of unsecured creditors in a cram down.  However, the Plan deprives the Debtor of that statutory right by requiring him to devote 100% of his income to the repayment of creditors' claim, over his objection and for an indefinite period of time.

23.      Sections 1115(a)(1) and 1129(a)(15), along with Rule 3022, must be construed so as to "avoid serious constitutional problems."  *Clemente*, 409 B.R. at 294 (citing *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)).  Under the doctrine of constitutional avoidance, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, [federal courts] will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."  *Edward J. DeBartolo Corp.*, 485 U.S. at 575.  "[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."  *Id.*, 485 U.S. at 575 (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895).  As set forth above, the Plan violates the Debtor's constitutional rights in numerous respects, and the Court should not construe Sections 1115(a)(1), 1129(a)(15), and Rule 3022 as authorizing the relief the Plan Proponents seek.

24.      Here, the Court can easily construe the applicable statutes in ways that do not violate the Debtor's constitutional protections.  Sections 1115(a)(1) and Rule 3022 should not be construed together as requiring a debtor to devote the entirety of his future income to the repayment of creditors' claims.  Under Rule 3022, a case must be closed when a debtor's estate is fully administered.  And unless the case is held open until all claims are paid in full, the Plan is

not feasible.  Keeping a debtor's case open artificially in order to capture all his future income

under Section 1115(a)(1) until all claims are paid in full does not comply with Rule 3022 and

violates the Debtor's constitutional rights.  The Court should not construe those provisions as

permitting a creditor to subject a debtor to indentured servitude against his will.

25.     Similarly, the Plan Proponents' attempt to use Section 1129(a)(15) as a basis to

require the Debtor to commit 100% of his future income to repaying creditors turns Section

1129(a)(15) on its head.  Section 1129(a)(15) is intended as a shield for creditors to prevent a

debtor from retaining property under a Chapter 11 plan without paying claims in full.  It was *not*

intended to be used by creditors as a sword to compel a debtor to devote all of his income to the

repayment of creditors' claims over his objection.  As set forth above, the Plan Proponents'

construction of Section 1129(a)(15) would subject all individual debtors to peonage or

indentured servitude against their will and in violation of the Thirteenth Amendment.

26.     Construed consistently with the Constitution, fundamental public and bankruptcy

policies, and the doctrine of constitutional avoidance, the Bankruptcy Code does not authorize

the relief the Plan Proponents seek.  Under any reasonable construction of Sections 1115(a)(1),

1129(a)(15), and Rule 3022, the Plan is not feasible and does not comply with the Bankruptcy

Code.  Accordingly, it cannot be confirmed.  11 U.S.C. § 1129(a)(1).

**E.      The Plan Cannot be Confirmed Because it is not Proposed in Good Faith**

27.     The Plan also cannot be confirmed because it is not proposed in good faith.  To

be confirmed, a plan must be "proposed in good faith and not by any means forbidden by law."

11 U.S.C. § 1129(a)(3).  The "good faith" standard requires a showing that the plan "was

proposed with honesty and good intentions and with a basis for expecting that a reorganization

can be effected." *Argo Fund Ltd. v. Bd. of Dirs. of Telecom Argentina, S.A. (In re Bd. of Dirs. of

Telecom Argentina, S.A.)*, 528 F.3d 162, 174 (2d Cir. 2008) (quoting *In re Koelbl*, 751 F.2d 137,

139 (2d Cir. 1984)).  "Good faith" "must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan . . . ."  *In re Genco Shipping & Trad. Ltd.*, 513 B.R. 233, 261 (Bankr. S.D.N.Y. 2014) (quoting *In re Leslie Fay Cos. Inc.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (citations omitted).  "Generally, a plan is proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code."  *Id.* (quoting *Leslie Fay*, 207 B.R. at 781) (citations omitted).  "The primary goal of chapter 11 is to promote the restructuring of the debtor's obligations so as to preserve the business and avoid liquidation."  *Id.* (quoting *Leslie Fay*, 207 B.R. at 781) (citations omitted). "Thus, good faith is shown when the plan has been proposed for the purpose of reorganizing the debtor, preserving the value of the bankruptcy estate, and delivering that value to creditors."  *Id.* "Good faith has been found to be lacking if a plan is proposed with ulterior motives."  *Id.* (citing *Koelbl*, 751 F.2d at 139).  Ultimately, the Court should determine whether a plan demonstrates a "fundamental fairness."  *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001).

