UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No.  15-21233 (AMN) |
| CURTIS JAMES JACKSON, III, | : | Chapter 11 |
| *Debtor* | : | |
| | : | Re: ECF Nos. 660, 832 |
| | : | |
| | : | |
| CURTIS JAMES JACKSON, III, | : | Adv. Pro. No. 17-2005 (AMN) |
| *Plaintiff* | : | |
| v. | : | |
| REED SMITH LLP, and | : | |
| PETER RAYMOND, | : | |
| *Defendants.* | : | Re: AP-ECF No. 22[1] |
| | : | |

## MEMORANDUM OF DECISION AFTER TRIAL AND
## ORDER DETERMINING AMOUNT OF REED SMITH LLP'S PROOF OF CLAIM

*Appearances*

| | |
|---|---|
| Imran H. Ansari, Esq. (admitted *pro hac vice*) | *Counsel for* |
| Joseph P. Baratta, Esq. (admitted *pro hac vice*) | *Curtis James Jackson, III,* |
| Baratta, Baratta & Aidala, LLP | *Plaintiff and Former Debtor* |
| 546 Fifth Avenue, 6th Floor | |
| New York, NY 10036 | |
| | |
| John L. Cesaroni, Esq. | *Local Counsel for* |
| James Berman, Esq. | *Curtis James Jackson, III,* |
| Christopher H. Blau, Esq. | *Plaintiff and Former Debtor* |
| Zeisler and Zeisler | |
| 10 Middle Street, 15th Floor | |
| Bridgeport, CT 06604 | |
| | |
| Thomas G. Rohback, Esq. | *Counsel for Reed Smith, LLC,* |
| Allison M. Vissichelli, Esq. (admitted *pro hac vice*) | *and Peter Raymond* |
| Craig M. Reiser, Esq. (admitted *pro hac vice*) | *Defendants and Claimants* |
| Axinn, Veltrop & Harkrider, LLP | |
| 90 State House Square | |
| Hartford, CT 06103 | |

---

[1] Citations to the docket of this adversary proceeding number 17-02005 are noted by "AP-ECF No. __." Citations to the docket of the Chapter 11 case of Curtis James Jackson, III, Case No. 15-21233 are noted by "ECF No. _."

I.    **NATURE OF PROCEEDINGS**

This post-trial opinion determines whether and to what extent a claim for pre-petition legal fees will be allowed.

The legal fees were generated by the law firm Reed Smith LLP ("Reed Smith"), which represented Curtis James Jackson, III ("plaintiff" or "Mr. Jackson"), in two pre-petition litigation cases: (1) a New York state court case captioned *Lastonia Leviston v. Curtis James Jackson, III,* New York State Supreme Court, Index No. 102499/2010 (the "Leviston Case"); and (2) an unrelated appeal before the United States Court of Appeals for the Second Circuit captioned *Simmons v. Stanberry, et al.*, docket number 14-3106 (the "Simmons Case").

In the midst of a jury trial in the Leviston Case, Mr. Jackson filed a voluntary Chapter 11 bankruptcy petition commencing case number 15-21233 (the "Main Case") on July 13, 2015 ("Petition Date").  The bankruptcy filing led to a short delay in concluding the trial, but ultimately the Leviston Case resulted in a $7 million dollar verdict against Mr. Jackson.  Defendants Reed Smith and Peter Raymond ("Mr. Raymond" and collectively with Reed Smith, the "claimants") represented Mr. Jackson in the Leviston Case until he fired them, approximately eleven (11) weeks before the jury trial started.  Soon thereafter Mr. Jackson also terminated the firm in the Simmons Case.  Within the umbrella of the Main Case here, Reed Smith filed a proof of claim ("POC 18") for unpaid legal fees and costs incurred from December 2014 through termination in March 2015 for the Leviston Case, and from December 2014 through June 20, 2015 in the Simmons Case.  Main Case Claims Register, Proof of Claim 18-1.

Within the Main Case, Mr. Jackson objected to POC 18 on numerous grounds. Separately, he commenced this adversary proceeding alleging pre-petition legal

malpractice claims against the claimants and incorporating the arguments in his objection to POC 18 filed in the Main Case.  ECF Nos. 660, 832.  The parties agreed the entire dispute would be resolved within this adversary proceeding.  ECF Nos. 759, 762; AP-ECF No. 22, ¶ 5.

Familiarity with the court's prior decisions limiting the issues to be tried is assumed. *See*, Memorandum of Decision and Order Granting Motion to Dismiss Counts One, Three, Four, and Five, and Part of Count Two, AP-ECF No. 62; Memorandum of Decision and Order Granting Motion for Summary Judgment, In Part, and Denying Motion for Summary Judgment as to Proof of Claim, AP-ECF No. 395; Partial Judgment in Favor of Defendants, AP-ECF No. 400; and Order Certifying Partial Judgment as a Final Judgment, AP-ECF No. 409 (collectively, the "Prior Decisions").  Mr. Jackson appealed the Prior Decisions and the appeal remains pending.  AP-ECF No. 405.  *See, In re: Curtis James Jackson, III, (Curtis James Jackson, III v. Reed Smith LLP and Peter Raymond)*, United States District Court for the District of Connecticut, Case No. 3:21-cv-00911 (VLB).

The Prior Decisions narrowed the remaining dispute to whether and in what amount Reed Smith's POC 18 should be allowed, and if so, whether it should be reduced due to:

(1)    the lack of a written retainer agreement in compliance with 22 NYCRR 1215.1;

(2)    an alleged conflict of interest; or

(3)    the legal fees exceeding their reasonable value pursuant to 11 U.S.C. § 502(b)(4)[2] (the "Remaining Issues").
AP-ECF Nos. 62, 395.

---

[2]    The provisions of Title 11, United States Code, comprise the Bankruptcy Code.  Unless otherwise noted, references to statutes are to the Bankruptcy Code and are cited as Bankruptcy Code § __.

Upon Mr. Jackson's motion, the court entered a limited stay of proceedings related to the Remaining Issues to allow time for his appeal to proceed. AP-ECF No. 439. However, the court declined to further extend the stay after the initial period expired and scheduled trial to commence on July 14, 2022. AP-ECF Nos. 454, 460. *See also,* ECF No. 34 in *In re: Curtis James Jackson, III, (Curtis James Jackson, III v. Reed Smith LLP and Peter Raymond)*, United States District Court for the District of Connecticut, Case No. 3:21-cv-00911 (VLB).

A six (6) day bench trial was held on the Remaining Issues on July 14, 15, 18, 19, and September 19, and 20, 2022. The court found the testimony of the witnesses to be credible and, in particular, the testimony of Mr. Jackson, Mr. Raymond, Mr. Savva, and Mr. Farber appeared to be based on their recollections of events occurring eight to ten years earlier. Following the parties' post-trial briefing, oral argument was held on December 1, 2022. AP-ECF Nos. 577, 582, 583, 584.

## II.    JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over this adversary proceeding by virtue of 28 U.S.C. § 1334(b). This court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1), and the District Court's General Order of Reference dated September 21, 1984. While this adversary proceeding originally presented core and non-core claims, the resolution of the Remaining Issues (*i.e.,* the resolution of an objection to a proof of claim) is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A)(matters concerning administration of the estate) and (B) (allowance or disallowance of claims). This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, applicable here pursuant to Rule

7052 of the Federal Rules of Bankruptcy Procedure. All parties consent to this court entering a final order or judgment in this adversary proceeding. AP-ECF Nos. 28, p .9, n. 1; 367; *see*, Fed.R.Bankr.P. 7008, 7012(b).

### III.    PROCEDURAL HISTORY & BACKGROUND

Mr. Jackson is a well-known rap music artist, actor, producer, and business entrepreneur.[3]

### *Pre-Petition Litigation*

Years prior to the Petition Date, in 2010, Lastonia Leviston ("Ms. Leviston") brought tort claims against Mr. Jackson in New York state court. Reed Smith defended Mr. Jackson in the Leviston Case from 2010 until March, 2015, when Mr. Jackson fired them weeks before the state court trial.[4] Prior to the Petition Date, the jury returned a substantial verdict for compensatory damages in Ms. Leviston's favor.[5] Before the punitive damages phase of the Leviston Case could commence, Mr. Jackson filed bankruptcy.

### *Mr. Jackson's Chapter 11 Filing*

On July 13, 2015, Mr. Jackson filed a voluntary Chapter 11 bankruptcy petition, commencing the Main Case. ECF No. 1. After Ms. Leviston obtained relief from the automatic stay, the jury in the Leviston Case awarded her punitive damages bringing the total verdict against Mr. Jackson to $7,000,000.[6] In his bankruptcy Schedule F – Creditors Holding Unsecured Non-Priority Claims, Mr. Jackson listed Reed Smith as a creditor holding a disputed, unsecured claim. ECF No. 55.

---

3    AP-ECF Nos. 22, 67, ¶ 7.
4    AP-ECF No. 466-29.
5    ECF No. 7, AP-ECF No. 528, p. 85, L. 11-23.
6    Within the Main Case here, Mr. Jackson reached a compromise with Ms. Leviston to resolve her claims and paid her approximately $4,300,000, consistent with his confirmed Chapter 11 Plan.

### Reed Smith's Proof of Claim

Reed Smith's claim for legal fees relies on a 2004 engagement letter as the underlying agreement with Mr. Jackson (the "2004 Engagement Letter"). POC 18-1, p. 5. On November 3, 2015, Reed Smith filed POC 18 asserting an unsecured claim totaling $609,235.41 for attorney's fees and expenses in the Leviston and Simmons cases, summarized in the following table. POC 18.

| POC 18 | Leviston Case | Simmons Case | Total: |
|---|---|---|---|
| Attorney's Fees | $503,624.50 | $70,190.05 | $573,814.55 |
| Expenses | $34,019.72 | $1,401.14 | $35,420.86 |
| Total: | $537,644.22 | $71,591.19 | $609,235.41 |

Of the $34,019.72 of expenses in the Leviston Case, Reed Smith explained it previously billed Mr. Jackson for only $17,859.58, and the remaining $16,160.14 of expenses were billed for the first time in POC 18.

For the Simmons Case, Schedule 3 to POC 18 included a list of seven (7) invoices for work billed from December 16, 2014 through June 20, 2015, with attorney's fees totaling $47,330.05 and expenses totaling $1,276.93, for a total of $48,606.98 billed. POC 18-1, p. 11. With the comment "[t]hrough 7/12/2015," additional, previously unbilled attorney's fees of $22,860 and expenses of $124.21 were added, resulting in the $71,591.19 claimed for the Simmons Case. POC 18-1, p. 11.

### Mr. Jackson's Chapter 11 Plan

On May 25, 2016, Mr. Jackson proposed his Third Amended Chapter 11 Plan of Reorganization (the "Plan"). ECF No. 485. The Plan provided that Reed Smith's disputed claim (a non-priority, unsecured claim) would be paid its *pro rata* share of the Plan's seventy-four (74%) percent distribution to unsecured creditors upon allowance. ECF No. 552, Exhibit A, §§ 1.05, 10.06(a). Reed Smith voted to accept the Plan. ECF No. 535. The court confirmed the Plan on July 7, 2016. ECF No. 552.

Mr. Jackson made all payments required under his Plan, including payments of seventy-four (74%) percent to all allowed, non-priority unsecured claims.  An escrow account for disputed claims like Reed Smith's was also established.  Mr. Jackson earned his Chapter 11 discharge on February 2, 2017.  ECF No. 764.

The Plan provides the Disbursing Agent (provided for in the Plan) will disburse seventy-four (74%) percent of any allowed amount to Reed Smith, and will refund any balance to Mr. Jackson.  AP-ECF No. 22; ECF No. 552, Exhibit A, §§ 10.06, 10.07.

### *Mr. Jackson's Objection to POC 18 and the Adversary Proceeding*

Following Plan confirmation, Mr. Jackson objected to Reed Smith's POC 18.  ECF Nos. 660, 832.  On January 27, 2017, Mr. Jackson commenced this adversary proceeding against Reed Smith and Peter Raymond, incorporating his objections to POC 18 and alleging various theories of legal malpractice.  AP-ECF Nos. 1, 22.  As noted, the Prior Decisions eliminated the legal malpractice claims and narrowed the scope of the objection to POC 18 to the Remaining Issues.  No objection was made to the request for allowance of reimbursement of Reed Smith's expenses.

### The 2004 Engagement Letter Applicability Argument

The parties dispute whether the 2004 Engagement Letter could be the contractual basis for Reed Smith's representation of Mr. Jackson in the Leviston and Simmons Cases.  Mr. Jackson argues that because both the Leviston and Simmons Cases were based in New York, the New York rule requiring a written engagement letter – 22 NYCRR § 1215.1 – obligated Reed Smith to have a written engagement letter for each case.  Reed Smith agrees the New York rule applies and relies on the 2004 Engagement Letter to satisfy it.

But Mr. Jackson also challenges the 2004 Engagement Letter's applicability to the Leviston and Simmons Cases because those litigation matters were not named or anticipated in 2004. He argues a separate agreement – which the parties agree does not exist – would be required before the 2004 Engagement Letter could serve as the basis for legal fees and costs.

Should the 2004 Engagement Letter not satisfy 22 NYCRR § 1215.1, Reed Smith submits the exception found in 22 NYCRR § 1215.2 applies, allowing representation of an existing client without a new engagement letter under certain circumstances. AP-ECF No. 577, p. 21. In particular, Reed Smith argues its services were, "of the same general kind" as previously rendered to and paid for by the client, which Mr. Jackson disputes. 22 NYCRR § 1215.2.

Mr. Jackson's counsel acknowledged during post-trial oral argument that even if Reed Smith failed to comply with 22 NYCRR § 1215.1, and the services rendered did not fall within the exception set forth in § 1215.2, Reed Smith may still be entitled to reasonable fees under a *quantum meruit* theory. In that event, Mr. Jackson challenges the reasonableness of the attorney's fees, generally.

### The Conflict of Interest Argument

Another prong of Mr. Jackson's argument regarding the 2004 Engagement Letter's unenforceability stems from the inclusion of a fee sharing provision with Mr. Jackson's former attorney, Theodor Sedlmayr. The fee sharing provision entitled Mr. Sedlmayr to receive a portion of the fees paid to Reed Smith in compensation for his services acting as a liaison or co-counsel between Mr. Jackson and the law firm. During the initial two years of the Leviston Case, from 2010 to 2012, Mr. Sedlmayr represented not only Mr. Jackson but also another rap musician named William Leonard Roberts, II, known

8

professionally as Rick Ross.   During the Leviston Case, Rick Ross was at times considered to be a potential witness.   Mr. Jackson asserts the fee sharing provision violated New York Disciplinary Rule 2-107 and 22 NYCRR § 1200.0, Rule 1.5(g) as applied to the Leviston Case.   AP-ECF No. 463, p. 16.   In particular, Mr. Jackson argues Reed Smith (1) failed to obtain his consent for the fee sharing provision in the 2004 Engagement Letter to be applicable to fees incurred in the Leviston Case; (2) impermissibly shared fees that were not in proportion to the services Mr. Sedlmayr performed; and (3) included Mr. Sedlmayr in strategic decisions on the Leviston Case, including the decision not to seek discovery from Rick Ross knowing he had a conflict in interest in representing Mr. Jackson and Rick Ross.   AP-ECF No. 582, p. 13-14.   Because the fee sharing provision was invalid, Mr. Jackson argues the 2004 Engagement Letter is unenforceable as the contractual basis for Reed Smith's fees in the Leviston Case.   AP-ECF No. 582, p. 15.

Mr. Jackson also argues Mr. Sedlmayr's alleged conflict of interest from 2010 to 2012 infected Reed Smith's representation of Mr. Jackson in the Leviston Case during the time period at issue here, December 2014 through early 2015.   Mr. Jackson alleges Reed Smith's work was constrained and impacted by strategic decisions made during the time Mr. Sedlmayr was representing Mr. Jackson, during 2010 through 2012, and the taint of that alleged conflict should prevent Reed Smith's recovery on POC 18.

During trial, Mr. Jackson's counsel acknowledged, "the conflict of interest doesn't necessarily speak to [the Simmons Case] directly.   However, we do obviously contest now the work of Reed Smith at that time, particularly time where they're billing for the Simmons matter and also the amount that they billed."   AP-ECF No. 529, p. 22.

Before trial, Mr. Jackson advanced an argument that Reed Smith had its own conflict of interest because it avoided seeking discovery from Rick Ross, allegedly to prevent interfering with a potential stream of referrals from Mr. Sedlmayr.  AP-ECF No. 463.  Mr. Jackson's theory was that if Reed Smith conducted discovery of one of Mr. Sedlmayr's clients, it might upset him, and chill future referrals to Reed Smith.  Mr. Jackson's expert, Professor Bruce Green, testified that he based his opinion that the 2004 Engagement Letter violated the New York Rules of Professional Conduct in part on assuming such a factual scenario to be true.  However, the evidence at trial failed to support this theory, being devoid of the number of referrals by Mr. Sedlmayr to Reed Smith, the income stream generated by such referrals, or the parties' thoughts or motivations regarding the Sedlmayr – Reed Smith referral stream.  Mr. Jackson did not advance this argument in his post-trial briefing, AP-ECF Nos. 582, 584, or during his post-trial oral argument, and instead abandoned or waived it.

### Bankruptcy Code § 502(b)(4) Argument

Mr. Jackson makes a two-fold argument that Reed Smith's attorney's fees in both the Leviston and Simmons Cases exceed the reasonable value for the services provided pursuant to Bankruptcy Code § 502(b)(4).  First, he claims Reed Smith cannot sustain its burden to show the fees are reasonable because its time records are rife with block billing and vague entries precluding review.  As part of this argument, Mr. Jackson notes the trial testimony failed to add clarity to these imprecise entries.  Second, Mr. Jackson asserts Reed Smith incurred fees for work not reasonably calculated to produce a benefit to him because Reed Smith lacked a coherent trial strategy.