28.     The Plan does not satisfy the good faith requirement of Section 1129(a)(3).  As set forth above, the Plan is designed to deprive the Debtor of basic, constitutionally guaranteed freedoms, including his freedom to work and earn a living, and seeks relief that is not permitted under the Bankruptcy Code.  As the Supreme Court recognized in *Local Loan*, the Bankruptcy Code is intended to provide debtors with "new opportunity in life and the clear field for future effort."  292 U.S. at 245.  By stripping the Debtor of his ability to earn a future income, the Plan violates these fundamental bankruptcy policies and does not "achieve a result consistent with the standards prescribed under the [Bankruptcy] Code."  *Genco*, 513 B.R. at 261.

29.      Further, the Plan is not designed to maximize recoveries to creditors.  The vast majority of the Debtor's income relates to personal services.  Thus, the difference in recoveries to creditors in a liquidation scenario and under the Plan depend upon the Debtor's willingness to continue to perform personal services in order to generate revenue.  Although the Plan is largely dependent on the Debtor's cooperation and future earnings, the Plan eliminates any economic incentive for the Debtor to work in the future by requiring that he turnover 100% of his income to the Trustee.  Even if the Debtor did consent to working under the direction of the Trustee and turning over 100% of this income to creditors (and he does not), the Plan will still have a materially adverse effect on his ability to generate revenue.  While the Plan contemplates that the Trustee will manage all of the Debtor's and Related Entities' post-confirmation business activities, there is no indication in the Disclosure Statement that the Trustee has the requisite knowledge or experience to do so.  The Trustee has no experience in the entertainment industry and, as a bankruptcy attorney, seems particularly ill-suited to successfully manage the Debtor's and Related Entities' operations.[10]

30.      It is inevitable that abruptly transitioning responsibility to the Debtor's and Related Entities' to the Trustee will result in a significant reduction in the Debtor's future income.  For example, business opportunities will certainly be lost once the counterparty learns that all of the Debtor's and Related Entities' commercial activities are subject to the Trustee's prior approval and oversight.  Similarly, key employees of the Related Entities may be unwilling to continue working under the direction of the Trustee given his lack of experience or his role as the Debtor's task master.  Neither the Plan nor Disclosure Statement addresses these very real

---

[10] Perhaps recognizing that the Trustee lacks the requisite knowledge and experience to properly manage the Debtor's business activities, the Plan purports to absolve the Trustee of any liability in connection with running the Debtor's business.  Plan at § 5.11.  The Disclosure Statement does not identify any consideration being given for this release and does not address why the Trustee should be entitled to be insulated from liability for negligence and breach of fiduciary duty under the Plan.

---

risks.  Instead, the Plan Proponents suggest that the Debtor's and Related Entities' future revenues can actually be *increased*.  As discussed below in connection with the Disclosure Statement, there is no basis for this assertion.

31.     Because the Plan is not designed to maximize the value of the Debtor's estate, the only apparent benefit to creditors is the ability to have significant, disputed claims resolved in their favor.  Under the Plan, the Debtor is prohibited from objecting to claims.  Plan at § 5.7(a).  The Trustee, who answers only to the Plan Proponents, has complete discretion in determining whether to object to claims.  *Id*.  The Debtor vehemently disputes the amounts of both Sleek's and Leviston's claims, both of which are the subject of pending litigation.  For example, although Sleek agreed to reduce its claim to $12,400,000 under the terms of a mediated settlement agreement, it has asserted claims in the Debtor's bankruptcy case in excess of $18,000,000.[11]  In addition, both Sleek's and Leviston's claims are currently subject to appellate review and other challenges and are thus subject to being reduced, modified, or vacated.  However, the Plan gives control of that pending litigation to a Trustee controlled by Sleek and Leviston.  By stripping the Debtor of his right to continue to litigate their own disputed claims, the Plan will confer a windfall on Sleek and Leviston and result in the automatic allowance of these claims regardless of their merit or the effect on the Debtor's estate.