Reed Smith maintains its fees are reasonable under a lodestar analysis which it asserts is the predominate method of assessing reasonableness.  AP-ECF No. 577, p. 6.

### *Trial Regarding Remaining Objections to POC 18*

Prior to trial, the parties submitted proposed findings of fact and conclusions of law.  AP-ECF Nos. 463, 464.  During trial, Reed Smith called witnesses including Mr. Jackson, Mr. Raymond, and its expert witness, Professor Stephen Gillers.  Mr. Jackson called witnesses including himself, Theodor Sedlmayr, Stephen Savva, Evan Farber, Craig Weiner, and his expert witness, Professor Bruce Green.  The list of exhibits admitted during trial, with copies of each exhibit, is found at AP-ECF No. 597.  The court held post-trial oral argument on December 1, 2022.  AP-ECF No. 595.

## IV.  FINDINGS OF FACT

In accordance with Fed.R.Civ.P. 52 and Fed.R.Bankr.P. 7052, after consideration and analysis of the trial testimony, the documents admitted into evidence, examination of the official record of the Chapter 11 case and the instant adversary proceeding, I find the following facts.

### *Theodor Sedlmayr*

Theodor Sedlmayr is an attorney specializing in entertainment transactional law.[7] In 2002, Mr. Jackson retained Mr. Sedlmayr to represent him in a variety of matters including recording contract negotiations, branding, music publishing, and film and television transactions.[8]  From 2002 to October 2012, if Mr. Jackson required specialized or non-entertainment related legal assistance, Mr. Sedlmayr assisted him by finding other lawyers to represent him, and then acting as a liaison or advisor on those matters.[9]  Mr. Jackson generally compensated Mr. Sedlmayr for his services as a liaison with a percentage of the other attorney's fees, depending on each specific arrangement.[10]  In

---

[7]    AP-ECF No. 572, p. 17, L. 12-14, p. 18, L. 6.
[8]    AP-ECF No. 572, p. 18, L. 22-23, p. 21, L. 17-24.
[9]    AP-ECF No. 572, p. 23, L. 7-16.
[10]   AP-ECF No. 572, p. 24, L. 4-8.

2004, Mr. Sedlmayr referred Mr. Jackson to Reed Smith to act as his litigation counsel after Mr. Jackson was named as a party in two lawsuits.[11]  In October 2012, Mr. Jackson replaced Mr. Sedlmayr with another entertainment transaction lawyer to handle his businesses.

### Reed Smith and Mr. Raymond

Reed Smith is a large law firm in New York.  Peter Raymond was the partner primarily responsible for the attorney-client relationship regarding the Leviston Case and the Simmons Case.[12]  Mr. Jackson retained Reed Smith as litigation counsel and signed the 2004 Engagement Letter on May 25, 2004.[13]  The 2004 Engagement Letter was addressed to Mr. Jackson care of Mr. Sedlmayr.[14]  Mr. Jackson directed Reed Smith to interact with Mr. Sedlmayr as Mr. Jackson's liaison where practical.[15]

None of the attorneys at Reed Smith explained the terms of the 2004 Engagement Letter to Mr. Jackson.[16]  Mr. Jackson did not recall with particularity signing the 2004 Engagement Letter, but testified Mr. Sedlmayr presented it to him for his signature without explanation, along with several other unrelated documents requiring his signature.[17]  Mr. Jackson acknowledges he had the option to, but chose not to, read the 2004 Engagement Letter.[18]  In slight contrast, Mr. Sedlmayr believed he and Mr. Jackson had discussed it

---

[11]     AP-ECF No. 528, p. 38, L. 14-23, p. 87, L. 1-3, p. 88, L. 15-25, p. 89, L. 1, 22-25, p. 90, L. 1-13; AP-ECF No. 529, p. 64, L. 3-9; AP-ECF No. 572, p. 38, L. 11-21.
[12]     AP-ECF Nos. 22, 67 ¶¶ 8-9; AP-ECF No. 528, pp. 86, L. 1-12; 167, L. 7-10; AP-ECF No. 529, p. 27, L. 21-25; p. 34, L. 8-15.
[13]     AP-ECF No. 528, p. 41, L. 1-6.
[14]     AP-ECF No. 466-15.
[15]     AP-ECF No. 528, p. 44, L. 22-25, p. 45, L. 1-7.
[16]     AP-ECF No. 528, p. 91, L. 2-25.
[17]     AP-ECF No. 528, p. 91, L. 2-25, p. 92, L. 1-21, p. 98, L. 15-17, p. 137, L. 7-8, 17-19, 24-25, p. 138, L. 1-2.
[18]     AP-ECF No. 528, p. 137, L. 17-25, p. 138, L. 1-2.

and met with another attorney at Reed Smith, Miles Cooley, around the time the letter was signed.[19]

Mr. Raymond had represented Mr. Jackson previously in 2002, before he joined Reed Smith in 2004.[20]  Mr. Raymond testified that over the course of his career he has tried more than twenty (20) cases.[21]  At the time of trial in this case, he was the head of Reed Smith's dispute section of its entertainment and media industry group.[22]

### The Terms of the 2004 Engagement Letter

The 2004 Engagement Letter contained a percentage-based fee sharing arrangement between Reed Smith and Mr. Sedlmayr.[23]  Mr. Sedlmayr testified Mr. Jackson agreed to the fee sharing arrangement with Reed Smith.[24] Mr. Sedlmayr explained his role included providing support and background information to Reed Smith to assist in any on-going litigation.[25]

The 2004 Engagement Letter did not specify it pertained to any specific legal matter.[26]  Rather, it stated Reed Smith would represent Mr. Jackson "in connection with certain of [his] activities in the entertainment business and with respect to third party claims and lawsuits that have been filed against [him]."[27]  Mr. Raymond was not involved with the 2004 Engagement Letter: he did not draft it,[28] did not review its terms with Mr. Jackson, did not know if anyone reviewed it with Mr. Jackson, and was not present when it was signed.[29]

---

[19]   AP-ECF No. 572, p. 39, L. 1-12, p. 45, L. 11-23.
[20]   AP-ECF Nos. 22, 67 ¶ 10; AP-ECF No. 528, p. 86, L. 13-16, p. 87, L. 4-7.
[21]   AP-ECF No. 528, p. 167, L. 21-24.
[22]   AP-ECF No. 528, p. 167, L. 15-20.
[23]   AP-ECF No. 529, p. 74, L. 10-15.
[24]   AP-ECF No. 572, p. 24, L. 1-8, p. 44, L. 6-15.
[25]   AP-ECF No. 572, p. 44, L. 6-15.
[26]   AP-ECF No. 529, p. 63, L. 18-25, p. 64, L. 1-2.
[27]   AP-ECF No. 466-15.
[28]   AP-ECF No. 529, p. 60, L. 21-23.
[29]   AP-ECF No. 528, p. 90, L. 25, AP-ECF No. 529, p. 61, L. 8-12, p. 62, L. 4-12.

Reed Smith notified clients of changes to hourly rates when it issued invoices.[30]
Mr. Jackson directed Reed Smith's bills should be sent directly to his accountants, GSO
Business Management, LLC.[31] All Reed Smith invoices at issue in POC 18 are addressed
to Mr. Jackson care of his accountants.[32]

### *Prior Litigation Handled by Reed Smith*

During the decade between the 2004 Engagement Letter and December 2014,
Reed Smith represented Mr. Jackson as both a plaintiff and a defendant in other cases
summarized in the following table (other than the Leviston and Simmons Cases) ("Other
Cases").[33]

| Case Name | Case Description | Resolution |
|---|---|---|
| Milan Music v. Jackson | New York state court breach of contract claim.[34] | Summary judgment for Mr. Jackson.[35] |
| Fharmacy Records v. Jackson | United States District Court for the Eastern District of Michigan: Intellectual property, copyright infringement matter.[36] | Case withdrawn and/or settled but Mr. Jackson was not required to pay any funds.[37] |
| Kwasi Jones v. Jackson | Two Maryland state court cases. | Settled.[38] |
| Armstrong v. Jackson | A New York Supreme Court Claim by a *pro se* prisoner. | Court granted Reed Smith's motion to dismiss based upon failure to state a cause of action.[39] |
| Jimmie James Johnson v. Jackson | New York Supreme Court | Mr. Raymond recalled the case but could not recall the resolution.[40] |

---

[30]    AP-ECF No. 529, p. 6, L. 6-10.
[31]    AP-ECF No. 528, p. 33, L. 25, p. 34, L. 1-4, 18-20, p. 35, L. 9-12.
[32]    For additional background regarding Mr. Jackson's relationship with his accountants, see the Memorandum of Decision and Order After Trial dated August 29, 2022, AP-ECF No. 371 in adversary proceeding case number 17-2068.
[33]    AP-ECF Nos. 466-30; 528, p. 30, L. 8-10, p. 32, L. 22-25, p. 33, L. 1-4.
[34]    AP-ECF No. 529, p. 8-9, p. 78, L. 1-11.
[35]    AP-ECF No. 529, p. 8, L. 14-21, p. 9, L. 2-7.
[36]    AP-ECF No. 529, p. 78, L. 7-20.
[37]    AP-ECF No. 529, p. 9, L. 8-16.
[38]    AP-ECF No. 529, p. 9, L. 17-25, p. 10, L. 1-7.
[39]    AP-ECF No. 529, p. 10, L. 8-13.
[40]    AP-ECF No. 529, p. 10, L. 15-19.

| Gabon v. Jackson | United States District Court for the Eastern District of Virginia: intellectual property, copyright matter. | Settled without payment by Mr. Jackson.[41] |
|---|---|---|
| Jackson v. Traffix / Shoot the Rapper | New York Supreme Court Claims by Mr. Jackson pursuant to NY Civ. Rights Law §§ 50, 51 against a video game company.[42] | Claim resolved by agreement to stop offending conduct.[43] |
| Curtis Jackson v. Taco Bell | United States District Court for the Southern District of New York: Mr. Jackson brought claims against Taco Bell pursuant to NY Civ. Rights Law §§ 50, 51.[44] | Settlement paying Mr. Jackson more than one ($1,000,000.00) million dollars.[45] |
| James Arthur Alcorn v. Jackson | New York Supreme Court Personal injury claim regarding Mr. Jackson's bodyguards, seeking punitive damages.[46] | Settled for $20,000 payment by Mr. Jackson.[47] |
| Poindexter v. Jackson | United States District Court for the Southern District of New York: copyright infringement | Dismissed.[48] |
| Shadrach Winstead v. Jackson | United States District Court for the District of New Jersey: copyright infringement claim[49] | Summary judgment for Mr. Jackson, upheld on appeal to Third Circuit Court of Appeals.[50] |
| Haji Duncan v. Jackson | United States District Court for the Eastern District of New York: copyright infringement claim | Summary judgment for Mr. Jackson[51] |

Notably, two of the Other Cases were brought by Mr. Jackson to enforce violations of New York Civil Rights Law §§ 50, 51, the same statutes at issue in the Leviston Case.[52]

Mr. Sedlmayr referred Mr. Jackson to Reed Smith for several of the Other Cases while Nikki Martin, Mr. Jackson's employee, arranged for Reed Smith to get involved in

---

[41]    AP-ECF No. 529, p. 10, L. 23-25, p. 11, L. 1-4.
[42]    AP-ECF No. 529, p. 79-80.
[43]    AP-ECF No. 529, p. 11, L. 9-25, p. 80, L. 10-12.
[44]    AP-ECF No. 529, pp. 80-81.
[45]    AP-ECF No. 529, p. 12, L. 15-25, p. 13, L. 1-16.
[46]    AP-ECF No. 529, p. 13, L. 21-25, p. 14, L. 1-15, pp. 83, 86.
[47]    AP-ECF No. 529, p. 14, L. 8-15.
[48]    AP-ECF No. 529, p. 14, L. 16-21.
[49]    AP-ECF No. 529, p. 86.
[50]    AP-ECF No. 529, p. 15, L. 1-15.
[51]    AP-ECF No. 529, p. 15, L. 16-20.
[52]    AP-ECF No. 528, p. 131, L. 8-13.

others.[53]  The 2004 Engagement Letter is the only engagement letter entered into between Reed Smith and Mr. Jackson.[54]  Until December 2014, Mr. Jackson paid all of Reed Smith's invoices for legal fees and costs without issue.[55]

### The Leviston Case

In February 2010, Ms. Leviston filed the Leviston Case in New York state court. Ms. Leviston asserted Mr. Jackson used her image and/or name in a video posted online for advertising purposes or purposes of trade, without her written permission under New York Civil Rights Law §§ 50, 51 ("New York Civil Rights Claim"), and intentionally inflicted emotional distress ("Emotional Distress Claim"; the online video is the "Video").[56] Familiarity with the nature of the allegations in the Leviston Case is assumed.  The court's earlier descriptions of the substance and challenging nature of the defense of the Leviston Case in the Prior Decisions were consistent with the trial record here and will not be repeated.

A pre-trial jury consultant hired by Reed Smith advised that the subject matter and facts of the case were challenging for a jury, reflecting unfavorably on Mr. Jackson.[57] Relevant here, Maurice Murray provided Mr. Jackson with a video, allegedly telling Mr. Jackson that he and Ms. Leviston (both depicted in the Video) consented to Mr. Jackson's use of it.[58]  At trial in the Leviston Case, Ms. Leviston needed to prove there was no written permission from her, but that was undisputed.

---

53    AP-ECF No. 529, p. 150, L. 3-18; AP-ECF No. 547, p. 205, L. 3-6.
54    AP-ECF No. 528, p. 96, L. 7-13, p. 115, L. 7-20; AP-ECF No. 529, p. 5, L. 20-24, p. 15, L. 21-24, p. 64.
55    AP-ECF No. 528, p. 38, L. 1-8, p. 171, L. 9-15.
56    AP-ECF No. 22, 67, ¶ 13.
57    AP-ECF No. 527, p. 61, L. 11-14.
58    AP-ECF No. 528, p. 217, L. 6-10.

### *Reed Smith's Representation of Mr. Jackson in the Leviston Case*

Ms. Leviston initially brought two cases against Mr. Jackson, one in New Jersey and one in New York.  Mr. Sedlmayr requested Reed Smith's services to defend Mr. Jackson, and Reed Smith initially obtained a dismissal of the New Jersey case.[59]

Like previous cases handled for Mr. Jackson, Mr. Raymond served as the lead attorney for the Leviston Case and as Mr. Jackson's main point of contact.[60]  Mr. Jackson could not recall if he ever provided his cell phone number to Mr. Raymond as a way to contact him, but knew he never provided his email address because he did not use email.[61]  Mr. Raymond supervised a number of other attorneys working on the Leviston Case including Evan Farber, a senior associate, then partner as of January 1, 2015, at Reed Smith; Sarah Levitan, a junior to mid-level associate; and Jeffrey Crampton, a junior associate.[62]

Reed Smith and Mr. Jackson did not enter into a new engagement letter for the Leviston Case.[63]  And, no one at Reed Smith – Mr. Raymond or otherwise – informed Mr. Jackson the representation would be based upon the 2004 Engagement Letter.[64]

> Q:  So you didn't provide him any agreement in writing that informed him that the terms of the 2004 engagement letter would be controlling on the Leviston matter, correct?
>
> A:  No. My understanding was that this [2004 Engagement Letter] was supposed to cover the various matters we were going to handle for him and that's the way we operated. There were no differences in the terms of the Leviston or any other case. The terms were essentially we billed our time and he paid the bills.[65]

---

[59]   AP-ECF No. 529, p. 226, L. 8-14, 21-25; AP-ECF No. 547, p. 203, L. 1-10.
[60]   AP-ECF No. 528, p. 86, L. 1-7, p. 173, L. 15-23.
[61]   AP-ECF No. 528, p. 74, L. 2-20.
[62]   AP-ECF No. 528, p. 173, L. 21-25, p. 174, L. 1, p. 175, L. 17-24; AP-ECF No. 529, p. 45, L. 11-13; AP-ECF No. 548, p. 19, L. 10-14, p. 20, L. 5-11.
[63]   AP-ECF No. 529, p. 37, L. 3-6.
[64]   AP-ECF No. 528, p. 116, L. 1-25, p. 117, L. 1-10; AP-ECF No. 529, p. 64, L. 24-25, p. 65, L. 1-3, p. 69, L. 24-25, p. 70, L.1-16.
[65]   AP-ECF No. 529, p. 65, L. 4-13, p. 68, L. 6-12, 17-25, p. 69, L. 12-25, p. 70, L. 1-6.

Mr. Jackson testified Mr. Sedlmayr also did not inform him Reed Smith's representation in the Leviston Case would be based upon the 2004 Engagement Letter.[66] From February 2010 until December 2014, Mr. Jackson paid all of Reed Smith's fees incurred related to the Leviston Case through his accountants, GSO Business Management, LLC.[67]   Reed Smith admits the amount billed to and paid by Mr. Jackson for the Leviston Case from 2010 to December 2014 exceeded one ($1,000,000.00) million dollars.[68]

Reed Smith communicated with Mr. Jackson through Mr. Sedlmayr as provided in the 2004 Engagement letter.[69]   Mr. Raymond explained:

> Well, part it was because the retainer agreement said that I was to liaise with Mr. Sedlmayr on all issue (sic) and I had ten years of practice with Mr. Jackson in which I did liaise with Mr. Sedlmayr because Mr. Jackson was off being a success in his businesses and didn't want to be -- I don't think he wanted to be involved in every detail of each litigation. And he, frankly, wasn't involved except when he had to be deposed or there was some specific reason that he needed to be involved. In (sic) the day-to-day basis, I dealt with Mr. Sedlmayr. That's what the agreement said and that was the practice we developed over ten years of many, many cases.[70]

But Reed Smith contacted Mr. Jackson directly to discuss what Mr. Raymond characterized as major decisions or to prepare for depositions.[71]   And, Mr. Sedlmayr recalled Mr. Jackson participating with him on telephone calls and in meetings.[72]

Consistent with their prior course of conduct, Mr. Sedlmayr provided advice on filings and discussed strategic decisions in the Leviston Case.[73]   However, he never appeared in or was counsel of record in the Leviston Case.[74]   Reed Smith paid Mr.