32.     This alone reveals the Plan Proponents' lack of good faith in proposing the Plan.  In analogous contexts, courts regularly consider whether a party attempts to use the bankruptcy process to gain a tactical advantage in litigation in determining whether a party is acting in good faith.  *See, e.g., In re Mirant Corp*., 2005 WL 2148362, at *8 (Bankr. N.D. Tex. Jan. 26, 2005).

---

[11] Sleek agreed to reduce its claim under a mediated term sheet dated February 4, 2015.  The Plan does not give effect to this agreement.

The preferential treatment given to Sleek and Leviston under the Plan amounts to dispositive tactical advantage in their ongoing litigation with the Debtor and smacks of bad faith.

33.    The *ad hominem* attacks levied against the Debtor in the Disclosure Statement further illustrate that the Plan Proponents are not acting in good faith.  The Plan Proponents' allegations regarding the Debtor's conduct in this case are neither helpful to creditors, accurate, nor justified.  Since the outset of this case, the Debtor has worked to create a business plan that will enable him to make a significant distribution to creditors.  Among other things, this required the Debtor to assess each of the Related Entities and their business models.  The Debtor has made significant progress in reducing expenses and streamlining the Related Entities' operations in order to maximize their future revenue.  The Debtor has also been working to liquidate many of his non-exempt assets.  For example, the Debtor has been working to sell his real estate holdings at market value rather than liquidation value.  At the same time, the Debtor has worked tirelessly to maintain and promote his brand, perhaps the estate's most valuable asset.  The Debtor's plan, which will deliver substantially greater value to creditors than the Plan Proponents' Plan, is the result of those efforts.  Thus, the Plan Proponents' assertion that the Debtor has no intent to repay creditors is both unfounded and contradicted by the terms of the Debtor's plan.

34.    By including pictures from the Debtor's social media accounts and implying that the Debtor is hiding assets—an allegation for which the Plan Proponents have no factual support and have not raised other than in the Disclosure Statement—the Plan Proponents intentionally ignore that the Debtor is in the entertainment and promotion business and must maintain his brand and image (or those of the products he is promoting).  If the Plan Proponents had any legitimate concern over the content of the photos, they could have simply asked the Debtor to

explain their content.    Instead, the Plan Proponents opted to levy unsubstantiated and inflammatory accusations against the Debtor in a public forum.    If the Plan Proponents truly believed that the Debtor has failed to account for "material amounts of cash," they would have raised the issue prior to filing the Disclosure Statement.    The pictures have no relevance to the Plan and serve no purpose in the Disclosure Statement other than to disingenuously smear the Debtor and bolster their preposterous Plan.    The Court should not approve any disclosure statement containing the Plan Proponents' reckless and unjustified allegations against the Debtor.

35.    Considering the totality of the circumstances, it is obvious that the Plan Proponents have not proposed the Plan "for the purpose of reorganizing the debtor, preserving the value of the bankruptcy estate, and delivering that value to creditors." *Genco*, 513 B.R. at 261.    Instead, the Plan has been "proposed with ulterior motives" in order to liquidate the Debtor's assets, wrest control of the Debtor's business and litigation activities, and ensure the allowance of their own disputed claims without a hearing on the merits. *Id*.    The Plan does not reflect "fundamental fairness" in dealing with the Debtor and his creditors and is not proposed in good faith. *Coram Healthcare Corp*., 271 B.R. at 234.    Therefore, it cannot be confirmed. *Genco*, 513 B.R. at 261.