---

[66]   AP-ECF No. 528, p. 118, L. 6-10
[67]   AP-ECF No. 171, p. 171, L. 12-15; AP-ECF No. 529, p. 33, L. 11-14.
[68]   AP-ECF Nos. 22, 67, ¶ 39.
[69]   AP-ECF No. 529, p. 98, L. 8-19.
[70]   AP-ECF No. 529, p. 164-165.
[71]   AP-ECF No. 528, p. 198, L. 24-25; p. 199, L. 1-5.
[72]   AP-ECF No. 572, p. 53, 6-11.
[73]   AP-ECF No. 529, p. 151, L. 10-12, 20-21.
[74]   AP-ECF No. 529, p. 151, L. 20-21.

Sedlmayr pursuant to the fee sharing provision in the 2004 Engagement Letter during the Leviston Case, until Mr. Jackson fired him in 2012.[75]  Despite Mr. Sedlmayr's inability to recall receiving funds, the court credits Mr. Raymond's testimony that funds were paid to Mr. Sedlmayr.[76]  Mr. Jackson was unaware Reed Smith paid Mr. Sedlmayr during the Leviston Case and felt it overcompensated him.[77]

During trial on September 19, 2022, Mr. Jackson's counsel moved to strike a portion of Mr. Sedlmayr's testimony related to funds received from Reed Smith as unresponsive to the question asked.  After review and consideration of the September 19, 2022 transcript, AP-ECF No. 572, and the audio of the trial, AP-ECF No. 563, the oral motion to strike will be granted, AP-ECF No. 566, and Mr. Sedlmayr's testimony starting on page 90 of AP-ECF No. 572, at line 19 through line 25, and continuing to line 1 on page 91, is stricken as unresponsive and as inadmissible hearsay.

### *Rick Ross and His Connection with Mr. Sedlmayr and Reed Smith*

Rick Ross at all relevant times was a musician and commercial rival of Mr. Jackson, and as Mr. Raymond characterized it, Mr. Jackson's "sworn enemy."[78]  Mr. Sedlmayr represented Rick Ross and provided him with entertainment-related transactional services starting in 2006 and 2007.[79]  Mr. Raymond also briefly represented Rick Ross in 2007.  At some point in 2007 – years prior to the Leviston Case – Mr. Sedlmayr requested Mr. Raymond attend a single mediation session with Rick Ross and his manager.[80]  Mr. Raymond understood Mr. Sedlmayr was counsel for Rick Ross in

---

75    AP-ECF No. 529, p. 87, p. 148, L. 1-5, p. 149, L. 4-8, p. 137, L. 25, p. 138, L. 1-2.
76    AP-ECF No. 572, p. 90, L. 11-16.
77    AP-ECF No. 528, p. 123, L. 4-10, p. 124, L. 13-21.
78    AP-ECF No. 528, p. 104, L. 10-14, p. 211, L. 15-24, 215, L. 20-23, AP-ECF No. 572, p. 1-8.
79    AP-ECF No. 572, p. 27, L. 9-13.
80    AP-ECF No. 529, p. 24, L. 1-6; AP-ECF No. 466-22.

2007.[81]  Mr. Raymond never represented Rick Ross again.  At some point, Mr. Raymond was advised the case underlying the mediation had been settled.[82]  Mr. Raymond did not believe he told Mr. Jackson about this brief representation of Rick Ross.[83]

### Rick Ross as a Potential Witness in the Leviston Case

In 2011, Mr. Raymond considered whether to depose Rick Ross or to possibly call him as a trial witness because of his potential ownership of a website that was alleged to have hosted the Video.[84]  Mr. Raymond, Mr. Jackson, and Ms. Martin discussed Rick Ross's involvement during a phone conference held on January 24, 2011.[85]  Thereafter, in an email dated January 24, 2011, Mr. Raymond told Mr. Sedlmayr and Ms. Martin he believed if they could, "prove that Rick Ross was the uploader of the video onto the internet, I think this will take a good deal of the sting out of the claims against [Mr. Jackson]" (the "January 2011 email").[86]  But, during this same time, Mr. Raymond was concerned taking his deposition was a risk because he believed Rick Ross – if provided the opportunity – would deny ownership or control of the website.[87]  Rick Ross also might testify his "rap-beef" with Mr. Jackson was a commercial ploy to gain more publicity and sell more music, which might help establish the commercial purpose element of Ms. Leviston's claim.[88]  Mr. Raymond believed a jury would find this evidence unfavorable to Mr. Jackson.

As part of this January 2011 email, Mr. Raymond sought approval from Mr. Sedlmayr to hire an investigator to look into Ms. Leviston's criminal past and whether the

---

[81]   AP-ECF No. 529, p. 155, L. 13-22.
[82]   AP-ECF No. 529, p. 25, L. 7-12.
[83]   AP-ECF No. 529, p. 223, L. 16-19.
[84]   AP-ECF No. 528, p. 213, L. 8-18; AP-ECF No. 529, p. 143, L. 17-25, p. 144, L. 1.
[85]   AP-ECF No. 465-15.
[86]   AP-ECF No. 465-15; AP-ECF No. 529, p. 97, L. 13-17, p. 101, L. 1-9.
[87]   AP-ECF No. 528, p. 213, L. 1-7.
[88]   AP-ECF No. 528, p. 215, L 1-11.

Video had been posted on other websites.[89]  According to Mr. Raymond, Mr. Sedlmayr did not do anything to impede his investigation into these matters.[90]  It was around this time when Mr. Sedlmayr first started feeling his relationship with Mr. Jackson was starting to break down.[91]  Mr. Sedlmayr testified that after the January 2011 email he became less involved in the Leviston Case, left Reed Smith to develop its strategy for Mr. Jackson's defense, and ceased to a great extent conferring with Mr. Jackson.[92]  Mr. Sedlmayr indicated Ms. Martin took a greater role in being involved in the Leviston Case during this time.[93]

On February 4, 2011, Mr. Raymond emailed Mr. Sedlmayr and Ms. Martin seeking to have Mr. Jackson's technology personnel (Corentin Villemeur) provide information to an investigator to assist in gathering evidence related to Rick Ross's involvement in posting the Video.[94]

### Mr. Sedlmayr's Representation of Rick Ross and the Rick Ross Subpoena

During the period from 2010 through 2012, Mr. Sedlmayr represented both Rick Ross and Mr. Jackson in their respective, entertainment-related transactions.[95]  Mr. Raymond was unsure whether he was aware Mr. Sedlmayr continued to represent Rick Ross (after knowing he represented him in 2007) when he sent the January 2011 email.[96]  Mr. Raymond was unsure if he had ever been told directly by Mr. Sedlmayr whether he continued to represent Rick Ross or whether he may have assumed this.[97]

---

[89]    AP-ECF No. 529, p. 100, L. 4-25, p. 101, L. 1-9, p. 240, L. 14-24, p. 241, L. 21-25; AP-ECF No. 465-15.
[90]    AP-ECF No. 529, p. 241, L. 21-25.
[91]    AP-ECF No. 572, p. 96, L. 8-16.
[92]    AP-ECF No. 572, p. 103, L. 16-25, p. 104, L. 1-7, p. 108, L. 13-25, p. 109, L. 1-3.
[93]    AP-ECF No. 572, p. 111, L. 14-20.
[94]    AP-ECF No. 597-20.
[95]    AP-ECF No. 529, p. 87, L. 24-25, p. 88, L. 1; AP-ECF No. 572, p. 37, L. 7-11, p. 96, L. 17-21.
[96]    AP-ECF No. 529, p. 94, L. 12-16, p. 97, L. 22-25, p. 98, L. 1-2, p. 101, L. 3-9.
[97]    AP-ECF No. 529, pp. 94-95.

At some point in 2011, Evan Farber or another Reed Smith associate drafted a subpoena for Rick Ross dated April, 2011.[98] Mr. Farber believed it was in 2011 when Mr. Raymond told him that Mr. Sedlmayr may represent Rick Ross.[99]   Mr. Farber recalled discussing with Mr. Raymond that Mr. Sedlmayr's representation of both Mr. Jackson and Rick Ross did not present a current conflict but could develop into a future conflict.[100] After the subpoena was drafted, Mr. Raymond had a conversation with Mr. Sedlmayr inquiring whether he would accept service of the subpoena for Rick Ross.[101]   Mr. Sedlmayr declined as his firm's policy was not to accept service for its transactional clients.[102] Ultimately, Reed Smith decided not to take a deposition of or serve a subpoena on Rick Ross.[103]

Despite participating in a phone call held January 24, 2011 discussing Rick Ross, Mr. Jackson testified Mr. Raymond never informed him Rick Ross could be relevant to his defense in the Leviston Case.[104]   Consistent with Mr. Jackson's testimony, Mr. Raymond acknowledged he did not confer specifically with Mr. Jackson about seeking discovery from Rick Ross.[105] Mr. Jackson believed Rick Ross should have been a major focus of his defense because of his involvement with the Video and his intense rap rivalry with Mr. Jackson.[106]   However, Mr. Jackson did not expect to discuss with Mr. Raymond

---

[98]     AP-ECF No. 528, p. 213, L. 16-25; AP-ECF No. 548, p. 39, L. 3-9; AP-ECF No. 465-16.
[99]     AP-ECF No. 548, p. 22, L. 2-24.
[100]    AP-ECF No. 548, p. 31, L. 6-14.
[101]    AP-ECF No. 529, p. 94, L. 17-25, p. 107, L. 8-13, p. 108, L. 1-4, 20-25, p. 1-2, p. 120, L. 5-10, p. 121, L. 19-25, p. 122, L. 1-6, p. 127, L. 1-12; Plaintiff's Rebuttal Exs.1, 2.
[102]    AP-ECF No. 529, p. 95, L. 9-13; p. 107, L. 5-13, p. 145, L. 3-6; AP-ECF No. 572, p. 96, L. 7-14.
[103]    AP-ECF No. 528, p. 214, L. 1-13; AP-ECF No. 529, p. 57, L. 3-5, p. 107, p. 2-4, 14-18.
[104]    AP-ECF No. 528, p. 105, L. 19-21.
[105]    AP-ECF No. 528, p. 111, L. 16-21; AP-ECF No. 529, p. 167, L. 16-19.
[106]    AP-ECF No. 528, p. 110, L. 7-20; *see also,* the Prior Decisions regarding Rick Ross and the Video.

which witnesses he intended to pursue in 2012, but only discuss the case when it was closer to trial.[107]

### 2012 Compliance Order

On February 29, 2012, Reed Smith entered into a stipulation with Ms. Leviston's counsel regarding certain discovery terms and what witnesses would or would not be called at trial, which became an order of the state court in the Leviston Case ("2012 Compliance Order").[108]  Neither Rick Ross nor Maurice Murray were listed.  Mr. Raymond stated one of the reasons Reed Smith entered into the 2012 Compliance Order was to prevent Ms. Leviston from calling additional witnesses to testify as to the psychological pain the Video's posting caused her and her children.[109]  Mr. Raymond did not tell Mr. Jackson personally about the 2012 Compliance Order but knew Mr. Farber had discussed it with Ms. Martin.[110]  Mr. Raymond could not recall discussing his trial strategy with Mr. Jackson directly prior to entering into the 2012 Compliance Order, but he did recall discussing the strategy with Mr. Sedlmayr and Ms. Martin.[111]

### Termination of Mr. Sedlmayr

At some point in 2011 or 2012, Mr. Jackson learned Mr. Sedlmayr represented Rick Ross as transactional counsel which caused him to lose confidence in the lawyer.[112]  By early October 2012, Mr. Jackson terminated Mr. Sedlmayr as his lawyer and directed his files be transferred to another entertainment transactional attorney.[113]

---

[107]    AP-ECF No. 528, p. 143, L. 24-25, p. 144, L. 1-5.
[108]    AP-ECF No. 465-32; AP-ECF No. 529, p. 208, L. 18-25, p. 209, L. 1-3.
[109]    AP-ECF No. 529, p. 233, L. 20-25, p. 234, L. 1-5.
[110]    AP-ECF No. 529, p. 182, L. 20-25, p. 183, L. 1-2; AP-ECF No. 548, pp. 61-63.
[111]    AP-ECF No. 529, p. 230, L. 11-25.
[112]    AP-ECF No. 528, p. 43, L. 6-20.
[113]    AP-ECF No. 528, p. 42, L. 25, p. 43, L. 1-2, p. 104, L. 10-14; AP-ECF No. 572, p. 24, L. 13-17, p. 31, p. 65.  Mr. Sedlmayr continued to represent Rick Ross until terminated in 2017.

Mr. Raymond learned this on October 4, 2012, and Reed Smith stopped paying Mr. Sedlmayr a portion of its fees.[114]   From October 2012 through December 2014, Mr. Jackson communicated with Reed Smith primarily through Ms. Martin as his point of contact.[115]   Given the demands of his profession, Mr. Jackson regularly designated representatives such as Ms. Martin to be his point of contact.[116]   However, Mr. Jackson never gave Ms. Martin a power of attorney to act on his behalf or to make significant legal decisions.[117]   Mr. Jackson ultimately fired Ms. Martin at some undisclosed point after he terminated Reed Smith, because he discovered she made decisions for him without authorization and tried to protect him by not telling him information he would rather have known.[118]   But, as for the Leviston Case, Mr. Jackson stated he was "not sure if they communicated anything to her that she didn't tell me."[119]

After Mr. Jackson terminated him, Mr. Sedlmayr referred what he categorized as "a couple other clients with matters" to Reed Smith.[120]

### Mr. Jackson's New Counsel

On November 17, 2014, Mr. Jackson retained Stephen J. Savva as counsel to provide him general legal and business consulting services.[121]   Mr. Savva agreed to charge Mr. Jackson a flat fee of $25,000 for each month, September 2014 through December 2014, despite normally charging clients $675 to $975 per hour for these services.[122]

---

[114]      AP-ECF No. 572, p. 22, L. 10-14, p. 149, L. 6-8.
[115]      AP-ECF No. 528, p. 198, L. 19-23, p. 199, L. 2-10.
[116]      AP-ECF No. 528, p. 65, L. 1-10,  p. 68, L. 7-11, p. 69, L. 8-15, 23-25, p. 70, L. 1-15, p. 77, L. 10-16; AP-ECF No. 529, p. 165, L. 20-2, p. 166, L. 8-13.
[117]      AP-ECF No. 528, p. 108, L. 12-17.
[118]      AP-ECF No. 528, p. 113, L. 4-9, p. 145, L. 16-25, p. 146, L. 1-11.
[119]      AP-ECF No. 528, p. 146, L. 12-14.
[120]      AP-ECF No. 572, p. 57, L. 18-25, p. 58, L. 13-14, p. 58, L. 17-21.
[121]      AP-ECF No. 466-49, AP-ECF No. 528, p. 62, L. 8-14.
[122]      AP-ECF No. 466-49.

Additionally, Mr. Jackson retained Craig Weiner of the law firm Robins, Kaplan, Miller & Ciresi, LLP to provide him legal advice in connection with the Leviston Case in December 2014.[123]  Mr. Weiner agreed to represent Mr. Jackson at a discounted rate of $675 per hour, less than his normal rate of $775 per hour.[124]

### *December 2014 and January 2015 - Leviston Trial Preparation*

In December 2014, Reed Smith attorneys spent significant time preparing for the Leviston Case trial.[125]  Mr. Raymond explained they had not spent a great deal of time on the Leviston Case after the 2012 Compliance Order and did not engage in trial preparation until learning of the tentative trial date of January 21, 2015.[126]

Once a trial date was set, Reed Smith attorneys spent time on a variety of tasks, including:

- Composing trial themes, analyzing the record, reviewing deposition transcripts, and determining the documents to be used as trial exhibits;
- Drafting an opening statement;
- Researching the scope of damages, crafting questions for cross-examination, and working on a chronology of events;
- Drafting a memorandum outlining admissibility of pieces of evidence;
- Preparing responses to possible objections, hearsay and otherwise;
- Preparing expert witnesses, reviewing expert reports and depositions;
- Attending a mediation;
- Considered obtaining information from a focus group (in the end Reed Smith did not pursue a focus group; and
- Preparing a request to continue the trial date, which was granted to allow both sides to file motions *in limine*.[127]

Mr. Raymond considered all these tasks routine and exactly the type of activity any attorney would undertake to prepare for trial.[128]  Mr. Raymond recalled working on a trial

---

[123]     AP-ECF No. 466-51, p. 5; AP-ECF No. 528, p. 67, L. 14-23, p. 68, L. 15-19.
[124]     AP-ECF No. 466-51, p. 7 (Retainer letter from Robins, Kaplan, Miller & Ciresi, LLP noting hourly rates for partners of the firm ranged from $625 to $895 and for associates from $330 to $575).
[125]     AP-ECF No. 528, p. 181, L. 22-25, p. 182, L. 1-6.
[126]     AP-ECF No. 528, p. 182, L. 10-25, p. 183, L. 1; p. 191, L. 9-19.
[127]     AP-ECF No. 528, p. 182, L. 1-6, pp. 187 – 188, pp. 194 – 198, 205; AP-ECF No. 529, p. 199, L. 12-25, p. 200, L. 1-8, p. 210, L. 25, p. 211, L. 1-8; AP-ECF No. 465-23.
[128]     AP-ECF No. 528, p. 190, L. 13-25, p. 191, L. 1-4.

preparation memorandum outlining the tasks needing completion.[129]   One motion *in limine* Reed Smith worked on was to preclude the testimony of Ms. Leviston's expert, Mr. Burgess, because his opinions lacked foundation.[130]   Mr. Raymond noted if Mr. Burgess testified, it would be helpful because Mr. Burgess did opine that someone other than Mr. Jackson had posted the Video first, but despite this helpful point, Reed Smith sought to preclude his testimony overall.[131]