## IV. THE DISCLOSURE STATEMENT DOES NOT CONTAIN ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125

### A.    Overview of the Disclosure Statement

36.    The Disclosure Statement does not contain adequate information within the meaning of Section 1125(a)(1) because lacks critical information necessary for creditors to make an informed judgment about whether to vote for or against the Plan.    Rather than providing creditors with useful information regarding the Debtor's financial condition, assets, and the likelihood that the Plan will be successful, the Disclosure Statement primarily contains irrelevant

and unnecessary invective against the Debtor.  Indeed, the Disclosure Statement contains almost no information whatsoever about the feasibility of the Plan or creditors' expected recoveries.  As a result, it would be impossible for a creditor to make an informed decision regarding the Plan based on the information in the Disclosure Statement.

37.     Throughout the Disclosure Statement, the Plan Proponents attempt to sidestep the disclosure requirements of Section 1125(a) by alleging that they do not have sufficient information to make the required disclosures.  Indeed, it appears that Plan Proponents have undertaken no independent investigation into the Debtor's financial affairs or his willingness or ability to make the payments required by the Plan despite the fact that creditors' recoveries under the Plan are wholly dependent upon those very issues.

38.     In response to discovery requests served earlier in this case, the Debtor provided the Plan Proponents with thousands of documents containing all or much of the information the Plan Proponents claim that they do not have, including detailed financial records and bank account information.  The Plan Proponents have also chosen not to take the Debtor's Rule 2004 examination despite previously having received authority from the Court to do so.  As such, the dearth of information in the Disclosure Statement is solely the result of the Plan Proponents' own willful ignorance rather than any of the Debtor's actions

39.     The Plan Proponents' willful ignorance does not excuse them from the disclosure requirements of the Bankruptcy Code.  "The purpose of the disclosure process is to obviate, not necessitate, independent investigation before agreeing to a reorganization." *In re Michelson*, 141 B.R. 715, 719 (Bankr. E.D. Cal. 1992).  As the proponents of the Plan, the Plan Proponents bear the burden of complying with the disclosure requirements in Section 1125(a).  *In re Celebrity Resorts, LLC*, 2010 WL 5392657, at *7 (Bankr. M.D. Fla. Dec. 28, 2010).  For the reasons set

forth below, the Plan Proponents have not met that burden here and the Disclosure Statement

cannot be approved.

**B.      The Disclosure Statement Does Not Contain Adequate Information About Feasibility, the Means of Implementation of the Plan, and Creditors' Expected Recoveries**

40.     Under the Plan, creditor recoveries are largely dependent on two things:  the

liquidation of the Debtor's assets and the Debtor's future earnings.  However, the Disclosure

Statement contains hardly any information about either source of recovery.  Similarly, the

Disclosure Statement lacks any information about the costs of the Plan and the net effect on the

Debtor's estate.  "A plan is necessarily predicated on knowledge of the assets and liabilities

being dealt with and on factually supported expectations as to the future course of the business

sufficient to meet the feasibility standard in [S]ection 1129(a)(11)."  *In re Adana Mortg.*

*Bankers, Inc*., 14 B.R. 29, 31 (Bankr. N.D. Ga. 1981) (quoting Senate Report No. 95-989, 95th

Cong., 2d Sess. (1978) 121, U.S.Code Cong. & Admin. News 1978, 5907).  Because the

Disclosure Statement does not provide sufficient detail regarding those issues, it cannot be

approved.  *Id.*

41.     Although the Plan provides for the liquidation of all of the Debtor's assets and the

distribution of the proceeds to creditors, the Disclosure Statement provides no independent

information regarding the value of those assets.  Disclosure Statement at § 6.2(b); Plan at § 5.3.