Reed Smith attorneys considered hiring a jury consultant to assist in determining the characteristics of a jury most helpful to Mr. Jackson's case and ultimately retained Joe Rice as a jury consultant.[132]   After providing the jury consultant with information about the case, a summary of what it anticipated Ms. Leviston would present, and what it intended for Mr. Jackson's defense, Mr. Raymond considered the resulting jury consultant's report troubling.[133]   As a result, the attorneys spent time considering how to mitigate issues that might cause a negative reaction from a jury.   Reed Smith advanced the cost of the jury consultant and billed Mr. Jackson.[134]

At some point in late 2014 or early 2015, Mr. Jackson met with Mr. Raymond to prepare for the trial and requested Reed Smith limit its attorney's fees in the Leviston Case trial to $500,000.[135]   Mr. Jackson testified he was concerned about expenses at this time due to an unrelated $18 million dollar judgment against him in another case.[136]   While Mr. Jackson believed Reed Smith had agreed to this request, there is no writing

---

[129]   AP-ECF No. 528, p. 184, L. 22-25, p. 185, L. 1-9; AP-ECF No. 529, p. 185, L. 5-12.
[130]   AP-ECF No. 529, p. 157.
[131]   AP-ECF No. 529, p. 157-158.
[132]   AP-ECF No. 528, p. 185, L. 5-9, 21-25, p. 195, L. 1-12; AP-ECF No. 529, p. 56, L. 19-25, p. 196, L. 15-22; AP-ECF No. 465-20.
[133]   AP-ECF No. 528, p. 192, L. 19-23; AP-ECF No. 529, p. 189, L. 5-18, p. 191-192; AP-ECF No. 465-20.
[134]   AP-ECF No. 529, p. 191, L. 9-15; AP-ECF No. 465-20.
[135]   AP-ECF No. 528, p. 35, L. 23-25, p. 36, L. 1-9, 14-19, p. 47, L. 20-25, p. 48, L. 1-5.
[136]   AP-ECF No. 528, p. 107, L. 3-11.

reflecting the agreement.[137]  Mr. Raymond acknowledged there was a discussion about the costs of trial and recalled stating the trial would cost a minimum of $500,000, but disagreed there was any agreement reached to limit fees to that amount.[138]

It was around this time, in December 2014, when Mr. Raymond was introduced to Mr. Savva and Mr. Weiner as additional counsel for Mr. Jackson.[139]  After learning of Mr. Savva's involvement, Mr. Raymond dealt mainly with him, in addition to Ms. Martin.[140] Mr. Raymond believed he had made it clear to Mr. Jackson and his representatives that he considered the Leviston Case a dangerous case because of the potential damages and recommended settling it.[141]  He explained that notwithstanding the on-going trial preparation, he was actively exploring settlement options.[142]

### *Trial Strategy*

In 2011, Mr. Raymond was undecided about whether to seek discovery from Maurice Murray – the Video participant who orally consented to its online posting – but generally thought he would hurt rather than help Mr. Jackson's defense.[143]  Mr. Raymond was concerned Maurice Murray would testify he had never provided Mr. Jackson with any consent – neither his nor Ms. Leviston's – if he were deposed.[144]

Instead, Mr. Raymond intended to have Mr. Jackson testify at trial as his key witness to explain – whether right or wrong – that he had acted under the assumption he had Ms. Leviston's consent.[145]  Mr. Raymond believed Mr. Jackson could testify to his

---

137    AP-ECF No. 528, p. 51, L. 20-24.
138    AP-ECF No. 528, p. 188, L. 20-25; p. 189, L. 1-4.
139    AP-ECF No. 528, p. 187, L. 15-23, p. 189, L. 5-16.
140    AP-ECF No. 528, p. 199, L. 1-10.
141    AP-ECF No. 528, p. 205, L. 1-11, AP-ECF No. 529, p. 86, L. 18-24.
142    AP-ECF No. 528, p. 205, L. 5-13.
143    AP-ECF No. 529, p. 162, L. 22-24, p. 163, L. 1-5.
144    AP-ECF No. 528, p. 201, L. 19-25.
145    AP-ECF No. 528, p. 200, L. 21-25, p. 201, L. 1-4; AP-ECF No. 529, p. 167, L. 5-9.

belief that Ms. Leviston consented to his use of the Video to advance her career.[146]  Mr. Raymond believed Mr. Jackson's testimony could have negated the 'intentional' element required for a claim of intentional infliction of emotional distress.[147]  Mr. Raymond believed he told Mr. Jackson in approximately December 2014 that he (Mr. Jackson) would be the center of the defense strategy and need to testify at trial.[148]  On January 17, 2015, Mr. Raymond met with Mr. Jackson to go through his proposed questions for his trial testimony.[149]  Mr. Savva attended this meeting.

Mr. Raymond could not recall discussing with Mr. Jackson whether or not to seek discovery from Maurice Murray, but firmly remembered discussing it with Mr. Sedlmayr and perhaps Ms. Martin also.[150]  In contrast, Mr. Jackson testified he was unaware Maurice Murray would not be called as a witness.

Despite conflicting testimony, it seems clear that at some point in December 2014, Mr. Jackson, Mr. Weiner, or Mr. Savva discussed Maurice Murray as a potential witness. Mr. Raymond recalled Mr. Weiner and Mr. Savva being critical of his trial strategy, his prior decision not to seek discovery from Maurice Murray, and insisting that Maurice Murray be located and deposed despite Mr. Raymond's belief he could be harmful to Mr. Jackson's defense.[151]  Mr. Jackson claimed Reed Smith did not articulate a reason not to call Maurice Murray as a witness beyond that they could not locate him.  Mr. Jackson, or his counsel, located Maurice Murray after conducting a simple internet search, revealing Maurice Murray was incarcerated in New Jersey.[152]  On January 12, 2015, Ms. Martin

---

146  AP-ECF No. 528, p. 202, L. 18-25, p. 203, L. 1-5.
147  AP-ECF No. 528, p. 201, L. 13-18.
148  AP-ECF No. 529, p. 231, L. 15-23.
149  AP-ECF No. 529, p. 228, L. 6-18, p. 229, L. 20-25, p. 230, L. 1-3.
150  AP-ECF No. 529, p. 163, 2-10, p. 167, L. 20-23, p. 178, L. 9-14.
151  AP-ECF No. 528, p. 189, L. 5-16; AP-ECF No. 529, pp. 175-177; AP-ECF No. 548, p. 50.
152  AP-ECF No. 528, p. 36, L. 19-25, p. 37, L. 1-5, p. 134, L. 11-16.

emailed Mr. Raymond stating: "I have to say [Mr. Jackson] was pretty disappointed to hear that all the while we were told Murray could not be found, [Mr. Savva] found him with a Google search."[153]

Around this same time period of December 2014 and January 2015, Mr. Raymond learned from an investigator that Maurice Murray may have received an offer from Ms. Leviston to testify on her behalf in exchange for a $250,000 payment.[154]   Despite his disbelief that Ms. Leviston would have made such an offer, Mr. Raymond thought this new allegation should be investigated and instructed Reed Smith attorneys to research the process of subpoenaing phone records for Maurice Murray from the New Jersey prison system.[155]   The work obtaining the phone records continued throughout January 2015.[156]

### *Reconsidering Rick Ross as a Potential Witness*

Despite discovery being foreclosed by the 2012 Compliance Order and the imminent trial, Reed Smith reconsidered its position about deposing Rick Ross.  Ms. Leviston's trial counsel produced evidence for the first time that one of Mr. Jackson's technology personnel – Coretin Villemeur – had posted statements implying he had hacked into or had access to Rick Ross's website, on the Twitter social media platform.[157] Mr. Raymond was concerned this evidence meant Mr. Villemeur had lied about what had happened and would undermine the argument that someone other than Mr. Jackson had posted the Video.[158]  Reed Smith spent time considering how to react to these new social media posts, what counter-evidence might be required, and whether it should depose

---

[153]     AP-ECF No. 465-33.
[154]     AP-ECF No. 528, p. 179, L. 1-10; p. 199 – 200; AP-ECF No. 529, p. 56, L. 5-23.
[155]     AP-ECF No. 528, pp. 178-179, 199, 202; AP-ECF No. 529, p. 177, L. 17-22.
[156]     AP-ECF No. 528, p. 203.
[157]     AP-ECF No. 529, p. 138, p. 4-25, p. 148, L. 15-20.
[158]     AP-ECF No. 528, p. 210, L. 1-18, p. 235 - 236.

Rick Ross.[159]  Mr. Raymond spent time reviewing videos Rick Ross had posted online in which he implied he had some ownership or control over the website used to host the Video, to potentially use to counter the Villemeur social media evidence.[160]  In an email dated March 12, 2015, Mr. Raymond stated: "A Ross depo would be great now and would solve all the problems."[161]  Ultimately, Reed Smith never took a deposition of Rick Ross, but succeeded in precluding evidence relating to the witness's Twitter postings from trial.[162]

### *February and March 2015 - Leviston Trial Preparation*

At some point in January 2015, the Leviston Case trial was continued to allow the assigned judge (Judge Wooten) to review motions *in limine* filed by both sides.[163]  Later in February or March, Reed Smith learned the trial would not commence until June.[164]

During this time, Reed Smith continued to be engaged in a variety of trial tasks including:

- Researching a basis to challenge Ms. Leviston's psychological expert;
- Obtaining the Maurice Murray prison recordings;
- Preparing for and attending status conferences regarding trial scheduling with Judge Wooten, including research to persuade Judge Wooten to schedule trial at a time Mr. Jackson was available to attend;
- Drafting a motion to strike the notice to admit the Twitter posts by Mr. Villemeur;
- Continuing to file motions *in limine* including seeking to preclude the testimony of a witness, Steve Burgess; and,
- Determining in light of the negative information in the jury consultant's report what sort of jury would respond to Mr. Jackson's defense.[165]

---

[159]    AP-ECF No. 529, p. 144, L. 2-19, p. 185, L. 1-4, p. 235-236; AP-ECF No. 528, p. 209, L. 13-25, p. 210, L. 1-18.
[160]    AP-ECF No. 528, p. 210, L. 23-25; p. 211, L. 1-14; AP-ECF No. 529, p. 51, L. 2-23, p. 52,  L. 1-9, p. 54, L. 1-3.
[161]    AP-ECF No. 529, p. 144, L. 20-25, p. 145, L. 1-2, pp. 234 - 235, L. 1; AP-ECF No. 465-26.
[162]    AP-ECF No. 529, p. 57, L. 3-5, p. 235- 236.
[163]    AP-ECF No. 528, p. 207.
[164]    AP-ECF No. 528, p. 208, L. 6-17.
[165]    AP-ECF No. 528, ps. 207 – 208.

### *Termination of Reed Smith*

On March 25, 2015, having lost confidence in Reed Smith, Mr. Jackson retained the law firm of Bickel & Brewer to represent him in the Leviston Case.[166]  Bickel & Brewer agreed to try the Leviston Case for a fee of $250,000, subject to increases if they successfully resolved the case in Mr. Jackson's favor.[167]  At some point later, Bickel & Brewer requested an additional $150,000 for services related to the Leviston Case.[168]  Mr. Jackson understood the need for this additional sum was because of unanticipated costs involved in bringing claims against Rick Ross for his involvement with the Video.[169]

Two days later, on March 27, 2015, Mr. Jackson fired Reed Smith as his counsel in the Leviston Case and directed his files be sent to Bickel & Brewer.[170]  Reed Smith transferred most of Mr. Jackson's file but withheld some of its immediate work product including witness scripts and its draft opening statement.[171]  Mr. Raymond explained those items were withheld as subject to an attorney's lien stemming from their unpaid fees and expenses.[172]  Judge Wooten provided Mr. Jackson could post a bond for the amount of unpaid fees and then Reed Smith would be required to turn over the withheld work product.[173]  No bond was posted.

### *Leviston Case Invoices and The Proof of Claim*

Mr. Raymond signed Reed Smith's POC 18 filed in the Main Case.[174]  The three invoices for the Leviston Case include time and expenses incurred between December

---

[166]    AP-ECF No. 466-33; AP-ECF No. 528, p. 50, L. 20-25, p. 51, L. 1-2.
[167]    AP-ECF No. 466-33, AP-ECF No. 528, p. 54, L. 22-25, p. 55, L. 1-2.
[168]    AP-ECF No. 528, p. 134, L. 2-10.
[169]    AP-ECF No. 528, p. 109, L. 1-25, p. 110, L. 1.
[170]    AP-ECF No. 466-29, AP-ECF No. 528, p. 127, L. 22-25.
[171]    AP-ECF No. 528, p. 220, L. 1-12; AP-ECF No. 529, p. 213, L. 17-25, p. 214, L. 1-5.
[172]    AP-ECF No. 528, p. 220, L. 7-12.
[173]    AP-ECF No. 528, p. 220, L. 13-20; AP-ECF No. 529, p. 214, L. 23-25, p. 216, L. 8-12.
[174]    AP-ECF No. 528, p. 168, L. 25, p. 169, L. 1.

2014 and March 2015.[175]  Mr. Raymond charged $865.00 per hour, while the hourly billing

rate for Reed Smith associates involved in the Leviston Case ranged from $355.00 to

$585.00 per hour.[176]  Reed Smith also charged rates of $235.00 and $270.00 per hour

for its technology-related personnel.  These billing rates were consistent throughout 2014,

were the applicable rates for invoices Mr. Jackson paid prior to December 2014, and were

the rates charged in all three invoices.[177]  Notably, Mr. Jackson does not challenge the

hourly rates.

The invoice dated January 20, 2015 covered time spent in December 2014,

totaling $59,084.50 ("January 20 Invoice").[178]  In the January 20 Invoice, Reed Smith

incurred 103.1 hours as reflected in the following table.

| January 20 Invoice – December 2014 Time[179] | | | |
|---|---|---|---|
| **Attorney** | **Number of Hours** | **Rate** | **Total** |
| Peter Raymond | 36.8 | $865.00 | $31,832.00 |
| Sarah Levitan | 42.2 | $355.00 | $14,981.00 |
| Evan Farber | 17 | $580.00 | $9,860.00 |
| Geoffrey Cramton | 5.9 | $355.00 | $2,094.50 |
| Elias Mantzopoulos | 1 | $270.00 | $270.00 |
| M. Schmidt | 0.2 | $235.00 | $47.00 |
| **Total** | **103.1** | ---- | **$59,084.50** |

The invoice dated March 24, 2015 consists of time spent in January 2015 ("March

24 Invoice").[180]  The March 24 Invoice sought a total of $299,793.00 in fees, reflecting

570.6 hours of time for six employees.[181]

| March 24 Invoice – January 2015 Time[182] | | | |
|---|---|---|---|
| **Attorney** | **Number of Hours** | **Rate** | **Total** |
| Peter Raymond | 129 | $865.00 | $111,585.00 |

175    AP-ECF No. 528, p. 171, L. 5-8.
176    AP-ECF No. 528, p. 175-176; AP-ECF Nos. 466-2, 466-3, 466-4.
177    AP-ECF No. 528, p. 176, L. 1-5, p. 181, L. 16-18.
178    AP-ECF No. 528, p. 173, L. 4-10; AP-ECF No. 529, p. 41; AP-ECF No. 466-2.
179    AP-ECF No. 466-2.
180    AP-ECF No. 528, p. 176, L. 17-20; AP ECF No. 466-3.
181    AP-ECF No. 529, p. 57, L. 11-21.
182    AP-ECF No. 466-3.

| | | | |
|---|---|---|---|
| Sarah Levitan | 178.6 | $355.00 | $63,403.00 |
| Evan Farber | 136.5 | $580.00 | $79,170.00 |
| Geoffrey Cramton | 120.2 | $355.00 | $42,671.00 |
| Daniel Mateo | 2.4 | $585.00 | $1,404.00 |
| Julia Lopez | 3.9 | $400.00 | $1,560.00 |
| **Total** | **570.6** | ---- | **$299,793.00** |

The third invoice dated April 14, 2015, seeking $144,747.00 includes 318.2 hours of time incurred in February 2015, and March 2015, and time incurred in January 2015 for two IT-related professionals who were late in submitting their time ("April 14 Invoice").[183]

| April 14 Invoice –  January, February and March 2015 Time[184] | | | |
|---|---|---|---|
| **Attorney** | **Number of Hours** | **Rate** | **Total** |
| Peter Raymond | 73.9 | $865.00 | $63,923.50 |
| Sarah Levitan | 42.8 | $355.00 | $15,194.00 |
| Evan Farber | 40.4 | $580.00 | $23,432.00 |
| Geoffrey Cramton | 71.2 | $355.00 | $25,276.00 |
| Elias Mantzopoulos (IT) | 39.2 | $270.00 | $10,584.00 |
| Alexander Ulmer (IT) | 50.7 | $125.00 | $6,337.50 |
| **Total** | **318.2** | ---- | **$144,747.00** |

The Leviston Case invoices for attorney's fees, only, are summarized in the following table.

| Leviston Case Attorney's Fees From the Three Invoices | |
|---|---|
| **Date of Invoice** | **Total** |
| January 20 Invoice – December 2014 Time | **$59,084.50** |
| March 24 Invoice – January 2015 Time | **$299,793.00** |
| April 14, 2015  Invoice January, February and March 2015 Time | **$144,747.00** |
| **Total** | **$503,624.50** |

In addition to the fees totaling $503,624.50, the invoices reflect Reed Smith incurred $17,859.58 in expenses.  While not introduced at trial, POC 18 also attached invoices for $16,160.14 of expenses Reed Smith incurred but had not been reimbursed

---

183    AP-ECF No. 466-4; AP-ECF No. 528, p. 181, L. 5-9.
184    AP-ECF No. 466-3.

for related to the Leviston Case.  Mr. Jackson did not lodge an objection to any specific expense beyond his general objection that the expenses were unreasonable because they related to an ill-conceived trial strategy.