While the Disclosure Statement lists the scheduled value of the Debtor's assets, the Plan

Proponents contend that these valuations are "speculative and unreliable."  Disclosure Statement

at §§ 3.3(a), (b).  Thus, according to the Plan Proponents' own assertions, creditors cannot rely

on the valuations provided in the Disclosure Statement.  While the Debtor contests that the

scheduled values of his assets are incorrect, the Plan Proponents bear the burden of providing

creditors with accurate and complete information regarding the assets to be distributed under the

Plan.  If the Plan Proponents believe the valuations set forth in the Disclosure Statement are

"speculative and unreliable," then they should obtain independent valuations of the Debtor's

assets and include those valuation in the Disclosure Statement.  The Plan Proponents' failure to

do so renders their own Disclosure Statement "speculative and unreliable" and precludes it from

being approved.

42.    The Plan Proponents' assertion that they "lack information to confirm the

valuations" of the Debtor's assets is simply wrong.  To date, the Debtor has provided the Plan

Proponents with thousands of documents and agreed to submit to a Rule 2004 examination.  The

Debtor has also filed a *Periodic Report Regarding Value, Operations, and Profitability of*

*Entities in Which the Estate of Curtis James Jackson III Holds a Substantial Or Controlling*

*Interest* [Docket No. 64] that contains financial information regarding each of the Related

Entities.  Further, the Plan Proponents have access to any additional information necessary to

complete an independent valuation of the Debtor's assets via the discovery process.  The Plan

Proponents' feigned or willful ignorance of the value of the Debtor's assets does not excuse them

from complying with the disclosure requirements of Section 1125(a).

43.    Beyond a liquidation analysis premised on valuations the Plan Proponents

contend are "speculative and unreliable," the Disclosure Statement fails to provide any of the

information that a hypothetical investor would need in order to make an informed judgment

about the Plan.  Because the Plan Proponents have neglected to provide any appraisals of the

Debtor's assets, including his real properties, there is no way for a hypothetical investor to make

a determination of the value of those assets.  *See In re Radco Properties, Inc*., 402 B.R. 666, 682

(Bankr. E.D.N.C. 2009) (disclosure statement that did not contain appraisals of debtor's

properties did not contain adequate information).  "A disclosure statement should provide the

average unsecured creditor 'what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution.'" *Id.* at 683 (quoting *In re Joseph A. Ferretti*, 128 B.R. 16, 19 (Bankr. N.H. 1991)). Conclusory allegations or opinions without supporting facts are not acceptable. *In re Ligon*, 50 B.R. 127, 130 (Bankr. M.D. Tenn. 1985).

44.     What little information the Plan Proponents do provide is contradictory, self-serving, and results-oriented. For example, in the section of the Disclosure Statement discussing the Debtor's assets, the Plan Proponents contend that the Debtor's interests in the Related Entities are "materially under-valued" at approximately $4.4 million. Disclosure Statement at § 3.3(b). However, in their liquidation analysis the Plan Proponents allege that the Debtor's interests in the Related Entities are only worth between $275,754 and $2,913,166. *Id.* at § 5.10. There is no factual support in the Disclosure Statement for either of these assertions.[12] The Plan Proponents' abject speculation regarding the Debtor's assets and financial condition, differing depending on its purpose, is wholly inconsistent with the disclosure requirements of Section 1125(a).

45.     The second source of creditors' recovery under the Plan is the Debtor's expected future earnings. However, the Disclosure Statement contains literally no information regarding the Debtor's expected future income or expenses. "Because the success of the [Plan] is clearly contingent on [the Debtor's future earnings and contributions], in order to provide adequate information, [the Plan Proponents] must disclose information regarding [the Debtor's] financial situation that shows [his] ability to make such contributions." *In re Forest Grove, LLC*, 448 B.R. 729, 735 (Bankr. D. S.C. March 3, 2011). Although the Plan Proponents contend that "the anticipated future income that may be generated from the Debtor's ongoing business activities

---

[12] If the Plan Proponents truly believe the Related Entities are materially undervalued, they should disclose their assessment of the values of those entities in the Disclosure Statement.

will be sufficient to satisfy the Claims of creditors" and that the Plan will "provide unsecured creditors with full payment of their Claims," Disclosure Statement at §§ 5.1, 6.1, the Disclosure Statement contains no evidence whatsoever to support these assertions.