### Billing Practices

Each Reed Smith attorney tracked the time they spent on a task in six-minute increments, inputting their time and a description of the tasks completed, on a daily or weekly basis so that invoices could be generated.[185]  Mr. Raymond acknowledged he generally did not note the time spent on an individual task after completing it.[186]  Rather, he compiled a list of tasks and the amount of time spent at the end of the day.[187]

Each employee's billing entries were for a single day, with multiple tasks lumped in a single entry, often covering multiple hours of time.[188]  Mr. Raymond could not parse the resulting block time entries to identify the time spent on any given task.[189]  He acknowledged this method of billing constituted block billing, and further testified "we did block billing throughout these invoices and in all prior invoices for Mr. Jackson."[190]

Mr. Jackson could not recall reviewing any of Reed Smith's invoices because the invoices were sent directly to his accountant.[191]  Mr. Jackson testified no one informed him of the amount of the invoices before his accountants paid them, but he also never asked anyone about the Reed Smith bills.[192]  Mr. Jackson relied on his accountants to keep him informed and to just pay the invoices.[193]

---

[185]    AP-ECF No. 528, p. 174, L. 2-7, p. 180, L. 18-25, p. 181, L. 1-4; AP-ECF No. 529, p. 44, L. 4-5.
[186]    AP-ECF No. 529, p. 42, L. 20-23.
[187]    AP-ECF No. 529, p. 42, L. 24-25; p. 43, L. 1, 14-17.
[188]    AP-ECF No. 529, p. 44, L. 9-15, p. 49, L. 5-9.
[189]    AP-ECF No. 529, p. 44, L. 9-25, p. 45, L. 1-5, p. 47, L. 15-22, p. 48, L. 1-5.
[190]    AP-ECF No. 529, p. 50, L. 9-17, p. 59, L. 12-13.
[191]    AP-ECF No. 528, p. 102, L. 1-8.
[192]    AP-ECF No. 528, p. 103, L. 9-15, p. 138, L. 10-21, p. 139, L. 1-3.
[193]    AP-ECF No. 528, p. 138, L. 13-25, p. 149, L. 15-20.

Mr. Jackson never received the three unpaid Leviston Case invoices until after he fired Reed Smith.[194]  Mr. Jackson felt he never received any benefit or value from the time incurred in these invoices.[195]  Mr. Jackson's feeling stemmed in part from Reed Smith not providing Mr. Jackson's new counsel with some of their work materials prior to the Leviston trial.[196]  However, Mr. Jackson was unaware of what Reed Smith did or did not transfer to his new trial counsel.[197]

### The Simmons Case and Universal's $30,000 Payment

The plaintiff in the Simmons Case (*Simmons v. Stanberry*), Tyrone Simmons, brought copyright claims against another musician, William Stanberry, and against Mr. Jackson, asserting he owned a beat Mr. Jackson used in his song, "I Got Money."[198]  Mr. Jackson had purchased the beat from Mr. Stanberry.[199]  But it turned out, Mr. Stanberry had sold the beat twice, first selling it to Mr. Simmons months before Mr. Jackson.[200]  Universal Music Group ("Universal") was named as a co-defendant for its role as the parent company of Mr. Jackson's record company responsible for issuing the song.[201]  Reed Smith represented Mr. Jackson and Universal, and Mr. Jackson paid for Reed Smith's fees and costs because he had indemnified Universal for any copyright claims.[202]  There was no writing other than the 2004 Engagement Letter explaining Reed Smith's representation of Mr. Jackson and Universal.[203]

---

[194]    AP-ECF No. 528, p. 108, L. 7-10.
[195]    AP-ECF No. 528, p. 128, L. 10-16.
[196]    AP-ECF No. 528, p. 128, L. 22-25.
[197]    AP-ECF No. 528, p. 142, L. 7-16.
[198]    AP-ECF No. 528, p. 171, L. 23-25, p. 172, L. 1-4.
[199]    AP-ECF No. 529, p. 16, L. 10-25.
[200]    AP-ECF No. 528, p. 228, L. 19-25, AP-ECF No. 529, p. 16, L. 10-25
[201]    AP-ECF No. 528, p. 170, L. 11-20; AP-ECF No. 529, p. 17, L. 3-25.
[202]    AP-ECF No. 529, p. 18, L. 5-25, p. 19, p. 1-16.
[203]    AP-ECF No. 529, p. 18, L. 5-25, p. 19, L. 1-16.

The district court granted Reed Smith's motion to dismiss the Simmons Case based on a statute of limitations argument, but the ruling was appealed to the Second Circuit Court of Appeals.[204] Reed Smith billed time for defending the district court's dismissal order, and preparing an appellate brief.[205] In February 2015, Reed Smith spent approximately 50.55 hours of time drafting the appellee brief.[206] Mr. Raymond explained the time included addressing a question of first impression in the Second Circuit regarding the running of the statute of limitations under the Copyright Act.[207] After appellate briefing but before appellate argument, Mr. Jackson replaced Reed Smith with Robins Kaplin, Mr. Weiner's law firm, to represent him in the appeal.[208] It is unclear from the trial record when Mr. Jackson terminated Reed Smith as counsel in the Simmons Case, but the court takes judicial notice pursuant to Fed.R.Evid. 201 that Robins Kaplan, LLP did not appear in the appellate case until June 2, 2015.[209]

Meanwhile, Universal retained Reed Smith to argue the appeal on its behalf, paying $30,000.00 of the fees incurred at some point after the Petition Date.[210] The Second Circuit Court of Appeals held oral argument in the Simmons Case in June of 2015.[211] Reed Smith agrees its claim for the Simmons Case fees should be reduced by the amount of Universal's payment.[212] Ultimately, the Second Circuit Court of Appeals affirmed the dismissal, in Mr. Jackson's favor.[213] Mr. Raymond considered this a win for

---

[204]    AP-ECF No. 528, p. 172, L. 1-4; p. 229, L. 1-5.
[205]    AP-ECF No. 528, p. 226, L. 6-9.
[206]    AP-ECF No. 466-8, AP-ECF No. 528, p. 227, L. 23-25, p. 228, L. 1-15.
[207]    AP-ECF No. 528, p. 227, L. 18-25, p. 228, L. 1-15.
[208]    AP-ECF No. 528, p. 170, L. 11-20, p. 222, L. 23-25, p. 230, L. 6-17, p. 231, L. 21-25, p. 232, L. 1.
[209]    See, Docket Entry No. 104 in *Simmons v. Stanberry*, Case No. 14-3106, entered on June 2, 2015.
[210]    AP-ECF No. 528, p. 170, L. 2-20; p. 230, L. 6-17; AP-ECF No. 529, p. 20, L. 18-25, p. 21, L. 1-16.
[211]    AP-ECF No. 528, p. 234, L. 24-25, p. 235, L. 6-20.
[212]    AP-ECF No. 577, p. 5.
[213]    AP-ECF No. 528, p. 172, L. 1-4.

Mr. Jackson because he had made a great deal of money from the song, potentially subjecting him to significant damages had the dismissal been reversed.[214]

Mr. Raymond charged $865.00 per hour in the Simmons Case, the same rate as charged in the Leviston Case. The Reed Smith associates working on the Simmons Case charged hourly rates ranging from $235.00 to $600.00 per hour. Paralegals working on the Simmons Case charged an hourly rate of $135.00.

During trial, Mr. Raymond acknowledged a December 16, 2014 invoice for the Simmons Case referenced in POC 18 had been paid.[215] The remaining unpaid invoices are summarized in the following table, which reduces the fees and expenses of $71,591.19 originally sought to $47,341.81, as the remaining claim for the Simmons Case.

| Simmons Case | | |
|---|---|---|
| Attorney | Number of Hours | Total Fees |
| Invoice dated January 20, 2015[216] | | |
| Peter Raymond | 3.6 | $3,114.00 |
| Evan Farber | 0.5 | $290.00 |
| Sarah Levitan | 2.1 | $745.50 |
| Shimaree Evans | 0.1 | $13.50 |
| *Totals* | *6.3* | *$4,163.00* |
| Invoice dated February 28, 2015[217] | | |
| Peter Raymond | 1.4 | $1,211.00 |
| *Totals* | *1.4* | *$1,211.00* |
| Invoice dated March 23, 2015[218] | | |
| Peter Raymond | 18.9 | $16,348.50 |
| Geoffrey Young | 31.9 | $19,140.00 |
| Sarah Levitan | 2.3 | $816.50 |
| Brian Blaho | 2.4 | $564.00 |
| Evelyn Green | 0.1 | $16.50 |
| Shimaree Evans | 0.4 | $54.00 |
| Sabrina Busgith | 0.43 | $58.05 |
| *Totals* | *56.43* | *$36,997.55* |

---

[214]   AP-ECF No. 528, p. 172, L. 5-11.
[215]   AP-ECF No. 466-5, AP-ECF No. 528, p. 223, L. 16-22.
[216]   AP-ECF No. 466-6.
[217]   AP-ECF No. 466-7.
[218]   AP-ECF No. 466-8.

| Invoice dated April 18, 2015[219] | | |
|---|---|---|
| Peter Raymond | 1.00 | $865.00 |
| *Totals* | *1.00* | *$865.00* |
| Invoice dated May 22, 2015[220] | | |
| Peter Raymond | 0.90 | $778.50 |
| Geoffrey Young | 0.50 | $300.00 |
| Shimaree Evans | 0.10 | $13.50 |
| *Totals* | *1.50* | *$1,092.00* |
| Invoice dated June 30, 2015[221] | | |
| Peter Raymond | 1.70 | $1,470.50 |
| Geoffrey Young | 0.40 | $240.00 |
| Brian Blaho | 0.10 | $23.50 |
| Shimaree Evans | 0.20 | $27.00 |
| *Totals* | *2.4* | *$1,761.00* |
| Sub-Total | 69.03 Hours | $46,089.55 |
| Expenses | --- | $1,252.26 |
| Grand Total | 69.03 Hours | $47,341.81 |

While Mr. Raymond testified there was approximately $22,860.00 due for time spent preparing for the appellate argument that was never billed to Mr. Jackson, nothing in the record substantiates that portion of the claim.[222]

Reed Smith provided evidence of $1,252.26 of expenses incurred as a result of the Simmons Case as detailed in the invoices dated January 2015 through June 30, 2015. The expenses include copying, research, and case-related search fees. Mr. Jackson did not contest any particular expense in the Simmons Case.

## V.    APPLICABLE LAW

### *Standard for Allowance of Claims*

Pursuant to Bankruptcy Code § 502(a), "a claim ... proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a). A timely filed proof of claim is *prima facie* evidence of the claim's validity

---

[219]    AP-ECF No. 466-9.
[220]    AP-ECF No. 466-10.
[221]    AP-ECF No. 466-11.
[222]    AP-ECF No. 528, p. 234-235.

and amount.  Fed.R.Bankr.P. 3001(f).  If an objection to a proof of claim is filed a court must determine the allowance of the claim pursuant to § 502(b).

To prevail on an objection, the objecting party must "produce evidence at least equal in probative force" to evidence offered by the claimant to "refute at least one of the allegations that is essential to the claim's legal sufficiency."  *In re Hampton Ventures, LLC*, 599 B.R. 474, 488 (Bankr. D. Conn. 2019) (internal citations omitted).  "If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence."  *Hampton Ventures*, 599 B.R. at 488 (internal citations omitted).

### *Reasonable Value of Services Pursuant to § 502(b)(4)*

An objection to a proof of claim predicated on services rendered by an attorney implicates Bankruptcy Code § 502(b)(4).  4 *Collier on Bankruptcy* ¶ 502.03 (16th 2023). Section 502(b)(4) directs a court to determine and allow such claim in an amount that does not "exceed[] the reasonable value of such services."  11 U.S.C. § 502(b)(4). "[W]hen Section 502(b)(4) uses the term "value" it is synonymous with the concept of "market value" or "price" such that an attorney is entitled to fees up to the reasonable market value of his services."  *In re Food Mgt. Group, LLC*, 04-20312 (ASH), 2008 WL 2788738, at *5 (Bankr. S.D.N.Y. July 16, 2008), *appeal dismissed and remanded*, 428 B.R. 576 (S.D.N.Y. 2009), *aff'd*, 484 B.R. 574 (S.D.N.Y. 2012)(finding such an interpretation consistent with the statute's purpose to prevent the debtor from defrauding its creditors by agreeing to pay its attorney excessive fees).  "The reasonableness of an attorney's pre-petition fees under § 502(b)(4) is a question of federal law … and bankruptcy courts have wide discretion in determining the reasonableness of the fees in

this context." *In re Regino*, 585 B.R. 322, 327 (Bankr. E.D.N.Y. 2018)(internal citations omitted).   No controlling standard for determining reasonable value under § 502(b)(4) exists and courts have utilized a variety of approaches including: a lodestar analysis multiplying a reasonable number of hours by a reasonable rate, standards under state rules of professional conduct, and standards used for considering fees under §§ 330 and 506(b).   *Regino*, 585 B.R. at 327-328 (collecting cases).   In *Regino*, the court applied a combination of the standards used in conjunction with §§ 330 and 506(b) and under state rules of professional conduct to determine reasonable value under § 502(b)(4).   *Regino*, 585 B.R. at 328.

These standards are substantially similar and using a combination is the best course for reviewing reasonable value under § 502(b)(4), as in *Regino*.   Courts within the Second Circuit have favored using the term "presumptively reasonable fee" to describe what a court seeks to set.   *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany and Albany County Bd. of Elections*, 522 F.3d 182, 190 (2d Cir. 2008)(court determines attorneys' fees by considering all case-specific variables[223] and setting a reasonable hourly rate.   That rate is then multiplied by the number of hours reasonably expended).   "Once a determination is made on the reasonableness of the hourly rate, then that rate is applied to the number of hours reasonably expended by counsel – which is scrutinized by the Court -- in determining the award."   *Bozdogan v. 23 Ludlam Fuel,*

---

[223]     The *Johnson* factors are derived from the Fifth Circuit's decision in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).   The twelve *Johnson* factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.   *Arbor Hill*, 522 F.3d at 186 n.3 (*citing Johnson*, 488 F.2d at 717–19).   The Second Circuit has directed courts to consider all case specific variables, including but not limited to the *Johnson* factors, when determining a reasonable hourly rate.   *Lilly v. City of New York*, 934 F.3d 222, 232 (2d Cir. 2019).

*Inc.*, 16-CV-1053 (JMW), 2022 WL 17987044, at *2 (E.D.N.Y. Dec. 29, 2022)(*citing, Arbor Hill*, 522 F.3d at 190). "The ultimate objective in awarding fees is to do rough justice, not to achieve auditing perfection." *Bozdogan*, 2022 WL 17987044, at *2 (*citing, Restivo v. Hessemann*, 846 F.3d 547, 589 (2d Cir. 2017)). In setting the rate, a court considers "the market rate prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Bozdogan*, 2022 WL 17987044, at *3.

The Rules of Professional Conduct in New York utilize a similar set of factors to determine whether a fee is excessive.[224] Under Rule 1.5(a), the factors include: "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent or made known to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent." NY RPC Rule 1.5(a)(1-8).[225] These eight (8) factors are included within the twelve *Johnson* factors.

The review of attorney's fees pursuant to Bankruptcy Code § 330(a) is substantially the same, with a slight adjustment for bankruptcy-specific considerations. Bankruptcy Code § 330(a)(3) directs a court to consider the nature, extent, and value of the services

---

[224] While this court is located in the District of Connecticut, the litigation matters – the Leviston Case and the Simmons Case – giving rise to the attorney's fees at issue here were both based in New York, making the New York Rules of Professional Conduct relevant.

[225] Rule 1.5(a) of the Connecticut Rules of Professional Conduct identifies the nearly identical eight factors. *See, Retained Realty, Inc. v. Spitzer*, 643 F. Supp. 2d 228, 240 (D. Conn. 2009)(adopting the American Bar Association's Model Rules of Professional Conduct).

by taking into account several factors, including the following factors relevant here: (1) "the time spent on [the] services; (2) the rates charged [ ]; … (4) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed … ."  11 U.S.C. § 330 (a)(3).  "The prevailing method for weighing § 330(a)(3) factors is the 'lodestar' approach." *In re Polanco*, 626 B.R. 12, 22 (Bankr. E.D.N.Y. 2021)(internal citations omitted)("[t]he lodestar amount represents the number of hours reasonably worked on a case multiplied by the reasonable hourly rate.").

### Reductions for Block Billing or Vague Billing Entries

Whether analyzing the reasonable value of attorney's fees under the Second Circuit's 'presumptively reasonable fee' approach or the standards of § 330(a), courts may reduce the fees for instances of block billing or vague descriptions.  *See, Bozdogan*, 2022 WL 17987044, at *4 (analyzing fees under the presumptively reasonable fee approach and finding "block-billing is frowned upon, since it amounts to the lumping together of discrete tasks with others that are not clearly defined, which makes it difficult for the court to allocate time to individual activities in order to gauge the reasonableness of time expended on each activity.)(internal citation omitted); *see also, In re Molina*, 632 B.R. 561, 574 (Bankr. S.D.N.Y. 2021)(In reviewing debtor's counsel's fees for reasonableness under § 330, the court noted the block billing and vagueness in the overall time entries made it difficult for the court to assess and reduced fees accordingly.).  "Block-billing, the practice of aggregating multiple tasks into one billing entry, is not prohibited … but can make it exceedingly difficult for courts to assess the reasonableness of the hours billed."  *LV v. New York City Dept. of Educ.*, 700 F. Supp. 2d 510, 525 (S.D.N.Y. 2010).  If time records or other evidence do not allow a court to determine the

reasonableness of the fee because of block billing or for any other reason, the fee applicant – who bears the burden of proof the same as a creditor seeking the allowance of its claim in a bankruptcy case – has failed to carry its burden. *In re Ridgemour Meyer Properties, LLC*, 08-13153 (SMB), 2018 WL 2305765, at *17 (Bankr. S.D.N.Y. May 18, 2018), *aff'd*, 599 B.R. 215 (S.D.N.Y. 2019), *aff'd*, 791 Fed. Appx. 279 (2d Cir. 2020)(summary order)(declining to impose an across-the-board reduction where the time entries amplified by trial testimony allowed the court to make an overall assessment as to reasonableness of the time spent.).