46.    The Debtor's schedules reflect more than $30,000,000 in claims.  *See* Summary of Schedules [Docket No. 54].  According to the Disclosure Statement, the Debtor has "an excess of monthly income over monthly expenses . . . of approximately $77,000."  *Id*. at § 6.1.  Like their analysis of the value of the Debtor's interests in the Related Entities, the Plan Proponents' analysis of the Debtor's historical and future income is also inconsistent.   The Disclosure Statement reflects that, from July to October 2015, the Debtor had negative monthly cash flow. *Id*. at § 3.1.  Yet, in addressing the feasibility of the Plan, the Plan Proponents contend that the Debtor's future monthly net income will exceed $77,000 per month by an amount sufficient to pay all creditors in full.  *Id*. at § 6.1.

47.    While the Plan Proponents assert their belief that "this income stream can be increased" and that the Debtor's monthly expenses can be decreased, the Disclosure Statement does not provide a single definitive example of how the Debtor's future net income will be increased or how his monthly expenses can be substantially decreased.  Indeed, the Disclosure Statement is wholly silent as to the actual business activities that will generate the revenue necessary to fund the Plan.  The Plan Proponents' general reference to "the Debtor's recording contracts, personal services contracts, and intellectual property" provides creditors with no substantive information regarding the business activities the Plan Proponents expect to fund the Plan.  Disclosure Statement at § 6.1.  The Disclosure Statement does not address whether these

personal services contracts can be assumed under Section 365 or acknowledge that these activities are valueless without the Debtor's participation.[13]

48.     It appears that a significant portion of the revenue necessary to fund the Plan will come from the Related Entities.  However, the Disclosure Statement contains no information at all regarding the Related Entities' businesses or their revenue.  The Disclosure Statement does not explain how the Related Entities will continue to generate revenue while they are being continually depleted of all cash by the Trustee.[14]  Nor does the Disclosure Statement address how the Related Entities will be funded in order to ensure their viability in the future.

49.     The Disclosure Statement also fails to address how the Trustee, with no experience in the entertainment industry, intends to successfully manage all of the various Related Entities and their operations.  The Disclosure Statement's vague reference to the Trustee hiring "particular professional persons with industry specific knowledge" to assist him in implementing the Plan provides no meaningful insight into the Trustee's ability to manage the Debtor's post-confirmation business.  Disclosure Statement at § 6.1.  What professionals?  Does the Trustee, a bankruptcy lawyer, know who to call for advice on the cost of time in a recording studio or the best means of promoting a hip-hop album?  Who will the Trustee hire to assist him in managing a boxing promotions company?  Although the Trustee's ability to actually manage the Debtor's businesses is subject to significant doubt, the Disclosure Statement is silent as to this issue.

---

[13] The same is true for the Related Entities, all of which depend upon the Debtor's services, without which they have little if any value.

[14] In this regard, the Plan Proponents seem to have underestimated the potential harm to the estate caused by their pursuit of the Plan.  Although the viability of the Plan depends on income from the Related Entities, the Plan and Disclosure Statement portend the transfer of ownership and management of the Related Entities to a bankruptcy lawyer with no experience in the entertainment industry and the depletion of those entities' cash and assets.  As discussed above, it is inevitable that the uncertainty caused by the dissemination of  Plan will have an adverse effect on the Related Entities and their employees.

50.    The Disclosure Statement should include a detailed discussion of the means of funding the Plan and an analysis of the effect confirmation of the Plan will have on the Debtor's business activities.  Instead, the Disclosure Statement offers nothing but glib answers to these critical questions.  As a result, the Plan Proponents assertions regarding creditor's recoveries and the feasibility of the Plan are completely without support.