### *Bankruptcy Code § 502(b)(1) and State Law Ethical Rule Violations*

Mr. Jackson also argues POC 18 should be disallowed because the 2004 Engagement Letter violated New York's rules pertaining to legal ethics. And while Mr. Jackson does not cite to Bankruptcy Code § 502(b)(1) in his filings, the argument falls within its parameters. Under § 502(b)(1), once an objection has been made to a claim's allowance, a court shall determine the amount of such claim as of the petition date (in this case July 13, 2015), except to the extent that the claim *is unenforceable under applicable law*. 11 U.S.C. § 502(b)(1)(*emphasis added*). "This provision is most naturally understood to provide that, with limited exceptions, any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy." *Travelers Cas. and Sur. Co. of Am. v. P. Gas and Elec. Co.*, 549 U.S. 443, 450 (2007); *see also, In re Brown*, 1:20-CV-03943 (MKV), 2021 WL 510157, at *8 (S.D.N.Y. Feb. 11, 2021)("the language could not be plainer – if a claimant would be estopped under non-bankruptcy law from having a valid claim against the debtor, a party may seek disallowance of the claim under section 502(b)(1)")(*citing, In re LightSquared Inc.*, 504 B.R. 321, 336 (Bankr. S.D.N.Y. 2013)).

Here, New York law is the applicable law to review whether the 2004 Engagement Letter is unenforceable. This is despite the statement in the 2004 Engagement Letter that any dispute would be resolved under California law. The parties proceeded here assuming New York applies by heavily briefing New York law (including ethical rules) and hiring expert witnesses versed in New York legal ethics. See, AP-ECF Nos. 577, 582.

"Bankruptcy courts generally apply the choice of law principles of the forum state." *In re Residential Capital, LLC*, 12-12020 (MG), 2022 WL 17836560, at *8 (Bankr. S.D.N.Y. Dec. 21, 2022)(*citing, In re Gaston & Snow*, 243 F.3d 599, 601–02 (2d Cir. 2001)("bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state."). Here the forum state is Connecticut. "Connecticut courts … have adopted the 'modern' choice of law rules found in the Restatement (Second) of Conflict of Laws (1971) ("Restatement")." *Aruba Hotel Enterprises N.V. v. Belfonti*, 611 F. Supp. 2d 203, 208 (D. Conn. 2009). Restatement (Second) of Conflict of Laws § 187, provides a choice-of-law clause will be enforced unless either:

> (a) The chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
> (b) Application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.
> *Farrell v. Capula Inv. US, LP*, FSTCV196040464S, 2019 WL 6248203, at *5 (Conn. Super. Oct. 21, 2019)(citing, Restatement (Second) of Conflict of Laws § 187(2) (1971)).

Restatement (Second) of Conflict of Laws § 188 directs courts to apply the law of the state which has the most significant relationship to the transaction and the parties where there has not been an effective choice of law. Restatement (Second) of Conflict of Laws § 188(1) (1971).

44

Here, the chosen state – California – does not have a substantial relationship to the parties or the litigation at issue. The litigation (Leviston Case) took place in New York applying the substantive law of New York, and the attorneys providing Mr. Jackson with services (Peter Raymond and his associates) were practicing law in New York. New York has a materially greater interest than the chosen state – California – in regulating the practice of law within its borders. *See, Cobalt Multifamily Inv'rs I, LLC v. Shapiro*, 857 F. Supp. 2d 419, 431 (S.D.N.Y. 2012*)(citing, LNC Inv., Inc. v. First Fid. Bank, Nat. Ass'n*, 935 F. Supp. 1333, 1350–51 (S.D.N.Y. 1996)("A state has a strong interest in regulating the conduct of a law firm licensed to practice within its borders, and a law firm consents to be so regulated when it locates its offices in a particular state.")).

The conclusion that New York law applies accords with the recent American Bar Association Formal Opinion 504 issued on March 1, 2023. In Formal Opinion 504, the Standing Committee on Ethics and Professional Responsibility in considering fee agreements noted a lawyer is subject to the rules of the jurisdiction of the tribunal for conduct in connection with a matter pending before a tribunal, or, for other conduct, to the rules of the jurisdiction in which the "predominate effect" of the lawyer's conduct occurs. *See*, Formal Opinion 504, p. 1. Factors to assess where that "predominant effect" occurs may include the client's location, where a transaction occurs, which jurisdiction's substantive law applies to the transaction, the location of the lawyer's principal office, where the lawyer is admitted, the location of the opposing party, and the jurisdiction with the greatest interest in the lawyer's conduct. *See*, Formal Opinion 504, p. 10. The factors, to the extent they apply, all weigh in favor of the court applying New York's legal ethical rules and law.

**Competing Expert Witnesses**

Both parties offered expert testimony in support of their respective positions as to whether the 2004 Engagement Letter complies with New York's engagement letter rules, 22 NYCRR §§ 1215.1 and 1215.2, and New York's conflict of interest rules, N.Y. Disciplinary R. 2-107(A) and 22 NYCRR § 1200.0, Rule 1.5(g). Reed Smith offered expert testimony from Stephen Gillers, a professor of law at New York University School of Law ("Professor Gillers"), who opined that the 2004 Engagement Letter complied with the provisions of 22 NYCRR § 1215.1 ("§ 1215.1")[226] and, if necessary, 22 NYCRR, § 1215.2 ("§ 1215.2"), and that no conflict of interest existed during Reed Smith's representation of Mr. Jackson.[227]

In contrast, Mr. Jackson offered expert testimony from Bruce Green, a professor of law at Fordham Law School ("Professor Green"),[228] who opined the terms of the 2004 Engagement Letter could not have applied to the Leviston Case[229] and that Reed Smith impermissibly shared fees with Mr. Sedlmayr who had a conflict of interest by representing Rick Ross during the course of the Leviston Case.

**Engagement Letter Rule**

Section 1215.1 to Title 22 of the Official Compilation of Codes, Rules, and Regulations of the State of New York requires an attorney who undertakes to represent a client and collect any fee from a client to provide the client with a written letter of engagement before commencing the representation or within a reasonable time thereafter ("Engagement Letter Rule"). 22 NYCRR § 1215.1(a). The Engagement Letter Rule requires engagement letters include: (1) an explanation of the scope of the legal

---

[226] AP-ECF No. 547, p. 52, L. 20-25, p. 53, L. 1-21.
[227] AP-ECF No. 465-3; AP-ECF No. 547, p. 9, L. 7-9, p. 11, L. 1-6, p. 12, L. 1-3.
[228] AP-ECF No. 465-17; AP-ECF No. 547, p. 107, L. 3-15.
[229] AP-ECF No. 547, p. 112, L. 1-5.

services to be provided; (2) an explanation of attorney's fees to be charged, expenses and billing practices; and (3) where applicable, a notification that the client may have a right to arbitrate fee disputes. 22 NYCRR § 1215.1(b). Nothing in the Engagement Letter Rule dictates the level of detail required when explaining the scope of services to be provided. *In re Food Mgt. Group, LLC,* 2008 WL 2788738, at *9 (finding engagement letter covering "litigation matters" a sufficient description for legal fees on account of litigation services provided after the date of the letter).

"In 2009, a variant of the Engagement Letter Rule was incorporated in the New York Rules of Professional Conduct." *Arent Fox LLP v. JDN AA, LLC*, 2018 WL 5981679, at *4 (N.Y.Supreme Court, November 14, 2018). Specifically, Rule 1.5(b) made it an attorney's ethical obligation to communicate to a client the scope of the representation and the basis and rate of any fee charged. 22 NYCRR § 1200.0, Rule 1.5(b)). If required by statute or court rule, the communication to the client must be in writing. Rule 1.5(b) does not apply – and therefore a communication about scope or fees or expenses is not required – if a lawyer meets four criteria: the lawyer has "regularly represented" the client in the past, the lawyer will charge that client "on the same basis or rate" as in the past, the lawyer will "perform services that are of the same general kind" as in the past, and the client has "paid" the lawyer's bills in the past. 22 NYCRR § 1200.0, Rule 1.5(b). Roy Simon, author of Simon's New York Rule of Professional Conduct Annotated, noted his interpretation of the words "regularly represented" to mean "regularly billed" and if a lawyer has billed a client two or more times in the past (and the client has paid the bills), then the lawyer has "regularly represented" the client for purposes of Rule 1.5(b). § 1.5:40 Phrase-by-Phrase Analysis, Simon's NY Rules of Prof. Conduct § 1.5:40, December 2021.

Professor Gillers believed the 2004 Engagement Letter complied with § 1215.1 and a new engagement letter was not necessary for Reed Smith's representation of Mr. Jackson in the Leviston Matter.[230]   Professor Gillers relied upon the following language and terms in the 2004 Engagement Letter in forming his opinion that the 2004 Engagement Letter covered future litigation:

- In the first sentence of the 2004 Engagement Letter, it references: "activities," "third-party claims," and "lawsuits."[231] Professor Gillers noted these were all in the plural form implying an on-going relationship.[232]  Again, under "Client Responsibilities" the 2004 Engagement Letter provides: "We will keep you informed of the status of all matters," again in the plural implying more than one matter.[233]

- The 2004 Engagement Letter's Termination provision contemplated more than one matter being addressed by Reed Smith at a time because it stated, "we will continue our services with regard to any matter as to which our compensation continues."[234]

- The 2004 Engagement Letter did not identify any specific matter by name, rather generally referred to "matters."[235]   The first sentence under the second co-counsel states: "Reed Smith LLP and various attorneys at that firm, including Fred Ansis, Peter Raymond, Kurt Peterson and Miles Cooley, have been working on various matters for you."[236]

Professor Gillers believed the 2004 Engagement Letter complied with § 1215.1(b)(1)'s requirement to include an explanation of the scope of legal services to be rendered.[237] Professor Gillers testified § 1215.1(b) required only a generic description of proposed legal services and did not require a particular lawsuit be named or case-specific evidentiary facts be set forth.[238]  In particular, he stated:

---

[230]   AP-ECF No. 547, p. 13, L. 17-20.
[231]   AP-ECF No. 466-15.
[232]   AP-ECF No. 547, p. 15, L. 20-25; p. 16, L. 1-4.
[233]   AP-ECF No. 466-15, p. 3, ¶ 2.
[234]   AP-ECF No. 466-15, p. 1, ¶ 2; ECF No. 547, p. 16, L. 5-10.
[235]   AP-ECF No. 547, p. 17, L. 12-14.
[236]   AP-ECF No. 466-15, p. 4, ¶ 7.
[237]   AP-ECF No. 547, p. 19, L. 7-13.
[238]   AP-ECF No. 547, p. 19, L. 14-17, 21-24.

> [T]he general language in that first sentence and the balance of the letter with its use of the plural language and the behavior of the parties in treating the letter as forming a professional relationship for future work, in combination supports the conclusion that this letter satisfied the requirements of the section.[239]

Professor Gillers relied on *In re Food Mgt. Group, LLC*, 2008 WL 2788738, at \*9 (concluding "[n]othing in 22 NYCRR § 1215.1 dictates the level of detail required when explaining the scope of services to be provided.").

Professor Green disagreed but acknowledged he had not read *In re Food Mgt. Group, LLC*.[240]  In his opinion, the 2004 Engagement Letter could not have applied to the Leviston Case because it was impossible to predict in 2004 the Leviston Case happening and thus, the parties could not have had a 'meeting of the minds' agreeing Reed Smith would represent Mr. Jackson in that matter.[241]  Professor Green opined that even if the 2004 Engagement Letter had been entered into in 2010 – at a time the Leviston Case existed – the Letter's scope of retention was insufficiently broad to encompass the Leviston Case.[242]  He testified the Letter's scope was unclear and would have required some other, further understanding or agreement between the parties before it could be found to apply to the Leviston Case.[243]

### *Exceptions to Engagement Letter Rule*

If there is "a significant change in the scope of services or the fee to be charged," an attorney must provide an updated letter of engagement to the client.  22 NYCRR § 1215.1.  However, an updated letter is not required under four (4) circumstances.  22 NYCRR § 1215.2.  The only exception relevant here is § 1215.2(b), providing § 1215.1's requirement for a written letter of engagement does not apply to representation where the

---

[239]    AP-ECF No. 547, p. 20, L. 13-18.
[240]    AP-ECF No. 547, p. 118, L. 24-25
[241]    AP-ECF No. 547, p. 113, L. 6-19.
[242]    AP-ECF No. 547, p. 114, L. 18-24, p. 117, L. 7-11.
[243]    AP-ECF No. 547, p. 114, L. 5-17, p. 117, L. 3-15.

attorney's services are of the same general kind as previously rendered to and paid for by the client.  22 NYCRR § 1215.2(b).

Because Professor Gillers considered the 2004 Engagement Letter sufficient under § 1215.1 to cover future matters such as the Leviston and Simmons Cases, he did not believe the court needed to consider the exceptions set forth in § 1215.2.[244]  But, if he was incorrect, then he believed § 1215.2(b) applied and Reed Smith could still represent Mr. Jackson in those cases without the need to enter into a new engagement letter because of Reed Smith's history of representing Mr. Jackson in matters of the same general kind as previously rendered to and paid for by Mr. Jackson.[245]  He believed it was irrelevant whether Mr. Jackson was a defendant or plaintiff in the Leviston Case when determining the "sameness" of the prior legal services.[246]  Professor Gillers placed no relevance on the specific facts of the Leviston Case – it involving a sex tape or potentially exposing Mr. Jackson to a significant amount of damages – as being relevant to whether or not it was of the same general kind as prior legal services.[247]  To support his opinion, Professor Gillers relied upon *Vandenburg & Feliu, LLP v. Interboro Packaging Corp.*, 896 N.Y.S.2d 111 (2010)(concluding a law firm was not required to provide a separate written retainer agreement for each case because the cases were of the same general kind (litigation) under 22 NYCRR § 1215.2(b)'s exception and the fact some involved litigation in other states did not change that conclusion).[248]

Professor Gillers noted that, even if § 1215.2 applied and even if there was no prior written agreement, an attorney still must comply with 22 NYCRR § 1200.0, Rule 1.5(b)

---

[244]    AP-ECF No. 547, p. 21, L. 18-25, p.22, L. 1-2, p. 60, L. 5-17, p. 61, L. 3-10.
[245]    AP-ECF No. 547, p. 22 – 24, p. 80, L. 12-25, p. 81, L. 1-2.
[246]    AP-ECF No. 547, p. 26, L. 1-10, 23-25.
[247]    AP-ECF No. 547, p. 24, L. 1-12.
[248]    AP-ECF No. 547, p. 24, L. 9-18.

obligating an attorney ethically to communicate to a client the scope of the representation and the basis or rate of the fees to be charged.[249]  Here, Professor Gillers noted there was a prior agreement, and that – despite the absence of express language in § 1215.2 directing that any terms of a prior engagement letter would apply to a new representation – § 1215.2 had such an effect.[250]  Thus, as it pertained to Mr. Jackson's case, Professor Gillers believed the 2004 Engagement Letter satisfactorily communicated the scope and terms of representation as required by Rule 1.5 and § 1215.1 and, when a new matter of the same general kind arose (like the Leviston Case), its terms would apply to the new representation without the need for a new written agreement.[251]

Professor Green disagreed.  First, Professor Green was unaware of any facts indicating Reed Smith informed Mr. Jackson the terms of the 2004 Engagement Letter would apply to the Leviston Case and believed such notification was required.[252]  He opined that even if § 1215.2(b) applied and a new written engagement letter was not necessary, the parties still needed to reach agreement as to the terms of the representation.[253]  But in his opinion, there was a lack of any agreement – written or oral – that the terms of the 2004 Engagement Letter would apply to the Leviston Case in 2010.[254]

> I don't believe any of the provisions of the 2004 agreement would apply unless in 2010, when Reed Smith was retained in the Leviston matter, they agreed, Reed Smith and Mr. Jackson on those particular terms again.  Or if they said, you know, we agree that the 20 -- 2004 agreement, those terms will be reapplied or continued, which I don't -- as far as I know, that Mr. Jackson never agreed to that.[255]

---

[249]   AP-ECF No. 547, p. 63, L. 1-24.
[250]   AP-ECF No. 547, p. 73, L. 4-11, p. 74, L. 3-12, p. 80, L. 13-25.
[251]   AP-ECF No. 547, p. 63, L. 7-24, p. 81, L. 4-11, p. 85, L. 2-13.
[252]   AP-ECF No. 547, p. 164, L. 22-25, p. 165, L. 1-7, p. 167, L. 22-24.
[253]   AP-ECF No. 547, p. 117, L. 12-20.
[254]   AP-ECF No. 547, p. 117, L. 21-25, p. 118, L. 1-2.
[255]   AP-ECF No. 547, p. 118, L. 7-14.

Professor Green discounted Reed Smith's history of representing Mr. Jackson in various matters from 2004-2010 as irrelevant.[256]  He also disagreed the Leviston Case was of the same general kind as the term was in § 1215.2(b).[257]  Professor Green testified Roy Simon's treatise regarding the New York Rules of Professional Conduct and a case called *Grossman v. West 26th Corp.,* 801 N.Y.S.2d 727 (Civ. Ct. Kings County 2005) supported his opinion that a greater degree of similarity – or more than generally litigation – was required between the prior litigation and the representation at issue for the exception to apply.[258]  In *Grossman*, the court concluded an attorney was precluded from recovering the amount for which he billed because he had failed to provide a written letter of engagement to his client after significantly increasing his fee compared to past representations.  *Grossman*, 801 N.Y.S.2d at 730 (the attorney was permitted to retain fees on a *quantum meruit* basis in an amount less than the amount billed).