51.    The Plan Proponents' speculation and unfounded assertions in the Disclosure Statement fall far short of the disclosure requirements under Section 1125(a)(1).  "Because the knowledge of [the Debtor's] financial condition is essential before any informed decision concerning the merits of [the Plan] can be made, it is vital, if not a prerequisite, that a description of available assets [and] their value . . . be disclosed under [Section] 1125.  *In re Dakota Rail, Inc.*, 104 B.R. 138, 147 (Bankr. D. Minn. 1989).  "[S]heer speculation and wishful thinking" in the "absence of any form of corroboration or contract from the alleged sources of the funds" necessary to implement the Plan is not sufficient.  *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005); *see also In re Const. Supervision Servs., Inc.*, 2012 WL 4681414, at *4 (Bankr. E.D.N.C. Oct. 1, 2012) (disclosure statement to plan funded by debtor's future income must contain information regarding projected income and how it will be generated).

52.    Without the necessary information regarding the feasibility and means of implementation of the Plan, the Disclosure Statement also lacks sufficient information regarding creditors' expected recoveries, the timing of such recoveries, and whether they would fare better in a liquidation in Chapter 7.  Indeed, a hypothetical creditor reading the Disclosure Statement would not find even an estimate of the length of time required under the Plan for creditors to be paid in full.  Reliable, supportable information regarding the value of the Debtor's assets and the Debtor's future income is necessary for creditors to determine whether they would fare better in

Chapter 7 than under the Plan.  Although the Disclosure Statement contains a liquidation analysis, the Plan Proponents themselves allege that the values reflected in their liquidation analysis are "speculative and unreliable."  Therefore, it is not possible for creditors to accurately determine whether they would fare better under Chapter 7 by reviewing the Disclosure Statement.

53.    The Disclosure Statement also includes no information regarding the costs of the Plan and its effect on creditors' expected recoveries.  Although the Plan provides that the Trustee is entitled to monthly compensation from estate funds without any review by the Court, the Disclosure Statement contains no information whatsoever about the actual terms of the Trustee's employment or the amount of his compensation.  Disclosure Statement at § 6.2(f); Plan at § 5.8, 5.14, 15.4.  Similarly, the Plan provides that the Trustee and Post-Confirmation Committee are entitled to retain an unlimited number of professionals and that those professionals are also entitled to compensation from the Debtor's estate without further Court review.  *Id.*   However, the Disclosure Statement provides no analysis or estimate of the Trustee's and Post-Confirmation Committee's projected expenses.  Without this information, creditors cannot make an informed decision regarding their potential recovery under the Plan.

54.    The Disclosure Statement also neglects to address what executory contracts the Trustee intends to assume and reject.  To satisfy the requirements of Section 1125(a), a disclosure statement should address the potential assumption or rejection of executory contracts and the unsecured claim that may result from such rejection.  *See In re Ferretti*, 128 B.R. 16, 21 (Bankr. D.N.H. 1991) ("If there is nothing to reject that should be stated. If there is something to reject that should be stated along with the possible unsecured claim that might come out of that rejection.").  The Disclosure Statement also fails to discuss in any depth the Trustee's intent with

respect to the Debtor's claims and causes of action against third parties, including the claims asserted in various lawsuits to which the Debtor is currently a party.  At a minimum, the Disclosure Statement should identify all pending litigation and any litigation that is likely to arise and address the Trustee's intent with respect to such litigation.  *In re Galerie Des Monnaies of Geneva, Ltd.*, 55 B.R. 253, 259 (Bankr. S.D.N.Y. 1985), *aff'd*, 62 B.R. 224 (S.D.N.Y. 1986); *In re Mickey's Enters., Inc.*, 165 B.R. 188, 194 (Bankr. W.D. Tex. 1994).