The reliance on *Grossman* appears misplaced.  There, the court focused on the increase in the fee charged for the representation at issue ($8,901.50) compared with the prior bills which never exceeded $1,000.  The court found the change in fee significant triggering the requirement under § 1215.1(a) for an updated letter when there is a significant change in the fee.  Here, the evidence does not include a significant change in fees.

### Ability to Recover Fees in Absence of an Engagement Letter

"[W]here a valid agreement exists between the parties, an action in *quantum meruit* to prevent unjust enrichment ordinarily is not available."  *New Windsor Volunteer Ambulance Corps., Inc. v. Meyers*, 442 F.3d 101, 118 (2d Cir. 2006).  "New York courts

---

[256]    AP-ECF No. 547, p. 168, L. 22-25, p. 169, L. 1-18.
[257]    AP-ECF No. 547, p. 120, L. 4-18.
[258]    AP-ECF No. 547, p. 120, L. 13-18, p. 122, L. 1-11.

have crafted ... a specific exception to this general rule, allowing an attorney who is discharged without cause to recover under *quantum meruit* even when the parties had an otherwise valid agreement covering the same subject matter." *Guzik v. Albright,* 16-CV-2257 (JPO), 2017 WL 3601244, at *3 (S.D.N.Y. Aug. 21, 2017); *accord Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 263 (2d Cir. 2004) (applying New York law) ("If the lawyer is discharged without cause and prior to the conclusion of the case ... he or she may recover ... in *quantum meruit*, the fair and reasonable value of the services rendered[.]").

Additionally, "[New York courts] recognize[] that counsel can be awarded *quantum meruit* fees even in the absence of a written retainer." *S.D. v. St. Luke's Cornwall Hosp.*, 96 N.Y.S.3d 467, 490 (N.Y. Sup. Ct. 2019)(*citing, Rubenstein v. Ganea*, 41 A.D.3d 54, 833 N.Y.S.2d 566 (2nd Dept. 2007)). However, if a lawyer is discharged for cause, he or she is not entitled to legal fees. *Universal Acupuncture Pain Services, P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d at 263. As one court noted, "it would defy common sense to allow attorneys [ ] who have been discharged for cause to recover a portion of their fees, since proportionate recovery is exactly what attorneys who have been discharged without cause are entitled to seek." *In re Food Mgt. Group, LLC*, 484 B.R. 574, 592 (S.D.N.Y. 2012).

To recover in *quantum meruit*, a plaintiff must establish

"(1) the performance of services in good faith,
(2) the acceptance of the services by the person to whom they are rendered,
(3) an expectation of compensation therefor, and
(4) the reasonable value of the services."
*Fulbright & Jaworski, LLP v. Carucci*, 63 AD3d 487, 489 (1st Dept 2009).

"Under New York law ... to determine the fair and reasonable value of legal services on the basis of *quantum meruit*, courts consider 'the difficulty of the matter, the

nature and extent of the services rendered, the time reasonably expended on those services, the quality of performance by counsel, the qualifications of counsel, the amount at issue, and the results obtained.'" *Popal v. Slovis*, 646 Fed. Appx. 35, 36 (2d Cir. 2016).

### Impermissible Fee Sharing and Conflicts of Interest

Mr. Jackson asserts the 2004 Engagement Letter cannot serve as the contractual basis for fees sought in POC 18 because it violated New York ethical rules regarding fee sharing and conflicts of interest rendering it unenforceable. AP-ECF No. 582, p. 13. Prior to April 1, 2009, Disciplinary Rule 2-107[259] of the New York Code of Professional Responsibility ("DR 2-107") generally prohibited a lawyer from dividing or sharing fees with lawyers outside their firm, subject to three exceptions: (i) "[t]he client consents to employment of the other lawyer after a full disclosure that a division of fees will be made; (ii) [t]he division is in proportion to the services performed by each lawyer, or, by a writing given the client, each lawyer assumes joint responsibility for the representation; and (iii) [t]he total fee of the lawyers does not exceed reasonable compensation for all legal services they rendered to the client." *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 91 (2d Cir. 2010)(*citing*, N.Y. Disciplinary R. 2-107(A)).

"[A]n attorney who seeks a share of the fee pursuant to such an agreement must have contributed some work, labor, or service toward the earning of the fee." *Moss v.*

---

[259]    The Disciplinary Rules of the Code of Professional Responsibility were superseded by New York's Rules of Professional Conduct effective April 1, 2009. The principles embodied in former DR 2–107 are now contained in Rule 1.5(g)-(h), N.Y. Comp.Codes R. & Regs. tit. 22, § 1200. The 2009 revisions would not affect the outcome in this matter as the substantive elements regarding a division of fees between lawyers remains the same. New York State Rule of Professional Conduct Rule 1.5(g) ("Rule 1.5(g)") provides, in relevant part, "a lawyer shall not divide a fee for legal services with another lawyer who is not associated in the same law firm unless: (1) the division is in proportion to the services performed by each lawyer or, by a writing given to the client, each lawyer assumes joint responsibility for the representation; (2) the client agrees to employment of the other lawyer after a full disclosure that a division of fees will be made, including the share each lawyer will receive, and the client's agreement is confirmed in writing; and (3) the total fee is not excessive." 22 NYCRR § 1200.0, Rule 1.5(g).

*Gurfein Douglas, LLP*, 128 N.Y.S.3d 892, 893 (N.Y. App. Div. 2d Dept. 2020)(agreeing there was no triable issue of fact warranting a denial of summary judgment where the record revealed the lawyer's role was merely that of a finder, who referred the plaintiff to the defendant); *see also*, *Nicholson v. Nason and Cohen, P.C.*, 597 N.Y.S.2d 23, 24 (N.Y. App. Div. 1st Dept. 1993)(internal citations omitted)("While a fee-splitting agreement will be enforced where the attorney seeking a share performed some work, labor or services which contributed toward the earning of the fee there being no requirement that compensation be in proportion to the amount of work actually performed, more is required of the forwarding attorney than the mere recommendation of a lawyer.").

New York Rule of Professional Conduct 1.7 addresses conflicts of interest with current clients and provides, in pertinent part, that "a lawyer shall not represent a client if a reasonable lawyer would conclude that either the representation will involve the lawyer in representing differing interests or there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests." 22 NYCRR 1200.0, Rule 1.7(a). A potential conflict may be waived if the lawyer reasonably believes he will be able to provide competent and diligent representation to each affected client, the representation is not prohibited by law, the representation does not involve the assertion of a claim by one client against the other in the same litigation, and each affected client gives informed consent, confirmed in writing. 22 NYCRR 1200.0, Rule 1.7(b). Courts in New York have declined to impute a conflict of interest of one firm to another firm. *See, Dietrich v. Dietrich*, 25 N.Y.S.3d 148, 150 (N.Y. App. Div. 1st Dept. 2016)("It would mean that attorneys from different firms could never work together – even on a single case – without having the conflicts of interest of each firm imputed to the other; it would impair clients'

ability to retain the lawyers of their choice."). "An attorney who violates a disciplinary rule may be discharged for cause and is not entitled to fees for any services rendered." *Jay Deitz & Associates of Nassau County, Ltd. v. Breslow & Walker, LLP*, 59 N.Y.S.3d 443, 447 (N.Y. App. Div. 2d Dept. 2017)(internal citations omitted).

Rule 1.7 roughly tracks the language of the American Bar Association's Model Rule 1.7. In Formal Opinion 92-367, the American Bar Association addressed the rule and determined whether a conflict of interest arises when a lawyer, while representing one client in litigation, may represent another client as a third-party witness in the same litigation. ABA Formal Opin. 92-367 (1992). In the Opinion, the Standing Committee on Ethics and Professional Responsibility opined, "as a general matter examining one's own client as an adverse witness on behalf of another client, or conducting third party discovery of one client on behalf of another client, is likely (1) to pit the duty of loyalty to each client against the duty of loyalty to the other; (2) to risk breaching the duty of confidentiality to the client-witness; and (3) to present a tension between the lawyer's own pecuniary interest in continued employment by the client-witness and the lawyer's ability to effectively represent the litigation client." Formal Opinion 92-367, p. 3. "Courts in this Circuit have held that a lawyer owes a duty of undivided loyalty to his client that precludes him from doing anything adverse to a client's interests*." All Star Carts and Vehicles, Inc. v. BFI Canada Income Fund*, CV08-1816 (LDW) (AKT), 2010 WL 2243351, at *3 (E.D.N.Y. June 1, 2010), adhered to, 2011 WL 13254531 (E.D.N.Y. Mar. 30, 2011). But the "case law is less clear when the conflict arises in the context of the simultaneous representation of a party and a non-party witness." *All Star Carts and Vehicles, Inc. v. BFI Canada Income Fund*, 2010 WL 2243351, at *4. In the context of evaluating an attorney's conflict in representing a party and a potential witness, the Second Circuit Court

56

of Appeals held only a "potential conflict of interest exists if the interests of the defendant may place the attorney under inconsistent duties at some time in the future." *United States v. Kliti*, 156 F.3d 150, 153 n. 3 (2d Cir.1998). Similarly, the New York Court of Appeals noted an attorney is placed in a very awkward position when that "attorney [must decide] whether and how best to impeach the credibility of a witness to whom he ... owe[s] a duty of loyalty." *People v. Carncross*, 927 N.E.2d 532, 537 (N.Y. 2010). New York courts addressing the issue, often in the criminal context, have not adopted a *per se* rule against "a defendant's lawyer simultaneously represent[ing] not a codefendant but a prosecution witness" but instead requiring some showing of an actual conflict." *People v. Solomon*, 980 N.E.2d 505, 508 (N.Y. 2012).

Professor Gillers testified Reed Smith's sharing of fees with Mr. Sedlmayr complied with all conditions under the New York Rules of Professional Conduct and no conflict of interest existed due to Mr. Sedlmayr's representation of Rick Ross.[260] Professor Gillers believed the 2004 Engagement Letter contained terms satisfying the requirements of 22 NYCRR 1200.0, Rule 1.5(g) ("Rule 1.5(g)").[261] Professor Gillers explained the pre-April 2009 version of Rule 1.5(g) – DR 2-107 – allowed a division of fees if the fees were in proportion to the serves rendered by each attorney.[262] He noted the successor rule – Rule 1.5(g) – retained this provision.[263] Professor Gillers indicated the phrase "in proportion to" had been interpreted to mean each attorney has performed at least some work and has not declined to perform additional work when requested.[264] In support of his opinion, Professor Gillers cited *Benjamin v. Koeppel*, 85 N.Y.2d 549 (1995)(noting "[i]t

---

[260]   AP-ECF No. 547, p. 28, L. 12-24, p. 33-1-9.
[261]   AP-ECF No. 547, p. 94, L. 2-10.
[262]   AP-ECF No. 547, p. 28, L. 25, p. 29, L. 8-25.
[263]   AP-ECF No. 547, p. 32.
[264]   AP-ECF No. 547, p. 31, L. 1-10.

has long been understood that in disputes among attorneys over the enforcement of fee-sharing agreements the courts will not inquire into the precise worth of the services performed by the parties as long as each party actually contributed to the legal work and there is no claim that either 'refused to contribute more substantially')(internal citations omitted); *Ballow Brasted O'Brien & Rusin P.C. v. Logan*, 435 F.3d 235, 243 (2d Cir. 2006)(agreeing with the decision in *Benjamin* to enforce agreements between attorneys for divisions of legal fees); and *Alderman v. Pan Am World Airways*, 169 F.3d 99 (2d Cir. 1999)(extending the rationale that an agreement for sharing fees between attorneys is enforceable to an agreement between a client and two attorneys so long as each contributed "some work" toward earning the fee.).[265]  In Professor Giller's opinion, Reed Smith's division of fees with Mr. Sedlmayr did not violate Rule 1.5(g) or DR 2-107.[266]

Professor Gillers concluded no conflict of interest existed between Reed Smith and/or Mr. Raymond and its representation of Mr. Jackson as it pertained to issuing a subpoena to Rick Ross.[267]  Professor Gillers was not aware of any facts indicating there was a significant risk that any of the Reed Smith attorney's professional judgments were adversely affected by the attorney's personal financial or business interests as required by Rule 1.7(a)(2).[268]  Professor Gillers also found a lack of a conflict because he was unaware of any facts indicating Mr. Sedlmayr was involved in the decision as to whether or not to subpoena Rick Ross.

> Q: So Professor Gillers, adopting that assumption, if the conversation were between counsel at Reed Smith and then counsel Theo Sedlmayr regarding the decisions of whether to seek discovery or subpoena Rick Ross, would that not be a conversation that would run afoul of ethical obligations?

---

[265]  AP-ECF No. 547, p. 32, L. 13-22.
[266]  AP-ECF No. 547, p. 30, L. 11-13.
[267]  AP-ECF No. 547, p. 33, L. 13-21.
[268]  AP-ECF No. 547, p. 33, L. 22-25, p. 34, L. 1, p. 35, L. 1-16.

A: So I just want to make it clear that I didn't see that in the record. And my answer is that merely broaching that subject to Mr. Sedlmayr does not rise to any level of a conflict until we know more about the conversation. There's nothing wrong with Mr. Raymond saying to Mr. Sedlmayr I may want to subpoena your client, Ross, what do you think about that? At that point Mr. Raymond may have no idea what Mr. Ross' interests were or were not.[269]

Professor Gillers noted that once Mr. Sedlmayr was terminated in 2012, any ethical issue regarding a conflict of interest or fee sharing disappeared.[270]

In contrast, Professor Green believed the fee sharing agreement between Mr. Sedlmayr and Reed Smith during the Leviston Case was ethically impermissible under Rule 1.5(g).[271]  First, he believed the fee sharing arrangement with Mr. Sedlmayr lacked Mr. Jackson's written consent required under Rule 1.5(g)(2), notwithstanding that Mr. Jackson signed the 2004 Engagement Letter that included the fee sharing provision.[272] Professor Green disagreed that consent obtained in the 2004 Engagement Letter could satisfy the written consent requirement, believing Reed Smith was obligated to obtain new written consent from Mr. Jackson before sharing fees in the Leviston Case.[273]  Second, Professor Green asserted Mr. Sedlmayr's compensation was not in proportion to the services performed as required by Rule 1.5(g)(1).[274]  He found Professor Gillers' reliance on the *Benjamin* and *Marin* cases misplaced because in those cases, the courts enforced fee sharing agreements between two attorneys concluding one attorney could not get out of their agreement with another attorney based on their own ethical violations.[275] Professor Green believed the question of whether an illegal fee sharing agreement would

---

[269]    AP-ECF No. 547, p. 100, L. 5-19.
[270]    AP-ECF No. 547, p. 44, L. 7-15.
[271]    AP-ECF No. 547, p. 123, L. 2-7.
[272]    AP-ECF No. 547, p. 124, L. 4-23.
[273]    AP-ECF No. 547, p. 125, L. 1-10.
[274]    AP-ECF No. 547, p. 126, L. 1-19.
[275]    AP-ECF No. 547, p. 127-128.

be enforced **against a client,** a different question from whether it would be enforced between two attorneys.[276]

Professor Green believed a conflict of interest existed with Mr. Sedlmayr's involvement in the Leviston Case and, as a result, Reed Smith's sharing of fees with him was impermissible. Professor Green based his opinion on his understanding the facts supported that Mr. Sedlmayr represented Rick Ross and was involved in the decision on whether to call Rick Ross as a witness (which is not consistent with the record) and thus, a conflict of interest existed.[277]  He cited opinions from the New York state bar and Nassau County Bar indicating it is inappropriate to divide fees with an attorney who could not take on the representation in the first instance due to a conflict.[278]

## VI.    DISCUSSION

### a. *Bankruptcy Code § 502(b)(1): Reed Smith's 2004 Engagement Letter Satisfied 22 NYCRR § 1215.1*

After reviewing the evidence and considering the opinions of the expert witnesses, I agree with Professor Gillers that the 2004 Engagement Letter complied with the provisions of 22 NYCRR §§ 1215.1 and 1215.2.  It is undisputed Reed Smith provided Mr. Jackson with an engagement letter in 2004, which he signed and returned, signaling his agreement and understanding of its terms.  For the next ten (10) years – through late 2014 – Mr. Jackson used the legal services of Reed Smith to pursue and defend various litigation cases, by all accounts to successful conclusions.

The 2004 Engagement Letter contemplated litigation arising in the future through its use of the plural when referring to activities, third-party claims, lawsuits and matters. *See,* AP-ECF No. 466-15.  Reed Smith pledged in the letter to "continue our services with

---

[276]    AP-ECF No. 547, p. 129, L. 7-19.
[277]    AP-ECF No. 547, p. 131, L. 12-25, p. 132, L. 1-4.
[278]    AP-ECF No. 547, p. 130, L. 22-25, p. 131, L. 1-11.

regard to any matter as to which our compensation continues." *See,* AP-ECF No. 466-15.   Regarding the Leviston Case, Reed Smith entered a timely appearance for Mr. Jackson in the state court litigation, conducted discovery, defended Mr. Jackson's own deposition in the case, and was the only counsel of record for Mr. Jackson from its inception in 2010 until just before trial commenced in 2015.

For substantially the reasons articulated by Professor Gillers, I conclude the 2004 Engagement letter complied with 22 NYCRR § 1215.1 because it included at least a generic description of proposed legal services, and, in doing so, sufficiently explained the scope of legal services to be provided.   I respectfully disagree with Professor Green as to his opinion that the Leviston Case was not included within the scope of matters contemplated by the 2004 Engagement Letter.