55.    Further, the Disclosure Statement contains an outright misrepresentation regarding creditors' expected recovery in this case.  In the Disclosure Statement, the Plan Proponents assert that they "believe that the only means by which creditors will receive payment on account of their Claims will be by the structure proposed by the Plan . . . ."  Disclosure Statement at § 3.5.  Although stated as the Plan Proponents' "belief," this is a misrepresentation of both fact and law.  To the contrary, and as set forth in the Plan Proponents' own liquidation analysis, creditors would receive a significant distribution if the Debtor's case were converted to Chapter 7.  *See* Disclosure Statement at § 5.1 (estimating up to a 43% recovery to unsecured creditors in Chapter 7).  The Plan Proponents' alleged "belief" that creditors will only receive payment if the Plan is confirmed is both disingenuous and misleading.

56.    As set forth above, the Disclosure Statement contains no supportable information regarding feasibility, the means of implementation of the Plan, or creditors' expected recoveries.  "[I]n order to provide adequate information, [the Disclosure Statement] must disclose information regarding [the Debtor's and Related Entities'] financial situation that shows [their] ability to make such contributions."  *Forest Grove*, 448 B.R. at 735.  Here, the Disclosure Statement fails to show any factual basis for the Plan Proponents' assertion that creditors' claims will be paid in full under the Plan and does not contain any detailed projections regarding the

Debtor's expected income and expenses.  "Therefore, the [D]isclosure [S]tatement reflects rank speculation instead of adequate information each creditor in each class needs to decide whether to vote for or against the [P]lan."  *In re Howell*, 2011 WL 1332176, at *2 (Bankr. N.D. Ga. Jan. 21, 2011).  Accordingly, the Disclosure Statement does not comply with Section 1125(a) and cannot be approved.

## V. CONCLUSION & PRAYER

57.     The Plan violates the Thirteenth Amendment, the Bankruptcy Code, and public policy.  Because the Plan is unconfirmable on its face, solicitation of the Plan would be futile and the Disclosure Statement should not be approved.  Further, the Disclosure Statement does not contain the information necessary for creditors to make an informed decision regarding the Plan. Indeed, the primary purpose of a disclosure statement is to inform creditors of the debtor's business plan for paying their claims.  Although their Plan is dependent upon the Debtor's future business activities, the Disclosure Statement is devoid of any real business plan.  As a result, the Disclosure Statement does not contain "adequate information" within the meaning of Section 1125 and cannot be approved.  Accordingly, the Debtor requests the entry of an order (i) denying approval of the Disclosure Statement and (ii) awarding the Debtor any further relief the Court deems appropriate.

Dated:  February 15, 2016                    Respectfully submitted,


                                             **NELIGAN FOLEY LLP**

                                              */s/ Patrick J. Neligan, Jr.*
                                             Patrick J. Neligan, Jr.
                                             Texas State Bar No. 14866000
                                             pneligan@neliganlaw.com
                                             James P. Muenker
                                             Texas State Bar No. 24002659
                                             jmuenker@neliganlaw.com
                                             John D. Gaither
                                             Texas State Bar No. 24055516
                                             jgaither@neliganlaw.com

                                             325 N. St. Paul, Suite 3600
                                             Dallas, Texas  75201
                                             Telephone:  214-840-5300
                                             Facsimile:  214-840-5301

                                             **ZEISLER & ZEISLER, P.C.**

                                              */s/ James Berman*
                                             James Berman
                                             CT Bar No. 06027
                                             jberman@zeislaw.com
                                             10 Middle Street, 15ᵗʰ Floor
                                             Bridgeport, Connecticut  06604
                                             Telephone:  (203) 368-4234
                                             Facsimile:  (203) 367-9778

                                             **COUNSEL FOR THE DEBTOR**


                        **CERTIFICATE OF SERVICE**

        The undersigned hereby certifies that on the 15th day of February, 2016, that a true and
correct copy of the foregoing was service electronically via this Court's ECF notification system.

                                              */s/ Patrick J. Neligan, Jr.*
                                             Patrick J. Neligan, Jr.