Even if I were to conclude the 2004 Engagement Letter did not satisfy the requirements of 22 NYCRR § 1215.1, applying the exception in § 1215.2(b) would result in a conclusion no new written agreement was required.   The Leviston Case – litigation premised on New York Civil Rights Law §§ 50 and 51 – was sufficiently similar to the Other Cases handled by Reed Smith for Mr. Jackson.   In fact, it was the same general kind of litigation as the Taco Bell case and the video game case (*see* earlier table of the Other Cases) that were also premised on violations of New York Civil Rights Law §§ 50 and 51.   Clearly, the Leviston Case falls within the purview of the § 1215.2(b) exception.

The 2004 Engagement Letter satisfied any requirement of 22 NYCRR § 1215.1 and Rule 1.5(b), to communicate the scope and terms of representation for the Leviston case when it arose.   Even if it did not, the facts here would fall within the exception set forth in § 1215.2(b) and relieve Reed Smith of the obligation to establish a new engagement letter or agreement.

Moreover, if the 2004 Engagement Letter did not apply here Reed Smith would be entitled to seek a *quantum meruit* recovery.  During post-trial oral argument, Plaintiff's counsel advanced an argument suggesting Reed Smith would not be entitled to *quantum meruit* because they were discharged for cause.  "A "for cause" termination must be based on more than "a client's 'general dissatisfaction' with the attorney's performance.*" Doviak v. Lowe's Home Centers, Inc.*, 21 N.Y.S.3d 754, 757 (N.Y. App. Div. 3d Dept. 2015)(internal citations omitted).  The record does not support a conclusion Reed Smith was fired "for cause" but rather due to Mr. Jackson's dissatisfaction with their trial strategy and discovery decisions.

For these reasons, Mr. Jackson's challenge to Reed Smith's POC 18 premised on violations of 22 NYCRR §§ 1215.1 and 1215.2 fails.

### b. Bankruptcy Code § 502(b)(1): No Conflict of Interest Invalidates Reed Smith's Entitlement to Fees

Mr. Jackson asserted a number of conflict of interest theories to invalidate Reed Smith's entitlement to attorney's fees and costs.  None of them are persuasive.

First, I am unpersuaded the 2004 Engagement Letter was unenforceable from its inception because of a fee sharing provision alleged to violate Rule 1.5.  I agree with Professor Gillers that the 2004 Engagement Letter adequately disclosed the fee arrangement, and the testimony of Messrs. Jackson, Sedlmayr, and Raymond is consistent that Mr. Jackson signed the letter agreement with the intention of retaining Reed Smith to represent him in more than one legal matter.

I further agree with Professor Gillers that the caselaw suggests an attorney receiving a shared fee under Rule 1.5 must have provided some services but is not required to have performed an equal amount of services.  Here, there is evidence Mr. Sedlmayr provided advice to Mr. Jackson on pending litigation, provided him with the

service of acting as his liaison with Reed Smith, and facilitated responses to Reed Smith's need for information and documents on Mr. Jackson's behalf.  I am unpersuaded the fee sharing provision fails to comply with the requirements of Rule 1.5.

There is no evidence Mr. Sedlmayr had a cognizable conflict of interest within the meaning of Rule 1.7(a) simply because he represented both Mr. Jackson and Rick Ross in entertainment-related business transactions during the period from 2010 through 2012. Nothing in the record explains why Mr. Sedlmayr's representation of one would be a conflict in his representation of the other.  There is a lack of evidence suggesting any of the entertainment-related business deals Mr. Sedlmayr provided counsel on were between Mr. Jackson and Rick Ross or that either client had different interests in any transaction.  The strongly felt "rap beef" between Mr. Jackson and Rick Ross, in the absence of evidence showing their legal interests were impacted in some way, is insufficient to constitute a conflict of interest for their lawyer.  "General antagonism between clients does not necessarily mean that a lawyer would be engaged in conflicted representations by representing the clients in separate, unrelated matters."  Restatement (Third) of the Law Governing Lawyers § 121 (2000).  The record does not support invalidating the 2004 Engagement Letter on the basis of Mr. Sedlmayr's representation of the two businessmen in their respective transactions.

Mr. Jackson's more complicated argument regarding a conflict of interest under Rule 1.7 addresses whether the fee sharing provision is unenforceable as applied in the Leviston Case because Mr. Sedlmayr had an actual conflict of interest in representing Rick Ross and Mr. Jackson during the period of 2010 to 2012.  But the record does not support the conclusion an actual conflict of interest existed.  As noted, Mr. Sedlmayr represented both Rick Ross and Mr. Jackson as transactional counsel during the time

period of February 2010 until Mr. Jackson terminated Mr. Sedlmayr in October 2012.  And

it appears undisputed Mr. Raymond communicated with Mr. Sedlmayr as Mr. Jackson's

liaison about the status and strategy of the Leviston Case during this time.  The evidence

also suggests Mr. Raymond was undecided during this time about whether or not to seek

discovery from Rick Ross.  Even assuming Rick Ross's interests were adverse to Mr.

Jackson in the Leviston Case (adverse not in the sense of a claim by Mr. Jackson (one

client) against Rick Ross (another client) or vice versa, but in the sense of shifting blame

for the Video's online presence from Mr. Jackson to Rick Ross), the "possibility" of Rick

Ross being a witness did not create an actual conflict for Mr. Sedlmayr.  Actual conflicts

of interest arise when an attorney has divided and incompatible loyalties "necessarily

preclusive of single-minded advocacy." *See*, *People v. Brown*, 124 N.E.3d 247, 250 (N.Y.

2019).  Here, the evidence does not support the conclusion (1) Mr. Sedlmayr was in a

position to block or prevent Reed Smith from taking discovery from Rick Ross; (2) Mr.

Sedlmayr would be placed in a position of examining one client on another client's behalf;

or (3) Mr. Sedlmayr's duty of loyalty to Mr. Jackson in the Leviston Case was impaired by

this concurrent, and unrelated, representation of Rick Ross in entertainment-related

transactions.

And, while the evidence indicates Mr. Sedlmayr declined to accept service of the

proposed subpoena on Rick Ross, I agree with Professor Giller's opinion that this in and

of itself did not create a conflict.  At that point in the litigation, any potential conflict was

merely speculative and, in any event, would have been waivable.  Because the evidence

– of declining to accept service and being aware one client might be a potential witness

in another client's case – is insufficient to conclude Mr. Sedlmayr had an actual conflict, I

decline to find this potential conflict as a basis to invalidate the 2004 Engagement Letter.

64

Even if I were to find Mr. Sedlmayr possessed an actual conflict, that finding does not require a denial of Reed Smith's fees. It is important to note the fees sought here were incurred years after Mr. Jackson fired Mr. Sedlmayr, mooting any conflict of interest issue. Plaintiff's counsel posited during post-trial oral argument – for the first time – that a "fruit of the poisonous tree" theory, analogous to the metaphor applied to admissibility of evidence, should apply to the potential conflict of interest. The argument asserts that Mr. Sedlmayr's conflict of interest continued to poison Reed Smith's representation of Mr. Jackson in 2014 and 2015, more than two years after Mr. Jackson fired Mr. Sedlmayr. This argument is not persuasive. I would have to conclude Mr. Sedlmayr had an actual conflict of interest and this conflict infected Reed Smith's decision not to pursue discovery from Rick Ross or to list him as a witness in the 2012 Compliance Order. But there is no evidence that Mr. Sedlmayr tried to steer Reed Smith away from taking such discovery – the only evidence is he refused service. I would also need to discredit Mr. Raymond's testimony that his decision not to seek discovery from Rick Ross was based on the risk he would harm, rather than help, Mr. Jackson's case. As no evidence supports this conclusion, I decline to do so. I would further have to conclude Mr. Sedlmayr's conduct impacted Reed Smith's time incurred in 2014 and 2015. But such a connection is speculative and not established.

The alternate argument that Reed Smith had an imputed conflict of interest resulting from Mr. Raymond's participation in a one-day mediation for Rick Ross years before the Leviston Case was filed, is similarly unsupported. No other reason has been provided for Mr. Raymond reaching out to Mr. Sedlmayr about serving a subpoena on Rick Ross. But even concluding Mr. Raymond knew Mr. Sedlmayr represented Rick Ross, I am unconvinced that presented an actual conflict of interest for Reed Smith. I

65

agree with Professor Gillers's conclusion that Reed Smith did not have a conflict because of the lack of evidence indicating there was a significant risk that any of the Reed Smith attorneys' professional judgments would be adversely affected by a personal, financial, or business interest as required by Rule 1.7(a)(2).[279]  Additionally, for the same reasons I declined to find Mr. Sedlmayr possessed an actual conflict of interest, I decline to conclude Reed Smith – a step removed from the Rick Ross and Mr. Jackson concurrent representation issue – had a conflict based upon their knowledge.

A third, less developed and likely waived conflict of interest theory rested on the idea Mr. Raymond and Reed Smith had a conflict because they received client referrals from Mr. Sedlmayr. The theory included the suggestion that Reed Smith would not want to "upset" Mr. Sedlmayr by deposing Rick Ross because it would possibly endanger its stream of referral income from Mr. Sedlmayr.  However, no evidence supports the idea that there was a stream of referral income.  At most, there is evidence of a handful of cases being referred to Reed Smith after Mr. Sedlmayr had been terminated, without any information about the significance of the cases, the fees generated, if any, etc.  This vague evidence is insufficient to support a conclusion that Reed Smith's duty of loyalty to Mr. Jackson may have been or was impacted by the potential for future referrals from Mr. Sedlmayr.  Because I am unpersuaded any conflict of interest theory invalidates the 2004 Engagement Letter, Mr. Jackson's objection to Reed Smith's POC 18 pursuant to Bankruptcy Code § 502(b)(1) will be overruled.

---

[279]    AP-ECF No. 547, p. 33, L. 22-25, p. 34, L. 1, p. 35, L. 1-16.

### c. Bankruptcy Code § 502(b)(4): Reasonable Fees and Expenses for the Leviston and Simmons Cases

#### Reasonableness of the Hourly Rate

Having determined that Reed Smith is entitled to recover attorney's fees for the pre-petition work it performed for Mr. Jackson before being fired as his attorneys, a reasonable fee must be determined using a combination of the standards used when considering allowance of fees under §§ 330 and 506(b), and under state rules of professional conduct to determine reasonable value under § 502(b)(4).  Mr. Jackson's main objection to Reed Smith's fees is the number of hours spent rather than the hourly rate of any individual.  Mr. Raymond charged $865 per hour.  I decline to adjust the rate. It is clear the Leviston Case was risky.  The facts were not favorable to Mr. Jackson and exposed him to substantial damages.  The fact the Leviston Case involved a celebrity of Mr. Jackson's stature also weighs against a downward adjustment of the rate. It is not difficult to conclude a great deal of labor would be required to prepare a proper defense. Likewise, nothing in the record suggests the experience or reputation of the Reed Smith attorneys warrants a downward adjustment.  Rather, Mr. Raymond's rate of $865 per hour falls within the range of reasonable rates for other attorneys practicing in New York City during the time, including Mr. Savva's normal rate of $975 per hour and Mr. Weiner's rate of $775 per hour.  As for the Reed Smith associates, their rates ranged from $270 per hour to $585 per hour.  Again, I do not see a basis for adjustment.

#### Reasonableness of the Hours Expended

The next step in the analysis is to determine the reasonableness of the number of hours expended.  Mr. Jackson argues the hours spent by Reed Smith were unreasonably high because Reed Smith lacked a coherent trial strategy.  However, the evidence shows Reed Smith had a trial strategy – good or bad we will never know since they were replaced

prior to the jury trial – but Mr. Jackson was dissatisfied with it.  His dissatisfaction with the trial strategy is not a basis to invalidate the number of hours spent preparing the Leviston Case for trial.

Nonetheless, the task of determining a reasonable amount of hours is substantially muddied by Reed Smith's persistent use of block billing.  Here, unlike some of the caselaw describing block billing as including vague descriptions such as "trial preparation" or "research" without more, the law firm's block billing consists of numerous tasks described in reasonable detail that are lumped into one time entry per day.  While the very general story of the trial preparation efforts is discernable from the block time entries, it is unknowable whether any individual task took an unreasonable amount of time.  For example, on December 8, 2014, four Reed Smith attorneys entered time for a team meeting, but all four indicated differing amounts of time, and two included tasks beyond the team meeting in their entry.  So, while I am able to discern there was a team meeting, I do not know whether the meeting lasted 1.4, 2.8, or 4.2 hours, or whether each person who billed for the meeting was in the meeting the whole time.  I am also unable to determine how much time was spent in the meeting versus working on other more administrative tasks such as emailing or reviewing documents.  And, while the court could speculate, the burden is on Reed Smith to prove the time spent by each individual was reasonable and block billing impedes this.  The time entries for December 16, 17, 19, 22, 23, and 30, 2014; January 2, 5, 7, 9, 12, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 26, 28, 29, and 30, 2015; February 3, 5, 17, 18, 19, and 20, 2015; and March 4, 11, 13, 18, 25, 26, and 30, 2015 reflect further instances of block billing.  The sheer volume of hours entered as block entries makes me question the efficacy and necessity of the hours.  Because of the pervasiveness of the block-billing, I have applied a twenty-five (25%) percent across

the board reduction to Reed Smith's hourly charges as a method to trim the "so-called fat" or account for the vagueness in the entries.  Applying this percentage to the attorney's fees of $503,624.50 sought for the Leviston Case, Reed Smith's allowed claim for those fees will be $377,718.38.

In addition to the fees, the invoices reflect Reed Smith incurred $17,859.58 in expenses.  While not introduced at trial, POC 18 also attached invoices for $16,160.14 of expenses Reed Smith incurred but had not been reimbursed for related to the Leviston Case.  Mr. Jackson did not lodge an objection to any specific expense beyond his general objection that the expenses were unreasonable because they related to an ill-conceived trial strategy.  Because there is a lack of objection to any specific expense, I conclude Reed Smith has met its burden to establish its entitlement to be reimbursed for expenses of $34,019.72.

Accordingly, Reed Smith will be allowed attorney's fees of $377,718.38 and expenses of $34,019.72, totaling $411,738.10 for the Leviston Case.

### Reasonable Fees and Expenses for the Simmons Case

For the Simmons Case, Reed Smith seeks a total of $70,190.05 in fees and $1,401.14 in expenses, less the $30,000 Universal payment.  I find the hourly rates charged for the Simmons Case fall within the range of reasonable rates and do not require reduction.  The number of hours billed in the Simmons Case fall within the range of reasonableness for preparing an appellate brief defending an appeal before the Court of Appeals for the Second Circuit.

As to the $22,000 (or more precisely $22,860 as stated in POC 18) of attorney's fees that added to POC 18 but were never billed to Mr. Jackson, Reed Smith failed to meet its burden.  Reed Smith failed to provide specific details or timesheets reflecting

which attorney spent time, at what rate, for how long, or as to what task, and thus failed to establish the reasonableness of this portion of its claim to attorney's fees.

Mr. Jackson did not object to any particular expense, and I find the $1,252.26 of expenses reasonable. After reducing the attorney's fees sought by the amount claimed in the paid December 2014 invoice, by Universal's $30,000 payment, and by the $22,860 of unbilled and unsubstantiated attorney's fees, the remaining attorney's fees and expenses total $17,341.81 as reflected in the following table.

| | |
|---|---:|
| Simmons Case Attorney's Fees sought: | $70,190.05 |
| Less $30,000 Universal payment: | ($30,000.00) |
| Less $1,240.50 in attorney's fees from December paid invoice | ($1,240.50) |
| Less $22,860 of unbilled and unsubstantiated attorney's fees | ($22,860.00) |
| *Simmons Case Attorney's Fees Total* | *$16,089.55* |
| Simmons Case Expenses sought | $1,401.14 |
| Less $24.67 in expenses from December 2014 paid invoice | ($24.67) |
| Less $124.21 of unbilled and unsubstantiated expenses | ($124.21) |
| *Simmons Case Expenses Total* | *$1,252.26* |
| **Simmons Case Total Attorney's Fees and Expenses** | **$17,341.81** |

Reed Smith's claim for the Simmons Case will be allowed in the amount of $16,089.55 for attorney's fees and $1,252.26 for expenses, for a total of $17,341.81.

I have considered all other arguments and find them to be without merit. The time within which a party may file an appeal of a final order of the bankruptcy court is fourteen (14) days after it is entered on the docket. *See*, Fed.R.Bankr.P. 8002(a)(1).

## VII. CONCLUSION AND ORDER

For the reasons stated in this Memorandum of Decision After Trial and Order Determining Amount of Reed Smith LLP's Proof Of Claim, it is hereby

**ORDERED:** The objection of Curtis James Jackson, III to Reed Smith LLP's Proof of Claim 18 (ECF Nos. 660, 832) is sustained in part and overruled in part, and relief on the complaint filed as AP-ECF No. 22 is accorded to both the plaintiff and the defendant Reed Smith LLP as set forth below; and it is further

**ORDERED:** Reed Smith LLP's Proof of Claim No. 18 is allowed in a total amount of $429,079.91 for pre-petition attorney's fees and expenses, divided between the Leviston Case and Simmons Case in the following reduced amounts:

1. For the Leviston Case, attorney's fees of $377,718.38 and expenses of $34,019.72, totaling $411,738.10; and

2. For the Simmons Case, attorney's fees of $16,089.55 and expenses of $1,252.26, totaling $17,341.81; [280] and it is further

**ORDERED:** This Memorandum and Order shall be entered in both case number 15-21233 (AMN) and adversary proceeding number 17-2005 (AMN); and it is further

**ORDERED:** A separate judgment shall enter in this adversary proceeding number 17-2005 (AMN).

Dated this 10th day of May, 2023, at New Haven, Connecticut.



*Ann M. Nevins*
Chief United States Bankruptcy Judge
District of Connecticut

---

[280] The terms of the confirmed Chapter 11 Plan will govern the portions of the disputed claim escrow to be paid by the Plan Administrator to the claimant and the former debtor.